# EXHIBIT A

1   Christina L. Henry, WSBA# 31273
    chenry@hdmlegal.com
2   Henry & DeGraaff, PS
    787 Maynard Ave S
3   Seattle, WA 98104
    Tel: +1-206-330-0595
4   Fax: +1-206-400-7609

5

6

7

8

9

10

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

11

| | |
|---|---|
| TOMMY BROWN, | |
| *on their behalf and on behalf of other similarly situated persons* | Case No: |
| Plaintiff, | |
| v. | COMPLAINT |
| TRANSWORLD SYSTEMS, INC., PATENAUDE & FELIX, APC, U.S. BANK, NA. NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-1, NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-2, NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-1, NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2, NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-3, NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-1, NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-2, NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-1, and NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-2, | (JURY DEMAND) |
| Defendants. | |

26

Plaintiff Tommy Brown, on his behalf and on behalf of similarly situated persons,

bring this action by their undersigned counsel and say in support:

COMPLAINT - 1

# I.   **INTRODUCTION**

1.      The Defendants have worked together and collectively orchestrated to illegally collect and attempt to collect allegedly owed debts. The issue has already been litigated and resolved against by a court of competent jurisdiction in a decision that estops the Defendants from contesting their liability.

2.      This action concerns the unlawful actions including the debt collection practices of Defendants National Collegiate Student Loan Trust 2004-1, National Collegiate Student Loan Trust 2004-2, National Collegiate Student Loan Trust 2005-1, National Collegiate Student Loan Trust 2005-2, National Collegiate Student Loan Trust 2005-3, National Collegiate Student Loan Trust 2006-1, National Collegiate Student Loan Trust 2006-2, National Collegiate Student Loan Trust 2007-1, and National Collegiate Student Loan Trust 2007-2 ("Trusts" or "NCSLT Trusts") through Transworld Systems, Inc. ("Transworld") and debt collection law firm Patenaude & Felix, A.P.C. ("P&F")(collectively "Defendants") on behalf of US Bank, National Association ("US Bank"). Specifically, the Defendants knew but recklessly disregarded:

   a.      The Defendants do not have the right to collect any sums from the Plaintiff and the Class members because the accounts they sought to collect on do not have the documentation necessary to prove the NCSLT Trust's ownership of the loans.

   b.      The Defendants do not have the right to flood the courts with consumer debt collection actions, under the color of law, based upon records they know are unreliable and are otherwise infected with inaccurate information.

   c.      Notwithstanding this knowledge, as part of their pattern and practice related to their unfair, deceptive, or otherwise unconscionable debt collection practices, Defendants act through their affiliates and authorized agents to collect and attempt to collect on the hundreds and thousands of purported consumer debts they acquire for pennies on the dollar of what they claim is due.

3.      Here, the debts the Defendants are attempting to collect upon are (i) non-governmental loans (ii) that originated for student borrowers with co-signers.

COMPLAINT - 2

HENRY & DEGRAAFF, P.S.
787 MAYNARD AVE S
SEATTLE, WASHINGTON  98104
telephone (206) 330-0595
fax (206) 400-7609

4.     As a direct and proximate result of the Defendants acts and omissions, the Plaintiff and Class members have sustained damages and losses in the form of incurred out of pocket expenses to determine his rights and responsibilities about whether the debt was legally owed. Plaintiff and the Class members are also entitled to statutory damages and injunctive relief.

## II.     PARTIES, JURISDICTION, AND VENUE

5.     Plaintiff Tommy Brown is a citizen of Washington state, the father of Osure Brown, and the cosigner on the loans at issue in this matter.

6.     Defendant Transworld Systems, Inc. ("Transworld" or "TSI") is a debt collector which acts on behalf of US Bank for the NCSLT Trusts and is engaged in the business of a collection agency, using the mails and telephone to collect consumer debts allegedly owed to others. Transworld is a corporation chartered under California law with offices at 507 Prudential Road, Horsham, Penn., 19044. Transworld does business in Washington, and its registered agent in Washington is CT Corporation System, 711 Capital Way S., Ste 204, Olympia, Wash., 98501. In addition:

    a.     Transworld is a debt collector as defined in the FDCPA. It acquired the alleged consumer loan accounts of the Plaintiff and putative class members at a time when it knew they were in default on or about November 1, 2014. Among the debts Transworld collects are "private student loans" allegedly owed to the NCSLT Trusts.

    b.     Transworld is managed by a Board of Directors.

    c.     To carry-out part of its consumer collections business, it also operates and manages an Attorney Network business unit, which includes P&F, that files debt collection lawsuits in Washington and nationwide to collect on behalf of the NCSLT Trusts.

    d.     These "Agency and Attorney Networks" were described on TSI's website (https://web.archive.org/web/20150511054427/https://www.tsico.com/Services/Agency_Attorney_Network.html) as follows:

COMPLAINT - 3

> Transworld Systems Inc. is expanding its existing Agency and Attorney Networks with current and new business opportunities. We are extremely proud of our Agency and Attorney Networks which designs and implements cost-effective collection solutions on behalf of clients across the country. We manage a nationwide network through leading edge technology and the expertise needed to achieve results.
>
> We strive to surpass the growing and complex needs of our clients through the professional services provided by our Agency and Attorney Networks. TSI is currently seeking collection agencies and law firms to support our growing network and expanded business opportunities. TSI has a variety of business opportunities in which we are seeking professional, cost-conscious industry experts to join our Agency and Attorney Networks. The business opportunities contain, although not limited to, the following: healthcare, commercial, student loans, telecommunications, and bank card.

   e. Transworld is a licensed Washington collection agency under UBI# 600-169-996.

   f. Transworld is a person subject to Revised Code of Washington Ch. 19.86.

  7. Defendant Patenaude & Felix, A.P.C. ("P&F") is a debt collection law firm incorporated in California. P&F is a professional corporation doing business under the laws of Washington. P&F's registered agent in Washington is Matthew Cheung, who conducts business out of an office in Lynnwood, Wash.

  8. P&F seeks to collect defaulted consumer debts on behalf of the NCSLT Trusts through litigation and the mails. In addition:

   a. P&F is a debt collector as defined in the FDCPA. It regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another including the alleged loan accounts of the Plaintiff and putative class members.

   b. P&F is managed by a Board of Directors.

   c. To carry-out part of its consumer collections business, it also operates as part of Transworld's Attorney Network business unit and files debt collection lawsuits in Washington and nationwide to collect on behalf of the Trusts.

   d. P&F is a licensed Washington collection agency.

COMPLAINT - 4

**HENRY & DEGRAAFF, P.S.**
787 MAYNARD AVE S
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

e.      P&F is a person subject to Revised Code of Washington Ch. 19.86.

f.      P&F and its lawyer in Washington, Matthew Cheung, have, by service and/or filing, commenced over 1400 lawsuits in the State of Washington with the plaintiff identified in such cases as one or more of the NCSLT Trusts.

g.      P&F was fully aware of, countenanced, permitted, and encouraged the conduct of its employee Matthew Cheung as set forth herein.

h.      The actions of Mr. Cheung on behalf of P&F were conducted in trade or commerce and primarily in connection with P&F's business has a collection agency.

i.      Matthew Cheung is an employee of P&F, and is a lawyer licensed to practice law in the state of Washington and practices law from an office address in Lynnwood, Wash.

9.      Defendants National Collegiate Student Loan Trust 2004-1, National Collegiate Student Loan Trust 2004-2, National Collegiate Student Loan Trust 2005-1, National Collegiate Student Loan Trust 2005-2, National Collegiate Student Loan Trust 2005-3, National Collegiate Student Loan Trust 2006-1, National Collegiate Student Loan Trust 2006-2, National Collegiate Student Loan Trust 2007-1, and National Collegiate Student Loan Trust 2007-2 (collectively "NCSLT Trusts" or "the Trusts") are Delaware statutory trusts, formed and existing pursuant to the laws of the state of Delaware for the purpose of acquiring purported consumer debts.

10.     Defendant U.S. Bank, NA is a National Banking Association which does business in King County, Washington.

11.     U.S. Bank National Association serves as the "indenture trustee" for the NCSLT 2006-2 Trust. U.S. Bank's role in the trusts is not related to its consumer banking activities whatsoever.

12.     U.S. Bank was designated as a Back-Up Special Servicer to the Trusts, a Back-Up to First Marblehead Education Resources, Inc. ("FMER"). In 2012, FMER resigned as Special Servicer and US Bank assumed that role.

COMPLAINT - 5

13.     U.S. Bank, rather than perform as Special Servicer, delegated its responsibilities, negligently, to a company named Turnstile Capital Management, LLC ("Turnstile"). US Bank, directly or through Turnstile, had the duty to properly supervise and control the activities of Transworld and its Attorney Network, and for breach of that duty is vicariously liable for the torts and other wrongful conduct committed against Plaintiff and others in Washington by Transworld and/or its Attorney Network.

14.     Asserting gross negligence and other actionable wrongful conduct, the NCSLT Trusts, by way of a Verified Amended Complaint filed in Delaware Chancery Court against Transworld and two codefendants (*The National Collegiate Master Student Loan Trust 1, et al v. U.S. Bank National Association, GSS Data Services Inc., Turnstile Capital Management, LLC and Transworld Systems, Inc.*; Chancery Court of Delaware, Cause #2018-0167-JRS) ("Verified Amended Complaint"),"[1] (A copy of which is Exhibit A, hereto), against U S. Bank, Turnstile, and GSS Data Services, Inc., made, among others, the following allegations which, on information and belief, after investigation, Plaintiff asserts are accurate, and on information and belief reallege:

15.     ¶45  "Neither the Trusts nor the Owners approved these arrangements with Turnstile or with Transworld. To the contrary, the Owners specifically informed the Administrator and U.S. Bank that they did not want Turnstile or TSI to perform any services relating to the Trusts. But the Administrator and U.S. Bank refused to follow the instructions from the Owners. The Trust did not hire Turnstile or TSI, neither Turnstile nor TSI acts at the direction of the Trusts, and they do not follow any directions or instructions issued by the Trusts. To the contrary, as discussed below, while the Owners of the Trusts have requested that TSI

---

[1] As of 2020, this suit has been consolidated with three others as *In re National Collegiate Student Loan Trusts Litigation*, C.A. No. 12111-VCS (Del. Ch. Jan. 21, 2020).

HENRY & DeGRAAFF, P.S.
787 MAYNARD AVE S
SEATTLE, WASHINGTON  98104
telephone (206) 330-0595
fax (206) 400-7609

cease filing lawsuits in the name of the Trusts where TSI cannot prove that the Trusts have standing to collect on defaulted loans, TSI has nevertheless continued to file such lawsuits."

16.     ¶46.  "To the contrary, TSI is an agent of U.S. Bank as Special Servicer. Under the Special Servicing Agreement, U.S. Bank was responsible for 'the enforcement, collection and servicing of Delinquent Loans and Defaulted Loans. . . .'"

17.     ¶47.  "U.S. Bank's duties further included monitoring the performance of Turnstile and replacing it if it was deficient or negligent in performing its duties. As set forth herein, Turnstile's performance of its duties was deficient and negligent, but U.S. Bank failed to monitor Turnstile's performance and failed to replace Turnstile as Subservicer.

18.     The remainder of the allegations as they pertain to U.S. Bank in said Verified Amended Complaint establish that U.S. Bank was in a position to prevent and avoid the unfair and deceptive acts and practices performed by Transworld, and the attorneys from Transworld's Attorney Network acting in Washington and elsewhere, that U.S. Bank knew of and was fully informed about said unfair and deceptive acts and practices being performed in Washington and elsewhere, that U.S. Bank had a duty to prevent and avoid such unfair and deceptive acts and practices, and that U.S. Bank negligently and/or grossly negligently and/or intentionally, failed to prevent such unfair and deceptive acts and practices in Washington and  elsewhere, and in fact aided and abetted the commission of such unfair and deceptive acts and practices in Washington and elsewhere by Transworld and the attorneys retained by Transworld to act in the name of the NCSLT Trusts in Washington and elsewhere.

19.     The doctrine of respondeat superior applies to U.S. Bank, and renders it responsible for the wrongful conduct of Transworld in Washington and elsewhere as herein alleged and for the wrongful actions of the attorneys retained by Transworld to act in the name of the NCSLT Trusts in Washington and elsewhere.

20.     Paragraphs 71 through 79 of the said Verified Amended Complaint establish that U.S. Bank and Transworld were fully aware, that the (variously Schedule 1, Schedule 2, or Schedule 3; collectively the "Loan Schedules") Loan Schedules do not exist. Despite that

HENRY & DEGRAAFF, P.S.
787 MAYNARD AVE S
SEATTLE, WASHINGTON  98104
telephone (206) 330-0595
fax (206) 400-7609

knowledge, Transworld, with the knowledge and consent of U.S. Bank, has continued in many cases, in Washington and elsewhere. to file affidavits and/or declarations under oath which falsely and knowingly testify that such schedules do exist, and that the affiant or declarant has personal knowledge of their existence.

21.     Paragraphs 80 through 85 of said Verified Amended Complaint set forth examples of case authority and rulings which establish that U.S. Bank, and Transworld, knew that the declarations and affidavits submitted to support claims made in the name of NCSLT Trusts concerning loan documentation were false.

22.     In fact, Transworld created false documents purporting to reflect the Loan Schedules from the original "Pool Supplement Agreements" and Transworld, through its employees and through its Attorney Network, falsely represented, through false affidavits and/or declarations, and through false statements in pleadings, testified or asserted that such documents were genuine loan documents and that the attorney, affiant or declarant had personal knowledge of their authenticity.

23.     The foregoing statements made in, or summarized from, the said Verified Amended Complaint constitute admissible evidence under Washington Evidence Rule 801(d)(2).

24.     U.S. Bank has been fully aware of the Transworld Consent Order Issued by the Consumer  Financial Protection Bureau ("CFPB") and fully aware of the unfair and deceptive acts and practices, including violations of the CAA and CPA by Transworld and U.S. Bank permitted, consented to, and aided and abetted those unfair and deceptive acts and practices.

25.     U.S. Bank was, and is, bound by the Transworld Consent Order issued by the CFPB. In fact, that order imposed both affirmative and prohibitory duties upon U.S. Bank, and U.S. Bank has failed and/or refused to act in accordance with its duties under said Transworld Consent Order. The failure of U.S. Bank to act in accordance with its duties under the Transworld Consent Order, and to ensure and enforce Transworld's compliance with that Consent Order, establish that US Bank's consent to, and aiding and abetting in the commission

HENRY & DEGRAAFF, P.S.
787 MAYNARD AVE S
SEATTLE, WASHINGTON  98104
telephone (206) 330-0595
fax (206) 400-7609

of, unfair and deceptive acts and practices by Transworld in violation of the CAA CPA, were willful and knowing.

26.     The actions, and non-actions of US Bank in consenting to, and aiding and abetting, the unfair and deceptive acts and practices of Transworld in violation of the CAA and the CPA, are themselves unfair practices in violation of the CPA, when committed by a national banking association in, or related to, its status as a trustee.

27.     Wilmington Trust Company serves as the "owner trustee" for the Trusts acting solely on behalf of the investors who purchase offered notes or shares of the Trusts. Wilmington Trust's role in the trusts is not related to consumer banking activities whatsoever.

28.     At all times relevant to this Complaint, Transworld has acted as the debt collector on behalf of the Trusts and the Trusts expressly authorized Transworld to carry out all work that it has done on their behalf.

29.     The Trusts each have an organizational structure that exercises immediate control over the Trusts' activities, has regular meetings in various offices, and decides how to conduct the affairs of the Trusts' business in Washington and elsewhere.

30.     The Trusts also work to carry out their business activities through a group of affiliates, partners, and agents.

31.     The Trusts are persons subject to Revised Code of Washington Ch. 19.86.

32.     This Court has jurisdiction over Transworld, P&E, U.S. Bank and the NCSLT Trusts because they do business in Washington State and King County by collecting or attempting to collect debts from Washington State residents who they allege owe debts to the Trusts. Therefore, Defendants have obtained the benefits of the laws of Washington (without the right to do so), and Defendants are subject to the jurisdiction of this Court.

33.     Venue is proper in in King County Superior Court because many of the acts and transactions occurred, and all Defendants transact business, in King County, Washington.

COMPLAINT - 9

### III.     FACTUAL BACKGROUND

**A.     NCSLT and Transworld Background**

34.     Based on publicly available documents and information and belief, the Trusts are investment vehicles that engaged in the practice of buying large numbers of education-related consumer loans and collecting payments from the borrowers for the benefit of investors. The Trusts have been subject to significant litigation, including some discussed infra, and are aware that the assets (i.e. purported student loans) acquired by them subject to this action are unenforceable.

35.     As the Trusts have no employees, any actions performed nominally by a Trust or on its behalf are actually performed by its board and management structure, servicers, or by attorneys hired by the servicers. On information and belief, NCO Financial Systems, Inc. was the default servicer for the Trusts until November 1, 2014, at which time Transworld became the new servicer and successor in interest to NCO.

36.     Transworld became the default loan servicer for the loan accounts at issue here and the loan accounts of certain of the putative class members at a time when it believed the loans were in default. Transworld became the servicer for the loan accounts and the loan accounts of the putative class members at a time then it knew the records were inaccurate, prone to errors, and otherwise were enforceable. This knowledge was based, upon information and belief, upon the records Transworld received from NCO and the Trusts and their affiliates at the time of the servicing transfer. However, Transworld has concealed this material information from the Plaintiff and putative class member Plaintiffs until a period of twelve months before the commencement of this action.

**1.     Transworld attorney network**

37.     Based upon public disclosures, and upon information and belief, Transworld retains a national network of law firms and attorneys to pursue delinquent borrowers by filing collection lawsuits in state courts. One of these firms is P&F.

COMPLAINT - 10

HENRY & DEGRAAFF, P.S.
787 MAYNARD AVE S
SEATTLE, WASHINGTON  98104
telephone (206) 330-0595
fax (206) 400-7609

38.     On information and belief, P&F is licensed as a collection agency in the State of Washington, and is therefore subject to laws that govern the practice of such agencies, including the federal Fair Debt Collection Practices Act ("FDCPA"), Washington's Collection Agency Act ("CAA"), and Washington's Consumer Protection Act ("CPA").

**B.      Debt Collection Begins**

39.     In October 2018, Patenaude & Felix sent ten letters, signed by Matthew Cheung, that were received by Tommy Brown stating that they would initiate collection efforts regarding an outstanding balance owed to the National Collegiate Student Loan Trusts. The collection letters failed to reference the original creditor Bank of America and did not include any breakdown of interest or service charge, collection costs, or late payment charges, if any, added to the original obligation by the original creditor or the last payment made on the loans.

40.     In response to a debt verification letters sent to Patenaude & Felix and signed for by Matthew Cheung, Tommy Brown received documentation regarding all ten loans, including payment histories from American Educational Services, and payments on a Loan Payment History Report after charge-off on September 4, 2012. Each loan verification response included accrued interest for each loan. There is no indication on any payment history to indicate who made the payments.

41.     In January 2019, Tommy Brown again received letters from Patenaude & Felix signed by Matthew Cheung informing him of a potential settlement for each NCSLT loan, indicating that they would discount a considerable portion of the obligation.

42.     In unfiled Complaints served on Tommy Brown in February 2019, the NCSLT Trusts made claims that he had liability on the debt allegedly owed to the Trusts even though he had never made any payment on the loans.

**1.      The Trusts File Suit**

43.     On April 5, 2019, Osure Brown and Tommy Brown were sued by the Trusts, represented by P&F, in ten separate cases in King County Superior Court, Nos. 19-2-09408-7, 19-2-09402-8, 19-2-0903-6, 19-2-09404-4, 19-2-09405-2, 19-2-09405-2, 19-2-09406-1, 19-2-

HENRY & DeGRAAFF, P.S.
787 MAYNARD AVE S
SEATTLE, WASHINGTON  98104
telephone (206) 330-0595
fax (206) 400-7609

09407-9, 19-2-09409-5, 19-2-09410-9, and 19-2-09411-7. The cases were subsequently consolidated into cause No. 19-2-09402-8.

44.     In each case, the NCSLT Trusts, Transworld, and P&F alleged that Tommy Brown, as cosigner on Osure Brown's loans, had liability for each one of the ten Bank of America loans Osure Brown had scheduled when filing his Chapter 13 bankruptcy case, and which, the Trusts alleged, had subsequently been purchased by the Trusts in the form of consolidated loan pools.

45.     Tommy Brown sent notices of appearance on all ten cases to counsel at P&F and on April 5, 2019 each lawsuit was filed separately, assigning ten case numbers and ten separate judges in King County Superior Court.

46.     Each of the ten complaints filed by the Trusts, with the aid and assistance of U.S. Bank and their debt collectors Transworld and P&F, was unfair and deceptive in multiple ways, as explained herein:

### 2.     The Trusts could not substantiate their ownership of the loans

47.     In each case, the NCSLT Trusts concurrently filed an affidavit (collectively the "Audet Affidavits") signed by Jennifer A. Audet, an employee of Transworld, the NCSLT Trusts' debt collector. Each of Audet's Affidavits claimed that Audet had personal knowledge regarding the records pertaining to the loan at issue, had verified that there was an outstanding principal balance on a loan currently owned by one of the Trusts, and was authorized by Transworld and US Bank, National Association to make the representations in the affidavit. Each Audet Affidavit also claimed that the associated loan had been transferred, sold and assigned to the NCSLT Trusts.

48.     Attached to each of the Audet Affidavits is a trio of exhibits purporting to substantiate the chain of assignment for the loan. Exhibit A was a notice from U.S. Bank identifying itself as the special servicer for a number of the Trusts, including the defendants, and confirming Transworld as the trusts' subservicer. Exhibit B was a document titled "Loan Application/Promissory Note" or "Loan Request /Credit Agreement" allegedly signed by

COMPLAINT - 12

HENRY & DEGRAAFF, P.S.
787 MAYNARD AVE S
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

Osure Brown as borrower and Tommy Brown as cosigner and submitted to BOA, along with a document titled "Note Disclosure Statement" that includes additional information about the alleged loan. Exhibit C consisted of a "Pool Supplement" evidencing the purported sale of certain loans from BOA to The National Collegiate Funding LLC, which would in turn sell them to one of the NCSLT Trusts, followed by a "Deposit and Sale Agreement" that purports to record the sale of the pool of loans from National Collegiate Funding to the designated Trust.

49.     In each case, both the Pool Supplement and the Deposit and Sale Agreement note that the actual list of loans in each pool is specified by an associated Schedule (variously Schedule 1, Schedule 2, or Schedule 3; collectively the "Loan Schedules") of the associated Pool Supplement. None of the Pool Supplements attached to any of the Audet Affidavits include the associated Schedule, despite the claim in the affidavits that Exhibit C "is a true and correct copy of the assignment Agreement(s) described herein."

50.     Additionally, the Audet Affidavit claimed that Tommy Brown had made payments on the loan, with the last payment made for various loans in 2017 and 2018, without disclosing that any payments made on the account were not made by Tommy Brown. When subsequently challenged on the validity of the Audet Affidavits, the Trusts responded by replacing them with a new affidavit (the "Luke Affidavit") signed by Bradley Luke, another Transworld employee presented as the custodian of records for the Trusts.

51.     The Luke Affidavit was accompanied by several exhibits that purported to substantiate the Trusts' ownership of the loans at issue. Like the Audet Affidavits, however, the Luke Affidavit failed to provide any of the Loan Schedules, or any other business records demonstrating that the Trusts had at any point purchased any loans originated by Osure Brown and/or Tommy Brown. Instead, it provided what appeared to be an excerpt of a spreadsheet, which appeared to have been expressly generated for litigation purposes long after the loans were purportedly originated.

COMPLAINT - 13

HENRY & DeGRAAFF, P.S.
787 MAYNARD AVE S
SEATTLE, WASHINGTON  98104
telephone (206) 330-0595
fax (206) 400-7609

**C.      Summary Judgment is Granted in Favor of the Browns**

52.      On September 20, 2019, the Browns moved for summary judgment in their favor in the consolidated matter for lack of standing and for failure to prove assignment of the loans, arguing that Bradley Luke did not have the ability to testify about the NCSLT Trusts' ownership of the loans at issue.

53.      On October 24, 2019, the Browns' motion for summary judgment and associated motions by all parties were heard before this Court by the Hon. Nicole Gaines-Phelps. On December 24, the court ordered that summary judgment be granted in favor of Osure Brown and Tommy Brown in the consolidated matter.

54.      The court also struck the affidavit of Bradley Luke as hearsay, because Mr. Luke was not employed by the entity that had custody and possession of the records and did not have knowledge of the retention policies of BOA, the alleged originator of the loans. Accordingly, the court granted the motion for summary judgment in favor of the Browns.

55.      The NCSLT Trusts, and their debt collectors Transworld and P&F, did not appeal the judgments entered against the Trusts in favor of the Browns. Those judgments are now final judgments.

**D.      The Trusts' Other Legal Woes Which Further Demonstrate Their Knowledge that They Chose to Conceal from the Plaintiff, Putative Class Members, and State Courts**

56.      The Trusts were recently the subject of investigation by the CFPB.

57.      On September 18, 2017 a complaint was filed by the CFPB against fifteen National Collegiate Student Loan Trusts, including all of the defendant trusts in the instant matter (collectively the "Collective NCSLT Trusts"), in the United States District Court for the District of Delaware, Cause No. 17-cv-01323-GMS (ECF No. 1 therein), attached hereto as Exhibit A.

58.      The same day, the parties jointly moved therein for entry of a consent judgment (ECF No. 3 therein), attached hereto as Exhibit B.

COMPLAINT - 14

Henry & DeGraaff, P.S.
787 Maynard Ave S
Seattle, Washington 98104
telephone (206) 330-0595
fax (206) 400-7609

59.    That consent judgment, having been submitted in federal court by the NCSLT Trusts under FRCP 11, in response to a complaint, is a knowing statement by a party and admission against interest.

60.    That consent judgment is incorporated by reference here as if fully set forth.

61.    On September 15, 2017, more than a year and a half before filing suit against the Browns, the CFPB issued a Consent Order in the matter of Transworld Systems, Inc. as agent for the Collective NCSLT Trusts, filing it as 2017-CFPB-0018. A copy of which is Exhibit C, hereto.

62.    That Consent Order was issued specifically as to Transworld's unfair and deceptive acts and practices on behalf of, or in the name of, the NCSLT Trusts. The Consent Order is both remedial and mandatory, and identified and prohibited many of the unfair and deceptive acts and practices of Transworld on behalf of, or in the name of, the NCSLT Trusts identified above.

63.    In the Consent Order, the CFPB found that Transworld and its nationwide network of law firms committed a number of offenses between November 1, 2014 and April 25, 2016, including:

    a.    Filing tens of thousands of collections lawsuits against borrowers in which they did not possess the complete documentation needed to prove the NCSLT Trusts owned the loans;

    b.    Filing tens of thousands of affidavits in support of collections lawsuits in which the affiant swore they had personal knowledge of the debt, when in fact the affiants frequently merely reviewed data on a computer screen, did not know the source of the data or how it was collected and maintained, and lacked knowledge of the chain of assignment records necessary to prove that the relevant Trust owned the loans;

    c.    Filing numerous lawsuits without the intent or ability to prove the claims, if contested.

COMPLAINT - 15

64.     The Consent Order further found that these acts constituted violations of the Consumer Financial Protection Act, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

65.     In 2018, the Collective NCSLT Trusts, through the Trusts' Owners (as defined in the Trust Agreements), filed suit in Delaware Chancery Court against Transworld and two codefendants, for breach of contract, charging them with costing the Collective NCSLT Trusts billions of dollars and with causing "wrongful and fraudulent …… cases being brought against thousands of borrowers." *See* Verified Amended Complaint, Exhibit A.

66.     Specifically, the Collective NCSLT Trusts have accused Transworld of injurious falsehood for, among other things:

a.     Recklessly making false and misleading representations to borrowers that the Collective NCSLT Trusts had a right to sue the Plaintiff and putative class members, when they did not;

b.     Falsely representing to borrowers that the Collective NCSLT Trusts possessed all of the notes, assignments and other documents needed to prove standing to foreclose on their loans, when they did not;

c.     In so doing, exposing the Collective NCSLT Trusts to lawsuits from borrowers.

67.     At the time the NCSLT Trusts filed suit against Osure Brown and Tommy Brown on April 5, 2019, the Trusts were aware of the CFPB Consent Order, and of their lawsuit against Transworld and other codefendants in Delaware Chancery Court.

68.     At the time the NCSLT Trusts filed suit against Osure Brown and Tommy Brown on April 5, 2019, the Trusts were aware of the reckless and injurious practices of Transworld as explained in the Delaware lawsuit.

69.     At the time the NCSLT Trusts filed suit against Osure Brown and Tommy Brown, with the aid and assistance of Transworld and P&F, on April 5, 2019, the NCSLT Trusts, U.S. Bank, Transworld, and P&F were aware of Transworld's reckless and injurious practices. Yet, Transworld, U.S. Banks, P&F, and the NCSLT Trusts continued their unfair and deceptive

HENRY & DEGRAAFF, P.S.
787 MAYNARD AVE S
SEATTLE, WASHINGTON  98104
telephone (206) 330-0595
fax (206) 400-7609

practices of flooding the courts with hundreds of debt collection actions without a reasonable basis to do so and without the right to due so based on their prior admissions in the CFPB Consent Orders.

70.     The actions of the NCSLT Trusts, Transworld, U.S. Bank and P&F in regard to Osure Brown and Tommy Brown were substantially identical to the actions that the Consent Order found they took in regard to thousands of borrowers across the country in violation of the Consumer Financial Protection Act.

71.     The NCSLT Trusts, P&F, U.S. Bank and Transworld were aware that they lacked the ability to prove their ownership of any loans taken out by Osure Brown and Tommy Brown at the time they filed their collection action against the Browns.

72.     The NCSLT Trusts are aware that they cannot prove they have a legitimate claim on the $12,847.59 paid to them from the bankruptcy estate of Osure Brown between 2012 and 2017. Yet, the NCSLT Trusts wish to retain the benefit from their improper actions.

73.     The NCSLT Trusts and U.S. Bank are aware that the Loan Schedules related to the purported student loans acquired by them are lost, and they do not exist now, if they ever did. No entity has the Loan Schedules and thus these loans are completely uncollectible.

## IV.     CLASS ALLEGATION

74.     Plaintiff Tommy Brown also sues on behalf of others, pursuant to Wash. Super. Ct. Civ. R. 23, who are similarly situated to Mr. Brown as a Washington Class. This Class of similar persons are defined as follows:

a.     **Washington Class: Those persons in the State of Washington** whom the trusts have communicated with, directly or indirectly, for the purpose of collecting a purported student loan owned by a Trust since April 3, 2016.

75.     Excluded as members of the Washington Class are any persons who fall within these definitions if the person is (i) an employee or independent contractor of any of the Defendants; (ii) a relative of an employee or independent contractor of any of the Defendants; or (iii) is an employee of the Court where this action is pending.

COMPLAINT - 17

76.     The Class definition may be amended or modified.

77.     Tommy Brown proposes to represent himself and the Washington Class defined above.

78.     Tommy Browns qualifies as a person who is a member of the respective Class definition he seeks to represent.

79.     The members of the Washington Class are capable of being described without difficult managerial or administrative problems. The members are readily identifiable from the information and records in the possession, custody or control of the Defendants, public records, and records of third parties including the consumer reporting agencies who report the Defendants furnished credit information to others as part of their business.

80.     Upon information and belief based on public records the Washington Class is sufficiently numerous such that individual joinder of all members is impractical. This allegation is based on the fact that NCSLT Trusts have sued thousands of consumers nationwide, including hundreds of cases in Washington by P&F and Transworld.

81.     There are questions of law and fact common to the Washington Class and, in fact, the wrongs alleged against the NCSLT Trusts are identical. The common issues include, but are certainly not limited to:

    a.     Whether the Defendants failed to meet the minimum investigation and good faith requirements of CR 11 and were in furtherance of and consequent to unfair and deceptive practices of repeatedly filing lawsuits without adequate investigation and without adequate or reasonable investigation by counsel;

    b.     Whether the Defendants engaged in any material investigation as to the completeness or authenticity of records to prove the chain of title and/or ownership of loan documents.

    c.     Whether the Defendants engaged in any material investigation regarding statutes of limitations, as may be applicable to the alleged borrowers.

COMPLAINT - 18

HENRY & DEGRAAFF, P.S.
787 MAYNARD AVE S
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

d.      Whether the Defendants filed and served a lawsuit when the alleged debt was barred by the six-year statute of limitations;

e.      Whether the Defendants should have engaged in collection of a debt when it was barred by the six-year statute of limitations.

f.      Whether the Defendants engaged in any investigation of prior collection activities to determine if any unfair practice had been committed which as a matter of law prevent collection of interest under RCW 26.16.450, or otherwise;

g.      Whether the Defendants engaged in any investigation of the validity or truth of statements contained in the alleged loan documents;

h.      Whether the Defendants both negligently and intentionally caused false evidence to be submitted in student loan collection actions commenced in the state of Washington;

i.      Whether the Defendants have used false, deceptive or misleading statements in connection with its attempts to collect debts from the Plaintiff;

j.      Whether the Defendants have made false statements concerning the character, amount or legal status of any debts;

k.      Whether the Defendants have made any threat to take legal action that they do not have the right to take;

l.      Whether the Defendants have used any unfair and deceptive means to collect or attempt to collect any debt;

m.      Where the Defendants sued the Plaintiff for a debt not owed to the Defendants;

n.      Whether the Defendants filed and served lawsuits without standing or ownership of the alleged debt.

o.      The Defendants net worth.

p.      Whether the Defendants have engaged in the unauthorized practice of law;

COMPLAINT - 19

q.      Whether the Defendants collecting debts in the name of the Trusts deceptive when the Trusts have no employees and act only through their affiliates and agents;

r.      Whether the Defendants letters sent to Plaintiff prior to filing that failed to identify the original creditor;

82.     The Plaintiff Tommy Brown's claims are the same as each member of the Washington Class and are based on the same legal and factual theories.

83.     There is nothing unusual about the Plaintiff to warrant a material difference between his claims and the claims of the members of the class he seeks to represent.

84.     The Defendants' likely defenses (though unavailing) are and will be typical of and the same or identical for each of the Washington Class and will be based on the same legal and factual theories. There are no valid, unique defenses or defenses that will become the major focus of the action.

85.     Tommy Brown will fairly and adequately represent and protect the interests of the class members.

86.     Tommy Brown does not have any interests antagonistic to the members of the class he seeks to represent.

87.     Tommy Brown seeks certification pursuant to Wash. Super. Ct. Civ. R. 23(b)(2) and (b)(3).

88.     The Defendants has acted on grounds that applies uniformly across the Washington Class. so that the underlying statutory relief afforded to the claims below is appropriate respecting each of the classes as a whole. Further, the common questions predominate over any individual questions and a class action is superior for the fair and efficient adjudication of this controversy. A class action will cause an orderly and expeditious administration of class members' claims, and economies of time, effort, and expenses will be fostered, and uniformity of decisions will be ensured.

HENRY & DEGRAAFF, P.S.
787 MAYNARD AVE S
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

89.     There are no individual questions to establish the claims of the Plaintiff and the Washington Class members. The claims are based on Defendants' omissions and failure to have either a permissible purpose to collect sums from the class members or attempt to collect sums from the class members.

90.     Tommy Brown's claims are typical of the claims of the Washington Class members.

91.     The Washington Class members have suffered damages, losses, and harm similar to those sustained by the Browns in relation to the improper, unfair, and deceptive collect activities of the Defendants in violation of state and federal laws governing their activities.

## V.     CAUSES OF ACTION

### A.     Count I:  Civil Conspiracy To Violate The Washington State Consumer Protection Act On Behalf of The Named Plaintiff And The Washington Class Members

92.      Plaintiff incorporates all preceding paragraphs as if set forth fully herein and assert this claim on their behalf and on behalf of the Washington Class members against each of the Defendants.

93.     Defendants have engaged in unfair and deceptive business practices in violation of the Revised Code of Washington Ch. 19.86.

94.     Such practices are likely to be repeated further, as illustrated by, among other things, similar conduct toward hundreds of other alleged debtors in Washington.

95.     Such practices are likely to be repeated further, as illustrated by, among other things, the recent filings in the District of Delaware District Court and entry of the final and not appealed Transworld Consent Order by the CFPB.

96.     Such conduct has damaged Plaintiff and the Washington Class members by without limitation, loss of time away from their work having to defendant the Defendants' improper debt collection actions in state court proceedings against them without the right to do so.

HENRY & DEGRAAFF, P.S.
787 MAYNARD AVE S
SEATTLE, WASHINGTON  98104
telephone (206) 330-0595
fax (206) 400-7609

97.     Such conduct constitutes an unacceptable risk to and/or damages the public interest.

98.     Such conduct should be enjoined as authorized by RCW 19.86.

99.     In additional to damages, Plaintiff and the Washington Class members are entitled to recover treble damages to the extent provided by statute together with reasonable attorney's fees and reasonable non-taxable costs and taxable costs.

100.    The Defendants have, amongst themselves, expressly or impliedly agreed to undertake unlawful debt collection efforts and/or violations of the Washington State Consumer Protection Act and/or the Washington Collection Agency Act.

101.    The Defendants, and each of them, have taken at least one overt wrongful act in furtherance of the said conspiracy.

102.    The Defendants are jointly and severally liable for the wrongful acts of the others in furtherance of the said conspiracy.

**B.      Count II: Violations of The Washington Collection Agency Act On Behalf Of The Named Plaintiff And The Washington Class**

103.    Plaintiff incorporates all preceding paragraphs as if set forth fully herein and assert this claim on their behalf and on behalf of the Washington Class members against the Defendants Transworld and P & F.

104.    Transworld and P & F have engaged in acts prohibited by the Washington Collection Agency Act, as more particularly set forth above.

105.    These Defendants have also improperly collected interest and fees from alleged borrowers following the commission, by one or more of them, or their agents, of acts prohibited by RCW 19.16 .250, in violation of RCW 19.16.450.

106.    All violations of the CAA by these Defendants also constitute violations of the CPA, RCW ch. 19.86, pursuant to RCW 19.16 .440.

HENRY & DEGRAAFF, P.S.
787 MAYNARD AVE S
SEATTLE, WASHINGTON  98104
telephone (206) 330-0595
fax (206) 400-7609

**C.    Count III: Claim Against All Defendants: Violation of The Washington State Consumer Protection Act on Behalf Of The Washington Class**

107.    Plaintiff incorporates all preceding paragraphs as if set forth fully herein and assert this claim on their behalf and on behalf of the Washington Class members against the Defendants.

108.    Defendants have engaged in unfair and deceptive business practices in violation of the Revised Code of Washington Ch. 19.86.

109.    Such practices are likely to be repeated further, as illustrated by, among other things, similar conduct toward hundreds of other alleged debtors in Washington.

110.    Such practices are likely to be repeated further, as illustrated by, among other things, the filing of this lawsuit after NCSLT's submission of the consent judgment motion in the District of Delaware District Court and entry of the final and not appealed Transworld Consent Order by the CFPB.

111.    Such conduct has damaged the Plaintiff by, without limitation, making him unable to manage his finances, causing him to incur out of pocket expenses to determine his legal rights and responsibilities which caused loss of time away from his business.

112.    Such conduct constitutes an unacceptable risk to and/or damages the public interest.

113.    Such conduct should be enjoined as authorized by RCW 19.86.

114.    In additional to damages, Plaintiff and the Class are entitled to recover treble damages to the extent provided by statute together with reasonable attorney's fees and reasonable non-taxable costs and taxable costs.

**D.    Count IV: Per Se Violation of Washington's Consumer Protection Act due to a Per Se Violation of The Fair Debt Collection Practices Act on Behalf Of The Washington Class**

115.    Plaintiff incorporates all preceding paragraphs as if set forth fully herein and assert this claim on their behalf and on behalf of the Washington Class members against the Defendants.

HENRY & DEGRAAFF, P.S.
787 MAYNARD AVE S
SEATTLE, WASHINGTON  98104
telephone (206) 330-0595
fax (206) 400-7609

116.    In RCW 19.86.020, the CPA provides that "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

117.    A CPA claim consists of the following elements: (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; and (5) causation.

118.    Violations of the FDCPA are per se violations of the CPA.

119.    Defendants' conduct violates the FDCPA through the following conduct as follows:

     a.    Transworld and P&F acquired their interest in the Named Plaintiff and FDCPA Class members' consumer loans during a period in which each allege (directly and indirectly) the loans of the Plaintiff and the Class were in default and were otherwise delinquent pursuant to the loan documents. In fact, P&F presented to various state courts in relation to the Plaintiff and the class members the sworn testimony under penalties of perjury Transworld's testimony of these facts on behalf of the Trusts. Therefore Transworld and P&F are Debt Collectors within the meaning of 15 U.S.C. § 1692a(6). Transworld and P&F also are debt collectors pursuant to 15 U.S.C. §1692a(6) because their principal business activity utilizes instrumentalities of interstate commerce or the mails related to the collection of consumer debts on behalf of others including the Trusts.

     b.    By communicating with the Plaintiff and the class members, directly and indirectly, and threatening and/or actually pursuing litigation and demanding sums not legally due from the Plaintiff and the class members, Transworld and P&F used false, deceptive, or misleading representations or means in connection with the collection of the consumer debts of the Named Plaintiff and the Class members in violation of 15 U.S.C. § 1692e, 1692e(2), 1692e(5) and 1692e(10).

     c.    Transworld's and P&F's actions and omissions described herein in relation to their knowledge of the Trust's inaccurate and incomplete records which are

COMPLAINT - 24

not sufficient to pursue debt collection actions also constitute unfair or unconscionable means to collect or attempt to collect from the Named Plaintiff and the Class Members in violation of 15 U.S.C. § 1692f.

      d.    Named Plaintiff and the Class members have suffered actual economic and non-economic damages, as more fully described *supra* and have incurred out of pocket expenses to determine to determine his legal rights and responsibilities which caused loss of time away from his business and made it impossible to manage their finances due to Transworld's and P&F's illegal debt collection practices and direct and indirect actions described herein.

120.    The FDCPA violations are per se violations of the CPA. Defendants' unfair and deceptive acts and practices repeatedly occurred in their trade and commerce, were capable of deceiving a substantial portion of the public, and have already injured many hundreds, if not thousands, of Washington residents.

121.    Defendants' wrongdoing is continuing in nature and represents an ongoing threat to Plaintiff and Class members.

122.    Class members generally are unaware that Defendants' collection practices are unlawful, and that Defendants are using false affidavits to obtain judgments

123.    Plaintiff and Class members will suffer continuing, immediate, and irreparable injury absent the issuance of injunctive and equitable relief.

124.    Plaintiff and Class members do not individually have a complete, speedy, and adequate remedy at law with respect to Defendants' continuing misconduct

125.    Preliminary and injunctive relief is necessary to prevent further injury to Plaintiff and Class members

126.    Defendants' conduct in violation of the CPA has proximately caused and continues to cause injury to Plaintiff and Class members in their business or property.

127.    Plaintiff and Class members are entitled to recover compensatory, special, and general damages as allowed by law.

HENRY & DeGRAAFF, P.S.
787 MAYNARD AVE S
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

128.    Plaintiff and the Class are entitled to recover treble damages, attorneys' fees, and costs pursuant to RCW 19.86.090.

**E.      Count V: Injunctive Relief**

129.    A party may seek injunctive relief for violations of the Consumer Protection Act. RCW 19.86.090.

130.    Plaintiff and Class members seek injunctive relief from this Court which would enjoin Defendants from collecting debts in the manner described above from the Plaintiff and Class members and from any other person similarly situated. *Scott v. Cingular Wireless*, 160 Wn. 2d 843, 853 (2007).

131.    Plaintiff and Class members seek an injunction prohibiting Defendants from its unlawful collection tactics, including but not limited to demanding money that is not owed, using Washington courts to extort payments and monies out of its residents by disregarding court rules and applicable law, collecting debts and filing lawsuits that are barred by the statute of limitations, misstating the law in collection lawsuits, providing insufficient or false affidavits and attempting to collect grossly inflated and illegal collection fees.

132.    Plaintiff and Class members have reason to believe these actions make up a pattern and practice of behavior and have impacted other individuals similarly situated.

133.    Injunctive relief is necessary to prevent further injury to Plaintiff and Class members and to the Washington public as a whole.

134.    Injunctive relief should therefore issue as described herein.

**F.      Count VI: Invasion of Privacy Against All Defendants on Behalf of the Washington Class.**

135.    Plaintiff incorporates all preceding paragraphs as if set forth fully herein and assert this claim on their behalf and on behalf of the Washington Class members against the Defendants.

136.    The Defendants have intruded upon the solitude and seclusion of the Plaintiff and members of the Washington Class.

COMPLAINT - 26

HENRY & DEGRAAFF, P.S.
787 MAYNARD AVE S
SEATTLE, WASHINGTON  98104
telephone (206) 330-0595
fax (206) 400-7609

137.    The Plaintiff and the members of the Washington Class each had a reasonable expectation that their solitude would not be intruded by demand letters and lawsuits by the Defendants.

138.    The Defendants intrusion given their knowledge that they did not have any legitimate claims against the Plaintiff and the members of the Washington Class and Defendants actions would be highly offensive to a reasonable person.

139.    The Plaintiff and the members of the Washington Class have been damaged by the Defendants' invasion of their privacy, including their right to solitude and seclusion.

140.    The Defendants' intentional and malicious conduct warrants the imposition of punitive damages.

## VI.      REQUEST FOR RELIEF

A.      WHEREFORE, the Plaintiff prays for the following relief and judgment in his favor and the other members of the Class and against the Defendants for Counts I, III, IV, V and VI of the Complaint and against Transworld's and P&F for Counts I-VI.

i.      The Court certify a Washington Class of persons defined herein as may be modified or amended;

ii.      The Court appoint Plaintiff and his counsel to represent the Washington Class certified;

iii.      The Plaintiff and Washington Class be awarded actual damages against each of the Defendants, jointly and severally, pursuant to the Washington Consumer Protection Act in an aggregated amount in excess of $75,000.00 for the Plaintiff;

iv.      The Plaintiff and Washington Class be awarded punitive damages in an amount to be determined;

v.      The Plaintiff and the Washington Class be awarded their costs, including attorney

COMPLAINT - 27

fees, pursuant to the Washington Consumer Protection Act;

vi.     For treble damages, pursuant to RCW 19.86.090, calculated from the damages determined by the court;

vii.    For injunctive relief pursuant to RCW 19.86.090 as described above; and

viii.   The Plaintiff and Washington Class be awarded such other and further relief as may be appropriate and proper.

Dated this 3rd of April 2020.

/s/ *Christina L Henry*
Christina L Henry, WSBA 31273
Counsel for Plaintiff
HENRY & DEGRAAFF, PS
787 Maynard Ave S
Seattle, WA 98104
206-330-0595 Fax 206-400-7609
*chenry@hdm-legal.com*

COMPLAINT - 28

# EXHIBIT A
# TO COMPLAINT

EFiled:  Jun 15 2018 04:31PM EDT
Transaction ID 62138855
Case No. 2018-0167-JRS

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| THE NATIONAL COLLEGIATE MASTER STUDENT LOAN TRUST I, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2003-1, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-1, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-2, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-1, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-3, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-1, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-2, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-1, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-2, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-3, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4, <br><br>        Plaintiffs, <br><br>    v. <br><br> U.S. BANK NATIONAL ASSOCIATION, GSS DATA SERVICES, INC., TURNSTILE CAPITAL MANAGEMENT, LLC, AND TRANSWORLD SYSTEMS, INC., <br><br>        Defendants. | ) ) ) ) ) ) C.A. No.  2018-0167-JRS ) ) ) ) ) **VERIFIED AMENDED** ) **COMPLAINT FOR** ) **INJUNCTIVE AND** ) **EQUITABLE RELIEF** ) **AND DAMAGES____** ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

CERTIFIED
AS A TRUE COPY:
ATTEST:

SUSSEX COUNTY
REGISTER IN CHANCERY
BY: _____
_____
Case Manager
11-4-2019

**GRANT & EISENHOFER P.A.**
123 Justison Street
Wilmington, DE 19801
302-622-7000
*Attorneys for Plaintiffs*

# **TABLE OF CONTENTS**

**Page**

NATURE OF THE ACTION ................................................................................ 1

THE PARTIES .................................................................................................... 6

JURISDICTION AND VENUE .......................................................................... 7

FACTUAL BACKGROUND .............................................................................. 8

A.    The Structure and Operation of the Trusts ............................................ 8

B.    The Trusts' Service Providers .............................................................. 11

       1.    The Master Servicing Agreement ............................................. 11

       2.    The Indenture ............................................................................ 11

       3.    The Administration Agreement ................................................. 14

       4.    The Special Servicing Agreement ............................................. 15

       5.    The Special Subservicing Agreement ....................................... 15

C.    Defendants Improperly Send Defaulted Loans to TSI in Violation
     of the Governing Documents .................................................................. 21

D.    Defendants Allow the Statute of Limitations on Defaulted Loans to
     Expire and Refuse to Provide Information Regarding Such Loans .............. 27

E.    Defendants' Failure to Obtain and Safeguard Documents Impedes
     the Trusts' Ability to Collect on Defaulted Loans ................................. 30

F.    Defendants' Improper Collection Activities Thwart Collections on
     Defaulted Loans and Expose the Trusts to Liability ............................. 37

G.    The Partial Audit of PHEAA .............................................................. 42

H.  GSS and U.S. Bank Prevent the Trusts' Servicer, Auditor and Lawyers From Being Paid ..........................................................................................43

    1.  Failure to Pay the Trusts' Servicer (Odyssey) .....................................43

    2.  Failure to Pay the Trusts' Auditor.......................................................46

    3.  Failure to Pay the Trusts' Lawyers .....................................................48

COUNT I:  Breach of Contract (against GSS) .....................................................53

COUNT II:  Tortious Interference with Contract (against GSS) ...........................55

COUNT III:  Breach of Contract (against U.S. Bank) ...........................................56

COUNT IV:  Breach of Duty of Care and to Avoid Conflicts of Interest (against U.S. Bank)............................................................................58

COUNT V:  Breach of Contract (against U.S. Bank) (Alternative Count)...........59

COUNT VI:  Breach of Contract (against Turnstile) .............................................61

COUNT VII: Injurious Falsehood (against TSI) ....................................................63

Plaintiffs, The National Collegiate Master Student Loan Trust I, The National Collegiate Student Loan Trust 2003-1, The National Collegiate Student Loan Trust 2004-1, The National Collegiate Student Loan Trust 2004-2, The National Collegiate Student Loan Trust 2005-1, The National Collegiate Student Loan Trust 2005-2, The National Collegiate Student Loan Trust 2005-3, The National Collegiate Student Loan Trust 2006-1, The National Collegiate Student Loan Trust 2006-2, The National Collegiate Student Loan Trust 2006-3, The National Collegiate Student Loan Trust 2006-4, The National Collegiate Student Loan Trust 2007-1, The National Collegiate Student Loan Trust 2007-2, The National Collegiate Student Loan Trust 2007-3, The National Collegiate Student Loan Trust 2007-4 (collectively, "Plaintiffs" or "The Trusts"), for their Verified Amended Complaint against Defendants U.S. Bank National Association ("U.S. Bank"), GSS Data Services, Inc. ("GSS"), Turnstile Capital Management, LLC ("Turnstile"), and Transworld Systems, Inc. ("TSI"), based on personal knowledge as to themselves and information and belief as to all other matters, allege as follows:

## **NATURE OF THE ACTION**

1.      This case involves egregious breaches of contract and other duties by Defendants that have cost the Plaintiff Trusts billions of dollars and that have

resulted in wrongful and fraudulent foreclosure cases being brought against thousands of borrowers of Student Loans owned by the Trusts.

2.      Plaintiffs are each Delaware statutory Trusts created to acquire pools of Student Loans that had been originated by banks and other financial institutions, provide for the servicing of the loans, and issue Notes backed by the Trust assets. The face amount of all Student Loans held by the Trusts is approximately $15 billion.

3.      In order to help the Trusts fulfill their responsibilities under the Trust Agreements, various entities were hired to perform certain discrete tasks.  At present, Defendant U.S. Bank serves as Indenture Trustee and also Special Servicer; Defendant GSS serves as Administrator; Defendant Turnstile serves as Special Subservicer; and Defendant TSI performs certain collection activities.  In addition, non-party Pennsylvania Higher Education Assistance Agency ("PHEAA") serves as the principal Servicer.

4.      When borrowers fail to make required payments on their loans, Defendants are responsible for pursuing collection, including legal proceedings. For example, TSI was hired to bring collection proceedings, Turnstile as Special Subservicer is responsible for monitoring and supervising the performance by TSI, and U.S. Bank as Special Servicer has control over many of TSI's activities and also is responsible for monitoring the performance of Turnstile and replacing it if it

-2-

was deficient or negligent in the performance of its duties. Defendants have failed miserably to discharge such duties, and in fact have engaged in improper and fraudulent conduct regarding the collection activities. Lawsuits brought to foreclose on defaulted loans repeatedly have been dismissed because Defendants failed to obtain the documentation necessary to prove the Trusts' ownership of the loans and standing to bring collection proceedings. Such improper collection practices, and the false and misleading representations that Defendants have made in the course of such lawsuits, have resulted in the Trusts being sued by borrowers and by the Consumer Financial Protection Bureau ("CFPB").

5. In the course of its investigation, the CFPB found rampant fraudulent and otherwise improper conduct in the collection activities, such as suits being filed against borrowers without all of the notes, assignments and other documents needed to prove standing to foreclose on the loans, and submission of false and misleading affidavits in collection cases. As a result of such wrongdoing by Defendants, done in the name of the Trusts, the CFPB has sought substantial monetary and equitable relief against the Trusts, and a proposed consent decree has been entered into whereby the Trusts would be required to pay tens of millions of dollars to the CFPB by reason of the improper conduct by the Defendants herein.

6. As a result of the failures of the Defendants to deal properly with delinquent and defaulted loans, and their active obstruction of efforts by the Trusts

and the Owners of the beneficial interests therein to obtain information concerning such activities, it is estimated the statute of limitations has expired on approximately $1 billion of loans, and approximately another $4 billion have become uncollectible. Additional loans are continuing to become statute barred, as Defendants continue to fail properly to discharge their duties.

7.     Defendants have no incentive to stop their fraudulent collection activities but rather are highly motivated to perpetuate the status quo. Defendants have made hundreds of millions of dollars in servicing and other fees and want to continue to feed at the Trusts' trough. And if borrowers who have been the victims of fraudulent collection cases sue, Defendants enter into settlements whereby the settlements are paid out of Trust assets.

8.     The Trusts have reason to believe that there is fraud in the servicing and administration of all of the loans in the Trusts. The Owners, through direction to the Owner Trustee and Trust counsel, have been trying to investigate, monitor, and stop the improper activities of each of the Defendants, only to be faced with every maneuver Defendants can employ in order to maintain the current collection scheme under U.S. Bank as Special Servicer. U.S. Bank as Indenture Trustee continuously mischaracterizes its duties in order to protect the collection scheme orchestrated by U.S. Bank as Special Servicer and all the other Defendants.

9.     The Trusts have attempted to stop and rectify these abuses, but Defendants have obstructed those efforts at every turn.  The Trusts appointed a new servicer, Odyssey Education Resources LLC ("Odyssey"), to deal with newly-defaulted loans, but GSS and U.S. Bank refused to acknowledge such appointment and U.S. Bank filed a lawsuit arguing the appointment was invalid.  The Trusts retained counsel to represent them in that lawsuit, but GSS and U.S. Bank have refused to pay the bills submitted by such counsel.  The Trusts commenced an audit of the primary servicer, PHEAA, but GSS and U.S. Bank refused to pay the bills submitted by the auditor hired by the Trusts to do the audit.  The Trusts' counsel negotiated a consent decree with the CFPB that would put an end to at least some of the servicing abuses committed by Defendants, but Defendants are strenuously opposing such consent decree, and to add insult to injury, GSS and U.S. Bank have refused to pay the bills submitted by that counsel too.

10.     The Trusts seek specific performance of the Governing Documents and other injunctive and equitable remedies arising out of Defendants' substantial breaches, as well as damages to compensate the Trusts for the substantial injuries the Trusts have suffered by reason of Defendants' wrongdoing as described herein.  All of the net proceeds of this case will be deposited into the appropriate collection account to be distributed pursuant to the waterfall set forth in the Indenture.

## THE PARTIES

11.     Plaintiffs are each Delaware statutory trusts with Wilmington Trust Company ("WTC"), a Delaware banking corporation, as their Owner Trustee. WTC has its principal business office at 1100 North Market Street, Wilmington, DE 19890.  On July 20, 2017, WTC resigned as Owner Trustee, but continues to function in that role as no replacement has yet been appointed.

12.     Defendant U.S. Bank is, upon information and belief, a nationally charted bank with its headquarters located at 800 Nicollet Mall, Minneapolis, MN 55402.

13.     Defendant GSS, upon information and belief, is a Massachusetts corporation with a principal business office located at 402 West Broadway, Suite 2000, San Diego, CA 92101.

14.     Defendant Turnstile, upon information and belief, is a Delaware limited liability company with a principal business office located at 402 West Broadway, Suite 2000, San Diego, CA 92101.

15.     Defendant TSI, upon information and belief, is a California corporation with a principal place of business in Ft. Washington, Pennsylvania. TSI is the successor to NCO.

16.     Non-party PHEAA is, upon information and belief, a public corporation, organized under the laws of the Commonwealth of Pennsylvania,

engaged in non-governmental commercial activity throughout the United States, including in Delaware.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 10 *Del. C.* § 341 because Plaintiffs seeks to compel specific performance with contractual obligations and seek other equitable relief.

18.     This Court has personal jurisdiction over Defendants in this action. U.S. Bank as Indenture Trustee and as Special Servicer and GSS as Administrator each contracted with the Trusts to provide, and has provided, services relating to loans to borrowers located in Delaware.  Furthermore, pursuant to the Indenture U.S. Bank has made payments to the Owner Trustee, WTC, in Delaware, and, on information and belief, has made payments to noteholders in Delaware.  As Special Servicer, U.S. Bank has authorized and supervised the bringing of collection lawsuits in Delaware against borrowers in default.   The Administrator has responsibility to, among other things, file tax returns for the Trusts in Delaware. Turnstile is a Delaware limited liability company that has responsibility under the Special Subservicing Agreement to, among other things, provide, and has provided, services relating to loans to borrowers located in Delaware.  TSI has, among other things, provided, services relating to defaulted loans to borrowers located in Delaware.

## FACTUAL BACKGROUND

### A.     The Structure and Operation of the Trusts

19.     Each of the NCSLT Trusts was created as a Delaware statutory trust

to acquire pools of Student Loans that had been originated by banks and other

financial institutions, provide for the servicing of the loans, and issue Notes backed

by the Trust assets.   The Notes are held by various noteholders and traded as

securities.   The face amount of all Student Loans held by the Trusts is

approximately $15 billion.

20.     Under 12 *Del. C.* § 3801(g), a Delaware statutory trust is "a separate

legal entity."   It is a juridical entity that "may sue and be sued."   12 *Del. C.*

§ 3804(a).

21.     Under the relevant Delaware statute and the Trust Agreements, the

Owner Trustee is responsible for managing the Trusts' affairs at the direction of

the Owners of the beneficial interest therein.   12 *Del. C.* § 3806(a) provides:

> Except to the extent otherwise provided in the governing instrument
> of a statutory trust, the business and affairs of a statutory trust shall be
> managed by or under the direction of its trustees.   To the extent
> provided in the governing instrument of a statutory trust, any person
> (including a beneficial owner) shall be entitled to direct the trustees or
> other persons in the management of the statutory trust.

22.     Implementing this provision, the Trust Agreements provide that the

Owner Trustee has all of the "rights, powers and duties set forth herein and in the

Statutory Trust Statute."   Trust Agreement § 2.04; *see* § 8.01.   Under § 2.03 of the

Trust Agreements (entitled "Purposes and Powers"), the Trusts have the obligation and power, *inter alia,* "to provide for the administration of the Trust and the servicing of the Student Loans." § 2.03(a)(ii).   The Trusts further have the power "[t]o engage in those activities and to enter into such agreements that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith." § 2.03(a)(iii).   They also have the power "[t]o engage in such other activities as may be required in connection with the conservation of Trust Property...." § 2.03(a)(iv).

23.     These are owner-directed Trusts.   As provided in § 2.03(b)(i) of the Trust Agreements, in conducting the operations of the Trusts, "[t]he Trust will act solely in in its own name," and "the Owner Trustee or other agents selected in accordance with this Agreement will act on behalf of the Trust subject to direction by the Owners...."   The Owner Trustee is required "to administer the Trust in the interests of the Owners." § 8.03.

24.     The beneficial interests in Plaintiff The National Collegiate Master Student Loan Trust I are owned by NC Residuals Owners Trust and SL Resid Holdings LLC.   The beneficial interests in Plaintiff The National Collegiate Student Loan Trust 2003-1 are owned by NC Owners, LLC ("NC Owners"), Pathmark Associates LLC ("Pathmark") and NC Residuals Owners Trust.   The beneficial interests in the remaining Plaintiffs are owned by NC Owners and

-9-

Pathmark.  (One or more of NC Owners, Pathmark, NC Residuals Owners Trust and SL Resid Holdings LLC are referred to herein as the "Owners.")

25.    The Owners have the right to "direct or consent to actions of the Owner Trustee and otherwise participate in the management and control of the affairs of the Trusts."  Trust Agreement p. 2 (definition of "Beneficial Interest").

26.    In October 2015, at the request of the Owners, WTC as Owner Trustee retained Chaitman LLP ("Chaitman") to represent the Trusts in litigation matters.   The Chaitman retention letter, which was executed by WTC and approved by the Administrator, provides that Chaitman "will act as Special Counsel for the Trusts managing litigation or other adversarial proceedings arising from or relating to one or more Trusts."  The letter further provides that Chaitman may act "[a]s requested or directed by … the Owners."   It further empowers Chaitman to "select[], engag[e] and manag[e] other law firms to provide" legal services to the Trusts.   Pursuant to such authorization granted by the Owner Trustee on behalf of the Trusts, Chaitman retained several other law firms to bring or defend actions and proceedings on behalf of the Trusts, including Grant & Eisenhofer P.A., McCarter & English, LLP, and DiCello Levitt & Casey LLC.

-10-

**B.     The Trusts' Service Providers**

27.     In order to preserve the value of the collateral (i.e., the Student Loans), several agreements regarding the servicing and administration of the Student Loans have been entered into.

### 1.     The Master Servicing Agreement

28.     The Trusts and PHEAA are parties to the Amended and Restated Private Loan Servicing Agreement between PHEAA and the First Marblehead Corporation ("FMC") (the "Master Servicing Agreement" or "MSA") and a series of Custodial Agreements entered into among Plaintiffs, U.S. Bank in its capacity as Indenture Trustee, and PHEAA.   PHEAA acts as the custodian of the Student Loans and services the Student Loans while they are in repayment and in the early stages of delinquency or default.

### 2.     The Indenture

29.     Each of the Trusts executed an Indenture with U.S. Bank as Indenture Trustee.   U.S. Bank executed the Indentures in Massachusetts.   The Indentures are governed by New York law.   The rights and duties of the Indenture Trustee are specified in each Indenture.

30.     The Indentures give the Indenture Trustee certain specified, mostly ministerial, duties, principally to deposit money collected on the Student Loans owned by the Trusts and to pay out money to Noteholders and others according to a specified "waterfall."

-11-

31.     The Indentures also provide that in the case of an Event of Default,"
the Indenture Trustee has certain obligations, such as to notify the Trusts of the
default and to request that the Trusts take action to remedy the default.

32.     The Indentures also contain a "Granting Clause" whereby each Trust
grants to the Indenture Trustee the Trust's "right, title, and interest" in the Student
Loans, the Servicing Agreements and all causes of action and all proceeds in
respect thereof.  This provision does not nullify any of the other provisions of the
Indentures and does not deprive the Trusts of the right to assert claims against
persons or entities who have injured the Trusts by, *inter alia*, breaching their
contractual obligations to the Trusts.  The purpose of the Granting Clause is, as set
forth therein, "to secure the payment of principal of and/or interest on … the
Notes" and "to secure compliance with the provisions of this Indenture, all as
provided in this Indenture."

33.     The definition of "Grant" contained in the Indenture makes clear that
a "Grant" conveys "rights powers and options (but none of the obligations) of the
Granting party."  Indenture Appendix A-16.  Therefore, the Trusts retain all of the
obligations that they have under the Trust Agreements and the Indentures.

34.     Among the many obligations that the Trusts retain is the obligation to
take various actions to protect the Trusts and enforce the obligations of persons
doing business with the Trusts.  For example, § 3.05 of the Indentures provides:

-12-

Protection of Indenture Trust Estate. The Issuer ... will take such other action necessary or advisable to:

\*     \*     \*     \*

(iii)    enforce any of the Collateral; or

(iv)    preserve and defend title to the Indenture Trust Estate ....

Similarly, § 3.07(d) of the Indentures provides: "If the Issuer shall have knowledge of the occurrence of a Servicer Default..., the Issuer shall promptly notify the Indenture Trustee and the Rating Agencies thereof, and shall specify in such notice *the action, if any, the Issuer is taking with respect to such default.... [T]he Issuer shall take all reasonable steps available to it to enforce its rights under the Basic Documents in respect of such failure.*" (Emphasis added). Such provisions would make no sense if the Trusts have been divested of their ability to assert claims relating to the Student Loans or the servicing agreements.

35.    Furthermore, the Granting Clause does not provide that the grant of rights to the Indenture Trustee makes the Indenture Trustee the "sole" or "exclusive" holder of such rights. This is in stark contrast to other provisions in the Indenture that use such words where exclusivity is intended. *See, e.g.,* Indenture § 6.10(b)(i) (describing rights that "shall be exercised ... solely at the direction of the Indenture Trustee").

36.    To the contrary, the Indenture makes clear that any grant of right to the Indenture Trustee to bring proceedings is not intended to be exclusive but rather is cumulative. Section 5.9 provides:

-13-

<u>Rights and Remedies Cumulative.</u>  No right or remedy herein conferred upon or reserved to the Indenture Trustee ... is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.

### 3.    **The Administration Agreement**

37.    The Trusts are parties to Administration Agreements entered into on various dates, by and among each of the Trusts individually, Wilmington Trust Company as Owner Trustee, U.S. Bank as Indenture Trustee, The National Collegiate Funding LLC as the Depositor, and First Marblehead Data Services, Inc. ("FMDS"), GSS's predecessor-in-interest, as the Administrator under each such Administration Agreement.  FMDS, which is a Massachusetts corporation, executed the Administration Agreement in Massachusetts.  The Administration Agreements are governed by New York law.

38.    The Administration Agreements provide the Administrator with certain specified rights and duties, but make clear that ultimate control rests with the Trusts.  Thus, § 1(d)(ii) of the Administration Agreements provides that as to non-ministerial matters, the Administrator shall not "take any action that the Issuer directs the Administrator not to take on its behalf."  It further provides that in the absence of instructions from the Indenture Trustee, in accordance with the Indenture, or from the Owner Trustee or the Owners, in accordance with the Trust Agreement, the Administrator shall not take any action regarding "[t]he initiation

-14-

of any claim or lawsuit by the Issuer … except for claims or lawsuits initiated in the ordinary course of business by the Issuer or their respective agents or nominees for the collection of the Student Loans owned by the Issuer." § 1(d)(i)(B).  Such provision plainly recognizes that the Issuer retained the ability to initiate lawsuits.

### 4.     The Special Servicing Agreement

39.     A Special Servicing Agreement was entered into on March 1, 2009, by and among First Marblehead Education Resources, Inc. ("FMER") as Special Servicer, U.S. Bank as Back-Up Special Servicer, and each of the Trusts, which named FMER as Special Servicer for delinquent and defaulted Loans and further provided that if FMER were to resign as Special Servicer, U.S. Bank would step in as the Special Servicer.   FMER executed the Special Servicing Agreement in Massachusetts.  The Special Servicing Agreement is governed by New York law.

40.     In March 2009, FMER hired TSI to provide default prevention and collection services in the event that U.S. Bank became Special Servicer, including hiring lawyers to bring collection cases.

### 5.     The Special Subservicing Agreement

41.     In March 2009, U.S. Bank made an agreement with Goal Structured Solutions, Inc. ("Goal") that if U.S. Bank were to become Special Servicer, it would hire an affiliate of Goal to act as Special Subservicer.

-15-

42.    In 2012, the Administrator was sold to Goal and renamed GSS, and shortly after that sale, FMER resigned as Special Servicer, triggering U.S. Bank's role as back-up Special Servicer. U.S. Bank, as it had promised Goal, thereupon entered into the Special Subservicing Agreement dated as of September 7, 2012, hiring Turnstile – a wholly-owned subsidiary of Goal – to perform certain responsibilities regarding defaulted and delinquent loans that U.S. Bank was obligated to perform for the benefit of the Trusts pursuant to the Special Servicing Agreement. The Special Subservicing Agreement is governed by New York law.

43.    Under the Special Subservicing Agreement, Turnstile was, among other things, "responsible for monitoring and supervising the performance by NCO" of its collection activities.   Special Subservicing Agreement ¶ 2.   The Special Subservicing Agreement required Turnstile to "conduct reviews of NCO's performance no less frequently than quarterly" and to meet with NCO on a quarterly basis to discuss with NCO its "post-default collections activities." *Id.* Turnstile was required to "provide oversight of activities of NCO with regard to account management, litigation assistance and/or settlement strategies." Special Subservicing Agreement Ex. A ¶ 1. Turnstile was further required to "instruct Servicers to provide original documents to NCO," "review, monitor and assist NCO in connection with counterclaims naming … any Trust in collection

litigation," and "review all settlement offers for account[s] with judgments entered on them." *Id.* ¶ 5.

44.     The Trusts are the intended beneficiaries of the Special Subservicing Agreement.    Under the Special Subservicing Agreement, Turnstile performs services that U.S. Bank was obligated under the Special Servicing Agreement to perform for the Trusts.  Those services relate to monitoring and supervising actions being taken to collect amounts due on delinquent and defaulted loans owned by the Trusts.  The only reason for any such services is to bring money into the Trusts.  In addition, Turnstile is paid by the Trusts for its services.  U.S. Bank and Turnstile also negotiated and included a clause in the Special Subservicing Agreement for the Trusts' benefit which provides for due diligence reviews of Turnstile's books and records and servicing activities, and the parties included in the clause the obligation of the Trusts to pay for such reviews.

45.     Neither the Trusts nor the Owners approved these arrangements with Turnstile or with TSI.  To the contrary, the Owners specifically informed the Administrator and U.S. Bank that they did not want Turnstile or TSI to perform any services relating to the Trusts.  But the Administrator and U.S. Bank refused to follow the instructions from the Owners.  The Trusts did not hire Turnstile or TSI, neither Turnstile nor TSI acts at the direction of the Trusts, and they do not follow any directions or instructions issued by the Trusts.  To the contrary, as discussed

-17-

below, while the Owners and the Trusts have requested that TSI cease filing lawsuits in the name of the Trusts where TSI cannot prove that the Trusts have standing to collect on defaulted loans, TSI has nevertheless continued to file such lawsuits.  The Trusts have no ability to control the activities of TSI regarding its collection activities.  TSI is not and never has been an agent of the Trusts.

46.     To the contrary, TSI is an agent of U.S. Bank as Special Servicer. Under the Special Servicing Agreement, U.S. Bank was responsible for "the enforcement, collection and servicing of Delinquent Loans and Defaulted Loans." This included "[r]etaining counsel on behalf of the applicable Trust (whether directly or through collection agencies) to further pursue enforcement and collection of Delinquent Loans and Defaulted Loans, including through litigation...." . U.S. Bank was responsible for approving TSI's selection of collection attorneys to bring collection lawsuits in Delaware, New York, Massachusetts and elsewhere.  U.S. Bank has direct control over TSI's collection activities, and U.S. Bank's approval is needed before TSI can revise a borrower's payment schedule.

47.     U.S. Bank's duties further included monitoring the performance of Turnstile and replacing it if it was deficient or negligent in performing its duties. As set forth herein, Turnstile's performance of its duties was deficient and

negligent, but U.S. Bank failed to monitor Turnstile's performance and failed to replace Turnstile as Subservicer.

48.     The relationships among the foregoing entities are illustrated in the chart on the following page.

**OWNERS**
**NC Owners**
**Pathmark**

Have the "right to direct" the "actions of the Owner Trustee and otherwise participate in the management of and control the affairs of the Trust."
Tr. Agr. § 1.01

**OWNER TRUSTEE**
**Wilmington Trust Co.**

Acts "on behalf of the Trust subject to direction by the Owners."
Tr. Agr. § 2.03(b)(1)

**ISSUER**
**NCSLT**
**Trusts**

**INDENTURE TRUSTEE**
**U.S. Bank**

**SERVICER and CUSTODIAN**
**PHEAA**

Must "hold all Original Credit Agreements and related documents." Serv. Agr. § 4.04

**ADMINISTRATOR**
**GSS (Goal affiliate)**

As to "non-ministerial" matters, shall not "take any action that the issuer directs the Administrator not to take."
Adm. Agr. § 1(d)(II) (C)

**SPECIAL SERVICER**
**U.S. Bank**

Provides "oversight of the activities of subservicers and replaces any subservicer "deemed to be deficient or negligent." Spec. Serv. Agr. § 2(B)

Oversees the means used by TSI in collecting any account and approves the selection of counsel to bring collection lawsuits

**TSI**
**f/k/a NCO**

TSI provides collection services relating to loans in default, including hiring lawyers to bring collection lawsuits.

**SPECIAL SUBSERVICER**
**Turnstile (Goal affiliate)**

Is "responsible for monitoring and supervising the performance by" TSI. Spec. Subserv. Agr. ¶ 2

-20-

### C.   Defendants Improperly Send Defaulted Loans to TSI in Violation of the Governing Documents

49.     PHEAA agreed to be legally bound by the MSA, and accordingly, to "provide and perform the [services defined therein] in full compliance with" the terms of the MSA.  The MSA allows for amendments "only by written instrument duly executed by [the Trusts] and [PHEAA]."  The MSA, and in particular, the Servicing Standards it incorporates, have been properly amended numerous times by agreements that were memorialized in the form of letters, and signed by the Trusts, PHEAA, and in some instances, other interested parties.   These amendments, or agreements, are known as "Read and Agreeds."

50.     Two specific Read and Agreeds address PHEAA's ability to distribute borrower-related information to third parties.   The two agreements preclude PHEAA from sending the information to any third parties other than FMER.

51.     The first such Read and Agreed, dated November 5, 2008 ("November 2008 Read and Agreed"), states that for "all questions, inquiries, documents, claim packages of all kinds, or other material relating to [the Loans]," PHEAA shall provide the information "directly to FMER" as Special Servicer. Naturally, FMER was a signatory to the agreement, as was the administrator at the time, FMDS (now GSS), in addition to the Trusts and PHEAA.

52.     The second Read and Agreed directing PHEAA to deal only with FMER is dated July 27, 2009 ("July 2009 Read and Agreed").  In the document, PHEAA agrees to send default notifications to FMER after 180 days of delinquency:  "[d]efault notifications must be submitted to FMER between the 180th and 210th day of delinquency."  Once again, PHEAA, as well as the Trusts' owners, Administrator, and FMER executed the agreement.

53.     Despite these agreements, GSS directed PHEAA to take contrary actions.  GSS's directive, and PHEAA's acquiescence, took place without the consent, and to the detriment, of the Trusts.  On July 20, 2012, GSS informed PHEAA by email that the new Special Servicer was U.S. Bank (succeeding FMER), and that U.S. Bank had an arrangement with TSI pursuant to which TSI would perform many of U.S. Bank's collections responsibilities.  In the email, the Administrator asserted that based on this role-shifting, "NCO will need the borrower data that was previously provided to [the Special Servicer]."  As an endorsement to this proposed change, the Administrator stated that it would provide PHEAA with a "direction letter" to "document this transaction."

54.     The Administrator never provided an appropriate direction letter. Further, without amendments to the MSA and related agreements, the Administrator's direction could not properly be implemented.  The Administrator is not a party to the MSA and had no authority to amend or supplement the MSA

or related agreements without receiving instructions from the Owner Trustee or the Owners in accordance to the Trust Agreement and the Administration Agreement. The Administration Agreement provides that with respect to "non-ministerial" matters:

> [T[he Administrator … shall not take any action unless the Administrator shall have received instructions from the Indenture Trustee, in accordance with the Indenture, from the Owner Trustee or the Owners, in accordance with the Trust Agreement. For the purpose of the preceding sentence, "non-ministerial matters" shall include, without limitation:
>
> (A)   The amendment of or any supplement to the Trust Related Agreements

Administration Agreement ¶ I(d)(i).   The Administrator never requested such instructions, and neither the Owners nor the Owner Trustee ever provided such instructions to the Administrator.

55.   Indeed, on August 6, 2012, two weeks after the Administrator sent the above direction to PHEAA, PHEAA responded: "You also mentioned that the NCSLT Trusts will be providing a direction letter to AES to document the transaction." The Administrator wrote again on August 15, asking PHEAA what PHEAA might be looking for in such a letter: "I would like to understand what you are looking for in the direction letter. Is this something as simple as the trusts acknowledging the new special servicing roles and directing [PHEAA] to move data as appropriate?" PHEAA replied: "I believe that would make sense but we

can certainly discuss this further when we setup the call regarding the changes needed to the agreements."

56.    Not only did PHEAA and GSS thus evidence their understanding that amendments to the Servicing Standards required the Trusts' authorization, they then circulated the particular Read and Agreeds that needed to be amended for the GSS email to be effective.  On August 17, 2012, pursuant to a request from GSS for "the existing servicing guidelines," PHEAA sent the Administrator the two Read and Agreeds discussed above.

57.    Fully aware of the need to amend the MSA in order to send defaulted Loans to NCO, the Administrator nevertheless plowed forward without the Trusts' or the Owners' authorization.  Beginning in 2012, as a result of the Administrator's direction, PHEAA began to send TSI all questions, inquiries, documents and claim packages that previously were sent to FMER, including, among others, defaulted loans relating to borrowers in Delaware.

58.    The Administrator's financial motive for persuading PHEAA to send loans and loan-information to TSI is clear.  Goal, through its wholly-owned subsidiary, Turnstile, was positioned to make money overseeing TSI's performance of special servicing responsibilities.  Under the Turnstile agreement, Turnstile was "responsible for monitoring and supervising the performance of NCO," including "reviews of NCO's performance no less frequently than

-24-

quarterly." Thus, by diverting loans to NCO, GSS was increasing the fees of Goal's other subsidiary.

59.     Through an Issuer Order dated May 22, 2015 sent by the Owner Trustee on behalf of the Trusts, the Trusts sought to obtain details about these arrangements. The Order directed GSS to provide "any and all correspondence [defined as including emails, letters, and other communication] given to PHEAA whereby (i) PHEAA was directed and instructed to cease providing the so called 'Default Notifications' (as defined in the July 27, 2009 letter from the Administrator to PHEAA) to FMER and (ii) PHEAA was directed and instructed to begin providing [the Default Notifications] to any of U.S. Bank, Turnstile, NCO and GSS Data Services, or any other party not referenced herein."

60.     GSS did not respond and continues to refuse to supply the requested information. However, the Trusts obtained the Administrator's email discussed above through their emergency audit of PHEAA, and thereafter, on behalf of the Trusts, the Owner Trustee sent the Administrator an Issuer Order, dated October 1, 2015, stating that the directives in the email lacked authority, and that for any further action, the Administrator needed to obtain prior written consent of the Trusts:

> [T]o insure full and complete compliance with the Administration
> Agreement, the undersigned hereby advises and instructs GSS, as
> Administrator, and all employees, agents and subcontractors working
> for or acting on behalf of GSS, as follows:

-25-

1.  With regards to any duties being performed by the Administrator under Sections l(c) and l(d) of the Administration Agreement, GSS is hereby directed to immediately stop performing those duties and to immediately cease and desist from taking any further actions without the prospective and express written authorization from the Owner Trustee, on behalf of the Trusts, which prospective and express written authorization shall only be considered by the Owner Trustee, on behalf of the Trusts, after the furnishing of the additional information requested pursuant to paragraph 3 below.   For the purposes of this paragraph 1, and to avoid any doubt, the Administrator can no longer rely upon any previous actual or assumed authorization.

2.  GSS is hereby directed to immediately cease and desist from giving any direction to PHEAA and to take no further action with regards to the servicing of defaulted and delinquent loans without the express written consent of the Owner Trustee, on behalf of the Trusts, which prospective and express written consent shall only be considered by the Owner Trustee, on behalf of the Trusts, after the furnishing of the additional information requested pursuant to paragraph 3 below.  For the purposes of this paragraph 2, and to avoid any doubt, the Administrator can no longer rely upon any previous actual or assumed consent.

3.  GSS is hereby directed to provide the Owner Trustee with additional information to include an accurate and complete description of any duties it is currently performing on behalf of the Trusts under [various sections of] the Administration Agreement, accompanied by the corresponding written authorization from the Owners or the Owner Trustee, on behalf of the Trusts ... in accordance with the Administration Agreement.

61.    The additional information sought by the Trusts was never disclosed, and the Trusts never provided the consent described in the Issuer Order. Nevertheless, since that time, PHEAA has transferred over $4.5 billion of defaulted Loans directly to TSI for collection, and it continues to do so to the present date.  System access to private Student Loan data is routinely provided to

this entity and others with which it has contracted to perform collections that neither the Owners nor the Owner Trustee has ever approved as required by the MSA. A number of lawsuits by borrowers have been brought against the Trusts, the Owners and the Administrator's affiliate alleging improper debt collection activities and raising significant issues as to whether the entities pursing the collections have possession and custody of the Loans and all of the documents needed to collect on the Loans. The CFPB investigated the very things the Owners want to investigate, and on the basis of its investigation the CFPB filed a federal complaint against the Trusts complaining as to abusive servicing behavior by the certain of the Defendants herein.

**D.    Defendants Allow the Statute of Limitations on Defaulted Loans to Expire and Refuse to Provide Information Regarding Such Loans**

62.    In February 2013, the Owners' agent, VCG Securities LLC ("VCG"), sent a written request to GSS for information related to loans that had expired past the statute of limitations for collections, and, that would be expiring out of statute in the subsequent twelve months. GSS responded that it did not have all of the requested information, and forwarded the request to U.S. Bank. U.S. Bank, in turn, stated that it had subserviced its special servicing duties to TSI, and forwarded the request there. In truth, at the time of the Trusts' request to GSS, Goal's wholly

owned subsidiary, Turnstile, was overseeing special servicing of the Loans as Special Subservicer, by virtue of its agreement with U.S. Bank.

63.   A month passed with no data disclosures.  The Owners emailed U.S. Bank again, and the next day, March 19, 2013, GSS provided certain data.

64.   The data showed that nearly $100 million in loans had expired past the statute of limitations in the preceding 270 days since U.S. Bank took over as Special Servicer, and another $225 million would be expiring within the subsequent twelve months.

65.   The Owners received additional data in May 2013 that was similarly damning.   The information revealed an expired loan balance of approximately $276 million, and a fast-growing loan balance at risk of expiring out of statute (the total had ballooned to approximately $268 million).

66.   These disclosures, and the need for more layers of detail rather than aggregated information which had been provided to date, prompted the Owners to send a new data request to U.S. Bank on May 10, 2013.  The Owners received no reply and so they wrote again on June 18, 2013.  This time, U.S. Bank did reply, but failed to provide data.  Instead, U.S. Bank indicated that "the request may have to go through the Administrator."

67.   Eventually, in early 2014, the Owners and U.S. Bank had a phone call in which U.S. Bank requested evidence of the amount of loans that had expired

past the collection statute.   Although this request ignored that the Owners themselves had been struggling to gain access to this information, in part due to U.S. Bank's posture that it was not responsible for obtaining or providing the data, the Owners nevertheless, on March 17, 2014, provided U.S. Bank with the information it had gathered.   In the same letter, however, the Owners requested additional information from U.S. Bank regarding defaulted loans, portfolio performance, and loan-level information.

68.    U.S. Bank once again deflected the request.   It sent an April 14, 2014 letter to the Owners which, *inter alia*, (i) referred the Owners to the Administrator, (ii) claimed to have authority only to send information to the Owners if authorized by the Administrator, and (iii) asserted that it would "not be responsible or accountable for performance of [TSI and Turnstile]," the two entities to whom U.S. Bank had farmed out its special servicing responsibilities.

69.    In fact, U.S. Bank as Special Servicer has contractual rights under the Special Subservicing Agreement to demand information from Turnstile and to terminate Turnstile for any failure to perform in any material respect its obligations under that agreement.

70.    The failures of U.S. Bank and Turnstile to fulfill their contractual duties to the Trusts regarding assertion of claims against defaulting borrowers and the monitoring and supervising of such efforts has caused the statute of limitations

-29-

to expire on loans of hundreds of millions of dollars, including loans to borrowers in Delaware.  Defendants' failures properly to collect on delinquent and defaulted loans, and their failures to monitor and supervise collection efforts,  continues to the present date, and loans continue to become statute-barred.

### E.    Defendants' Failure to Obtain and Safeguard Documents Impedes the Trusts' Ability to Collect on Defaulted Loans

71.    Defendants have filed, in the name of the Trusts, lawsuits throughout the country seeking to collect on defaulted loans, and are continuing to do so to the present date.   Among other places, such lawsuits have been recently filed in Delaware,[1] New York,[2] and Massachusetts.[3]

---

[1]  *See, e.g., NCSLT v. Plummer*, No. CPU4-17-003152 (filed July 25, 2017); *NCSLT v. Cosby*, No. CPU5-17-001090 (filed July 25, 2017); *NCSLT v. Takklai* (filed July 25, 2017); *NCSLT v. Gordon*, No. CPU5-17-001091 (filed July 25, 2017); *NCSLT v. Tineo*, No. CPU4-17-003028 (filed July 25, 2017); *NCSLT v. Morgan*, No. CPU6-16-0011273 (filed Dec. 9, 2016).

[2] *See, e.g., NCSLT 2007-2 v. Singn*, No. 158221/17 (N.Y. Sup. Ct. N.Y. Co. filed Sept. 14, 2017); *NCSLT 2007-4 v. Sasieta*, No. 151612/17 (N.Y. Sup. Ct. N.Y. Co. filed Feb. 20, 2017); *NCSLT 2006-4 v. Joyner*, No. 151531 (N.Y. Sup. Ct. N.Y. Co. filed Feb. 16, 2017); *NCSLT v. Valentin*, No. 156033/16 (N.Y. Sup. Ct. N.Y. Co. filed Aug. 31, 2016).

[3] *See, e.g., NCSLT 2006-4 v. Powley*, 2016 Mass. Super. LEXIS 744 (Mass. Super. Ct. May 12, 2016); *NCSLT 2007-3 v. Durgin*, 2016 Mass. Super. LEXIS 509 (Mass. Super. Ct. May 11, 2016); *NCSLT 2007-2 v. Lewis*, 2016 Mass. Super. LEXIS 719 (Mass. Super. Ct. Apr. 6, 2016); *NCSLT 2006-1 v. Sweda*, 2016 Mass. Super. LEXIS 281 (Mass. Super. Ct. Mar. 17, 2016); *NCSLT 2006-3 v. Matthew*, 2015 Mass. Super. LEXIS 1644 (Mass. Super. Ct. June 9, 2015); *NCSLT 2006-4 v. Laracy*, 2014 Mass. Super. LEXIS 504 (Mass. Super. Ct. Nov. 4, 2014).

72.     Defendants' record keeping failures, however, have impeded the Trusts' ability to collect from borrowers who have defaulted on their loans.

73.     To establish standing and obtain a judgment against a defaulted borrower, the Trusts, who were not the original lenders, must demonstrate their ownership of the loan.

74.     The transaction documents dealt with this as follows.  First, each deal included Pool Supplement agreements, whereby the originator of the loans (called the "Program Lender") "transfers, sells, sets over and assigns to The National Collegiate Funding LLC (the 'Depositor') ... each student loan set forth on the attached Schedule 1."  Each Schedule 1 states that the list of loans is "On file with FMC" (i.e., First Marblehead).

75.     Second, there are Deposit and Sale agreements, whereby the Depositor sold to the Trust the loans listed on Schedule 1 to the Pool Supplement agreements.

76.     Defendants, however, have failed to obtain and safeguard the Schedule 1 to each Pool Supplement agreement.  PHEAA has admitted that it does not possess and made no effort to obtain these documents.  In a document request in a related case, the Trusts requested that PHEAA produce "All Pool Supplement Agreements, including all related schedules" in PHEAA's possession, custody or

control.   PHEAA responded that PHEAA "is not aware of any responsive documents."

77.   The Defendants involved in pursuing defaulted loans, including without limitation U.S. Bank as Special Servicer, Turnstile and TSI, have failed to obtain the Schedule 1s and other documents needed to prove ownership of the loans.   Pursuant to § 5b of Exhibit A to the Special Subservicing Agreement, Turnstile is required to "instruct Servicers to provide original documents to" TSI, but it has failed to do so.   As Special Servicer, U.S. Bank has responsibility to take action regarding "the enforcement and collection of Delinquent Loans and Defaulted Loans to maximize the collection of amounts payable of the Student Loans," including without limitation retaining collection agencies and others to prosecute lawsuits against borrowers in default.   Special Servicing Agreement § 2. And U.S. Bank is required to monitor Turnstile's performance and replace Turnstile if Turnstile's performance is deficient, but U.S. Bank has failed to do so.

78.   As a result of the failure to obtain and safeguard the Schedule 1s to the Pool Supplement agreements and other documents relating to the Student Loands, it has become difficult if not impossible properly to foreclose on defaulted loans, including loans to borrowers in Delaware, New York and Massachusetts.

79.   In the course of its investigation, the CFPB found that TSI has filed at least 1,214 collection lawsuits against borrowers even though it lacked the

-32-

documentation necessary to prove that the Trusts owned the loans. In these lawsuits, the CFPB found, documentation of a complete chain of assignment evidencing that the subject loan was transferred to the Trusts was lacking. In at least 208 lawsuits, TSI lacked the promissory note to prove that a debt was owned. These deficiencies, which continue to the present to infect lawsuits brought by TSI, have crippled the Trusts' ability to prevail in attempting to collect on defaulted loans.

80.   For example, in *NCSLT 2006-1, 2007-4 v. Glynn*, 219-2015-CV-00209 (N.H. Super. Ct. 2015), the court dismissed efforts to collect on a defaulted loan, stating:

> The court determines that the evidence presented is insufficient to demonstrate that the plaintiff owns the debt. As noted above, the 2007 pool supplement assigned certain loans to NCF [National Collegiate Funding, LLC] – namely the loans listed on Schedule 1. However, NCSLT has failed to provide the court with a copy of Schedule 1. Without Schedule 1, the court cannot determine which loans Bank of America assigned to NCF. Thus, the court determines that NCSLT has failed to establish it owns Glynn's debt.

81.   In *Nat'l Collegiate Student Loan Trust 2007-4 v. Watson*, 2016 N.Y. Misc. LEXIS 5116 (N.Y. Civ. Ct. Bronx Co. Jan. 7, 2016), Jonathan Boyd, an employee of TSI, testified that "TSI is the designated custodian of records" for the plaintiff Trust and that the loan in question had been assigned to the Trust. The court dismissed the case, because of a failure "to establish the chain of title from the original lender" to the Trust. The court stated:

> Mr. Boyd's unsupported testimony that the defendants' loan was part of the assignment from The National Collegiate Funding LLC assigned to the Plaintiff is insufficient based upon the pool supplements listed in Schedule A.   Mr. Boyd did not provide any testimony that identified defendants' Charter One Continuing Education Loan as part of Schedule A of the Deposit and Sale Agreement.

*Id.* at *8.

82.     Similarly, the Ohio Court of Appeals overturned a judgment in favor of the Trusts because the Trusts

> neglected to include documentation to prove that it is entitled to demand judgment on the note.   Although the record contains reference to the pool agreement and an uncontested affidavit that [defendant borrower] is in default, NCSLT did not include specific documentation to directly link the pool of debts assigned to NCSLT from [the originating bank] to the debt [that the defendant has] incurred and had defaulted upon.

*NCSLT 2005-1 v. Owusu*, 2016 Ohio 259 (Ohio Ct. App., Butler Co., Jan. 25, 2016).

83.     A Louisiana court made a nearly identical ruling, reversing, based on the Trusts' document deficiencies, a lower court's grant of summary judgment in favor of the Trusts.  *NCSLT 2003-1 v. Thomas*, 129 So. 3d 1231 (La. App. 2d Cir. 2013).   Again, the court found that "[t]he Pooling Agreement offer[ed] no description of the loans being assigned by [the originating bank] . . . . As a result, genuine issues of material fact exist as to whether plaintiff is the rightful holder of that loan." *Id.* at *1234-35.

84.   And in *Nat'l Collegiate Student Loan Trust 2006-1 v. Werner*, No. 169/14 (N.Y. Sup. Ct. Putnam Co. Jan. 28, 2015), the court granted the defendant's motion to dismiss based on its statute of limitations defense and also because there was not "adequate proof of the existence of an assignment" of the loan to the Trust.

85.   While all of these and similar cases were brought in the name of the Trusts, the entities responsible for bringing or supervising the cases were one or more of the Defendants herein responsible for servicing and collecting defaulted loans, namely, U.S. Bank, Turnstile and TSI.  The Trusts did not authorize such suits and had (and have) no control over the conduct of such suits.

86.   As with other servicing deficiencies, the Owners sought information to understand the causes and potential solutions.  On April 26, 2016, on behalf of the Trusts an Issuer Order to be sent by the Owner Trustee to the Administrator seeking, *inter alia*, "[a] list of all Lawsuits [defined as those "described within Section 1(d)(i)(B) of the Administration Agreement"] initiated by or against the Trusts ... that have been resolved by judgment, settlement, compromise or other final disposition over the last three (3) years ...."

87.   The Administrator's letter response came three weeks later, and contained the following admission:

> With respect to your requests ... regarding certain collection litigation under Section 1(d)(i)(B) of the Administration Agreements, by definition, that section relates to 'non-ministerial' matters which the Administrator is under no obligation to take action upon, and

therefore you have requested information that the Administrator does not compile and cannot provide.

88.     The Administrator is correct insofar as the first part of §1(d)(i)(B) does address non-ministerial matters for which the Administrator has no obligation to take action: "Non-ministerial matters shall include, without limitation . . . (B) The initiation of any claim or lawsuit by the Issuer and the compromise of any action, claim or lawsuit brought by or against the Issuer ...." Incredibly, however, the Administrator ignored, both in its letter, and as a service provider, the other half of the provision which continues, "except for claims or lawsuits initiated in the ordinary course of business by the Issuer or their respective agents or nominees for the collection of the Student Loans owned by the Issuer...."

89.     As demonstrated by the numerous borrower lawsuits, such as those discussed above, where the Trusts have lost, U.S. Bank, Turnstile and TSI have behaved improperly regarding pursuing defaulted loans, including loans to borrowers in Delaware, New York and Massachusetts, and this wrongdoing continues to the present date. U.S. Bank and Turnstile are continuing to the present date to breach their obligations to monitor and supervise the collection efforts.

**F.    Defendants' Improper Collection Activities Thwart
          Collections on Defaulted Loans and Expose the Trusts to Liability**

90.    The failures by U.S. Bank, Turnstile and TSI to engage in proper servicing and collection activities, and the failures by U.S. Bank and Turnstile to fulfill their contractual obligations to monitor and supervise servicing and collection activities, have not only thwarted the ability of the Trusts to collect amounts due on defaulted loans, they have exposed the Trusts to claims by borrowers in Delaware, New York, Massachusetts and elsewhere, including class action lawsuits, as well as claims by the CFPB.

91.    In connection with collecting or attempting to collect debt from borrowers, between November 1, 2012 and April 25, 2016, Turnstile and TSI initiated at least 94,046 collections lawsuits in courts across the country.

92.    In support of the lawsuits, employees of Turnstile and TSI submitted affidavits and documents wherein the affiants swore that they had personal knowledge of the records evidencing the loans.  The CFPB has found that, in fact, in numerous instances the affiants lacked personal knowledge of the loan records.

93.    In many affidavits, the affiants stated that "I have reviewed the chain of title records as business records" regarding the relevant account.  The CFPB found that, in fact, the affiants lacked access to deposit and sale agreements, the last link in the chain of assignment transferring loans into the Trusts.  In numerous

instances, affiants did not review the chain of assignment records prior to executing the affidavits.

94.    In many affidavits, the affiants asserted that they had personal knowledge that the loans were transferred, sold, and assigned to the plaintiff Trusts on dates certain.  The CFPB found that, in fact, affiants lacked personal knowledge of the chain of assignment records necessary to prove that the relevant Trust owned the subject loan.

95.    On numerous occasions, to address a backlog of Affidavits, employees of Turnstile such as interns and mailroom clerks were instructed to execute Affidavits.

96.    On September 18, 2017, a Consent Order was entered in a CFPB administrative proceeding styled *In the Matter of Transworld Systems, Inc.*, No. 2017-CFPB-0018.  TSI stipulated to the entry of such Consent Order.  The Consent Order states that TSI hired law firms to pursue on behalf of the Trusts collections lawsuits regarding defaulted loans.  The Consent Order states that in such lawsuits, false affidavits executed by employees of TSI were submitted.  Such affidavits by TSI employees falsely stated that the affiants had reviewed the Trusts' chain of assignment documentation and that they had personal knowledge of the Trusts' records concerning the loans, although "a complete chain of assignment evidencing that the subject loan was transferred to and owned by the Trust was lacking" and

even though "the promissory note to prove that a Debt was owed did not exist." The Consent Order states that in these collection lawsuits the law firms hired by TSI "could not prove that a Debt was owed to the Trusts, if contested."

97.     By reason of the foregoing improper conduct by Turnstile and TSI, and the failures by Turnstile and U.S. Bank to discharge their contractual duties to supervise and monitor collection activities and lawsuits, numerous lawsuits brought on behalf of the Trusts to collect amounts due on defaulted loans have been dismissed.

98.     In addition, numerous lawsuits have been brought against the Trusts by borrowers because of alleged improper servicing/collection activities and the failures by Turnstile and U.S. Bank to discharge their contractual duties to supervise and monitor collection activities and lawsuits. For example, *Winne v. NCSLT 2005-1*, No. 16-cv-00229 (D. Me.), is a purported class action by borrowers who claim they are being unlawfully pursued for student loan debts that they do not owe. The complaint alleges claims under, *inter alia*, the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq*, and the Truth in Lending Act, 15 U.S.C. § 1631, *et. seq*. While the case asserts claims against the Trusts (as well as the Owners' agent, VCG), in fact all of the collection activities complained of were performed by, or were the responsibility of, various of the Defendants herein, including U.S. Bank as Special Servicer, Turnstile, and TSI.

99.   A similar case asserting claims against the Trusts due to wrongful conduct by TSI is *Eul v. Transworld Sys., Inc.*, No. 15-cv-7755 (N.D. Ill.).   The Trusts sustained damages because the settlement in that case, which was approved by the Court on May 1, 2018, provided, among other things, that the amounts owed by class members (i.e., obligors on the Student Loans) to the Trusts would be reduced and that plaintiffs' counsel would be paid their attorneys' fees and expenses by, on information and belief, the Trusts.   (The Trusts were not consulted concerning the litigation, which was handled and settled by TSI and attorneys hired by TSI.)

100.   Other such lawsuits against the Trusts include, without limitation, *Miller v. Transworld Systems Inc*., No. 18-cv-0748 (E.D.N.Y.); *Kennedy v. Transworld Sys., Inc.*, No. 16-cv-0033 (N.D. Ga.); *Carden v. NCSLT 2006-4*, No. 16-cv-692 (E.D. Pa.); *Sheld v. NCO Fin. Sys., Inc.*, No. 15-cv-1140 (D. Nev.); *Bartell v. NCSLT 2005-3*, No. 14-cv-4238 (N.D. Cal.); and *Muzac v. Wilmington Trust Co.*, No. BC 607214 (Cal. Super. Ct.).

101.   *Winslow v. Forster & Garbus, LLP*, 2017 U.S. Dist. LEXIS 205113 (E.D.N.Y. Dec. 13, 2017), illustrates some of the false statements that TSI and its agents have made concerning the Trusts in cases brought against borrowers that have put the Trusts in jeopardy.   Counsel retained by TSI filed in the name of NCSLT 2005-3 a case against a borrower in the New York Civil Court.   The

-40-

complaint in that case "falsely identifie[d] the Trust as the original creditor" on the loan. *Id.* at *28. Indeed, the court noted that the lawyers retained by TSI "have filed numerous complaints stating that [the Trusts] 'are the original creditor' and that the Trust 'is authorized to proceed with the action.'" *Id.* at *38. The court held that this "statement that the Trust was the original creditor is a false and misleading statement" and that "this false statement as to the Trust's status as the 'original creditor' is material as a matter of law." *Id.* at *29. The court held: "The statement as to the Trust's 'original creditor' status violates both the FDCPA and Section 349" of the N.Y. Gen. Bus. Law. *Id.* at *54.

102. In addition, as noted above, the CFPB conducted an investigation regarding whether the collections are being sought from persons who do not owe money to the Trusts, or who are being sued in situations where the documentation needed to establish liability is missing and/or false affidavits are being used in the collection proceedings. The CFPB filed a complaint against the Trusts over these activities. *See Consumer Financial Protection Bureau v. The National Collegiate Master Student Loan Trust, et al.*, No. 17-cv-1323 (D. Del.). In that proceeding, a Consent Judgment has been agreed to requiring the Trusts to pay millions of dollars and also imposing significant equitable relief against the Trusts. In addition, state regulators, including the Attorney General of the State of New York and the Attorneys General of at least 10 other states, are investigating these

activities, and Defendants' conduct has exposed the Trusts to sanctions from such regulators as well.

103.    The improper lawsuits being brought in the name of the Trusts have also caught the attention of state attorneys general.  For example, on February 27, 2018, the Minnesota Attorney General wrote to the Owners concerning a case that TSI had filed in the name of NCSLT 2007-4 against a borrower in Minnesota state court.    The Attorney General asked for, among other things, documentation reflecting the complete chain of assignment from the loan originator to the Trust, and demanded that all collection activities cease until full and complete verification and documentation of the debt is provided to the borrower.  As the Owners do not have any such documentation nor any ability (without judicial assistance) to stop TSI and its agents from pursuing their improper collection activities, they have been unable to comply.

104.  Because of Defendants' improper servicing and collection activities, the Trusts have been barred from doing business in several states.

### G.      The Partial Audit of PHEAA

105.    After PHEAA continuously failed to cooperate with the Trusts by providing certain information and was in default of various reporting obligations to the Trusts under the MSA, the Trusts invoked the Emergency Audit provision of the MSA, Section 7.10.

106.   The Trusts retained Boston Portfolio Advisors ("BPA") to conduct the Emergency Audit.  The Emergency Audit commenced on September 11, 2015 and continued for less than two days before PHEAA abruptly and without justification terminated it.

107.   Despite PHEAA's failure to cooperate with the Emergency Audit (although it did provide certain additional information for off-site review), the preliminary results of the Emergency Audit show pervasive and material breaches of the servicing requirements of the Governing Documents.

### H.   GSS and U.S. Bank Prevent the Trusts' Servicer, Auditor and Lawyers From Being Paid

108.   After years of fighting for transparency, eventually obtaining information in piecemeal, and all the while suffering massive damages, the Trusts then faced GSS's and U.S. Bank's tandem gamesmanship with respect to payments.  U.S. Bank and GSS worked together to refuse to pay a key servicer hired by the Trusts and the auditor retained by the Trusts to conduct the audits of PHEAA.

### 1.   Failure to Pay the Trusts' Servicer (Odyssey)

109.   To improve the performance of the Loans, the Owners exercised their right to appoint a Servicer to the Trusts.  The Trusts chose Odyssey.  In appointing Odyssey, the Trusts had the objective of improving the poor performance of the deals by, among other things: (1) determining which Loans have a market value

that is lower than the amount of fees that are being paid to service them, and disposing of them in accordance with the Indenture (by doing this, the Trusts benefit by not having to pay Administrator, Indenture Trustee and Servicer Fees on Loans that have no chance of recovery, thus increasing the amount of money available to pay Noteholders); and (2) improving the performance of any Loans that defaulted after the Odyssey engagement by instructing the Servicer, PHEAA, to direct "newly defaulted loans" to Odyssey.

110. The Trusts' engagement of Odyssey was done in strict adherence to the exclusive rights of the Issuer to hire Servicers under the Governing Documents. On December 30, 2014, pursuant to § 2.03 of each of the Trust Agreements and § 3.07(b) of each of the Indentures, the Issuers of six of the trusts caused the Owner Trustee to engage Odyssey as a "Servicer," as defined in the Indentures, to perform certain services for the Trusts. A "Servicing Agreement" was executed by and between Odyssey as a Servicer for the Trusts and Wilmington Trust Company as the Owner Trustee for each of the trusts. Pursuant thereto, in consideration of the services provided, Odyssey is entitled to payment by the Trusts.

111. Odyssey provided such services, and the Trusts each owe Odyssey for those services. Odyssey rendered the corresponding bills, which, pursuant to the Administration Agreement, were duly provided to the Administrator, with the

-44-

direction that it forward same to the Indenture Trustee, U.S. Bank, so that it will make payment to Odyssey.

112.   Pursuant to Section 1(a)(i)(G) of the Administration Agreement, the Administrator was obligated to follow that direction.   Under that provision, the Administrator "shall take all appropriate action that is the duty of the Issuer to take pursuant to the Trust Related Agreements including, without limitation, ... [p]roviding instructions to the Indenture Trustee as required by Section 8.02(d) of the Indenture." Section 802(d)(1) of the Indentures provides that the Administrator "shall instruct the Indenture Trustee" to make distributions to pay "Servicing Fees," and further, that "the Indenture Trustee shall comply with such instruction." Thus, under the Administration Agreement, it is the Administrator's duty to instruct the Indenture Trustee to pay the Servicer at the direction of the Issuer.   The Administrator cannot demand further approval or seek further details of the services rendered.  If the Administrator has a question or needs guidance in this regard, it is to seek direction from the Owner Trustee, not the Indenture Trustee.

113.   Notwithstanding the foregoing, the Administrator objected to the bills and took the position that it would not forward the bills to the Indenture Trustee unless extensive information concerning Odyssey was provided.

114.   The Owner Trustee thereupon issued an Issuer Order on behalf of the Trusts on January 20, 2016 directing the Administrator to prepare and transmit all

of the documents necessary to cause the Indenture Trustee to pay the Odyssey bills. The Administrator did so, but when it transmitted the bills to the Indenture Trustee the Administrator stated that it had concerns about whether Odyssey was properly appointed a servicer.

115. While under the Indenture, the Indenture Trustee is obligated to pay bills sent to it by the Administrator, the Indenture Trustee has failed and refused to pay Odyssey's bills.

116. Instead, the Indenture Trustee filed a petition in a Minnesota state court purporting to seek instructions as to whether Odyssey was properly appointed and whether its invoices should be paid.

117. On April 25, 2018, Magistrate Judge Fallon filed a Report and Recommendation that the Odyssey invoices should be paid. *See In re NCSLT 2003-1*, 2018 U.S. Dist. LEXIS 75802 (D. Del. Apr. 25, 2018). Odyssey still has not been paid.

### 2.   **Failure to Pay the Trusts' Auditor**

118. As discussed earlier, the Trusts hired BPA to conduct an emergency audit of PHEAA. The Trusts were authorized to do so by § 9.03(b) of the Trust Agreements, which permits the Owner Trustee to consult with counsel, accountants and other skilled persons.

119. Concomitantly, the Owner Trustee is entitled to reimbursement. Section 10.01 of the Trust Agreements provides, among other things, that the Owner Trustee "shall be entitled to be reimbursed by the Administrator," and, to the extent not paid by the Administrator, from the Trust Property, for "the reasonable compensation, expenses and disbursements of such agents, representatives, experts and counsel as the Owner Trustee may employ in connection with the exercise and performance of its rights and duties" under the Trust Agreements and the Trust Related Agreements [as defined therein]."

120. Section 1(a)(i)(C) of the Administration Agreement states that the Administrator will pay the Owner Trustee its fees and expenses as are set forth in Section 10.01 of the Trust Agreements. Further, under Section 8.02(d)(l)(i) of the Indentures for the Trusts, the Administrator shall instruct the Indenture Trustee to make distributions from the Trusts' Collection Accounts for the payment of the fees and expenses of the Owner Trustee.

121. On July 20, 2016, the Owner Trustee issued an Issuer Order on behalf of the Trusts directing the Administrator to prepare and transmit all of the documents necessary to cause the Indenture Trustee to pay the BPA bills.

122. On August 9, 2016, the Administrator, working hand-in-glove with PHEAA in trying to intimidate BPA, sent an email to the Owner Trustee stating that the Administrator "is not comfortable instructing the Indenture Trustee to pay"

-47-

BPA's invoices relating to its work on the Emergency Audit.  The Administrator confirmed this refusal in an August 24, 2016 letter.

123.   This refusal constitutes a violation of the Administration Agreement, pursuant to which the Administrator does not have the discretion to disobey an Issuer Order and refuse to send the auditor's bills to U.S. Bank.

### 3.   Failure to Pay the Trusts' Lawyers

124.   Under the Governing Documents, the procedure for the Trusts' lawyers to be paid is straightforward.  The Owner Trustee sends the bills to the Administrator, who in turn sends bills to the Indenture Trustee for payment.  Upon receipt of the bills, the Indenture Trustee is supposed to pay them on a monthly basis.  The Governing Documents do not give the Administrator discretion to pick and choose which bills it will send, nor do the Governing Documents give the Indenture Trustee discretion as to which bills sent to it by the Administrator it will pay.  *See* Indenture § 8.02(d).

125.   For some period of time, the process worked as intended, i.e., the Owner Trustee sent the bills to the Administrator, the Administrator sent the bills to the Indenture Trustee, and the bills were paid.  However, the process came to a halt in the fall of 2016, when the Administrator and the Indenture Trustee began working in tandem to refuse to pay the Trusts' lawyers and thereby stifle attempts by the Trusts to rectify the servicing failures.  First, the Administrator and the

Indenture Trustee questioned the validity of transactions whereby NC Owners and Pathmark obtained interests in the beneficial ownership of the Trusts, and therefore whether their directions to the Owner Trustee concerning the payment of legal bills (and other matters) are valid. Pending their satisfaction on this alleged issue, the Administrator refused to send bills to the Indenture Trustee, and the Indenture Trustee refused to pay bills it has received.

126. There is no merit to the alleged concern regarding the ownership status of NC Owners and Pathmark. The transfers of beneficial interests to them complied with all applicable rules and provisions of the Governing Documents, and the expressed concerns by U.S. Bank and GSS were merely ploys designed to prevent the Trusts from pursuing its claims against Defendants. The validity of the transactions involving the transfer of the ownership interests was upheld by Vice Chancellor Slights. *See* Order in *The Nat'l Collegiate Student Loan Master Trust I v. PHEAA*, No. 12111-VCS (Del. Ch. Nov. 17, 2017).

127. But the resolution of the ownership issue did not cause the Administrator to resume processing the bills from the Trusts' lawyers. Instead, the Administrator invented other reasons to refuse to process the bills from the Trusts' lawyers. The Administrator has taken the position that it will not process bills unless the Owner Trustee sends an issuer order directing the Administrator to do so and making various representations concerning the bills. Nothing in the

-49-

Administration Agreements, the Trust Agreements, or any other relevant agreement contains any such requirement.

128.   In addition, the Administrator and the Indenture Trustee have taken the position that the Trusts' lawyers are not entitled to be paid from the Trusts' assets.   This is inconsistent with the fact that up until the fall of 2016, the Administrator did process for payment the bills of the Trusts' lawyers, and the Indenture Trustee paid them out of Trust assets.   It is also inconsistent with the Trust Agreements, the Administration Agreements, and the Indentures.

129.   As set forth above, by retention letter dated October 12, 2015, the Owner Trustee retained Chaitman LLP as Special Counsel to the Owner Trustee. That engagement letter authorized Chaitman to retain other counsel as needed, and Chaitman has done so.   Section 9.03(b) of the Trust Agreements permits the Owner Trustee to consult with counsel in the exercise or administration of the Trusts. Section 10.01 of the Trust Agreements provides that the Owner Trustee shall be entitled to be reimbursed by the Administrator, and, to the extent not paid by the Administrator, from the Trust property for the reasonable compensation, expenses and disbursements of such agents and counsel as the Owner Trustee may employ in connection with the exercise and performance of its rights and duties under the Trust Agreements. Section 1(a)(i)(C) of the Administration Agreements states that the Administrator will pay the Owner Trustee its fees and expenses as are set forth

in Section 10.01 of the Trust Agreements. Further, under Section 8.02(d)(1)(i) of the Indentures, the Administrator shall instruct the Indenture Trustee to make distributions from the Trusts' Collection Accounts for the payment of the fees and expenses of the Owner Trustee.

130. In June 2016, on behalf of the Trusts, the Owner Trustee sent an Issuer Order to the Administrator, certifying that the bills submitted by Chaitman and the law firms retained by Chaitman were incurred in the Owner Trustee's capacity as Owner Trustee pursuant to Sections 9.03(b) and 10.01 of the Trust Agreements and are payable under Section 8.02(d)(1)(i) of the Indentures.

131. The bills submitted by Chaitman and the law firms retained by Chaitman are Owner Trustee expenses and the Administrator and the Indenture Trustee have no valid reason for refusing to process them for payment. Nevertheless, the Administrator has persisted in refusing to process for payment bills from the Trusts' lawyers, including lawyers located in Delaware.

132. The Administrator's refusal to process bills from lawyers hired by the Trusts stands in stark contrast with the Administrator's conduct with respect to lawyers hired by the Administrator or by TSI to represent the Trusts. The Administrator and/or TSI have hired law firms to represent the Trusts in lawsuits brought by borrowers against the Trusts, such as those discussed above. The

Administrator has not objected to the payment of invoices submitted by such lawyers.

133.   The Administrator's willingness to process such lawyers bills is particularly noteworthy because neither the Administrator nor TSI even has the right to hire lawyers to represent the Trusts.  Section 1(d)(ii) of the Administration Agreements provides that the Administrator shall not "take any action that the Issuer directs the Administrator not to take on its behalf."  As discussed above, on October 1, 2015, on behalf of the Trusts the Owner Trustee sent an Issuer Order to the Administrator directing the Administrator to cease performing any non-ministerial duties on behalf of the Trusts.  Hiring counsel to defend the Trusts is clearly a non-ministerial duty, and therefore the Administrator lacks the right to hire such counsel, but the Administrator has wrongfully disobeyed this instruction.

134.   TSI also lacks the right to hire counsel to defend the Trusts.  TSI was hired by the Special Servicer, U.S. Bank, and therefore TSI's rights cannot exceed those of the Special Servicer.  The Special Servicing Agreement does not give the Special Servicer the right to hire counsel to defend the Trusts, and therefore TSI does not possess that right either.

135.   But while refusing to process payment to the lawyers properly hired by the Trusts, the Administrator has continued to process payment for the lawyers improperly hired by the Administrator or TSI to represent the Trusts.

136.   In addition, Defendants have continued improperly to pay out of Trust assets their own lawyers' fees.  The Owners directed GSS to cease processing such bills for payment, but GSS ignored such directions.  As noted above, Section 1(d)(ii) of the Administration Agreements provides that the Administrator shall not "take any action that the Issuer directs the Administrator not to take on its behalf." On December 8, 2017, the Owners, acting on behalf of the Trusts, directed GSS to cease authorizing payments to all counsel other than counsel hired by the Trusts and counsel engaged to bring lawsuits on behalf of the Trusts in the ordinary course of the Trusts' business.  GSS was further directed to furnish the Owners with records of all payments from Trust assets to lawyers or law firms since November 22, 2015.  GSS has refused to comply with these requests and, on information and belief, continues to process such bills for payment, and U.S. Bank as Indenture Trustee continues to pay such bills from lawyers for GSS, U.S. Bank, Turnstile and TSI, including lawyers located in Delaware, out of Trust assets.

## COUNT I
### (Breach of Contract against GSS)

137.   Plaintiffs incorporate by reference, as if set forth fully herein, the averments in paragraphs 1 through 136 above.

138.   The Administration Agreement constitutes a valid and binding agreement enforceable against GSS by Plaintiffs.

139. GSS had contractual obligations to provide specified services under the Administration Agreement.

140. GSS had an additional obligation to fully carry out each and every action necessary to fulfill the Administration Agreement under the covenant of good faith and fair dealing implied in every contract.

141. Because of GSS's acts and omissions described above, GSS breached its contractual obligations to Plaintiffs, as well as the implied covenant of good faith and fair dealing.

142. Plaintiffs request an award of specific performance requiring GSS to comply with the Administration Agreement in all material respects, including without limitation:

      a.    requiring GSS to comply with all Issuer Orders directed to GSS by the Owner Trustee or the Owners;

      b.    requiring GSS to provide to the Owners the information that the Trusts have requested with respect to defaulted loans;

      c.    requiring GSS to revoke its direction to PHEAA to send defaulted Student Loans and other Loan-related information to NCO;

      d.    requiring GSS to obtain and provide to the Trusts information regarding lawsuits involving borrowers brought by or against the Trusts;

      e.    requiring GSS to send to U.S. Bank BPA's invoices with instructions to pay same;

      f.    requiring GSS to send to U.S. Bank invoices from the Trusts' lawyers with instructions to pay same;

-54-

g.  requiring GSS to cease attempting to block the Trusts' retention of Odyssey as a servicer;

h.  requiring GSS to cease processing for payment out of Trust assets bills submitted by lawyers for GSS, U.S. Bank, Turnstile and TSI.

143.  In addition, as a direct, proximate result of GSS's breaches, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

144.  Plaintiffs have no adequate remedy at law.

## COUNT II
### (Tortious Interference with Contract against GSS)

145.  Plaintiffs incorporate by reference, as if set forth fully herein, the averments in paragraphs 1 through 144 above.

146.  The Governing Documents constitute valid and binding agreements enforceable against PHEAA by Plaintiffs.

147.  As Administrator for the Trusts, GSS has at all relevant times known that the Governing Documents constitute valid and binding agreements enforceable against PHEAA by Plaintiffs.

148.  As set forth above, GSS has caused PHEAA to violate its obligations under the MSA and other Governing Documents by, among other things, in bad faith instructing PHEAA to send defaulted Student Loans and other information to NCO.

-55-

149.   GSS has no justification for causing PHEAA to breach the MSA and other Governing Documents by, among other things, in bad faith instructing PHEAA to send defaulted Student Loans and other information to NCO.

150.   As a direct, proximate result of GSS's conduct interfering with PHEAA's performance of its agreements, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

## COUNT III
## (Breach of Contract against U.S. Bank)

151.   Plaintiffs incorporate by reference, as if set forth fully herein, the averments in paragraphs 1 through 150 above.

152.   The Indenture and the Special Servicing Agreement constitute valid and binding agreements enforceable against U.S. Bank by Plaintiffs.

153.   U.S. Bank had contractual obligations to provide specified services under the Indenture and the Special Servicing Agreement.

154.   U.S. Bank had an additional obligation to fully carry out each and every action necessary to fulfill the Indenture and the Special Servicing Agreement under the covenant of good faith and fair dealing implied in every contract.

155.   The Special Servicing Agreement provides that the Special Servicer, at its discretion shall, *inter alia*, provide "oversight of the activities of Subservicer with regard to account management, litigation assistance, and/or settlement strategies." It further provides the Special Servicer shall, in its sole judgment,

-56-

replace any subservicer who is "deemed to be deficient or negligent in performing the duties outlined in its subservicing agreement with the Special Servicer." U.S. Bank breached the covenant of good faith and fair dealing by failing to exercise any discretion or any judgment whatsoever regarding the activities of the subservicers. There is a gap in the Special Servicing Agreement that may be filled by the covenant of good faith and fair dealing. By leaving these matters to the Special Servicer's discretion and judgment, the Special Servicing Agreement assumed that the Special Servicer would, in fact, exercise such discretion and judgment in good faith. If the parties had thought about the matter, they would have negotiated a provision requiring the Special Servicer to exercise its discretion and judgment in good faith regarding the actions of the subservicers.

156. Because of U.S. Bank's acts and omissions described above, U.S. Bank breached its contractual obligations to Plaintiffs, as well as the implied covenant of good faith and fair dealing.

157. Plaintiffs request an award of specific performance requiring U.S. Bank to comply with the Indenture and the Special Servicing Agreement in all material respects, including without limitation:

a.     requiring U.S. Bank as Indenture Trustee to pay invoices for services rendered by Odyssey;

b.     requiring U.S. Bank as Indenture Trustee to pay invoices for legal services rendered by lawyers representing the Trusts;

c.    requiring U.S. Bank as Indenture Trustee to pay invoices for services rendered by BPA;

d.    requiring U.S. Bank as Indenture Trustee to cease making payments out of Trust assets to lawyers for U.S. Bank, GSS, Turnstile and TSI;

e.    requiring U.S. Bank as Special Servicer to provide to the Owners the information that the Trusts have requested with respect to defaulted loans;

f.    requiring U.S. Bank as Special Servicer to perform its supervisory duties over the activities of Turnstile and TSI.

158.  In addition, as a direct, proximate result of U.S. Bank's breaches, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

159.  Plaintiffs have no adequate remedy at law.

## COUNT IV
### (Breach of Duty of Care and to Avoid Conflicts of Interest against U.S. Bank)

160.  Plaintiffs incorporate by reference, as if set forth fully herein, the averments in paragraphs 1 through 159 above.

161.  As Indenture Trustee, U.S. Bank owes Plaintiffs a duty of due care and a duty to avoid conflicts of interests.

162.  Because of U.S. Bank's acts and omissions described above, U.S. Bank breached its obligation of duty care.

163.  In addition, by serving both as Indenture Trustee and as Special Servicer, U.S. Bank has a conflict of interest that has caused it to thwart the Trusts' efforts to take appropriate action in response to the wrongdoing by the Special

Servicer and those entities that it has hired and is supposed to supervise with respect to servicing and collection activities regarding loans in default.

164.   Because of U.S. Bank's failure to exercise due care and its conflicts of interest, U.S. Bank is liable in tort to Plaintiffs.

165.   Plaintiffs request an injunction:

    a.    requiring U.S. Bank as Indenture Trustee to pay invoices for services rendered by Odyssey;

    b.    requiring U.S. Bank as Indenture Trustee to pay invoices for legal services rendered by lawyers representing the Trusts;

    c.    requiring U.S. Bank as Indenture Trustee to pay invoices for services rendered by BPA;

166.   In addition, as a direct, proximate result of U.S. Bank's tortious conduct, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

167.   Plaintiffs have no adequate remedy at law.

**COUNT V**
**(Breach of Contract against U.S. Bank)**
**(Alternative Count)**

168.   Plaintiffs incorporate by reference, as if set forth fully herein, the averments in paragraphs 1 through 167 above.

169.   This Count is pleaded in the alternative in the event that it is determined that by reason of the Granting Clause in the Indenture, the Trusts lack

standing to assert some or all of the claims pleaded herein and that the right and obligation to assert such claims belongs exclusively to the Indenture Trustee.

170. The Indenture constitutes a valid and binding agreement enforceable against U.S. Bank by Plaintiffs.

171. U.S. Bank had contractual obligations to provide specified services under the Indenture.

172. U.S. Bank had an additional obligation to fully carry out each and every action necessary to fulfill the Indenture under the covenant of good faith and fair dealing implied in every contract.

173. U.S. Bank and GSS have asserted that pursuant to the Granting Clause in the Indenture, the Trusts assigned to U.S. Bank all of the Trusts' rights and obligations to assert claims concerning the matters pleaded herein.

174. U.S. Bank has failed to sue Turnstile for breach of the Special Subservicing Agreement. U.S. Bank has failed to sue GSS for breach of the Administration Agreement. U.S. Bank has failed to sue itself as Indenture Trustee for breach of the Indenture. U.S. Bank has failed to sue itself as Special Servicer for breach of the Special Servicing Agreement. U.S. Bank has failed to sue TSI for injurious falsehood. And U.S. Bank has failed to request the Trusts, pursuant to Section 5.16 of the Indentures, to take such action.

175.  In the event it is determined that U.S. Bank and GSS are correct as to the application of the Granting Clause, then by failing to sue GSS, Turnstile, TSI and U.S. Bank for the wrongdoing described herein, U.S. Bank has breached its contractual obligations under the Indenture.

176.  Because of U.S. Bank's acts and omissions described above, U.S. Bank breached its contractual obligations to Plaintiffs, as well as the implied covenant of good faith and fair dealing.

177.  Plaintiffs request an award of specific performance requiring U.S. Bank to comply with the Indenture in all material respects, including by filing suit against Turnstile, GSS, U.S. Bank and TSI on account of the wrongdoing described herein.

178.  In addition, as a direct, proximate result of U.S. Bank's breaches, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

179.  Plaintiffs have no adequate remedy at law.

### COUNT VI
### (Breach of Contract against Turnstile)

180.  Plaintiffs incorporate by reference, as if set forth fully herein, the averments in paragraphs 1 through 179 above.

181.  The Special Subservicing Agreement constitutes a valid and binding agreement enforceable against Turnstile by Plaintiffs.

182.   Because, among other things, the purpose of the Special Subservicing Agreement was to monitor and supervise the performance by TSI and thereby to recover for the Trusts monies owed to the Trusts with respect to Student Loans, and the Special Subservicing Agreement represents an outsourcing of obligations owed by U.S. Bank to the Trusts pursuant to the Special Servicing Agreement, the Trusts are intended third-party beneficiaries of the Special Subservicing Agreement.

183.   Turnstile had contractual obligations to provide specified services under the Special Subservicing Agreement.

184.   Turnstile had an additional obligation to fully carry out each and every action necessary to fulfill the Special Subservicing Agreement under the covenant of good faith and fair dealing implied in every contract.

185.   Because of Turnstile's acts and omissions described above, Turnstile breached its contractual obligations to Plaintiffs, as well as the implied covenant of good faith and fair dealing.

186.   Plaintiffs request an award of specific performance requiring Turnstile to comply with the Special Subservicing Agreement in all material respects.

187.   In addition, as a direct, proximate result of Turnstile's breaches, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

188.   Plaintiffs have no adequate remedy at law.

## COUNT VII
### (Injurious Falsehood against TSI)

189.  Plaintiffs incorporate by reference, as if set forth fully herein, the averments in paragraphs 1 through 188 above.

190.  TSI has caused to be filed, and continues to cause to be filed, in the name of the Trusts lawsuits against borrowers in default.

191.  In such lawsuits, TSI has knowingly and/or recklessly made false and misleading statements concerning the Trusts and their standing to foreclose on the loans.  In particular, TSI has falsely expressly or impliedly represented that the Trusts are legally entitled to foreclose on the loans and that the Trusts possess all of the notes, assignments and other documents needed to prove standing to foreclose on the loans.  TSI has also falsely represented that the Trusts are the original creditors on the loans.

192.  By reason of such false statements concerning the Trusts and by bringing lawsuits in the name of the Trusts in situations where the Trusts are not legally entitled to foreclose on the loans and where the Trusts do not possess notes, assignments and other documents needed to demonstrate standing to foreclose on loans, TSI has exposed the Trusts to lawsuits from borrowers.

193.  Because of TSI's acts, misrepresentations and omissions described above, TSI is liable to Plaintiffs for the tort of injurious falsehood.

-63-

194.  Plaintiffs request an injunction requiring TSI to cease filing lawsuits in the name of the Trusts without having proof that the Trusts are legally entitled to foreclose on the loans and possess notes, assignments and other documents needed to demonstrate standing to foreclose on loans.

195.  In addition, as a direct, proximate result of TSI's tortious conduct, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

196.  Plaintiffs have no adequate remedy at law.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

a) Granting Plaintiffs injunctive relief in the form of an order of specific performance;

b) Enjoining Defendants from bringing or authorizing lawsuits against borrowers until and unless Defendants can demonstrate that the Trusts possess all of the documentation necessary to prove that the Trusts are entitled to collect on the borrowers' loans;

c) Enjoining Defendants from paying into the Collection Account monies received from borrowers unless Defendants can demonstrate that the Trusts possess all of the documentation necessary to prove that the Trusts are entitled to collect on the borrowers' loans;

d) Awarding Plaintiffs damages in an amount to be determined at trial;

e) Requiring each Defendant to refund to the Trusts all attorneys' fees that they have charged to the Trusts;

f) Awarding Plaintiffs their costs and attorneys' fees incurred in litigating this action;

g) Awarding Plaintiffs prejudgment and post-judgment interest; and

h) Awarding Plaintiffs such other and further relief as this Court may deem just and equitable.

Dated:  June 15, 2018                                     Respectfully submitted,

                                                         **GRANT & EISENHOFER P.A.**

                                                         By ___*/s/ James J. Sabella*____
                                                         James J. Sabella (#5124)
                                                         Michael T. Manuel (#6055)
                                                         123 Justison Street
                                                         Wilmington, DE 19801
                                                         302-622-7000

                                                         *Attorneys for Plaintiffs*

-65-

# EXHIBIT B
# TO COMPLAINT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU<br><br>       Plaintiff,<br><br>       v.<br><br>THE NATIONAL COLLEGIATE MASTER STUDENT LOAN TRUST; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2003-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-3; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-3; and NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4, Delaware Statutory Trusts,<br><br>       Defendants. | Case No. _____<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER RELIEF** |

## INTRODUCTION

1.      Plaintiff, the Consumer Financial Protection Bureau ("Bureau"), brings

this action against the fifteen (15) National Collegiate Student Loan Trusts ("Defendants," or "NCSLTs", or "the Trusts") under sections 1031(a), 1036(a), and 1054(a) of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531, 5536(a), 5564(a), to obtain permanent injunctive relief, restitution, refunds, disgorgement, damages, civil money penalties, and other appropriate relief for Defendants' violations of Federal consumer financial law in connection with Defendants' servicing and collection of private student loan debt.

2.     The Bureau has reviewed the debt collection and litigation practices of the fifteen (15) Delaware statutory trusts referred to as the National Collegiate Student Loan Trusts, which are the National Collegiate Master Student Loan Trust, NCSLT 2003-1, NCSLT 2004-1, NCSLT 2004-2, NCSLT 2005-1, NCSLT 2005-2, NCSLT 2005-3, NCSLT 2006-1, NCSLT 2006-2, NCSLT 2006-3, NCSLT 2006-4, NCSLT 2007-1, NCSLT 2007-2, NCSLT 2007-3, and NCSLT 2007-4), as performed by Defendants' Servicers and Subservicers (as defined below) pursuant to the various servicing agreements between Defendants and each such Servicer or agreements between a Servicer and a Subservicer.

3.     To collect on defaulted private student loans, Defendants' Servicers filed collections lawsuits on behalf of Defendants in state courts across the country. In support of these lawsuits, Subservicers on behalf of Defendants executed and filed affidavits that falsely claimed personal knowledge of the account records and the consumer's debt and, in many cases, personal knowledge of the chain of assignments establishing ownership of the loans. In addition, Defendants' Servicers on behalf of Defendants filed at least 2,000 collections lawsuits without the documentation necessary to prove Trust ownership of the loans or on debt that was time-barred. Finally, notaries for Defendants' Servicers notarized more than 25,000 affidavits even

though they did not witness the affiants' signatures.

## JURISDICTION AND VENUE

4.      The Court has subject-matter jurisdiction over this action because it is
brought under Federal consumer financial law, 12 U.S.C. § 5565(a)(1), presents a federal
question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C.
§ 1345.

5.      Venue is proper in this District because Defendants are located and do
business in this District. 12 U.S.C. § 5564(f).

## PLAINTIFF

6.      The Bureau is an independent agency of the United States charged with
regulating the offering and provision of consumer financial products or services under
Federal consumer financial laws. 12 U.S.C. § 5491(a). The Bureau has independent
litigating authority to enforce Federal consumer financial laws, including the CFPA. 12
U.S.C. §§ 5531(a), 5564(a)−(b).

## DEFENDANTS

7.      Defendants are any and all of the fifteen (15) Delaware statutory trusts
referred to as the National Collegiate Student Loan Trusts ("NCSLTs" or "the Trusts,"
which are the National Collegiate Master Student Loan Trust, NCSLT 2003-1, NCSLT
2004-1, NCSLT 2004-2, NCSLT 2005-1, NCSLT 2005-2, NCSLT 2005-3, NCSLT 2006-
1, NCSLT 2006-2, NCSLT 2006-3, NCSLT 2006-4, NCSLT 2007-1, NCSLT 2007-2,
NCSLT 2007-3, and NCSLT 2007-4) and their successors and assigns.

8.      Defendants are "covered person[s]" under 12 U.S.C. § 5481(6) because
they engaged in "servicing loans, including acquiring, purchasing selling [or] brokering"
and in the collection of debt. 12 U.S.C. § 5481(15)(A)(i), (x).

## DEFENDANTS' UNLAWFUL ACTS OR PRACTICES

9.     The NCSLTs comprise fifteen (15) Delaware statutory trusts created between 2001 and 2007.

10.     The basic purpose of each Trust is to acquire a pool of private student loans, execute the indentures and issue notes secured by the pools of student loans, enter into the so-called trust-related agreements, and provide for the administration of the Trusts and the servicing and collection of student loans.

11.     Each Trust is an Owner-directed Delaware statutory trust formed under the laws of Delaware.

12.     Defendants do not have employees, and all actions relating to the administration of the Trusts, servicing of the student loans, and collecting debt are carried out by Defendants' Servicers.

13.     Defendants' Servicers are any Servicer, Primary Servicer, Subservicer, Special Servicer, Administrator, and any other individual or entity acting on behalf of the Trusts with respect to the servicing and collection of the student loans owned by the Trusts, whether retained directly by Defendants or retained by an individual or entity acting on behalf of Defendants.

14.     Each Servicer is a "covered person" under 12 U.S.C. § 5481(6) because it engaged in "servicing loans, including acquiring, purchasing, selling, [or] brokering" and in "collecting debt." 12 U.S.C. § 5481(15)(A)(i), (x).

15.     Each Servicer acted as an agent of the Trusts.

16.     Since November 1, 2014, Defendants' Subservicer has been Transworld Systems, Inc.

17.     The Trusts hold more than 800,000 private student loans sold by originating lenders to the Trusts.

18.     Debt-collection activities on behalf of Defendants are carried out by Defendants' Servicers, including the Special Servicer and the Subservicers.

19.     Defendants' Servicers and other entities executed, notarized, and filed deceptive affidavits on behalf of Defendants.

20.     Defendants' Servicers and other entities, on behalf of Defendants, filed collections lawsuits lacking documentation needed to prove ownership of the loans.

21.     In 2009, Defendants entered into a special servicing agreement with the Special Servicer in order to provide for the servicing, collection, and litigation of delinquent and defaulted loans.  This agreement required the Special Servicer to hire Subservicers and enter into and adhere to the Default Prevention and Collection Services Agreement of March 1, 2009, as amended.

22.     In 2012, upon the resignation of the Special Servicer and pursuant to the terms of the special servicing agreement, the Back-Up Special Servicer assumed the role of Special Servicer.

23.     In 2012, the Special Servicer amended the Default Prevention and Collection Services Agreement of March 1, 2009 in order to expand the role of the Subservicer to Defendants with respect to the collection and enforcement of the student loans owned by Defendants.

## FALSE AND MISLEADING AFFIDAVITS AND TESTIMONY

24.     In connection with collecting or attempting to collect debt from consumers, between November 1, 2012 and April 25, 2016, Subservicers, acting through

Defendants' Special Servicer and acting on behalf of Defendants, initiated 94,046 collections lawsuits in courts across the country.

25.     In support of the collections lawsuits, Subservicers acting on behalf of Defendants submitted affidavits and documents in support of Defendants' claims that consumers owed debts to Defendants.

26.     Affiants on behalf of Defendants executed, notarized, and caused to be filed affidavits—often attaching exhibits—in Defendants' collections lawsuits.

27.     In these affidavits, the affiants swore that they had personal knowledge of the education loan records evidencing the debt.

28.     In fact, in numerous instances, affiants lacked personal knowledge of the education loan records evidencing the debt when they executed the affidavits.

29.     The affiants also swore in the affidavits that they were authorized and competent to testify about the consumers' debts through review of and "personal knowledge" of the business records, including electronic data, in their possession.

30.     In fact, in numerous instances, affiants lacked personal knowledge of the business records, including the electronic data, showing that consumers owed debts to the Defendants.

31.     Affiants were instructed to review data on a computer screen to verify information in the affidavits about the debts. Affiants, however, did not know the source of the data on that screen, how the data was obtained or maintained, whether it was accurate, or whether those data meant that the debt was in fact owed to Defendants.

32.     Each affiant also swore that he or she had "personal knowledge of the record management practices and procedures of Plaintiff [the Trust] and the practices and procedures Plaintiff requires of its loan servicers and other agents."

33.   In fact, affiants lacked personal knowledge of the record management practices and procedures of Defendants and the practices and procedures of Defendants' agents.

34.   In many affidavits, the affiants also swore, "I have reviewed the chain of title records as business records" regarding the relevant account.

35.   In fact, in numerous instances, affiants did not review the chain of assignment records prior to executing the affidavits. In some cases, affiants reviewed only "chain of title" records that had been found online. In fact, at least one of Defendants' Servicers instructed affiants that they did not need to review the chain of assignment records before executing affidavits that represented that the affiant had reviewed those records.

36.   In fact, affiants did not have access to deposit and sale agreements—the last link in the chain of assignment transferring loans into the Trust—until May 30, 2014.

37.   In many affidavits, the affiants asserted that they had personal knowledge that the loans were transferred, sold, and assigned to the Trusts on dates certain.

38.   In fact, affiants lacked personal knowledge of the chain of assignment records necessary to prove that the relevant Trust owned the subject loan.

39.   In some instances, when affiants complained to management that they did not have personal knowledge of certain representations made in the affidavits, Defendants' Servicers instructed the affiants to continue signing the affidavits. In some instances, affiants felt "bullied" by management and followed the instructions for fear of losing their jobs.

40.     On numerous occasions, to address a backlog of affidavits, employees of Defendants' Servicers such as interns and mailroom clerks were instructed to execute affidavits.

41.     On numerous occasions, between November 1, 2012 and September 1, 2013, the Servicers filed stale affidavits that had earlier been executed by a previous Servicer. Contrary to the statements in the affidavits, the affiants in question were no longer "authorized to testify" in the matter and no longer had access or knowledge of the consumer's account records or debt.

42.     Affiants also later provided live testimony in court, purportedly based on personal knowledge, similar to the statements made in the affidavits as described in Paragraphs 27–38.

## IMPROPERLY NOTARIZED AFFIDAVITS

43.     Between November 1, 2012 and August 3, 2014, in connection with collecting or attempting to collect debt from consumers, Defendants' Servicers acting on behalf of Defendants filed at least 11,412 affidavits in collections lawsuits.

44.     Between November 1, 2012 and August 3, 2014, Defendants' Servicers acting on behalf of Defendants improperly notarized virtually every affidavit executed and filed.

45.     Affiants executed the affidavits on their own outside the presence of the notary.

46.     Affiants placed executed affidavits in a specified location.

47.     Defendants' Servicers' notaries later notarized stacks of previously signed affidavits all at once at their desks.

48.     Contrary to the representations in the affidavits, affiants did not personally appear before notaries.

49.     Contrary to the representations in the affidavits, notaries did not place the affiants under oath or witness their signatures.

50.     On numerous occasions, notaries notarized affidavits executed by affiants on a prior date. At least one of Defendants' Servicers instructed notaries to ensure that the notarization date matched the date of execution, even if that meant backdating the notarization date.

51.     In many cases, the notaries did in fact back date their notarization of the affidavits.

## FILING LAWSUITS WITHOUT THE INTENT OR ABILITY TO PROVE THE CLAIMS, IF CONTESTED

52.     Defendants filed at least 1,214 collections lawsuits against consumers even though the documentation needed to prove they owned the loans was missing. Through these lawsuits, the Defendants obtained approximately $21,768,807 in judgments against consumers.

53.     In these lawsuits, documentation of a complete chain of assignment evidencing that the subject loan was transferred to the Defendants was missing.

54.     In addition, the Defendants filed at least 812 collections lawsuits where the documentation did not support Trusts' ownership of the loans. The chain of assignment documentation shows that these loans were allegedly transferred to Defendants before they were in fact disbursed to consumers.

55.     In at least 208 other collections lawsuits, the promissory note to prove that a debt was owed did not exist or cannot be located.

56.     For each collections lawsuit described in Paragraphs 52–55, Defendants could not prove that a debt was owed to Defendants, if contested.

57.     Defendants knew, or their processes should have uncovered, that these chain of assignment documents were missing or flawed, yet Defendants continued to file collections lawsuits.

## COLLECTION OF TIME-BARRED DEBT

58.     In at least 486 collections lawsuits, in connection with collecting or attempting to collect debt from consumers, Defendants filed a collections lawsuit outside the applicable statute of limitations.

## THE CONSUMER FINANCIAL PROTECTION ACT

59.     The CFPA provides that it is unlawful for any covered person "to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law." 12 U.S.C. § 5536(a)(1)(A). The CFPA grants the Bureau authority to commence a civil action against any person who violates a Federal consumer financial law, such as the CFPA. 12 U.S.C. § 5564(a).

## VIOLATIONS OF THE CFPA

60.     The CFPA prohibits a covered person from committing or engaging in any "unfair, deceptive, or abusive act or practice" in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service. 12 U.S.C. §§ 5531, 5536(a)(1)(B).

61.     Servicing loans and collecting debt are "consumer financial products or services" under the CFPA. 12 U.S.C. § 5481(15)(A)(i), (x).

# DECEPTIVE ACTS OR PRACTICES

## COUNT I

### False and Misleading Affidavits and Testimony

62.     The Bureau incorporates the allegations in Paragraphs 1–61 by reference.

63.     In numerous instances, in connection with collecting or attempting to collect debt, Defendants represented to consumers, directly or indirectly, expressly or by implication, that affiants or witnesses in court had personal knowledge of the education loan records evidencing the debt.

64.     In fact, in numerous instances, affiants and witnesses lacked personal knowledge of the education loan records evidencing the debt when they executed the affidavits.

65.     In numerous instances, Defendants represented to consumers, directly or indirectly, expressly or by implication, that affiants and witnesses had personal knowledge of the record management practices and procedures of the Trust and the practices and procedures the Trust requires of its loan servicers and other agents.

66.     In fact, affiants and witnesses lacked personal knowledge of the record management practices and procedures of the Trusts and the practices and procedures of Trusts' agents.

67.     In numerous instances, Defendants represented to consumers, directly or indirectly, expressly or by implication, that affiants and witnesses had reviewed the chain of title records and asserted that they had personal knowledge that the loans were transferred, sold, and assigned to the Trust on dates certain.

68.     In fact, on numerous occasions, affiants and witnesses had not reviewed the chain of title records and lacked personal knowledge that the loans were transferred,

sold and assigned to the Trust.

69.     Defendants' representations set forth in Paragraphs 63–68 are material and likely to mislead consumers acting reasonably under the circumstances.

70.     Defendants' representations set forth in Paragraph 63–68 constitute deceptive acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531, 5536(a)(1)(B).

## COUNT II

### Improperly Notarized Affidavits

71.     The Bureau incorporates the allegations in Paragraphs 1–61 by reference.

72.     In numerous instances, in connection with collecting or attempting to collect debt, Defendants represented to consumers, directly or indirectly, expressly or by implication, that the affidavits submitted in support of its collections lawsuits were properly sworn and executed before a notary.

73.     In fact, in numerous instances, the affidavits were unsworn and executed outside the presence of a notary.

74.     Defendants' representations set forth in Paragraphs 72–73 are material and likely to mislead consumers acting reasonably under the circumstances.

75.     Defendants' representations set forth in Paragraph 72–73 constitute deceptive acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531, 5536(a)(1)(B).

## COUNT III

### Filing Lawsuits without the Intent or Ability to Prove the Claims, if Contested

76.     The Bureau incorporates the allegations in Paragraphs 1–61 by reference.

77.     In numerous instances, in connection with collecting or attempting to collect debt, Defendants represented to consumers, directly or indirectly, expressly or by

implication, that collections lawsuits were supported by valid and reliable legal documentation needed to obtain judgment.

78.     In fact, in numerous lawsuits, documentation of a complete chain of assignment evidencing that the subject loan was transferred to Defendants was missing.

79.     In fact, in numerous lawsuits, a promissory note proving the existence of the debt was missing.

80.     In fact, in numerous lawsuits, the Trusts could not prove their claims, if contested.

81.     Defendants' representations set forth in Paragraphs 77–80 are material and likely to mislead consumers acting reasonably under the circumstances.

82.     Defendants' representations set forth in Paragraph 77–80 constitute deceptive acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531, 5536(a)(1)(B).

## COUNT IV

### Collection of Time-Barred Debt

83.     The Bureau incorporates the allegations in Paragraphs 1–61 by reference.

84.     In numerous instances, in connection with collecting or attempting to collect debt, Defendants represented to consumers, directly or indirectly, expressly or by implication, that the Trusts had a legal right to obtain judgment through its collections lawsuits.

85.     In fact, in numerous instances, the statute of limitations on these loans had expired.

86.     Defendants' representations set forth in Paragraphs 84–85 are material and likely to mislead consumers acting reasonably under the circumstances.

87.     Defendants' representations set forth in Paragraph 84–85 constitute deceptive acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531, 5536(a)(1)(B).

## UNFAIR PRACTICES

### COUNT V

### Filing Lawsuits without the Intent or Ability to Prove the Claims, if Contested

88.     The Bureau incorporates the allegations in Paragraphs 1–61 by reference.

89.     Under section 1031 of the CFPA, an act or practice is unfair if it causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers, and such substantial injury is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. §§ 5531(c), 5536(a)(1)(B).

90.     In numerous instances, in connection with collecting or attempting to collect debt through collections lawsuits, Defendants filed collections lawsuits without the intent or ability to prove the claims, if contested.

91.     Defendants' acts or practices have caused or were likely to cause substantial injury to consumers, estimated to be at least $3.5 million in payments made in connection with these lawsuits.

92.     Consumers could not reasonably avoid the harm, and the harm was not outweighed by countervailing benefits to consumers or competition.

93.     Defendants' acts or practices set forth in Paragraph 90–92 constitute unfair acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531(c), 5536(a)(1)(B).

## CONSUMER INJURY

94.     Consumers have suffered or were likely to suffer substantial injury as a result of Defendants' violations of the CFPA. In addition, Defendants have been unjustly

enriched as a result of their unlawful acts or practices.

## THIS COURT'S POWER TO GRANT RELIEF

95.     The CFPA empowers this Court to grant any appropriate legal or equitable relief including, without limitation, a permanent or temporary injunction, rescission or reformation of contracts, the refund of moneys paid, restitution, disgorgement or compensation for unjust enrichment, payments of damages or other monetary relief, limits on the activities or functions of Defendants, and civil money penalties. 12 U.S.C. § 5565(a). In addition, the CFPB may recover its costs in connection with the action, if it is the prevailing party. 12 U.S.C. § 5565(b).

## PRAYER FOR RELIEF

96.     Wherefore, the Bureau requests that the Court:

   a.  Permanently enjoin Defendants from committing future violations of the CFPA;

   b.  Grant additional injunctive relief as the Court may deem to be just and proper;

   c.  Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the CFPA, including, but not limited to, rescission or reformation of contracts, the refund of moneys paid, restitution, disgorgement or compensation for unjust enrichment, and payment of damages or other monetary relief;

   d.  Award the Bureau civil money penalties; and

   e.  Award the Bureau the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated: September 18, 2017

Respectfully submitted,

ANTHONY ALEXIS
*Enforcement Director*

Deborah Morris
*Deputy Enforcement Director*

/s/ Carolyn Hahn
Carolyn Hahn
(E-mail: Carolyn.Hahn@cfpb.gov)
(Phone: 202-435-7250)
Edward Keefe
(E-mail: Edward.Keefe@cfpb.gov)
(Phone: 202-435-9198)
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
Telephone: (202) 435-9198
Facsimile: (202) 435-7722
Email: Carolyn.Hahn@cfpb.gov

For the Consumer Financial Protection Bureau

# EXHIBIT C
# TO COMPLAINT

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| Consumer Financial Protection Bureau,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>THE NATIONAL COLLEGIATE MASTER STUDENT LOAN TRUST; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2003-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-3; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-3; and NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4, Delaware Statutory Trusts,<br><br>　　　　Defendants. | Case No. |

# [PROPOSED] CONSENT JUDGMENT

Plaintiff, the Consumer Financial Protection Bureau ("Bureau"), commenced this civil action against fifteen (15) Delaware statutory trusts referred to as the National Collegiate Student Loan Trusts ("NCSLTs" or "the Trusts"), which are the National Collegiate Master Student Loan Trust, NCSLT 2003-1, NCSLT 2004-1, NCSLT 2004-2, NCSLT 2005-1, NCSLT 2005-2, NCSLT 2005-3, NCSLT 2006-1, NCSLT 2006-2, NCSLT 2006-3, NCSLT 2006-4, NCSLT 2007-1, NCSLT 2007-2, NCSLT 2007-3, and NCSLT 2007-4 on September 14, 2017, to obtain injunctive relief, damages and other monetary relief, and civil money penalties.

The Complaint alleges violations of sections 1031(a) and 1036(a)(1) of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531(a), 5536(a)(1).

Plaintiff and Defendants request that the Court enter this Consent Judgment. The parties have agreed to resolve this case without further litigation. The Defendants waive service, answering the Complaint, and consent to the entry of this Consent Judgment against them by this Court, the terms of which are set forth herein.

## FINDINGS

1. This Court has jurisdiction over the parties and the subject matter of this action.

2. Plaintiff and Defendants agree to entry of this Order to settle and resolve all matters in this dispute arising from the conduct alleged in the Complaint to the date this Order is entered.

3. Defendants neither admit nor deny any allegations in the Complaint, except as specifically stated in this Order. For the purposes of this Order,

2

Defendants admit the facts necessary to establish the Court's jurisdiction over them and the subject matter of this action.

4.  Since at least November 1, 2012, in order to collect on defaulted private student loans, Defendants' Servicers filed Collections Lawsuits on behalf of Defendants in state courts across the country. In support of these lawsuits, Subservicers on behalf of Defendants executed and filed affidavits that falsely claimed personal knowledge of the account records and the consumer's debt, and in many cases, personal knowledge of the chain of assignments establishing ownership of the loans. In addition, Defendants' Servicers on behalf of Defendants filed more than 2,000 debt collections lawsuits without the documentation necessary to prove Trust ownership of the loans or on debt that was time-barred. Finally, notaries for Defendants' Servicers notarized over 25,000 affidavits even though they did not witness the affiants' signatures.

5.  Defendants waive any rights to seek judicial review or otherwise challenge or contest the validity of this Order. Defendants also waive any claim it may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action to the date of this Order. Each party will bear its own costs and expenses, including without limitation attorneys' fees.

6.  Entry of this Order is in the public interest.

## **DEFINITIONS**

7.  The following definitions apply to this Order:

3

a. "Administration Agreements" means the agreements by and among each of the Trusts and the Administrator dated November 1, 2001 (Master Trust); December 11, 2003 (NCSLT 2003-1); September 10, 2004 (NCSLT 2004-1); October 28, 2004 (NCSLT 2004-2); February 23, 2005 (NCSLT 2005-1); June 9, 2005 (NCSLT 2005-2); October 12, 2005 (NCSLT 2005-3); March 9, 2006 (NCSLT 2006-1); June 9, 2006 (NCSLT 2006-2); June 8, 2006 (NCSLT 2006-3); December 7, 2006 (NCSLT 2006-4); March 8, 2007 (NCSLT 2007-1); June 14, 2007 (NCSLT 2007-2); September 20, 2007 (NCSLT 2007-3); and September 20, 2007 (NCSLT 2007-4).

b. "Administrator" means the Administrator, as defined in the Trust Indenture, providing certain duties of the Trusts pursuant to the Administration Agreements.

c. "Affected Consumers" includes Consumers who are or were subject to a Collections Lawsuit filed by Defendants' agents on behalf of Defendants on or after November 1, 2012 to collect a Debt where (a) the documentation necessary to prove the existence of the Debt does not exist or cannot be located by Defendants; (b) the documentation necessary to prove Trust ownership of the Debt does not exist or cannot be located by Defendants; or (c) the lawsuit was time-barred.

d. "Affiant" means any signatory to an Affidavit, other than one signing solely as a notary or witness to the act of signing, signing in his or her capacity as an employee or agent of Defendants,

4

including employees or agents of Defendants' Servicers or
Subservicers.

e. "Affidavit" means any sworn statement filed with a court in
connection with litigation to collect on a Debt.

f. "Board" means the registered owner of a majority of the beneficial
interest in each of the Trusts.

g. "Clearly and Prominently" means

i. as to written information: written in a type size and location
sufficient for an ordinary consumer to read and comprehend
it and disclosed in a manner that would be easily
recognizable and understandable in language and syntax to
an ordinary consumer; if the information is contained in a
multi-page print document, the disclosure appears on the
first page.

ii. as to information presented orally: spoken and disclosed in a
volume, cadence, and syntax sufficient for an ordinary
consumer to hear and comprehend.

h. "Collections Lawsuits" means attempts by Defendants' Servicers on
behalf of Defendants (or a third party acting on their behalf for an
account owned or alleged to be owned by Defendants) through
judicial processes in the United States of America, to collect or
establish a Consumer's liability for a Debt.

i. "Consumer" means any natural person obligated or allegedly
obligated to pay any Debt.

5

j.      "Debt" means any obligation or alleged obligation of a Consumer to
pay money arising out of a transaction in which the money,
property, insurance, or services that are the subject of the
transaction are primarily for personal, family, or household
purposes, whether or not such obligation has been reduced to
judgment.

k.      "Effective Date" means the date on which the Order is entered on
the docket by the Court.

l.      "Enforcement Director" means the Assistant Director of the Office
of Enforcement for the Consumer Financial Protection Bureau, or
his or her delegate.

m.      "Primary Servicer" means the Servicer servicing student loans for
Defendants under the Amended and Restated Private Student Loan
Servicing Agreement dated September 28, 2006.

n.      "Related Consumer Action" means a private action by or on behalf
of one or more Consumers or an enforcement action by another
governmental agency brought against Defendants based on
substantially the same facts as described in the Complaint.

o.      "Relevant Period" includes the period from November 1, 2012 to the
Effective Date.

p.      "Defendants" means any or all of the fifteen (15) Delaware statutory
trusts referred to as the National Collegiate Student Loan Trusts
("NCSLTs" or "the Trusts," which are the National Collegiate
Master Student Loan Trust, NCSLT 2003-1, NCSLT 2004-1, NCSLT

6

2004-2, NCSLT 2005-1, NCSLT 2005-2, NCSLT 2005-3, NCSLT
2006-1, NCSLT 2006-2, NCSLT 2006-3, NCSLT 2006-4, NCSLT
2007-1, NCSLT 2007-2, NCSLT 2007-3, and NCSLT 2007-4) and
their successors and assigns.

q.    "Servicer" (or "Trusts' Servicer") means any Servicer, Primary
Servicer, Subservicer, Special Servicer, Administrator, and any
other individual or entity acting on behalf of Defendants with
respect to the servicing of the student loans owned by Defendants,
whether retained directly by Defendants or retained by an
individual or entity acting on behalf of Defendants.

r.    "Servicing Agreement" means any Servicing Agreement that meets
the definition of Servicing Agreement in each Trust's Indenture.

s.    "Special Servicer" means the Servicer providing services to the
Trusts with respect to defaulted and delinquent student loans under
the Special Servicing Agreements dated March 1, 2009 and May 1,
2009 (the "Special Servicing Agreements").

t.    "Subservicer" means any service provider that was retained by, and
contracted with, directly or indirectly, the Special Servicer, as an
agent of the Special Servicer, to provide services, including default
prevention, and collection services, including but not limited to
litigation, with respect to the servicing of the student loans owned
by Defendants.

u.    "The Trust Agreements" are the Trust Agreements creating each of
the Trusts.

7

# ORDER

**IT IS ORDERED** that:

## I. Conduct Requirements

8.  Defendants must provide all Defendants' Servicers that are engaged in the servicing or collection of Debts with actual notice of this Order within thirty (30) days of the Effective Date.

9.  Defendants and their officers, agents, servants, employees, and attorneys who have actual notice of this Order, including but not limited to all of Defendants' Servicers, whether acting directly or indirectly, may not violate sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536, and must take the following affirmative actions:

    a.  Defendants shall take all actions necessary to comply with the terms of the Order, including but not limited to ensuring that all of Defendants' Servicers acting as Defendants' agents comply with the terms of the Order.

    b.  Defendants must require that any of Defendants' Servicers or other agents retained by Defendants in connection with servicing or collection of student loans (1) agree to abide by the terms and conditions of the Order and (2) require any agents that Defendants' Servicers hire in connection with servicing or collection of student loans to abide by the terms and conditions of the Order.

    c.  Defendants and their officers, agents, servants, employees, and attorneys who have actual notice of this Order, including but not limited to all of Defendants' Servicers, whether acting directly or

8

indirectly, may not initiate a Collections Lawsuit to collect Debt
unless they possess:

    i.     the documentation necessary to prove that a Trust owns the
loan, including but not limited to, documentation reflecting
the complete chain of assignment from the Debt's originator
to the specific Trust claiming ownership; and

    ii.    a document signed by the Consumer, such as a promissory
note, evidencing the agreement to pay the loan forming the
basis of the Debt.

d.    Defendants and their officers, agents, servants, employees, and
attorneys who have actual notice of this Order, including but not
limited to all of Defendants' Servicers, whether acting directly or
indirectly, may not initiate a Collections Lawsuit to collect on a loan
for which the applicable statute of limitations has expired.

e.    Defendants and their officers, agents, servants, employees, and
attorneys who have actual notice of this Order, including but not
limited to all of Defendants' Servicers, whether acting directly or
indirectly, may not collect any Debt through Collections Lawsuits
that Defendants or their agents have any reason to believe may be
unenforceable.

f.    Defendants, their officers, agents, servants, employees, and
attorneys, and all other persons in active concert or participation
with any of them, who receive actual notice of this Order, including
but not limited to all of Defendants' Servicers, whether acting

directly or indirectly, are permanently restrained and prohibited, in connection with the collection of a Debt, from submitting any Affidavit:

i.      containing an inaccurate statement;

ii.     in which the Affiant represents, expressly or by implication, that the Affiant is familiar with or has personal knowledge of the Consumer's education loan records or the maintenance of those records when that is not the case;

iii.    in which the Affiant represents, expressly or by implication, that the Affiant has personal knowledge of the Consumer's Debt when that is not the case;

iv.     in which the Affiant represents, expressly or by implication, that the Affiant has personal knowledge of the loan's chain of assignment or ownership when that is not the case;

v.      in which the Affiant represents, expressly or by implication, that the Affiant has personal knowledge of the documents relating to the loan's chain of assignment or ownership when that is not the case;

vi.     representing, expressly or by implication, that the Affidavit has been properly notarized if the Affidavit was not executed in the presence of a notary or if the notarization was otherwise not compliant with applicable notary laws; or

vii.    in which the Affiant represents, expressly or by implication, that any documents or records concerning the Debt that

10

forms the basis of the Collections Lawsuit have been reviewed by the Affiant when that is not the case.

10. Defendants are permanently restrained and prohibited from reselling Debt that is time-barred or for which Defendants lack the necessary documentation required by Paragraph 9(c) without obtaining the written agreement of the purchaser to comply with this Order.

11. Defendants, their officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, including but not limited to all of Defendants' Servicers, whether acting directly or indirectly, are permanently restrained and prohibited from, in connection with the collection of a Debt, providing any testimony in a Collections Lawsuit that contains any misrepresentations, including false statements that the witness:

    a.    is familiar with or has personal knowledge of the Consumer's education loan records or the maintenance of those records;

    b.    has personal knowledge of the Consumer's Debt;

    c.    has personal knowledge of the loan's chain of assignment or ownership; or

    d.    has personal knowledge of the documents relating to the loan's chain of assignment or ownership.

12. If Defendants determine that any of their agents, including but not limited to all of Defendants' Servicers, are on behalf of Defendants engaging in any conduct prohibited by this Order, including but not limited to Paragraphs

9 and 11 of this Order, Defendants promptly will take the necessary steps to ensure that their agents cease any and all practices that violate this Order.

13.    Within thirty (30) days of making any determination described in Paragraph 12, Defendants must submit to the Enforcement Director a report detailing (1) the practices that violate the Order, (2) the specific agents engaged in the practices in question, and (3) a plan to ensure that the practices cease and to remediate any harm resulting from the practices.

14.    With regard to pending Collections Lawsuits in which Defendants, through actions taken by Defendants' Servicers acting on behalf of Defendants, have filed an Affidavit that contains any misrepresentations—including but not limited to false statements that the Affiant (1) is familiar with or has personal knowledge of the Consumer's education loan records or the maintenance of those records, (2) has personal knowledge of the Consumer's indebtedness, (3) has personal knowledge of the loan's chain of assignment or ownership, (4) has personal knowledge about the maintenance of documents relating to the loan's chain of assignment or ownership, or (5) has attached as an exhibit a true and correct copy of a document—Defendants must either withdraw the pending Collections Lawsuit or ensure that the Affidavit is withdrawn. Defendants must instruct their attorneys, Defendants' Servicers, and their agents to either withdraw the pending Collections Lawsuit or notify the court of the following in writing while simultaneously providing the court with a copy

12

of the Order entered into between the Bureau and Defendants: "Plaintiff withdraws the affidavit of [insert name of affiant] pursuant to an Order entered into by the Consumer Financial Protection Bureau and the National Collegiate Student Loan Trusts."

15. With regard to concluded Collections Lawsuits in which Defendants, through actions of Defendants' Servicers acting on behalf of Defendants, filed with a court or in arbitration an Affidavit that contained any misrepresentations—including but not limited to false statements that the Affiant (1) is familiar with or has personal knowledge of the Consumer's education loan records or the maintenance of those records, (2) has personal knowledge of the Consumer's indebtedness, (3) has personal knowledge of the loan's chain of assignment or ownership, (4) has personal knowledge about the maintenance of documents relating to the loan's chain of assignment or ownership, or (5) has attached as an exhibit a true and correct copy of a document—Defendants must instruct their attorneys, the Defendants' Servicers, and their agents to cease post-judgment enforcement activities and will seek, and will instruct their agents to seek, to remove, withdraw, or terminate any active wage garnishment, bank levies, and similar means of enforcing those judgments or settlements as well as cease accepting settlement payments related to any such concluded Collections Lawsuits.

16. With regard to servicing of Debt owned by Defendants, Defendants shall within ten (10) days of the Effective Date (1) direct the Primary Servicer to cease transferring any Debt to the Special Servicer and any Subservicer and

instead retain possession of the Debt pending approval and implementation of the Compliance Plan provided for in Section III; (2) direct the Special Servicer and any Subservicer to suspend further collection efforts on all Debt owned by Defendants pending approval and implementation of the Compliance Plan provided for in Section III; (3) direct the Special Servicer and any Special Servicer agent to discontinue making outbound call attempts, sending collection letters, providing negative reports to any of consumer reporting agencies the credit bureaus, or other efforts as may be instructed by Defendants and are necessary to effectuate compliance with this Order; (4) direct the Primary Servicer to instruct the Special Servicer and all Subservicers to return to the Primary Servicer all student loans in their portfolio owned by Defendants that are completed and the subject of each monthly Compliance Audit Report described in Paragraph 20; and (5) direct Defendants' Servicers to take any other appropriate actions necessary to effectuate compliance with this Order as instructed by the Defendants.

17. Defendants shall direct (1) the Primary Servicer and Special Servicer to remit all payments from Consumers to an escrow account as designated by Defendants pursuant to Paragraph 18; (2) the Subservicer to remit funds to the Special Servicer and the Special Servicer to remit those payments to the escrow account as designated by Defendants pursuant to Paragraph 18; and (3) the Primary Servicer and Special Servicer to provide an itemized report to the Defendants identifying the payments remitted at the loan level in a format approved by the Defendants.

18.    Nothing in this Order shall prohibit Defendants or their Servicers from accepting payments from Consumers made in the regular course on Debt that is not subject to a Collections Lawsuit. All such payments shall be held in escrow until the requirements of Paragraphs 9(c)(1) and (2) are satisfied and Defendants have determined that sufficient loan documentation exists to either retain the payment or refund the amount paid as to be provided for in the Compliance Plan of Section III. Defendants may use funds from the escrow to carry out Trust operations, including payments to noteholders sufficient to avoid events of default under the Indenture Trust, auditors, consultants, accountants, legal counsel, and other necessary professionals.

## II. Compliance Audit

19.    Within thirty (30) days of the Effective Date, Defendants must secure and retain one or more qualified, independent consultants or auditors with specialized experience in the servicing of student loans, and acceptable to the Enforcement Director, to conduct an independent audit of all of the servicing and collecting conducted by Defendants' Servicers on student loans owned by Defendants from inception of each of the Trusts to the present, using procedures and standards generally acceptable to the student loan–servicing industry. The purposes of the Compliance Audit must be to determine, at a minimum:

a.    For each and every student loan, whether Defendants, or their agents (including Defendants' Servicers), have or ever had in their possession sufficient loan documentation, including signed

promissory notes and documentation reflecting the complete chain of assignment since the loan's origination, to support the claim that a Debt is currently owed to a Trust, including but not limited to, assignments from the Debt's originator to the Trust claiming ownership and any subsequent assignments by the Trust to a student loan guarantor (such as The Education Resources Institute or its successors);

b.     Whether certain loans owned by Defendants are no longer legally enforceable because the applicable statute of limitations has expired;

c.     Whether Collections Lawsuits have been filed on any loans for which sufficient documentation, including signed promissory notes and documentation reflecting the complete chain of assignment from the Debt's originator to the Collections Lawsuit's named plaintiff, is not in the possession of the Collections Lawsuit's named plaintiff, or a Defendants' Servicer acting on behalf of the named plaintiff, to prove the existence of the Debt owed to the Trust in question, or where the applicable statute of limitations has expired;

d.     Whether judgments were obtained in Collections Lawsuits described in Paragraph 19(c), the identity of Consumers from whom the Defendants obtained payments in response to those Collections Lawsuits, and the specific amounts collected from these Consumers;

16

    e.       Whether any student loans were disbursed to the Consumers after the loans allegedly were transferred to the Defendants;

    f.       Whether any of Defendants' agents, including but not limited to any of Defendants' Servicers, have failed to comply with any Federal consumer financial law or any of the Servicers' Servicing Guidelines; and

    g.       Whether any of Defendants' agents, including but not limited to any of Defendants' Servicers, are or have engaged in any practices on behalf of Defendants after the Effective Date that violate this Order.

20.    Within one hundred and eighty (180) days of the Effective Date and each thirty (30) days thereafter until finished, the independent consultant(s) must provide a written report to Defendants detailing the findings of the audit (the "Compliance Audit Reports"). The Compliance Audit Report with respect to additional Affected Consumers shall be completed within one hundred and eighty (180) days of the Effective Date, and the remainder of the Compliance Audit Reports within three hundred and sixty (360) days of the Effective Date. The Compliance Audit Report shall include the auditors' findings, conclusions, and a description of its methodology.

21.    Defendants must provide the Compliance Audit Reports to the Enforcement Director within fourteen (14) days of receipt by Defendants.

22.    Within thirty (30) days of receiving the final Compliance Audit Report identified in Paragraph 20, Defendants must submit to the Enforcement

Director for review and non-objection an amendment to the Compliance

Plan ("Amended Compliance Plan") described in Section III to:

a.      ensure the withdrawal and dismissal without prejudice of any

        pending Collections Lawsuits identified in Paragraph 19(c);

b.      ensure that Defendants and their agents, including but not limited

        to any of Defendants' Servicers, will not take any steps to initiate

        collections or furnish negative reports to consumer reporting

        agencies, on loans identified in Paragraph 19(a), or accept payments

        on any defaulted Debts, unless and until Defendants first verify the

        existence of the documentation referenced in that subparagraph in

        order to prove the existence of the Debt and the identity of the

        current owner;

c.       ensure that Defendants and their agents, including but not limited

        to any of Defendants' Servicers, will not take any steps to collect

        Debts by any means on any loans identified in Paragraph 19(b)

        without Clearly and Prominently disclosing to the Consumer as

        follows:

        i.      For those time-barred debts that generally cannot be

                included in a consumer report under the provisions of the

                Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681c(a), but

                can be collected through other means pursuant to applicable

                state law, Defendants will instruct their agents to include the

                following statement: "The law limits how long you can be

                sued on a debt and how long a debt can appear on your

18

> credit report. Due to the age of this debt, we will not sue you
> for it or report payment or non-payment of it to a credit
> bureau."

    ii.    For those time-barred debts that can be collected through
> other means pursuant to applicable state law, and may be
> included in a consumer report under the provisions of FCRA,
> 15 U.S.C. § 1681c(a), Defendants will instruct their agents to
> include the following statement: "The law limits how long
> you can be sued on a debt. Because of the age of your debt,
> we will not sue you for it."

23.    Defendants and their agents are prohibited from making any
representation or statement, or from taking any other action that
interferes with, detracts from, contradicts, or otherwise undermines the
disclosures required in Paragraph 22.

24.    Defendants will be deemed to have complied with the disclosure
requirements of Paragraph 22 if Defendants or their agents makes a
disclosure to Consumers in a specific jurisdiction that (1) is required by the
laws or regulations of that jurisdiction, (2) complies with those laws or
regulations, and (3) is substantially similar to the disclosure required by
Paragraph 22.

25.    The Enforcement Director will have the discretion to make a
determination of non-objection to the Amended Compliance Plan or to
direct the Defendants to revise it. If the Enforcement Director directs the
Defendants to revise the Amended Compliance Plan, Defendants must

make the requested revisions and resubmit the Amended Compliance Plan
to the Enforcement Director within thirty (30) days.

26.     After receiving notification that the Enforcement Director has made a
determination of non-objection to the Amended Compliance Plan,
Defendants must implement and adhere to the steps, recommendations,
deadlines, and timeframes outlined in the Amended Compliance Plan.

27.     Within thirty (30) days of receiving notification that the Enforcement
Director has made a determination of non-objection to the Amended
Compliance Plan, Defendants will provide the Amended Compliance Plan
and the Compliance Audit Reports to Transworld Systems, Inc. ("TSI"), or,
if applicable, to the Defendants' successor Special Servicer or Subservicer.

## III.    Compliance Plan

28.     Within one hundred and twenty (120) days of the Effective Date,
Defendants must submit to the Enforcement Director for review and
determination of non-objection a comprehensive compliance plan
designed to ensure that Defendants and Defendants' Servicers acting on
their behalf comply with all applicable Federal consumer financial laws
and the terms of this Order ("Compliance Plan"). The Compliance Plan
must include, at a minimum:

a.      Detailed steps for addressing each action required by this Order
including operations meetings with the Primary Servicer;

b.      Specific timeframes and deadlines for implementation of the steps
described above; and

20

    c.    Comprehensive, written policies and procedures designed to ensure that any agents acting on behalf of the Defendants do not engage in practices in violation of this Order. These policies and procedures must include:

        i.    Detailed steps for addressing each action required of the Defendants or their agents, including but not limited to the Defendants' Servicers, by this Order;

        ii.    Comprehensive, written policies and procedures designed to prevent violations of Federal consumer financial laws and associated risks of harm to Consumers including regular operations meetings with and audits of each Servicer and establishment of procedures to respond to exception requests;

        iii.    An effective employee training program required for all of the agents' employees, including but not limited to Affiants, whose duties include reviewing, drafting, preparing, processing, verification, execution or notarization of Affidavits that includes regular, specific, comprehensive training in Federal consumer financial laws commensurate with individual job functions and duties;

        iv.    Implementation of reasonable and appropriate written policies and procedures to ensure the proper notarization processes for Affidavits, including that notaries place the Affiants under oath and witness their signatures;

v.  Implementation of reasonable and appropriate written policies and procedures to ensure that Affiants verify the accuracy of each statement made in an Affidavit before executing the Affidavit; and

vi.  Comprehensive, written policies and procedures designed to ensure that any law firms engaged by any agent to collect Debt does not violate any Federal consumer financial laws, which must include, at a minimum:

(1)  the law firm's duty to maintain adequate internal controls to ensure compliance with Federal consumer financial laws;

(2)  the law firm's duty to provide adequate training on compliance with all applicable Federal consumer financial laws and the agent's policies and procedures related to Collections Lawsuits;

(3)  the agent's authority to conduct periodic onsite reviews of the law firm's controls, performance, and information systems related to Collections Lawsuits; and

(4)  periodic review by the agent of the law firm's controls, performance, and information systems related to Collections Lawsuits.

29.  The Enforcement Director will have the discretion to make a determination of non-objection to the Compliance Plan or direct

22

Defendants to revise it. If the Enforcement Director directs Defendants to revise the Compliance Plan, Defendants must make the revisions and resubmit the Compliance Plan to the Enforcement Director within thirty (30) days.

30.　　After receiving notification that the Enforcement Director has made a determination of non-objection to the Compliance Plan or any amendments thereto, Defendants must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Compliance Plan.

## IV.　Role of the Board

31.　　The Board must review all submissions (including plans, reports, programs, policies, and procedures) required by this Order prior to submission to the Bureau.

32.　　Although this Order requires Defendants to submit certain documents for the review or non-objection by the Enforcement Director, the Board of Defendants will have the ultimate responsibility for proper and sound management of Defendants and for ensuring that Defendants comply with Federal consumer financial law and this Order.

33.　　In each instance that this Order requires the Board to ensure adherence to or perform certain obligations of Defendants, the Board must:

　　a.　　Authorize whatever actions are necessary for Defendants to fully comply with the Order;

　　b.　　Require timely reporting by Defendants' Servicers to the Board on the status of compliance obligations; and

        *c.*      Require timely and appropriate corrective action to remedy any material non-compliance with any failures to comply with Board directives related to this Section.

## V.  Order to Pay Redress

34.    Within ten (10) days of the Effective Date, the Defendants must reserve or deposit into a segregated deposit account $3,500,000, for the purpose of providing redress to Affected Consumers as required by this Section.

35.    Within one-hundred and twenty (120) days of the Effective Date, the Defendants must submit to the Enforcement Director for review and non-objection a comprehensive written plan for providing redress to the previously identified Affected Consumers consistent with this Order ("Redress Plan"). The Enforcement Director will have the discretion to make a determination of non-objection to the Redress Plan or direct Defendants to revise it. If the Enforcement Director directs Defendants to revise the Redress Plan, Defendants must make the revisions and resubmit the Redress Plan to the Enforcement Director within thirty (30) days. After receiving notification that the Enforcement Director has made a determination of non-objection to the Redress Plan, Defendants must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Redress Plan.

36.    The Redress Plan must apply to all Affected Consumers and:

        a.      Specify how Defendants will identify all Affected Consumers;

Case 1:17-cv-01323-MN  Document 8-1   Filed 09/18/17   Page 25 of 40   PageID #: 47

b.  Provide processes for providing redress covering all Affected
Consumers including providing redress for:

    i.  Affected Consumers where the documentation necessary to
prove the existence of the Debt did not exist or cannot be
located by Defendants;

    ii.  Affected Consumers where the documentation necessary to
prove Trust ownership of the Debt did not exist or cannot be
located by Defendants; and

    iii.  Affected Consumers who were subject to a Collections
Lawsuit outside the applicable statute of limitations.

c.  Include a description of the following:

    i.  Methods used to compile a list of potential Affected
Consumers;

    ii.  Methods used to calculate the amount of redress to be paid
to each Affected Consumer;

    iii.  Procedures for issuance and tracking of redress to Affected
Consumers; and

    iv.  Procedures for monitoring compliance with the Redress
Plan.

37.  The Redress Plan, at a minimum, must provide full restitution of all
amounts collected since the initiation of the Collections Lawsuit filed
against them from:

a.  The approximately 2,700 Affected Consumers identified prior to the
Effective Date, who paid approximately $3,500,000; and

b. The Affected Consumers identified by the Compliance Audit in
Section II.

38. The Redress Plan must describe the process for providing redress for
Affected Consumers and must include the following requirements:

a. A timetable for providing restitution to Affected Consumers
identified in Paragraph 37(a) and (b) that provides restitution to
each group of Affected Consumers as soon as practicable;

b. Defendants must mail a bank check to each Affected Consumer
along with a Redress Notification Letter (as defined below);

c. Defendants must send the bank check by United States Postal
Service first-class mail, address correction service requested, to the
Affected Consumer's last known address as maintained by
Defendants' records;

d. Defendants must make reasonable attempts to obtain a current
address for any Affected Consumer whose Redress Notification
Letter or redress check is returned for any reason, using the National
Change of Address System, and must promptly re-mail all returned
letters and redress checks to current addresses, if any; and

e. Processes for handling any unclaimed funds.

39. With respect to redress paid to Affected Consumers, the Redress Plan
must include:

a. The form of the letter ("Redress Notification Letter") to be sent
notifying Affected Consumers of the redress, which must include
language explaining the manner in which the amount of redress

26

was calculated and a statement that the provision of the refund

payment is in accordance with the terms of this Order; and

b.    The form of the envelope that will contain the Redress Notification

Letter.

40.    Defendants must not include in any envelope containing a "Redress

Notification Letter" any materials other than the approved letters and

redress checks, unless Defendants have obtained written confirmation

from the Enforcement Director that the Bureau does not object to the

inclusion of such additional materials.

41.    Within ninety (90) days of completion of the Redress Plan, Defendants

must submit a report ("Redress Plan Report") to the Enforcement

Director, which must include a review and assessment from an

independent auditor agreed upon by Defendants and the Enforcement

Director, on Defendants' compliance with the terms of the Redress Plan,

including:

a.    The methodology used to determine the population of Affected

Consumers;

b.    The redress amount for each Affected Consumer;

c.    The total number of Affected Consumers;

d.    The procedures used to issue and track redress payments;

e.    The amount, status, and planned disposition of all unclaimed

redress payments; and

f.    A description of the work of independent consultants that
      Defendants have used, if any, to assist and review their execution of
      the Redress Plan.

42.    Defendants must submit an Amended Redress Plan within thirty (30) days
       of the completion of the Compliance Audit with respect to additional
       Affected Consumers required by Section II that incorporates the results of
       that Audit. The amended Redress Plan must contemplate providing full
       restitution to all additional Affected Consumers identified in the
       Compliance Audit within 120 days of submission of the Amended Redress
       Plan.

43.    Defendants must provide all of the relief to Consumers required by the
       Order, regardless of whether the total of such relief exceeds the amount
       reserved or deposited into a segregated account in this Section.

44.    After completing the Redress Plan, if the amount of redress provided to
       Affected Consumers is less than $3,500,000, within thirty (30) days of the
       completion of the Redress Plan, Defendants must pay to the Bureau, by
       wire transfer to the Bureau or to the Bureau's agent, and according to the
       Bureau's wiring instructions, the difference between the amount of redress
       provided to Affected Consumers and $3,500,000.

45.    The Bureau may use these remaining funds to pay additional redress to
       Affected Consumers. If the Bureau determines, in its sole discretion, that
       additional redress is wholly or partially impracticable or otherwise
       inappropriate, or if funds remain after the additional redress is completed,
       the Bureau will deposit any remaining funds in the U.S. Treasury as

disgorgement. Defendants will have no right to challenge any actions that the Bureau or its representatives may take under this Section.

46. Defendants may not condition the payment of any redress to any Affected Consumer under this Order on that Affected Consumer's waiving any right.

47. With regard to the Debt that has yet to be collected from Affected Consumers for whom Defendants and their agents do not possess or cannot locate the documentation necessary to prove the existence of the Debt or Defendants' ownership of the Debt, Defendants must within one hundred and twenty (120) days of the Effective Date—and for Affected Consumers identified in the Compliance Audit Reports, within thirty (30) days of the completion of the Compliance Audit Reports—instruct that their agents within 90 days:

    a.    Withdraw, dismiss, or terminate all pending Collections Lawsuits filed against Affected Consumers;

    b.    Release or move to vacate all judgments obtained during the Relevant Time Period in connection with these Collections Lawsuits;

    c.    Cease post-judgment enforcement activities and seek to remove, withdraw, or terminate its active wage garnishment, bank levies, and similar means of enforcing those judgments or settlements as well as cease accepting settlement payments related to any Collections Lawsuits;

d.  Refrain from (i) representing to a Consumer or any other person that Defendants are or were owed a Debt, (ii) taking any steps to collect or to seek to collect the Debt in question, (iii) furnishing reports on the Debt in question, except as otherwise required by this Order; and

e.  Request that the consumer reporting agencies correct any affected collection account or tradeline, which may include amending, deleting, or suppressing the incorrect account or tradeline.

48.  With regard to time-barred Debt that has yet to be collected from Affected Consumers, Defendants and their agents will not take any steps to collect Debts by any means without Clearly and Prominently disclosing to the consumer:

a.  For those time-barred debts that generally cannot be included in a consumer report under the provisions of the FCRA, 15 U.S.C. § 1681c(a), but can be collected through other means pursuant to applicable state law, Defendants will instruct their agents to include the following statement: "The law limits how long you can be sued on a debt and how long a debt can appear on your credit report. Due to the age of this debt, we will not sue you for it or report payment or non-payment of it to a credit bureau."

b.  For those time-barred debts that can be collected through other means pursuant to applicable state law, and may be included in a consumer report under the provisions of the FCRA, 15 U.S.C. § 1681c(a), Defendants will instruct their agents to include the

30

following statement: "The law limits how long you can be sued on a

debt. Because of the age of your debt, we will not sue you for it."

49.   Defendants and their agents are prohibited from making any

representation or statement, or from taking any other action that

interferes with, detracts from, contradicts, or otherwise undermines the

disclosures required in Paragraph 48.

50.   Defendants will be deemed to have complied with the disclosure

requirements of Paragraph 48 if Defendants or their agents make a

disclosure to Consumers in a specific jurisdiction that (1) is required by the

laws or regulations of that jurisdiction, (2) complies with those laws or

regulations, and (3) is substantially similar to the disclosure required by

Paragraph 48.

## VI.   Order to Pay Disgorgement

51.   Defendants shall pay $7,800,000 as disgorgement for the proceeds they

received from the unlawful practices related to the filing of Collections

Lawsuits during the Relevant Period.

52.   Within ten (10) days of the Effective Date, Defendants shall pay the above

amount in the form of a wire transfer to the Bureau or such agent as the

Bureau may direct, and in accordance with wiring instructions to be

provided by counsel for the CFPB. The Bureau will then transfer the

payment to the United States Treasury as disgorgement.

53.   In the event of any default on Defendants' obligations to make payment

under this Order, interest, computed under 28 U.S.C. § 1961, as amended,

will accrue on any outstanding amounts not paid from the date of default to the date of payment, and will immediately become due and payable.

## VII.  Order to Pay Civil Money Penalty

54.  Under section 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law described in the Complaint, and taking into account the factors in 12 U.S.C. § 5565(c)(3), the Defendants must pay a civil money penalty of $7,800,000 to the Bureau.

55.  Within ten (10) days of the Effective Date, Defendants must pay the civil money penalty by wire transfer to the Bureau or to the Bureau's agent in compliance with the Bureau's wiring instructions.

56.  The civil money penalty paid under this Order will be deposited in the Civil Penalty Fund of the Bureau as required by section 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

57.  Defendants must treat the civil money penalty paid under this Order as a penalty paid to the government for all purposes. Regardless of how the Bureau ultimately uses those funds, Defendants may not:

   a.  Claim, assert, or apply for a tax deduction, tax credit, or any other tax benefit for any civil money penalty paid under this Order; or

   b.  Seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made under any insurance policy, with regard to any civil money penalty paid under this Order.

58.  To preserve the deterrent effect of the civil money penalty in any Related Consumer Action, Defendants may not argue that Defendants are entitled

to, nor may Defendants benefit by, any offset or reduction of any compensatory monetary remedies imposed in the Related Consumer Action because of the civil money penalty paid in this action or because of any payment that the Bureau makes from the Civil Penalty Fund ("Penalty Offset"). If the court in any Related Consumer Action grants such a Penalty Offset, Defendants must, within thirty (30) days after entry of a final order granting the Penalty Offset, notify the Enforcement Director, and pay the amount of the Penalty Offset to the U.S. Treasury. Such a payment will not be considered an additional civil money penalty and will not change the amount of the civil money penalty imposed in this action.

## VIII.  Additional Monetary Provisions

59.     In the event of any default on Defendants' obligations to make payment under this Order, interest, computed under 28 U.S.C. § 1961, as amended, will accrue on any outstanding amounts not paid from the date of default to the date of payment and will immediately become due and payable.

60.     Defendants must relinquish all dominion, control, and title to the funds paid to the fullest extent permitted by law and no part of the funds may be returned to Defendants.

61.     Under 31 U.S.C. § 7701, Defendants, unless they already have done so, must furnish to the Bureau their taxpayer identifying numbers, which may be used for purposes of collecting and reporting on any delinquent amount arising out of this Order.

62.     Within thirty (30) days of the entry of a final judgment, consent order, or settlement in a Related Consumer Action, Defendants must notify the

Enforcement Director of the final judgment, consent order, or settlement
in writing. That notification must indicate the amount of redress, if any,
that Defendants paid or is required to pay to Consumers and describe the
Consumers or classes of Consumers to whom that redress has been or will
be paid.

## IX.   Reporting Requirements

63.   Defendants must notify the Enforcement Director of any development that
may affect compliance obligations arising under this Order, including but
not limited to a dissolution, assignment, sale, merger, or other action that
would result in the emergence of a successor company; the creation or
dissolution of a subsidiary, parent, or affiliate that engages in any acts or
practices subject to this Order; the filing of any bankruptcy or insolvency
proceeding by or against Defendants; or a change in Defendants' name or
address. Defendants must provide this notice, if practicable, at least thirty
(30) days before the development but in any case no later than fourteen
(14) days after the development.

64.   Within one hundred and twenty (120) days of the Effective Date, and again
one year after the Effective Date, Defendants must submit to the
Enforcement Director an accurate written compliance progress report
("Compliance Report") that has been approved by the Board, which, at a
minimum:

a.   Describes in detail the manner and form in which Defendants have
complied with this Order; and

   b.    Attaches a copy of each Order Acknowledgment obtained under

         Section X, unless previously submitted to the Enforcement Director.

## X. Order Distribution and Acknowledgment

65.    Within thirty (30) days of the Effective Date, Defendants must deliver a

       copy of this Order to each of their board members or owners as well as to

       any managers, employees, Servicers, or other agents and representatives

       who have responsibilities related to the subject matter of the Order.

66.    For five (5) years from the Effective Date, Defendants must deliver a copy

       of this Order to any business entity resulting from any change in structure

       referred to in Section IX, any future board members, executive officers, or

       owners, as well as to any managers, employees, Servicers, or other agents

       and representatives who will have responsibilities related to the subject

       matter of the Order before they assume their responsibilities.

67.    Defendants must secure a signed and dated statement acknowledging

       receipt of a copy of this Order, ensuring that any electronic signatures

       comply with the requirements of the E-Sign Act, 15 U.S.C. §§ 7001–31,

       within thirty (30) days of delivery, from all persons receiving a copy of this

       Order under this Section.

## XI.    Recordkeeping

68.    Defendants must create, or if already created, must retain for at least five

       (5) years from the Effective Date, the following business records:

   a.    All documents and records necessary to demonstrate full

         compliance with each provision of this Order, including all

         submissions to the Bureau.

    b.    **All documents and records pertaining to the Redress Plan,**

        **described in Section V.**

69.    **Defendants must retain the documents identified in Paragraph 68 for the**

    **duration of the Order.**

70.    **Defendants must make the documents identified in Paragraph 68 available**

    **to the Bureau upon the Bureau's request.**

## XII.   Notices

71.    **Unless otherwise directed in writing by the Enforcement Director,**

    **Defendants must provide all submissions, requests, communications, or**

    **other documents relating to this Order in writing, with the subject line, "*In***

    ***re* [name of Respondent], File No. Year-CFPB-  ," and send them either:**

    a.    **By overnight courier (not the U.S. Postal Service), as follows:**

        **Assistant Director for Enforcement**
        **Consumer Financial Protection Bureau**
        **ATTENTION: Office of Enforcement**
        **1625 Eye Street, N.W.**
        **Washington D.C. 20006; or**

    b.    **By first-class mail to the below address and contemporaneously by**

        **email to Enforcement_Compliance@cfpb.gov:**

        **Assistant Director for Enforcement**
        **Consumer Financial Protection Bureau**
        **ATTENTION: Office of Enforcement**
        **1700 G Street, N.W.**
        **Washington D.C. 20552**

## XIII.  Cooperation with the Bureau

72.    **Defendants must cooperate fully with the Bureau in this matter and in any**

    **investigation related to or associated with the conduct described in the**

    **Complaint. Defendants must provide truthful and complete information,**

evidence, and testimony, and Defendants must cause their officers, employees, representatives, or agents to appear for interviews, discovery, hearings, trials, and any other proceedings that the Bureau may reasonably request upon five (5) days' written notice, or other reasonable notice, at such places and times as the Bureau may designate, without the service of compulsory process.

## XIV.   Compliance Monitoring

73.   Within fourteen (14) days of receipt of a written request from the Bureau, Defendants must submit additional Compliance Reports or other requested information, which must be made under penalty of perjury; provide sworn testimony; or produce documents.

74.   Defendants must permit Bureau representatives to interview any employee or other person affiliated with Defendants who has agreed to such an interview. The person interviewed may have counsel present.

75.   Nothing in this Order will limit the Bureau's lawful use of civil investigative demands under 12 C.F.R. § 1080.6 or other compulsory process.

## XV.   Retention of Jurisdiction

76.   The Court will retain jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

77.   Notwithstanding the provisions of Paragraph 76, any time limits for performance fixed by this Order may be extended by mutual written agreement of the parties and without further Court approval. Additionally, details related to administration of §§ IX through XIV of this Order may be

modified by written agreement of the parties and without further Court approval. Any other modifications to this Order may be made only upon approval of the Court, upon motion by any party.

## XVI.  Administrative Provisions

78.  The Bureau releases and discharges Defendants from all potential liability for law violations that the Bureau has or might have asserted based on the practices described in the Complaint, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. The Bureau may use the practices described in this Order in future enforcement actions against Defendants and their affiliates, including, without limitation, to establish a pattern or practice of violations or the continuation of a pattern or practice of violations or to calculate the amount of any penalty. This release does not preclude or affect any right of the Bureau to determine and ensure compliance with the Order or to seek penalties for any violations of the Order.

79.  Should Defendants seek to transfer or assign all or part of its operations that are subject to this Order, Defendants must, as a condition of sale, obtain the written agreement of the transferee or assignee to comply with all applicable provisions of this Order.

**IT IS SO ORDERED.**

Dated: _____

_____
UNITED STATES DISTRICT JUDGE

Consented and agreed to:


FOR THE CONSUMER FINANCIAL PROTECTION BUREAU:


           ANTHONY ALEXIS
           *Enforcement Director*

           Deborah Morris
           *Deputy Enforcement Director*

           /s/ Carolyn Hahn          
           Carolyn Hahn
           (E-mail: Carolyn.Hahn@cfpb.gov)
           (Phone: 202-435-7250)
           Edward Keefe
           (E-mail: Edward.Keefe@cfpb.gov)
           (Phone: 202-435-9198)
           1700 G Street NW
           Washington, DC 20552
           Fax: (202) 435-7722

           Attorneys for Plaintiff
           Consumer Financial Protection Bureau

FOR THE NATIONAL COLLEGIATE STUDENT LOAN TRUSTS

Defendants National Collegiate Student Loan Trusts
Waive service and answer of the Complaint and
Consent to entry of this Consent Judgment.

/s/ Daniel M. Silver
Daniel M. Silver (#4758)
MCCARTER & ENGLISH, LLP
Renaissance Centre
405 North King Street, 8th Floor
Wilmington, DE 19801
(302) 984-6300
dsilver@mccarter.com


/s/ James A. Kosch
JAMES A. KOSCH
(E-mail: jkosch@mccarter.com)
(Telephone: 973-639-2028)
MCCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry St.
Newark, NJ 07102
Fax (973) 297-3964

# EXHIBIT D
# TO COMPLAINT

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

Consumer Financial Protection Bureau,

           Plaintiff,

        v.

THE NATIONAL COLLEGIATE MASTER
STUDENT LOAN TRUST; NATIONAL
COLLEGIATE STUDENT LOAN TRUST
2003-1; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2004-1;
NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2004-2; NATIONAL
COLLEGIATE STUDENT LOAN TRUST
2005-1; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2005-2;
NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2005-3; NATIONAL
COLLEGIATE STUDENT LOAN TRUST
2006-1; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2006-2;
NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2006-3; NATIONAL
COLLEGIATE STUDENT LOAN TRUST
2006-4; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2007-1;
NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2007-2; NATIONAL
COLLEGIATE STUDENT LOAN TRUST
2007-3; and NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2007-4,
Delaware Statutory Trusts,

           Defendants.

Case No.

# [PROPOSED] CONSENT JUDGMENT

1

Plaintiff, the Consumer Financial Protection Bureau ("Bureau"), commenced this civil action against fifteen (15) Delaware statutory trusts referred to as the National Collegiate Student Loan Trusts ("NCSLTs" or "the Trusts"), which are the National Collegiate Master Student Loan Trust, NCSLT 2003-1, NCSLT 2004-1, NCSLT 2004-2, NCSLT 2005-1, NCSLT 2005-2, NCSLT 2005-3, NCSLT 2006-1, NCSLT 2006-2, NCSLT 2006-3, NCSLT 2006-4, NCSLT 2007-1, NCSLT 2007-2, NCSLT 2007-3, and NCSLT 2007-4 on September 14, 2017, to obtain injunctive relief, damages and other monetary relief, and civil money penalties.

The Complaint alleges violations of sections 1031(a) and 1036(a)(1) of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531(a), 5536(a)(1).

Plaintiff and Defendants request that the Court enter this Consent Judgment. The parties have agreed to resolve this case without further litigation. The Defendants waive service, answering the Complaint, and consent to the entry of this Consent Judgment against them by this Court, the terms of which are set forth herein.

## **FINDINGS**

1. This Court has jurisdiction over the parties and the subject matter of this action.

2. Plaintiff and Defendants agree to entry of this Order to settle and resolve all matters in this dispute arising from the conduct alleged in the Complaint to the date this Order is entered.

3. Defendants neither admit nor deny any allegations in the Complaint, except as specifically stated in this Order. For the purposes of this Order,

Defendants admit the facts necessary to establish the Court's jurisdiction over them and the subject matter of this action.

4.      Since at least November 1, 2012, in order to collect on defaulted private student loans, Defendants' Servicers filed Collections Lawsuits on behalf of Defendants in state courts across the country. In support of these lawsuits, Subservicers on behalf of Defendants executed and filed affidavits that falsely claimed personal knowledge of the account records and the consumer's debt, and in many cases, personal knowledge of the chain of assignments establishing ownership of the loans. In addition, Defendants' Servicers on behalf of Defendants filed more than 2,000 debt collections lawsuits without the documentation necessary to prove Trust ownership of the loans or on debt that was time-barred. Finally, notaries for Defendants' Servicers notarized over 25,000 affidavits even though they did not witness the affiants' signatures.

5.      Defendants waive any rights to seek judicial review or otherwise challenge or contest the validity of this Order. Defendants also waive any claim it may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action to the date of this Order. Each party will bear its own costs and expenses, including without limitation attorneys' fees.

6.      Entry of this Order is in the public interest.

## **DEFINITIONS**

7.      The following definitions apply to this Order:

3

a.  "Administration Agreements" means the agreements by and among each of the Trusts and the Administrator dated November 1, 2001 (Master Trust); December 11, 2003 (NCSLT 2003-1); September 10, 2004 (NCSLT 2004-1); October 28, 2004 (NCSLT 2004-2); February 23, 2005 (NCSLT 2005-1); June 9, 2005 (NCSLT 2005-2); October 12, 2005 (NCSLT 2005-3); March 9, 2006 (NCSLT 2006-1); June 9, 2006 (NCSLT 2006-2); June 8, 2006 (NCSLT 2006-3); December 7, 2006 (NCSLT 2006-4); March 8, 2007 (NCSLT 2007-1); June 14, 2007 (NCSLT 2007-2); September 20, 2007 (NCSLT 2007-3); and September 20, 2007 (NCSLT 2007-4).

b.  "Administrator" means the Administrator, as defined in the Trust Indenture, providing certain duties of the Trusts pursuant to the Administration Agreements.

c.  "Affected Consumers" includes Consumers who are or were subject to a Collections Lawsuit filed by Defendants' agents on behalf of Defendants on or after November 1, 2012 to collect a Debt where (a) the documentation necessary to prove the existence of the Debt does not exist or cannot be located by Defendants; (b) the documentation necessary to prove Trust ownership of the Debt does not exist or cannot be located by Defendants; or (c) the lawsuit was time-barred.

d.  "Affiant" means any signatory to an Affidavit, other than one signing solely as a notary or witness to the act of signing, signing in his or her capacity as an employee or agent of Defendants,

4

including employees or agents of Defendants' Servicers or
Subservicers.

e.     "Affidavit" means any sworn statement filed with a court in
connection with litigation to collect on a Debt.

f.     "Board" means the registered owner of a majority of the beneficial
interest in each of the Trusts.

g.     "Clearly and Prominently" means

i.     as to written information: written in a type size and location
sufficient for an ordinary consumer to read and comprehend
it and disclosed in a manner that would be easily
recognizable and understandable in language and syntax to
an ordinary consumer; if the information is contained in a
multi-page print document, the disclosure appears on the
first page.

ii.     as to information presented orally: spoken and disclosed in a
volume, cadence, and syntax sufficient for an ordinary
consumer to hear and comprehend.

h.     "Collections Lawsuits" means attempts by Defendants' Servicers on
behalf of Defendants (or a third party acting on their behalf for an
account owned or alleged to be owned by Defendants) through
judicial processes in the United States of America, to collect or
establish a Consumer's liability for a Debt.

i.     "Consumer" means any natural person obligated or allegedly
obligated to pay any Debt.

j.  "Debt" means any obligation or alleged obligation of a Consumer to pay money arising out of a transaction in which the money, property, insurance, or services that are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

k.  "Effective Date" means the date on which the Order is entered on the docket by the Court.

l.  "Enforcement Director" means the Assistant Director of the Office of Enforcement for the Consumer Financial Protection Bureau, or his or her delegate.

m.  "Primary Servicer" means the Servicer servicing student loans for Defendants under the Amended and Restated Private Student Loan Servicing Agreement dated September 28, 2006.

n.  "Related Consumer Action" means a private action by or on behalf of one or more Consumers or an enforcement action by another governmental agency brought against Defendants based on substantially the same facts as described in the Complaint.

o.  "Relevant Period" includes the period from November 1, 2012 to the Effective Date.

p.  "Defendants" means any or all of the fifteen (15) Delaware statutory trusts referred to as the National Collegiate Student Loan Trusts ("NCSLTs" or "the Trusts," which are the National Collegiate Master Student Loan Trust, NCSLT 2003-1, NCSLT 2004-1, NCSLT

6

2004-2, NCSLT 2005-1, NCSLT 2005-2, NCSLT 2005-3, NCSLT
2006-1, NCSLT 2006-2, NCSLT 2006-3, NCSLT 2006-4, NCSLT
2007-1, NCSLT 2007-2, NCSLT 2007-3, and NCSLT 2007-4) and
their successors and assigns.

q.    "Servicer" (or "Trusts' Servicer") means any Servicer, Primary

Servicer, Subservicer, Special Servicer, Administrator, and any

other individual or entity acting on behalf of Defendants with

respect to the servicing of the student loans owned by Defendants,

whether retained directly by Defendants or retained by an

individual or entity acting on behalf of Defendants.

r.    "Servicing Agreement" means any Servicing Agreement that meets

the definition of Servicing Agreement in each Trust's Indenture.

s.    "Special Servicer" means the Servicer providing services to the

Trusts with respect to defaulted and delinquent student loans under

the Special Servicing Agreements dated March 1, 2009 and May 1,

2009 (the "Special Servicing Agreements").

t.    "Subservicer" means any service provider that was retained by, and

contracted with, directly or indirectly, the Special Servicer, as an

agent of the Special Servicer, to provide services, including default

prevention, and collection services, including but not limited to

litigation, with respect to the servicing of the student loans owned

by Defendants.

u.    "The Trust Agreements" are the Trust Agreements creating each of

the Trusts.

## ORDER

**IT IS ORDERED** that:

### I. Conduct Requirements

8.  Defendants must provide all Defendants' Servicers that are engaged in the servicing or collection of Debts with actual notice of this Order within thirty (30) days of the Effective Date.

9.  Defendants and their officers, agents, servants, employees, and attorneys who have actual notice of this Order, including but not limited to all of Defendants' Servicers, whether acting directly or indirectly, may not violate sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536, and must take the following affirmative actions:

   a.  Defendants shall take all actions necessary to comply with the terms of the Order, including but not limited to ensuring that all of Defendants' Servicers acting as Defendants' agents comply with the terms of the Order.

   b.  Defendants must require that any of Defendants' Servicers or other agents retained by Defendants in connection with servicing or collection of student loans (1) agree to abide by the terms and conditions of the Order and (2) require any agents that Defendants' Servicers hire in connection with servicing or collection of student loans to abide by the terms and conditions of the Order.

   c.  Defendants and their officers, agents, servants, employees, and attorneys who have actual notice of this Order, including but not limited to all of Defendants' Servicers, whether acting directly or

8

indirectly, may not initiate a Collections Lawsuit to collect Debt
unless they possess:

    i.    the documentation necessary to prove that a Trust owns the
loan, including but not limited to, documentation reflecting
the complete chain of assignment from the Debt's originator
to the specific Trust claiming ownership; and

    ii.    a document signed by the Consumer, such as a promissory
note, evidencing the agreement to pay the loan forming the
basis of the Debt.

d.    Defendants and their officers, agents, servants, employees, and
attorneys who have actual notice of this Order, including but not
limited to all of Defendants' Servicers, whether acting directly or
indirectly, may not initiate a Collections Lawsuit to collect on a loan
for which the applicable statute of limitations has expired.

e.    Defendants and their officers, agents, servants, employees, and
attorneys who have actual notice of this Order, including but not
limited to all of Defendants' Servicers, whether acting directly or
indirectly, may not collect any Debt through Collections Lawsuits
that Defendants or their agents have any reason to believe may be
unenforceable.

f.    Defendants, their officers, agents, servants, employees, and
attorneys, and all other persons in active concert or participation
with any of them, who receive actual notice of this Order, including
but not limited to all of Defendants' Servicers, whether acting

directly or indirectly, are permanently restrained and prohibited, in connection with the collection of a Debt, from submitting any Affidavit:

i. containing an inaccurate statement;

ii. in which the Affiant represents, expressly or by implication, that the Affiant is familiar with or has personal knowledge of the Consumer's education loan records or the maintenance of those records when that is not the case;

iii. in which the Affiant represents, expressly or by implication, that the Affiant has personal knowledge of the Consumer's Debt when that is not the case;

iv. in which the Affiant represents, expressly or by implication, that the Affiant has personal knowledge of the loan's chain of assignment or ownership when that is not the case;

v. in which the Affiant represents, expressly or by implication, that the Affiant has personal knowledge of the documents relating to the loan's chain of assignment or ownership when that is not the case;

vi. representing, expressly or by implication, that the Affidavit has been properly notarized if the Affidavit was not executed in the presence of a notary or if the notarization was otherwise not compliant with applicable notary laws; or

vii. in which the Affiant represents, expressly or by implication, that any documents or records concerning the Debt that

10

forms the basis of the Collections Lawsuit have been
reviewed by the Affiant when that is not the case.

10.    Defendants are permanently restrained and prohibited from reselling Debt
that is time-barred or for which Defendants lack the necessary
documentation required by Paragraph 9(c) without obtaining the written
agreement of the purchaser to comply with this Order.

11.    Defendants, their officers, agents, servants, employees, and attorneys, and
all other persons in active concert or participation with any of them, who
receive actual notice of this Order, including but not limited to all of
Defendants' Servicers, whether acting directly or indirectly, are
permanently restrained and prohibited from, in connection with the
collection of a Debt, providing any testimony in a Collections Lawsuit that
contains any misrepresentations, including false statements that the
witness:

    a.    is familiar with or has personal knowledge of the Consumer's
        education loan records or the maintenance of those records;

    b.    has personal knowledge of the Consumer's Debt;

    c.    has personal knowledge of the loan's chain of assignment or
        ownership; or

    d.    has personal knowledge of the documents relating to the loan's
        chain of assignment or ownership.

12.    If Defendants determine that any of their agents, including but not limited
to all of Defendants' Servicers, are on behalf of Defendants engaging in any
conduct prohibited by this Order, including but not limited to Paragraphs

11

9 and 11 of this Order, Defendants promptly will take the necessary steps to ensure that their agents cease any and all practices that violate this Order.

13.  Within thirty (30) days of making any determination described in Paragraph 12, Defendants must submit to the Enforcement Director a report detailing (1) the practices that violate the Order, (2) the specific agents engaged in the practices in question, and (3) a plan to ensure that the practices cease and to remediate any harm resulting from the practices.

14.  With regard to pending Collections Lawsuits in which Defendants, through actions taken by Defendants' Servicers acting on behalf of Defendants, have filed an Affidavit that contains any misrepresentations—including but not limited to false statements that the Affiant (1) is familiar with or has personal knowledge of the Consumer's education loan records or the maintenance of those records, (2) has personal knowledge of the Consumer's indebtedness, (3) has personal knowledge of the loan's chain of assignment or ownership, (4) has personal knowledge about the maintenance of documents relating to the loan's chain of assignment or ownership, or (5) has attached as an exhibit a true and correct copy of a document—Defendants must either withdraw the pending Collections Lawsuit or ensure that the Affidavit is withdrawn. Defendants must instruct their attorneys, Defendants' Servicers, and their agents to either withdraw the pending Collections Lawsuit or notify the court of the following in writing while simultaneously providing the court with a copy

12

of the Order entered into between the Bureau and Defendants: "Plaintiff withdraws the affidavit of [insert name of affiant] pursuant to an Order entered into by the Consumer Financial Protection Bureau and the National Collegiate Student Loan Trusts."

15.     With regard to concluded Collections Lawsuits in which Defendants, through actions of Defendants' Servicers acting on behalf of Defendants, filed with a court or in arbitration an Affidavit that contained any misrepresentations—including but not limited to false statements that the Affiant (1) is familiar with or has personal knowledge of the Consumer's education loan records or the maintenance of those records, (2) has personal knowledge of the Consumer's indebtedness, (3) has personal knowledge of the loan's chain of assignment or ownership, (4) has personal knowledge about the maintenance of documents relating to the loan's chain of assignment or ownership, or (5) has attached as an exhibit a true and correct copy of a document—Defendants must instruct their attorneys, the Defendants' Servicers, and their agents to cease post-judgment enforcement activities and will seek, and will instruct their agents to seek, to remove, withdraw, or terminate any active wage garnishment, bank levies, and similar means of enforcing those judgments or settlements as well as cease accepting settlement payments related to any such concluded Collections Lawsuits.

16.     With regard to servicing of Debt owned by Defendants, Defendants shall within ten (10) days of the Effective Date (1) direct the Primary Servicer to cease transferring any Debt to the Special Servicer and any Subservicer and

instead retain possession of the Debt pending approval and implementation of the Compliance Plan provided for in Section III; (2) direct the Special Servicer and any Subservicer to suspend further collection efforts on all Debt owned by Defendants pending approval and implementation of the Compliance Plan provided for in Section III; (3) direct the Special Servicer and any Special Servicer agent to discontinue making outbound call attempts, sending collection letters, providing negative reports to any of consumer reporting agencies the credit bureaus, or other efforts as may be instructed by Defendants and are necessary to effectuate compliance with this Order; (4) direct the Primary Servicer to instruct the Special Servicer and all Subservicers to return to the Primary Servicer all student loans in their portfolio owned by Defendants that are completed and the subject of each monthly Compliance Audit Report described in Paragraph 20; and (5) direct Defendants' Servicers to take any other appropriate actions necessary to effectuate compliance with this Order as instructed by the Defendants.

17. Defendants shall direct (1) the Primary Servicer and Special Servicer to remit all payments from Consumers to an escrow account as designated by Defendants pursuant to Paragraph 18; (2) the Subservicer to remit funds to the Special Servicer and the Special Servicer to remit those payments to the Special Servicer and the Special Servicer to remit those payments to the escrow account as designated by Defendants pursuant to Paragraph 18; and (3) the Primary Servicer and Special Servicer to provide an itemized report to the Defendants identifying the payments remitted at the loan level in a format approved by the Defendants.

18.     Nothing in this Order shall prohibit Defendants or their Servicers from accepting payments from Consumers made in the regular course on Debt that is not subject to a Collections Lawsuit. All such payments shall be held in escrow until the requirements of Paragraphs 9(c)(1) and (2) are satisfied and Defendants have determined that sufficient loan documentation exists to either retain the payment or refund the amount paid as to be provided for in the Compliance Plan of Section III. Defendants may use funds from the escrow to carry out Trust operations, including payments to noteholders sufficient to avoid events of default under the Indenture Trust, auditors, consultants, accountants, legal counsel, and other necessary professionals.

## II. Compliance Audit

19.     Within thirty (30) days of the Effective Date, Defendants must secure and retain one or more qualified, independent consultants or auditors with specialized experience in the servicing of student loans, and acceptable to the Enforcement Director, to conduct an independent audit of all of the servicing and collecting conducted by Defendants' Servicers on student loans owned by Defendants from inception of each of the Trusts to the present, using procedures and standards generally acceptable to the student loan–servicing industry. The purposes of the Compliance Audit must be to determine, at a minimum:

a.      For each and every student loan, whether Defendants, or their agents (including Defendants' Servicers), have or ever had in their possession sufficient loan documentation, including signed

promissory notes and documentation reflecting the complete chain of assignment since the loan's origination, to support the claim that a Debt is currently owed to a Trust, including but not limited to, assignments from the Debt's originator to the Trust claiming ownership and any subsequent assignments by the Trust to a student loan guarantor (such as The Education Resources Institute or its successors);

b.      Whether certain loans owned by Defendants are no longer legally enforceable because the applicable statute of limitations has expired;

c.      Whether Collections Lawsuits have been filed on any loans for which sufficient documentation, including signed promissory notes and documentation reflecting the complete chain of assignment from the Debt's originator to the Collections Lawsuit's named plaintiff, is not in the possession of the Collections Lawsuit's named plaintiff, or a Defendants' Servicer acting on behalf of the named plaintiff, to prove the existence of the Debt owed to the Trust in question, or where the applicable statute of limitations has expired;

d.      Whether judgments were obtained in Collections Lawsuits described in Paragraph 19(c), the identity of Consumers from whom the Defendants obtained payments in response to those Collections Lawsuits, and the specific amounts collected from these Consumers;

16

    e.      Whether any student loans were disbursed to the Consumers after the loans allegedly were transferred to the Defendants;

    f.      Whether any of Defendants' agents, including but not limited to any of Defendants' Servicers, have failed to comply with any Federal consumer financial law or any of the Servicers' Servicing Guidelines; and

    g.      Whether any of Defendants' agents, including but not limited to any of Defendants' Servicers, are or have engaged in any practices on behalf of Defendants after the Effective Date that violate this Order.

20.    Within one hundred and eighty (180) days of the Effective Date and each thirty (30) days thereafter until finished, the independent consultant(s) must provide a written report to Defendants detailing the findings of the audit (the "Compliance Audit Reports"). The Compliance Audit Report with respect to additional Affected Consumers shall be completed within one hundred and eighty (180) days of the Effective Date, and the remainder of the Compliance Audit Reports within three hundred and sixty (360) days of the Effective Date. The Compliance Audit Report shall include the auditors' findings, conclusions, and a description of its methodology.

21.    Defendants must provide the Compliance Audit Reports to the Enforcement Director within fourteen (14) days of receipt by Defendants.

22.    Within thirty (30) days of receiving the final Compliance Audit Report identified in Paragraph 20, Defendants must submit to the Enforcement

Director for review and non-objection an amendment to the Compliance

Plan ("Amended Compliance Plan") described in Section III to:

a.      ensure the withdrawal and dismissal without prejudice of any

        pending Collections Lawsuits identified in Paragraph 19(c);

b.      ensure that Defendants and their agents, including but not limited

        to any of Defendants' Servicers, will not take any steps to initiate

        collections or furnish negative reports to consumer reporting

        agencies, on loans identified in Paragraph 19(a), or accept payments

        on any defaulted Debts, unless and until Defendants first verify the

        existence of the documentation referenced in that subparagraph in

        order to prove the existence of the Debt and the identity of the

        current owner;

c.       ensure that Defendants and their agents, including but not limited

        to any of Defendants' Servicers, will not take any steps to collect

        Debts by any means on any loans identified in Paragraph 19(b)

        without Clearly and Prominently disclosing to the Consumer as

        follows:

        i.      For those time-barred debts that generally cannot be

                included in a consumer report under the provisions of the

                Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681c(a), but

                can be collected through other means pursuant to applicable

                state law, Defendants will instruct their agents to include the

                following statement: "The law limits how long you can be

                sued on a debt and how long a debt can appear on your

18

credit report. Due to the age of this debt, we will not sue you
for it or report payment or non-payment of it to a credit
bureau."

ii.    For those time-barred debts that can be collected through
other means pursuant to applicable state law, and may be
included in a consumer report under the provisions of FCRA,
15 U.S.C. § 1681c(a), Defendants will instruct their agents to
include the following statement: "The law limits how long
you can be sued on a debt. Because of the age of your debt,
we will not sue you for it."

23.    Defendants and their agents are prohibited from making any
representation or statement, or from taking any other action that
interferes with, detracts from, contradicts, or otherwise undermines the
disclosures required in Paragraph 22.

24.    Defendants will be deemed to have complied with the disclosure
requirements of Paragraph 22 if Defendants or their agents makes a
disclosure to Consumers in a specific jurisdiction that (1) is required by the
laws or regulations of that jurisdiction, (2) complies with those laws or
regulations, and (3) is substantially similar to the disclosure required by
Paragraph 22.

25.    The Enforcement Director will have the discretion to make a
determination of non-objection to the Amended Compliance Plan or to
direct the Defendants to revise it. If the Enforcement Director directs the
Defendants to revise the Amended Compliance Plan, Defendants must

19

make the requested revisions and resubmit the Amended Compliance Plan
to the Enforcement Director within thirty (30) days.

26.    After receiving notification that the Enforcement Director has made a
determination of non-objection to the Amended Compliance Plan,
Defendants must implement and adhere to the steps, recommendations,
deadlines, and timeframes outlined in the Amended Compliance Plan.

27.    Within thirty (30) days of receiving notification that the Enforcement
Director has made a determination of non-objection to the Amended
Compliance Plan, Defendants will provide the Amended Compliance Plan
and the Compliance Audit Reports to Transworld Systems, Inc. ("TSI"), or,
if applicable, to the Defendants' successor Special Servicer or Subservicer.

### III.   Compliance Plan

28.    Within one hundred and twenty (120) days of the Effective Date,
Defendants must submit to the Enforcement Director for review and
determination of non-objection a comprehensive compliance plan
designed to ensure that Defendants and Defendants' Servicers acting on
their behalf comply with all applicable Federal consumer financial laws
and the terms of this Order ("Compliance Plan"). The Compliance Plan
must include, at a minimum:

a.    Detailed steps for addressing each action required by this Order
including operations meetings with the Primary Servicer;

b.    Specific timeframes and deadlines for implementation of the steps
described above; and

      c.     Comprehensive, written policies and procedures designed to ensure that any agents acting on behalf of the Defendants do not engage in practices in violation of this Order. These policies and procedures must include:

      i.     Detailed steps for addressing each action required of the Defendants or their agents, including but not limited to the Defendants' Servicers, by this Order;

      ii.     Comprehensive, written policies and procedures designed to prevent violations of Federal consumer financial laws and associated risks of harm to Consumers including regular operations meetings with and audits of each Servicer and establishment of procedures to respond to exception requests;

      iii.     An effective employee training program required for all of the agents' employees, including but not limited to Affiants, whose duties include reviewing, drafting, preparing, processing, verification, execution or notarization of Affidavits that includes regular, specific, comprehensive training in Federal consumer financial laws commensurate with individual job functions and duties;

      iv.     Implementation of reasonable and appropriate written policies and procedures to ensure the proper notarization processes for Affidavits, including that notaries place the Affiants under oath and witness their signatures;

     v.       Implementation of reasonable and appropriate written policies and procedures to ensure that Affiants verify the accuracy of each statement made in an Affidavit before executing the Affidavit; and

     vi.      Comprehensive, written policies and procedures designed to ensure that any law firms engaged by any agent to collect Debt does not violate any Federal consumer financial laws, which must include, at a minimum:

          (1)     the law firm's duty to maintain adequate internal controls to ensure compliance with Federal consumer financial laws;

          (2)     the law firm's duty to provide adequate training on compliance with all applicable Federal consumer financial laws and the agent's policies and procedures related to Collections Lawsuits;

          (3)     the agent's authority to conduct periodic onsite reviews of the law firm's controls, performance, and information systems related to Collections Lawsuits; and

          (4)     periodic review by the agent of the law firm's controls, performance, and information systems related to Collections Lawsuits.

29.    The Enforcement Director will have the discretion to make a determination of non-objection to the Compliance Plan or direct

22

Defendants to revise it. If the Enforcement Director directs Defendants to revise the Compliance Plan, Defendants must make the revisions and resubmit the Compliance Plan to the Enforcement Director within thirty (30) days.

30.    After receiving notification that the Enforcement Director has made a determination of non-objection to the Compliance Plan or any amendments thereto, Defendants must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Compliance Plan.

## IV.    Role of the Board

31.    The Board must review all submissions (including plans, reports, programs, policies, and procedures) required by this Order prior to submission to the Bureau.

32.    Although this Order requires Defendants to submit certain documents for the review or non-objection by the Enforcement Director, the Board of Defendants will have the ultimate responsibility for proper and sound management of Defendants and for ensuring that Defendants comply with Federal consumer financial law and this Order.

33.    In each instance that this Order requires the Board to ensure adherence to or perform certain obligations of Defendants, the Board must:

   a.    Authorize whatever actions are necessary for Defendants to fully comply with the Order;

   b.    Require timely reporting by Defendants' Servicers to the Board on the status of compliance obligations; and

23

    *c.*    Require timely and appropriate corrective action to remedy any material non-compliance with any failures to comply with Board directives related to this Section.

## V. Order to Pay Redress

34.    Within ten (10) days of the Effective Date, the Defendants must reserve or deposit into a segregated deposit account $3,500,000, for the purpose of providing redress to Affected Consumers as required by this Section.

35.    Within one-hundred and twenty (120) days of the Effective Date, the Defendants must submit to the Enforcement Director for review and non-objection a comprehensive written plan for providing redress to the previously identified Affected Consumers consistent with this Order ("Redress Plan"). The Enforcement Director will have the discretion to make a determination of non-objection to the Redress Plan or direct Defendants to revise it. If the Enforcement Director directs Defendants to revise the Redress Plan, Defendants must make the revisions and resubmit the Redress Plan to the Enforcement Director within thirty (30) days. After receiving notification that the Enforcement Director has made a determination of non-objection to the Redress Plan, Defendants must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Redress Plan.

36.    The Redress Plan must apply to all Affected Consumers and:

    a.    Specify how Defendants will identify all Affected Consumers;

      b.     Provide processes for providing redress covering all Affected Consumers including providing redress for:

          i.     Affected Consumers where the documentation necessary to prove the existence of the Debt did not exist or cannot be located by Defendants;

          ii.     Affected Consumers where the documentation necessary to prove Trust ownership of the Debt did not exist or cannot be located by Defendants; and

          iii.     Affected Consumers who were subject to a Collections Lawsuit outside the applicable statute of limitations.

      c.     Include a description of the following:

          i.     Methods used to compile a list of potential Affected Consumers;

          ii.     Methods used to calculate the amount of redress to be paid to each Affected Consumer;

          iii.     Procedures for issuance and tracking of redress to Affected Consumers; and

          iv.     Procedures for monitoring compliance with the Redress Plan.

37.     The Redress Plan, at a minimum, must provide full restitution of all amounts collected since the initiation of the Collections Lawsuit filed against them from:

      a.     The approximately 2,700 Affected Consumers identified prior to the Effective Date, who paid approximately $3,500,000; and

    b.    The Affected Consumers identified by the Compliance Audit in Section II.

38.    The Redress Plan must describe the process for providing redress for Affected Consumers and must include the following requirements:

    a.    A timetable for providing restitution to Affected Consumers identified in Paragraph 37(a) and (b) that provides restitution to each group of Affected Consumers as soon as practicable;

    b.    Defendants must mail a bank check to each Affected Consumer along with a Redress Notification Letter (as defined below);

    c.    Defendants must send the bank check by United States Postal Service first-class mail, address correction service requested, to the Affected Consumer's last known address as maintained by Defendants' records;

    d.    Defendants must make reasonable attempts to obtain a current address for any Affected Consumer whose Redress Notification Letter or redress check is returned for any reason, using the National Change of Address System, and must promptly re-mail all returned letters and redress checks to current addresses, if any; and

    e.    Processes for handling any unclaimed funds.

39.    With respect to redress paid to Affected Consumers, the Redress Plan must include:

    a.    The form of the letter ("Redress Notification Letter") to be sent notifying Affected Consumers of the redress, which must include language explaining the manner in which the amount of redress

26

was calculated and a statement that the provision of the refund payment is in accordance with the terms of this Order; and

b.  The form of the envelope that will contain the Redress Notification Letter.

40.  Defendants must not include in any envelope containing a "Redress Notification Letter" any materials other than the approved letters and redress checks, unless Defendants have obtained written confirmation from the Enforcement Director that the Bureau does not object to the inclusion of such additional materials.

41.  Within ninety (90) days of completion of the Redress Plan, Defendants must submit a report ("Redress Plan Report") to the Enforcement Director, which must include a review and assessment from an independent auditor agreed upon by Defendants and the Enforcement Director, on Defendants' compliance with the terms of the Redress Plan, including:

a.  The methodology used to determine the population of Affected Consumers;

b.  The redress amount for each Affected Consumer;

c.  The total number of Affected Consumers;

d.  The procedures used to issue and track redress payments;

e.  The amount, status, and planned disposition of all unclaimed redress payments; and

f.     A description of the work of independent consultants that Defendants have used, if any, to assist and review their execution of the Redress Plan.

42.     Defendants must submit an Amended Redress Plan within thirty (30) days of the completion of the Compliance Audit with respect to additional Affected Consumers required by Section II that incorporates the results of that Audit. The amended Redress Plan must contemplate providing full restitution to all additional Affected Consumers identified in the Compliance Audit within 120 days of submission of the Amended Redress Plan.

43.     Defendants must provide all of the relief to Consumers required by the Order, regardless of whether the total of such relief exceeds the amount reserved or deposited into a segregated account in this Section.

44.     After completing the Redress Plan, if the amount of redress provided to Affected Consumers is less than $3,500,000, within thirty (30) days of the completion of the Redress Plan, Defendants must pay to the Bureau, by wire transfer to the Bureau or to the Bureau's agent, and according to the Bureau's wiring instructions, the difference between the amount of redress provided to Affected Consumers and $3,500,000.

45.     The Bureau may use these remaining funds to pay additional redress to Affected Consumers. If the Bureau determines, in its sole discretion, that additional redress is wholly or partially impracticable or otherwise inappropriate, or if funds remain after the additional redress is completed, the Bureau will deposit any remaining funds in the U.S. Treasury as

disgorgement. Defendants will have no right to challenge any actions that the Bureau or its representatives may take under this Section.

46.    Defendants may not condition the payment of any redress to any Affected Consumer under this Order on that Affected Consumer's waiving any right.

47.    With regard to the Debt that has yet to be collected from Affected Consumers for whom Defendants and their agents do not possess or cannot locate the documentation necessary to prove the existence of the Debt or Defendants' ownership of the Debt, Defendants must within one hundred and twenty (120) days of the Effective Date—and for Affected Consumers identified in the Compliance Audit Reports, within thirty (30) days of the completion of the Compliance Audit Reports—instruct that their agents within 90 days:

a.    Withdraw, dismiss, or terminate all pending Collections Lawsuits filed against Affected Consumers;

b.    Release or move to vacate all judgments obtained during the Relevant Time Period in connection with these Collections Lawsuits;

c.    Cease post-judgment enforcement activities and seek to remove, withdraw, or terminate its active wage garnishment, bank levies, and similar means of enforcing those judgments or settlements as well as cease accepting settlement payments related to any Collections Lawsuits;

    d.    Refrain from (i) representing to a Consumer or any other person that Defendants are or were owed a Debt, (ii) taking any steps to collect or to seek to collect the Debt in question, (iii) furnishing reports on the Debt in question, except as otherwise required by this Order; and

    e.    Request that the consumer reporting agencies correct any affected collection account or tradeline, which may include amending, deleting, or suppressing the incorrect account or tradeline.

48.    With regard to time-barred Debt that has yet to be collected from Affected Consumers, Defendants and their agents will not take any steps to collect Debts by any means without Clearly and Prominently disclosing to the consumer:

    a.    For those time-barred debts that generally cannot be included in a consumer report under the provisions of the FCRA, 15 U.S.C. § 1681c(a), but can be collected through other means pursuant to applicable state law, Defendants will instruct their agents to include the following statement: "The law limits how long you can be sued on a debt and how long a debt can appear on your credit report. Due to the age of this debt, we will not sue you for it or report payment or non-payment of it to a credit bureau."

    b.    For those time-barred debts that can be collected through other means pursuant to applicable state law, and may be included in a consumer report under the provisions of the FCRA, 15 U.S.C. § 1681c(a), Defendants will instruct their agents to include the

30

following statement: "The law limits how long you can be sued on a debt. Because of the age of your debt, we will not sue you for it."

49. Defendants and their agents are prohibited from making any representation or statement, or from taking any other action that interferes with, detracts from, contradicts, or otherwise undermines the disclosures required in Paragraph 48.

50. Defendants will be deemed to have complied with the disclosure requirements of Paragraph 48 if Defendants or their agents make a disclosure to Consumers in a specific jurisdiction that (1) is required by the laws or regulations of that jurisdiction, (2) complies with those laws or regulations, and (3) is substantially similar to the disclosure required by Paragraph 48.

## VI. Order to Pay Disgorgement

51. Defendants shall pay $7,800,000 as disgorgement for the proceeds they received from the unlawful practices related to the filing of Collections Lawsuits during the Relevant Period.

52. Within ten (10) days of the Effective Date, Defendants shall pay the above amount in the form of a wire transfer to the Bureau or such agent as the Bureau may direct, and in accordance with wiring instructions to be provided by counsel for the CFPB. The Bureau will then transfer the payment to the United States Treasury as disgorgement.

53. In the event of any default on Defendants' obligations to make payment under this Order, interest, computed under 28 U.S.C. § 1961, as amended,

will accrue on any outstanding amounts not paid from the date of default to the date of payment, and will immediately become due and payable.

## VII.   Order to Pay Civil Money Penalty

54.   Under section 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law described in the Complaint, and taking into account the factors in 12 U.S.C. § 5565(c)(3), the Defendants must pay a civil money penalty of $7,800,000 to the Bureau.

55.   Within ten (10) days of the Effective Date, Defendants must pay the civil money penalty by wire transfer to the Bureau or to the Bureau's agent in compliance with the Bureau's wiring instructions.

56.   The civil money penalty paid under this Order will be deposited in the Civil Penalty Fund of the Bureau as required by section 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

57.   Defendants must treat the civil money penalty paid under this Order as a penalty paid to the government for all purposes. Regardless of how the Bureau ultimately uses those funds, Defendants may not:

    a.   Claim, assert, or apply for a tax deduction, tax credit, or any other tax benefit for any civil money penalty paid under this Order; or

    b.   Seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made under any insurance policy, with regard to any civil money penalty paid under this Order.

58.   To preserve the deterrent effect of the civil money penalty in any Related Consumer Action, Defendants may not argue that Defendants are entitled

to, nor may Defendants benefit by, any offset or reduction of any
compensatory monetary remedies imposed in the Related Consumer
Action because of the civil money penalty paid in this action or because of
any payment that the Bureau makes from the Civil Penalty Fund ("Penalty
Offset"). If the court in any Related Consumer Action grants such a Penalty
Offset, Defendants must, within thirty (30) days after entry of a final order
granting the Penalty Offset, notify the Enforcement Director, and pay the
amount of the Penalty Offset to the U.S. Treasury. Such a payment will not
be considered an additional civil money penalty and will not change the
amount of the civil money penalty imposed in this action.

## VIII.  Additional Monetary Provisions

59.    In the event of any default on Defendants' obligations to make payment
under this Order, interest, computed under 28 U.S.C. § 1961, as amended,
will accrue on any outstanding amounts not paid from the date of default
to the date of payment and will immediately become due and payable.

60.    Defendants must relinquish all dominion, control, and title to the funds
paid to the fullest extent permitted by law and no part of the funds may be
returned to Defendants.

61.    Under 31 U.S.C. § 7701, Defendants, unless they already have done so,
must furnish to the Bureau their taxpayer identifying numbers, which may
be used for purposes of collecting and reporting on any delinquent amount
arising out of this Order.

62.    Within thirty (30) days of the entry of a final judgment, consent order, or
settlement in a Related Consumer Action, Defendants must notify the

Enforcement Director of the final judgment, consent order, or settlement
in writing. That notification must indicate the amount of redress, if any,
that Defendants paid or is required to pay to Consumers and describe the
Consumers or classes of Consumers to whom that redress has been or will
be paid.

## IX.  Reporting Requirements

63.   Defendants must notify the Enforcement Director of any development that
may affect compliance obligations arising under this Order, including but
not limited to a dissolution, assignment, sale, merger, or other action that
would result in the emergence of a successor company; the creation or
dissolution of a subsidiary, parent, or affiliate that engages in any acts or
practices subject to this Order; the filing of any bankruptcy or insolvency
proceeding by or against Defendants; or a change in Defendants' name or
address. Defendants must provide this notice, if practicable, at least thirty
(30) days before the development but in any case no later than fourteen
(14) days after the development.

64.   Within one hundred and twenty (120) days of the Effective Date, and again
one year after the Effective Date, Defendants must submit to the
Enforcement Director an accurate written compliance progress report
("Compliance Report") that has been approved by the Board, which, at a
minimum:

a.   Describes in detail the manner and form in which Defendants have
complied with this Order; and

34

       b.      Attaches a copy of each Order Acknowledgment obtained under Section X, unless previously submitted to the Enforcement Director.

## X. Order Distribution and Acknowledgment

65.    Within thirty (30) days of the Effective Date, Defendants must deliver a copy of this Order to each of their board members or owners as well as to any managers, employees, Servicers, or other agents and representatives who have responsibilities related to the subject matter of the Order.

66.    For five (5) years from the Effective Date, Defendants must deliver a copy of this Order to any business entity resulting from any change in structure referred to in Section IX, any future board members, executive officers, or owners, as well as to any managers, employees, Servicers, or other agents and representatives who will have responsibilities related to the subject matter of the Order before they assume their responsibilities.

67.    Defendants must secure a signed and dated statement acknowledging receipt of a copy of this Order, ensuring that any electronic signatures comply with the requirements of the E-Sign Act, 15 U.S.C. §§ 7001–31, within thirty (30) days of delivery, from all persons receiving a copy of this Order under this Section.

## XI.   Recordkeeping

68.    Defendants must create, or if already created, must retain for at least five (5) years from the Effective Date, the following business records:

       a.      All documents and records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Bureau.

    b.    **All documents and records pertaining to the Redress Plan, described in Section V.**

69.    Defendants must retain the documents identified in Paragraph 68 for the duration of the Order.

70.    Defendants must make the documents identified in Paragraph 68 available to the Bureau upon the Bureau's request.

## XII.   Notices

71.    Unless otherwise directed in writing by the Enforcement Director, Defendants must provide all submissions, requests, communications, or other documents relating to this Order in writing, with the subject line, "*In re* [name of Respondent], File No. Year-CFPB-   ," and send them either:

    a.    **By overnight courier (not the U.S. Postal Service), as follows:**

        **Assistant Director for Enforcement**
        **Consumer Financial Protection Bureau**
        **ATTENTION: Office of Enforcement**
        **1625 Eye Street, N.W.**
        **Washington D.C. 20006; or**

    b.    **By first-class mail to the below address and contemporaneously by email to Enforcement_Compliance@cfpb.gov:**

        **Assistant Director for Enforcement**
        **Consumer Financial Protection Bureau**
        **ATTENTION: Office of Enforcement**
        **1700 G Street, N.W.**
        **Washington D.C. 20552**

## XIII.  Cooperation with the Bureau

72.    Defendants must cooperate fully with the Bureau in this matter and in any investigation related to or associated with the conduct described in the Complaint. Defendants must provide truthful and complete information,

evidence, and testimony, and Defendants must cause their officers,
employees, representatives, or agents to appear for interviews, discovery,
hearings, trials, and any other proceedings that the Bureau may
reasonably request upon five (5) days' written notice, or other reasonable
notice, at such places and times as the Bureau may designate, without the
service of compulsory process.

## XIV.  Compliance Monitoring

73.  Within fourteen (14) days of receipt of a written request from the Bureau,
Defendants must submit additional Compliance Reports or other
requested information, which must be made under penalty of perjury;
provide sworn testimony; or produce documents.

74.  Defendants must permit Bureau representatives to interview any
employee or other person affiliated with Defendants who has agreed to
such an interview. The person interviewed may have counsel present.

75.  Nothing in this Order will limit the Bureau's lawful use of civil
investigative demands under 12 C.F.R. § 1080.6 or other compulsory
process.

## XV.  Retention of Jurisdiction

76.  The Court will retain jurisdiction of this matter for purposes of
construction, modification, and enforcement of this Order.

77.  Notwithstanding the provisions of Paragraph 76, any time limits for
performance fixed by this Order may be extended by mutual written
agreement of the parties and without further Court approval. Additionally,
details related to administration of §§ IX through XIV of this Order may be

modified by written agreement of the parties and without further Court
approval. Any other modifications to this Order may be made only upon
approval of the Court, upon motion by any party.

## XVI. Administrative Provisions

78.    The Bureau releases and discharges Defendants from all potential liability
for law violations that the Bureau has or might have asserted based on the
practices described in the Complaint, to the extent such practices occurred
before the Effective Date and the Bureau knows about them as of the
Effective Date. The Bureau may use the practices described in this Order
in future enforcement actions against Defendants and their affiliates,
including, without limitation, to establish a pattern or practice of
violations or the continuation of a pattern or practice of violations or to
calculate the amount of any penalty. This release does not preclude or
affect any right of the Bureau to determine and ensure compliance with
the Order or to seek penalties for any violations of the Order.

79.    Should Defendants seek to transfer or assign all or part of its operations
that are subject to this Order, Defendants must, as a condition of sale,
obtain the written agreement of the transferee or assignee to comply with
all applicable provisions of this Order.

**IT IS SO ORDERED.**

Dated:                                    _____
                                          UNITED STATES DISTRICT JUDGE

Consented and agreed to:

FOR THE CONSUMER FINANCIAL PROTECTION BUREAU:

ANTHONY ALEXIS
*Enforcement Director*

Deborah Morris
*Deputy Enforcement Director*

/s/ Carolyn Hahn
Carolyn Hahn
(E-mail: Carolyn.Hahn@cfpb.gov)
(Phone: 202-435-7250)
Edward Keefe
(E-mail: Edward.Keefe@cfpb.gov)
(Phone: 202-435-9198)
1700 G Street NW
Washington, DC 20552
Fax: (202) 435-7722

Attorneys for Plaintiff
Consumer Financial Protection Bureau

FOR THE NATIONAL COLLEGIATE STUDENT LOAN TRUSTS

Defendants National Collegiate Student Loan Trusts
Waive service and answer of the Complaint and
Consent to entry of this Consent Judgment.

*/s/ Daniel M. Silver*
Daniel M. Silver (#4758)
MCCARTER & ENGLISH, LLP
Renaissance Centre
405 North King Street, 8th Floor
Wilmington, DE 19801
(302) 984-6300
dsilver@mccarter.com

/s/ James A. Kosch
JAMES A. KOSCH
(E-mail: jkosch@mccarter.com)
(Telephone: 973-639-2028)
MCCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry St.
Newark, NJ 07102
Fax (973) 297-3964