# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON

TOMMY BROWN,
    *on his behalf and on behalf of other*
    *similarly situated persons*

        Plaintiff,

        v.

TRANSWORLD SYSTEMS, INC.,
PATENAUDE & FELIX, APC, U.S. BANK,
NA. NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2004-1, NATIONAL
COLLEGIATE STUDENT LOAN TRUST
2004-2, NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2005-1,
NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2005-2, NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2005-3,
NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2006-1, NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2006-2,
NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2007-1, and NATIONAL
COLLEGIATE STUDENT LOAN TRUST
2007-2,

        Defendants.

Case No:  2:20-cv-00680-DGE

## APPENDIX OF EXHIBITS TO THE

## AMENDED COMPLAINT

| TABLE OF EXHIBITS TO AMENDED COMPLAINT | | |
|---|---|---|
| **Exhibit Number** | **Description** | **Page** |
| A | The First Marblehead Corporation 2007 Annual Report (relevant excerpts) | AC Apx. 1 |
| B | Boston Portfolio Advisors December 30, 2015 Audit of the Servicing Performance Review of Pennsylvania Higher Education Assistance Agency's ("PHEAA") American Education Services ("AES") Unit | AC Apx. 14 |
| C | Consumer Financial Protection Bureau – Transworld Systems, Inc. Consent Order (September 18, 2017) | AC Apx. 58 |
| D | *NCSLTs v. U.S. Bank, NA, et al.* Verified Complaint, the Court of Chancery of the State of Delaware (June 15, 2018) | AC Apx. 90 |
| E | Affidavit of James H. Cummins (January 6, 2020) | AC Apx. 158 |
| F | Affidavit of Jacqueline Jefferis (January 6, 2020) | AC Apx. 165 |
| G | *First Marblehead v. The Education Resources Institute Inc.*, December 8, 2011 Memorandum and Order (Doc. 17) USDC for the District of MA (Case No. 11-10241) | AC Apx. 172 |
| H | NY-Transworld Systems, Inc. Assurance of Discontinuance (September 11, 2020) | AC Apx. 196 |
| I | State of Connecticut Department of Banking-Transworld Consent Order (October 2017) | AC Apx. 219 |



# The First Marblehead Corporation

The First Marblehead Corporation Annual Report 2007

Brown
v.
Transworld

Exhibit A
to
Amended Complaint

Annual Report 2007

AC Apx-1

# Shareholder Letter

October 5, 2007

Dear Shareholders,

This has been an extraordinary year of progress and success for First Marblehead. We continued to meet the growing demand for private capital, facilitating 429,000 loans while helping students fulfill their education dreams. First Marblehead had a record fiscal year, generating total revenue of $881 million, up 55% from last year. Our net income for the fiscal year was $371 million, up 57% over last year, and earnings were $3.92 per diluted share, an increase of 60% over the prior year. Our four-year compound annual growth rate of 80% for earnings per share exceeded that of 95% of S&P 500 companies. We are very proud of this exceptional level of performance. Our company has continued to produce consistently outstanding results against the backdrop of volatile credit market cycles and necessary legislative reform efforts in the student lending industry.

The terrific results in revenue and earnings growth for the fiscal year were driven by significant growth in our facilitated loan volume, superior execution in our securitization program, a focus on our core competencies and enhanced operating capabilities. We have continued to help meet the growing demand for private education loans by providing an integrated suite of services for student loan programs to banks and other financial services companies and marketers. Senior management and our employees at First Marblehead are dedicated to being the leading provider of financial solutions that help students achieve their education dreams.

## Highlights of Fiscal Year 2007

### Diversifying our Revenue Base

- Fiscal 2007 was a significant year in terms of expanding our business and client bases. We acquired or expanded relationships with 30 clients in fiscal 2007 and had no attrition of any significant clients during the fiscal year. We added 20 new clients in fiscal 2007, representing a cross section of banks, consumer finance companies, affinity-focused financial services companies and marketing companies. We help our clients deliver competitive education finance solutions to their customer and member bases.

### Capital Markets

- For fiscal 2007, we securitized $3.75 billion of private student loans. The blended yield was over 18% with approximately $457 million coming in the form of upfront cash at the time of closing. Investor demand in our securitization program has been diverse and strong.

- For fiscal 2007, the mix of direct-to-consumer to school channel loans available for securitization was 79% to 21%. We continued to see increasing consumer demand as borrowers sought a range of options in a direct relationship with a lender; however, the school channel remains an important and viable growth channel where we plan to continue to allocate meaningful resources.

## Solid Operating Results

### Total Revenue $(M)



### Net Income $(M)



### Earnings Per Share[1]



**AC Apx.3**

[1] Earnings per share adjusted to reflect post-split values

- The rolling 12-month volume of loans available for securitization as of June 30, 2007 increased 33% over the last fiscal year to $3.9 billion.

### Processing Efficiency
- We processed a record 1.3 million loan applications that helped provide approximately 429,000 student loans to finance education at 5,800 schools. Our facilitated volume for the year was $4.3 billion, an increase of 28% over last fiscal year.

### Marketing Expertise
- We continued to supplement our clients' brand and distribution skills with our knowledge of the marketplace. The growth of our marketing services enabled us to offer our clients a more complete suite of products and support than ever before. We continue to design and test products, channels and messaging through our proprietary brands and take our knowledge back to our existing client base.

- Loans branded under our original proprietary brand, Astrive® Student Loans, represented approximately 12% of our overall facilitated loan volume for the fiscal year. Additionally, we rolled out two new proprietary brands during fiscal 2007 to enhance our knowledge regarding subsegments of the student loan marketplace. These brands will complement the learnings and volumes of our Astrive loans. We believe that as a result of the use of our proprietary brands, we have enabled clients for whom we coordinate marketing services to increase their loan volume.

### Enhancing our Core Capabilities
- We added significantly to our operating capabilities – investing in our people, processes and technology. We added experienced leadership talent, bringing in over a dozen executives, with an average of 20+ years of experience in critical areas of information technology (IT), marketing, sales and strategic planning. We expanded our internal training, employee engagement, and learning and development initiatives. We invested heavily in upgrading and expanding our core IT infrastructure to build in significant disaster recovery and back-up capabilities and to prepare us for the growth we expect.

- We completed the acquisition of Union Federal Saving Bank, a federally-chartered thrift located in Rhode Island, in November 2006.

### Returning Capital to our Shareholders
- Our company paid $59 million in dividends to shareholders and repurchased $61 million of stock this fiscal year. In the fourth quarter, our board increased the quarterly cash dividend to $0.25 per share from $0.15, an increase of 67%. This was the fourth consecutive quarterly increase and, overall, dividends increased 94% for fiscal 2007 as compared with fiscal 2006. First Marblehead also repurchased 1.76 million shares during the fiscal year. We continue to look for opportunities to enhance shareholder value through stock buy-backs, dividends and investments in the company.

## Our Future

The student loan financing industry continues to evolve. The funding gap between the cost of a college education and traditional sources of funding continues to widen and is estimated to be $122 billion. First Marblehead has long been a proponent of the principles

**AC Apx.4**

of smart borrowing, encouraging students to access grants and low-cost loans to achieve their education dreams before considering private loan solutions, and our business model supports responsible borrowing for all students. We see great opportunity in the future as we continue to enable private capital to meet the borrowing needs of students. The market for private student loans has been growing at a rate of 30% annually. We have built a strong foundation to position the company to meet the needs of students in the future. Looking forward to 2008, we are already off to a fast start. Demand is very strong as we have worked with our clients to bring even more private student loan solutions to borrowers.

First Marblehead has delivered strong, quality growth to our shareholders, and we remain proud of the performance of the company. We appreciate the efforts of all 1,000 of our dedicated employees as they focus on our mission of helping students and executing on our plan to continue enhancing value for you—our shareholders.

**Jack L. Kopnisky**
Chief Executive Officer, President &
Chief Operating Officer

**Peter B. Tarr**
Chairman and General Counsel

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

---

# Form 10-K

**(Mark One)**

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended: June 30, 2007**

**OR**

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from        to**

**Commission file number:  001-31825**

---

# THE FIRST MARBLEHEAD CORPORATION
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **04-3295311** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **The Prudential Tower**<br>**800 Boylston Street, 34th Floor**<br>**Boston, Massachusetts** | |
| (Address of principal executive offices) | **02199-8157**<br>(Zip Code) |

Registrant's telephone number, including area code:  **(617) 638-2000**

---

Securities registered pursuant to Section 12(b) of the Act:

| | |
|---|---|
| **Common Stock, $.01 par value** | **New York Stock Exchange** |
| (Title of each class) | (Name of each exchange on which registered) |

Securities registered pursuant to Section 12(g) of the Act:  **None**

---

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant:  (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act (Check one):

Large accelerated filer ☒          Accelerated filer ☐          Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  Yes ☐   No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant (without admitting that any person whose shares are not included in the calculation is an affiliate) was approximately $3,171,000,000 based on the last reported sale price of the common stock on the New York Stock Exchange on December 30, 2006.

Number of shares of the registrant's class of common stock outstanding as of July 31, 2007: 93,405,267

---

**DOCUMENTS INCORPORATED BY REFERENCE**

The registrant intends to file a proxy statement pursuant to Regulation 14A within 120 days of the end of the fiscal year ended June 30, 2007. Pursuant to Paragraph G(3) of the General Instructions to Form 10-K, information required by items 10, 11, 12, 13 and 14 of Part III have been omitted from this report (except for information required with respect to our executive officers and code of ethics, which is set forth under "Executive Officers" and "Code of Ethics" in Part I of this report) and are incorporated by reference to the definitive proxy statement to be filed with the Securities and Exchange Commission.

**THE FIRST MARBLEHEAD CORPORATION**

**ANNUAL REPORT ON FORM 10-K**
**For the Fiscal Year Ended June 30, 2007**

**TABLE OF CONTENTS**

PART I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

ITEM 1. BUSINESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

ITEM 1A. RISK FACTORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

ITEM 1B. UNRESOLVED STAFF COMMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36

ITEM 2. PROPERTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36

ITEM 3. LEGAL PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36

ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS . . . . . . . . . . . .   36

PART II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37

ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED
STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES . . . .   37

ITEM 6. SELECTED FINANCIAL DATA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION
AND RESULTS OF OPERATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42

ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET
RISK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   65

ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA . . . . . . . . . . . . . . . . . . .   66

ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON
ACCOUNTING AND FINANCIAL DISCLOSURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   66

ITEM 9A. CONTROLS AND PROCEDURES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   66

ITEM 9B. OTHER INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   67

PART III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   68

ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE . . . .   68

ITEM 11. EXECUTIVE COMPENSATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   68

ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND
MANAGEMENT AND RELATED STOCKHOLDER MATTERS . . . . . . . . . . . . . . . . . . . . .   68

ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND
DIRECTOR INDEPENDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   68

ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES . . . . . . . . . . . . . . . . . . . . . . . .   69

PART IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   70

ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES . . . . . . . . . . . . . . . . . . . .   70

FIRST MARBLEHEAD and ASTRIVE are either registered trademarks or trademarks of The First Marblehead Corporation. All other trademarks, service marks or trade names appearing in this annual report are the property of their respective owners.

All share and per share information in this annual report give effect to a three-for-two stock split of our common stock which was effected in the form of a stock dividend in December 2006.

This annual report includes forward-looking statements within the meaning of Section 21E of the Securities Exchange Act of 1934, as amended, or the Exchange Act, and Section 27A of the Securities Act of 1933, as amended, or the Securities Act. For this purpose, any statements contained herein regarding our strategy, future operations, financial position, future revenues, projected costs, market position, prospects, plans and objectives of management, other than statements of historical facts, are forward-looking statements. The words "anticipates," "believes," "estimates," "expects," "intends," "may," "plans," "projects," "will," "would" and similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain these identifying words. We cannot guarantee that we actually will achieve the plans, intentions or expectations expressed or implied in our forward-looking statements. Matters subject to forward-looking statements involve known and unknown risks and uncertainties, including economic, regulatory, competitive and other factors, which may cause actual results, levels of activity, performance or the timing of events to be materially different than those exposed or implied by forward-looking statements. Important factors that could cause or contribute to such differences include our "critical accounting estimates" described in Item 7 of Part II of this annual report, and the factors set forth under the caption "Risk Factors" in Item 1A of Part I of this annual report. Although we may elect to update forward-looking statements in the future, we specifically disclaim any obligation to do so, even if our estimates change, and readers should not rely on those forward-looking statements as representing our views as of any date subsequent to August 28, 2007.

## PART I

**Item 1.      Business**

*We use the terms "First Marblehead," "we," "us" and "our" in this annual report to refer to the business of The First Marblehead Corporation and its subsidiaries.*

**Overview**

The First Marblehead Corporation provides outsourcing services for private education lending in the United States. We help meet the growing demand for private education loans by providing national and regional financial institutions and educational institutions, as well as businesses, education loan marketers and other enterprises, with an integrated suite of design, implementation and securitization services for student loan programs. Using our services, our clients can offer borrowers access to competitive, customized student loan products. We receive fees for the services we provide in connection with processing and securitizing our clients' loans. We focus primarily on loan programs for undergraduate, graduate and professional education, and, to a lesser degree, on the primary and secondary school market. Private education loans are not guaranteed by the U.S. government and are funded by private sector lenders. They are intended to be used by borrowers who have first considered other sources of education funding, including the federally guaranteed loan programs, grants and other aid.

We enable our clients to offer student and parent borrowers competitive loan products, while managing the complexities and risks of these products. We provide our clients with a continuum of services, from the initial phases of program design through application processing and support to the ultimate disposition of the loans through securitization transactions that we structure and administer. We have developed loan processing and support systems that are designed to accommodate new clients, additional loan products and incremental loan volume. We also own a proprietary database of more than 20 years of historical information on private student loan performance, which helps us to facilitate the structuring and pricing of our clients' loan programs and to supervise the servicing and default management processes for the securitized loans. In addition, our proprietary database increases the efficiency of the securitizations of our clients' loans by enabling us to provide to participants in the securitization process historical payment, default and recovery data on which to base estimates as to credit losses and reserves.

The following table presents certain financial and operating information for the fiscal years ended June 30, 2007, 2006 and 2005. For additional information about our financial performance for each of the last three fiscal years, including our total assets, we refer you to the audited consolidated financial statements and accompanying notes attached as Appendix A to this annual report.

| | Fiscal year ended June 30, | | |
|---|---|---|---|
| | **2007** | **2006** | **2005** |
| | (dollars in thousands) | | |
| Total revenues .......................................... | $  880,704 | $  569,035 | $  421,265 |
| Net income .............................................. | $  371,331 | $  235,960 | $  159,665 |
| Approximate student loan applications processed.............. | 1,325,000 | 938,000 | 876,000 |
| Approximate number of schools with loans facilitated .......... | 5,800 | 5,600 | 5,300 |
| Principal amount of student loans facilitated ................... | $4,292,528 | $3,362,565 | $2,662,106 |
| Principal amount of student loans facilitated that were also available to us for securitization ........................ | $3,873,048 | $2,920,048 | $2,179,524 |
| Principal and accrued interest balance of student loans securitized............................................... | $3,750,043 | $2,762,368 | $2,262,493 |
| Principal balance of student loans facilitated and available to us at year end for later securitization ......................... | $  831,912 | $  663,800 | $  385,804 |

1

We have provided structural advisory and other services for 36 securitization transactions since our formation in 1991. We facilitated five securitizations in fiscal 2007, four securitizations in fiscal 2006 and five securitizations in fiscal 2005.

### Private Student Lending Overview

The lifecycle of a private student loan, which can be over 20 years long, consists of a series of processes and involves many distinct parties. Because the activities of these parties are largely uncoordinated but heavily regulated, the processes associated with designing, implementing, financing and administering student loan programs are complex, resource intensive and costly.

Set forth below is a chart outlining the series of processes in the private student loan lifecycle:



### Program Design and Marketing

Lenders, education loan marketers and educational institutions face an array of choices in attempting to satisfy their strategic and financial goals, as well as the needs of student borrowers. If an organization decides to initiate a loan program, it typically needs to make significant investments in staffing and infrastructure in order to support the program. In designing loan programs, the factors that these organizations generally consider include:

- borrower creditworthiness criteria, including acceptable credit scores, credit bureau ratings and cosigner requirements, as well as factors such as employment and income history and any past derogatory credit events;

- borrower eligibility criteria, including enrollment status, academic progress and citizenship or residency;

- loan limits, including minimum and maximum loan amounts on both an annual and aggregate basis;

- interest rates, including the frequency and method of adjustment;

- amount of fees charged to the borrower, including origination, guarantee and late fees;

- repayment terms, including maximum repayment term, minimum monthly payment amounts, rate reduction incentive programs and prepayment penalties, and deferment and forbearance options;

- loan guarantee arrangements to ensure repayment of defaulted principal and interest payments;

2

**AC Apx.10**

- third parties that are not themselves lenders but which market loans on behalf of the lenders that fund the loans. We refer to these third parties as loan marketers, and we refer to the lenders that fund these loans as program lenders; and

- "school channel," which are programs marketed directly to educational institutions by:

  - lenders; and

  - education loan marketers on behalf of program lenders.

Although we offer our clients a fully integrated suite of outsourcing services, we do not charge separate fees for many of these services. Moreover, although we receive fees for providing loan processing services to The Education Resources Institute, Inc., or TERI, in connection with TERI-guaranteed loans, and fees from certain of our clients for marketing coordination services, these fees represent reimbursement of the direct expenses we incur. Accordingly, we do not earn a profit on these fees. Although we provide these various services without charging a separate fee, or at cost in the case of processing TERI-guaranteed loans and marketing coordination services, we generally enter into agreements with the private label lenders giving us the exclusive right to securitize the loans that they do not intend to hold, and we receive structural advisory fees and residuals for facilitating securitizations of these loans. Our level of profitability depends on our ability to earn structural advisory fees and residuals from facilitating securitizations of private label loans. We may in the future enter into arrangements with private label lenders under which we provide outsourcing services but do not have the exclusive right to securitize the loans that they originate. We also receive fees as the administrator of the trusts that have purchased the private label loans, and in this capacity monitor the performance of the loan servicers. See "Management's Discussion and Analysis of Financial Condition and Results of Operations."

The primary driver of our results of operations and financial condition is the volume of loans for which we provide outsourcing services from loan origination through securitization. The volume of loans for which we structured securitizations increased to approximately $3.8 billion in fiscal 2007 from approximately $2.8 billion in fiscal 2006 and approximately $2.3 billion in fiscal 2005.

### Program Design and Marketing Coordination

We help our clients design their private loan programs. Our loan program design approach begins with a standard set of pricing options, legal agreements and third-party relationships that we can then customize for our clients in order to satisfy their particular needs. In addition, we assist certain clients with the design and execution of their marketing programs.

#### Program Design

We have developed strong relationships with lenders and other organizations through active marketing by our field sales force and business development executives. Our private label clients are typically lenders or educational loan marketers that desire to supplement their existing federal loan or other consumer lending programs with a private loan offering. Increasingly, these lenders or marketers are responding to competitive pressures to offer private loan programs. They are attracted to an opportunity to extend their existing brand in the federal loan or consumer lending marketplace to the private student loan marketplace.

Beyond federal student loan lenders, our approach is flexible enough to facilitate private student loan programs for a range of clients, who, in turn, serve a variety of consumers. We believe a private label opportunity exists with any business, union, affinity group or other organization that has employees, customers, members or other constituencies who are concerned about education costs. We can assist such organizations in partnering with a lender and in designing a program that provides tangible benefits to their constituencies, while simultaneously generating additional revenue. Regardless of whether the client

**AC Apx.11**

is a commercial bank, marketing company, affinity organization or a large corporation, we can contribute our specialized knowledge, experience and capabilities to assist these entities in the development of a private loan program to meet their needs, while minimizing their resource commitment and exposure to credit risk.

One of the key components of our private label programs is the opportunity for our lender clients to mitigate their credit risk through a loan repayment guarantee by TERI. TERI guarantees repayment of the borrowers' loan principal, together with capitalized and/or accrued interest on defaulted loans. For additional information on TERI, see "—Relationship with The Education Resources Institute." If the lender disposes of the loan in a securitization, this guarantee remains in place and serves to enhance the terms on which asset-backed securities are offered to investors.

Private label clients fall into two categories:

- *Make and sell.*  In this category, lenders select credit criteria and loan terms tailored to meet their needs and then outsource to us all operating aspects of loan origination and customer support, and typically hold the loans on their balance sheets for some limited period of time. Lenders that wish to have their loans guaranteed by TERI are required to meet TERI's underwriting criteria. In the case of clients that do not desire, or do not have the ability, to fund the loans initially, we arrange for them to work with a program lender in marketing their programs to customers. In both cases, after the holding period, we will facilitate a securitization to enable lenders to dispose of the loans, from which we generate structural advisory fees and residuals. See "—Securitization."

- *Make and hold.*  In this category, clients outsource all operating aspects of loan origination and customer support, but finance the loans on their balance sheets and generally continue to hold the loans through the scheduled repayment, prepayment or default. Clients retain the ability to securitize the loans through us, even if they elect not to do so initially. Unless clients securitize their make and hold loans through us, the revenues we generate on these loans are limited to the processing fees that we receive from TERI, which represent reimbursement of the direct expenses we incur in originating the loans.

The following table presents information regarding the aggregate principal and accrued interest balance of private label loans that we processed during the fiscal years ended June 30, 2007, 2006 and 2005:

|  | Fiscal year ended June 30, | | |
| --- | --- | --- | --- |
|  | 2007 | 2006 | 2005 |
|  | (dollars in billions) | | |
| Approximate "make and sell" volume processed | $3.8 | $2.8 | $2.1 |
| Approximate "make and hold" volume processed | 0.4 | 0.4 | 0.5 |
| Approximate total volume processed | $4.2 | $3.2 | $2.6 |

*Marketing Coordination*

We provide marketing coordination services intended to enable our lender and loan marketer clients to increase loan volume and resulting program revenue. We have established an in-house department that works in collaboration with clients, third-party agencies and vendors to support the development, execution and analysis of direct response marketing programs, including direct mail, direct response television, and Internet-based marketing campaigns. These programs are designed to drive direct-to-consumer loan program volume and generate learnings that inform ongoing marketing optimization and refinement.

Sunshine Act already passed by the U.S. House of Representatives would impose significant additional disclosure and processing burdens on our loan origination operations. Other proposals, which have not yet passed in either house of Congress, would reduce protection of the loans we securitize in bankruptcy proceedings.

Violations of the laws or regulations governing our operations, or the operations of TERI or our other clients, could result in the imposition of civil or criminal penalties, the cancellation of our contracts to provide services or our exclusion from participating in education loan programs. These penalties or exclusions, were they to occur, would negatively impair our ability to operate our business. In addition, the loan assets held by securitization trusts that we have structured could be adversely impacted by violation of tax or consumer protection laws. In such event, the value of our residual interests could also be adversely impacted. In some cases, such violations may render the loan assets unenforceable.

***Recent litigation has sought to re-characterize certain loan marketers and other originators as lenders; if litigation on similar theories were successful against us or any third-party marketer, the loans that we securitize would be subject to individual state consumer protection laws.***

We provide financial and educational institutions, as well as other organizations, with an integrated suite of services in support of private student loan programs. All of the lenders with which we work are federally-insured banks and credit unions and, therefore, are not subject to many state consumer protection laws, including limitations on certain interest rates, fees and other charges. In providing our private student loan services to our clients, we do not act as a lender, guarantor or loan servicer, and the terms of the loans that we securitize are regulated in accordance with the laws and regulations applicable to the lenders.

The association between high-interest "payday loans" marketers and out-of-state national banks has come under recent scrutiny. Recent litigation asserts that payday loan marketers use out-of-state lenders in order to evade the usury and interest rate caps, and other consumer protection laws, imposed by the states where they do business. Such litigation has sought, successfully in some instances, to re-characterize the loan marketer as the lender for purposes of state consumer protection law restrictions. Similar civil actions have been brought in the context of gift cards. We believe that our activities, and the activities of third parties whose marketing on behalf of lenders is coordinated by us, are distinguishable from the activities involved in these cases.

Additional state consumer protection laws would be applicable to the loans we facilitate if we, or any third-party loan marketer whose activities we coordinate, were re-characterized as a lender, and the loans (or the provisions governing interest rates, fees and other charges) could be unenforceable. In addition, we could be subject to claims by consumers, as well as enforcement actions by regulators. Even if we were not required to cease doing business with residents of certain states or to change our business practices to comply with applicable laws and regulations, we could be required to register or obtain licenses or regulatory approvals that could impose a substantial cost on us. To date, there have been no actions taken or threatened against us on the theory that we have engaged in unauthorized lending. However, such actions could have a material adverse effect on our business.

***The price of our common stock may be volatile.***

The trading price of our common stock may fluctuate substantially, depending on many factors, some of which are beyond our control and may not be related to our operating performance. These fluctuations could cause you to lose part or all of your investment in our shares of common stock. Those factors that could cause fluctuations include, but are not limited to, the following:

- actual or anticipated changes in our earnings or fluctuations in our operating results or in the expectations of securities analysts;

33

**AC Apx.13**

Brown
v.
Transworld

Exhibit B
to
Amended Complaint

# Servicing Performance Review of Pennsylvania Higher Education Assistance Agency

**12/30/2015**

**Prepared By:**

**BOSTON PORTFOLIO ADVISORS, INC.**

**AC Apx.14**

## Contents

Appendices ................................................................................................................................... 2

Executive Summary ...................................................................................................................... 3

    Objective ................................................................................................................................. 3

    Management Meetings .......................................................................................................... 5

Background ................................................................................................................................... 6

Operations/Systems ................................................................................................................... 11

    Delinquency and Default Due Diligence ........................................................................... 11

    Loan Conversion ................................................................................................................. 12

    Complaints .......................................................................................................................... 12

    Vendor Oversight ............................................................................................................... 14

    Disaster Recovery ............................................................................................................... 14

    Business Continuity ............................................................................................................ 15

Loan and Collateral Review ...................................................................................................... 16

    Sampling Methodology ...................................................................................................... 16

    Overall Observations ......................................................................................................... 17

    Collateral Review ............................................................................................................... 18

    Servicing Review ................................................................................................................ 20

Servicing Contract Compliance Review ................................................................................... 24

    Servicing Contract Compliance Review Result Table ....................................................... 25

    Servicing Contract Compliance Review Result Details ..................................................... 26

## Appendices

Appendix A    Grant Thornton Auditors' Report of Independent Service Auditors for the period of October 1, 2013 to September 30, 2014

Appendix B    Annual Report of the CFPB Student Loan Ombudsman dated October 2015

Appendix C    PHEAA's System Access Narrative Letter dated September 25, 2015

*Confidential*

2

## Executive Summary

On behalf of Wilmington Trust Company ("The Trust"), Boston Portfolio Advisors, Inc. ("BPA") conducted an emergency audit of the student loans serviced by the Pennsylvania Higher Education Assistance Agency ("PHEAA") via its student loan servicer American Educational Services ("AES").  The loan portfolio consists of approximately 800,000 loans with original balances totaling approximately $12 billion within 15 NCSLT securitization trusts.

The on-site review team consisted of Thomas Glanfield, Desiree Daly, Mark Mousseau, Kathy Palmer, Jacob Brier and William Steadman of BPA.  Jorge Rodriguez-Lugo and Tad Cook from VCG Acquisitions, Inc. ("VCG") also participated in the on-site meetings.  The review was conducted in PHEAA's Harrisburg, PA offices on September 9, 10 and 11, 2015.  A loan level review of the securitizations was conducted on site and then continued remotely at BPA's offices accessing PHEAA's information.

### Objective

The objective of the servicing review was to:

- Assess the quality of loan servicing functions performed by PHEAA.

- Evaluate the quality of the loan documentation.

- Assess the effectiveness of the servicing operation as it impacts the value of the loans in the trusts and its requirements under the Servicing and Custodial Agreements and any other agreement governing PHEAA's servicing of NCSLT Trusts.

- Conduct a review of 379 accounts from the servicing system to examine adherence to servicing requirements, policies and procedures.

- Assess servicing contract requirement and determine next steps.

The overall approach was divided into three major efforts: (1) review servicing process, policies, procedures, vendor oversight, compliance, payment processing, and document management for accounts pre- and post-charge-off; and (2) review student loan notes, document availability, balance amounts, transaction activities and correspondence at the individual loan level; and (3) Review PHEAA servicing contracts to understand PHEAA's responsibilities and determine further testing needs.

BPA conducted a Servicing Review of Policies, Procedures including a review of the Servicing and Custodial Agreements including the Servicing Guidelines and Service Level Agreement to determine PHEAA's/AES's responsibility for maintaining servicing records.

*Confidential*                                                                                                          3

**AC Apx.16**

1. BPA conducted a loan level review, including:

   • Selected a sample of loans from PHEAA's servicing system, including loans that were paid-off, charged-off or otherwise brought to a zero balance on the AES servicing system, and a sample of loans that are still being serviced by PHEAA.

   • Reviewed collection servicing notes, activities and correspondence to assess if collection efforts were consistent with the Servicing Guidelines referenced in the Servicing Agreement and/or AES Servicing Policies and Procedures.

   • Conducted an audit of selected documents to determine whether PHEAA custodial requirements were met and appropriate maintenance of electronic records has been followed.

2. BPA received the following to complete the review:

   • PHEAA/AES Servicing and Custodial Agreements and any amendments and addendums.

   • Account and transaction histories with pre-charge-off and post-charge-off data.

   • Access using the AES web portal to AES's loan servicing system and imaged servicing files, including the following documents:

     ○ Existence of and signature for the Student Loan Note.
     ○ Existence of and signature for the Student Loan Application.
     ○ Existence of and signature for the Loan Disclosure Statement.
     ○ Notification letter to borrowers informing them of servicing transfer.

   • AES MR50 and MR53 files for various selected months

   • AES vendor Policies and Procedures for vendor and subcontractor selection and vendor audit.

   • Copies of servicing policies and procedures applicable to the NCSLT portfolio.

**AC Apx.17**

## Management Meetings

VCG and BPA interviewed the following people:

| | |
|---|---|
| Jason Swartley | SVP, Chief Legal and Compliance Officer |
| Deb Callahan | Senior Counsel |
| Vicky Roganish | Vice President, Client Relations |
| Kenneth Shutter | Assistant Vice President, Client Relations |
| Sarah Parish | Client Relations |
| Stephanie Foltz | SVP of Client Relations, Loan Operations and Client Contractual Testing |
| Todd Mosko | SVP of Loan Assets Management |
| Tyler Baer | Assistant Vice President |

**AC Apx.18**

## Background

The following background information was gathered through conversations with PHEAA management and is helpful in understanding how and why certain policies and procedures existed as they did.  PHEAA's initial relationship was with First Marblehead Corporation ("FMC").  PHEAA, as a loan servicer, did not originate any loans and stated that the process of how FMC originated was convoluted.  A timeline is outlined below:

Initial Relationship (2001):

- In 2001, FMC created an alliance with The Education Resource Institute ("TERI"), a non-profit loan guarantor, wherein FMC acquired TERI's loan processing operations, forming the basis of FMC's new subsidiary, First Marblehead Education Resources ("FMER").  As part of this agreement, FMC was to provide the loan origination and processing services related to TERI education loans as part of a master servicing agreement.

- FMC had two subsidiary companies, both of which played a role in the portfolios:
    - FMER, acted as a special servicer and performed other functions which included marketing and sales for FMC;
    - First Marblehead Data Services, Inc. ("FMDS") acted as administrator and performed tasks that included trust administration services and investor reporting.

- Also in 2001 the first servicing contract between FMC and PHEAA was created. The agreement stated that PHEAA would service fully disbursed loans that would become part of the trusts. Most of the originating banks at the time used TERI as the guarantor but those that did not later added the TERI guaranty. PHEAA began servicing loans after they were originated by the banks or by FMC (most were originated by FMC).   The loans were serviced under separate guidelines prior to securitization.

- While loan data was sent to PHEAA electronically, FMC sent loan documents in paper form. The documents included the collateral documents supporting each loan, namely the promissory notes, and disclosure statements. PHEAA indicated there was no consistent order or system of filing for the documents. PHEAA sorted the documents, organized and imaged the files onto their system. Original signature documents were kept in storage and copies of original signatures were retained for one year then destroyed.  Although there was a process to check the data, PHEAA did not create a list of missing documents as the loans were delivered.

- In instances where claims had to be processed through the TERI guaranty, PHEAA was instructed and authorized by FMC to use Affidavits of Lost Note.  PHEAA was advised by FMC that because the loans ultimately come back to FMC at the time the claim is filed, it did not matter if PHEAA was missing any collateral documents and that it was acceptable for PHEAA to send an affidavit of missing noted to FMC at the

**AC Apx.19**

time the claim was filed if, in fact, a note was missing.  This became a standard process as it was a less costly option.  PHEAA stated that FMC was more interested in how a loan was serviced and not the presence of a note that was held by FMC, therefore PHEAA did not have to prove that the loan origination documentation existed as FMC theoretically had possession of the documentation.

- Certain documents were held by TERI as guarantor.  PHEAA did not consistently receive all of the documents for each loan and according to PHEAA the contract did not require that TERI send every single document to PHEAA.

Amended and Restated Servicing Agreement (2006):

- The Servicing Agreement was amended and restated in 2006 to accommodate the dual role in creating an SPE and committed loans, added regulatory language, as well as service level requirements for securitization filings since the NCSLT trusts were now securitized. Per PHEAA, the agreement needed to be "market approved" to sell to investors, rating agencies, etc.

- PHEAA and FMC held quarterly meetings to review issues. FMC would inform PHEAA of pending changes to servicing guidelines requiring TERI's approval. Changes were made by FMC on behalf of and signed off by TERI.

- Per PHEAA, there was high turnover at FMC during the 2006-2008 time period resulting in inconsistencies and many changes.  The people at FMC that drafted the 2006 agreement were only at FMC for a short period of time.

- PHEAA is not aware of the criteria FMC used for assigning a batch of loans to any given trust except the general knowledge that FMC was able to package loans to appeal to investors.  PHEAA would change the owner on its system upon notification from FMC. Loans were not bundled by disbursement year or period (i.e. the 2007 trust does not contain all loans originated in the 2006-2007 academic year) and the criteria that FMC used to formulate the trusts was never disclosed to PHEAA. The first trust (National Collegiate Master Student Loan Trust) was replenished with 6 independent securitizations from 2001 to 2006, while the other 14 trusts were one and done transactions. The early disbursements were all direct to consumer and mainly with Chase Bank and Bank One.

- PHEAA has custodial responsibilities for the loan documents but indicated it did not receive nor have all of the documents for each loan.  PHEAA wrote to FMC on numerous occasions to send orderly documents which continued for more than two years.  PHEAA requested an imaging solution to eliminate the need for paper documents. It was an ongoing struggle to obtain the documents from FMC/FMER.

- As the trust performance deteriorated, TERI mandated that PHEAA develop a process to get borrowers to perform better resulting in constant changes to

payment plans. PHEAA stated that bondholders accused them of putting "band aids" on the loans.  In an effort to cure delinquencies, FMC started outsourcing collections to approximately 5 independent collection agencies (Zwicker, DCS, Windham, CCS, Simms). The outsourcing occurred when a loan was between 31 and 179 days delinquent prior to being paid by TERI's guaranty.

Portfolio Bond Performance Issues and TERI's Bankruptcy (2008):

- By 2008, there were numerous bondholder lawsuits alleging that FMC was trying to hide portfolio underperformance. Charge off temporarily changed to 90 days instead of 180.

- In April 2008, TERI filed a petition in the United States Bankruptcy Court for relief under Chapter 11 of the United States Bankruptcy Code.

- Also in April 2008, the servicing agreement between FMC and PHEAA received its third amendment, adding NCO Financial Systems, Inc. ("NCO") as an outsourcing party to receive loans for collections.  According to the agreement:
    - NCO was added as the 31-60 day default prevention collector.  PHEAA would send daily files to NCO containing all loans that were between 31-60 days delinquent and NCO performed collection services to bring the accounts to less than 31 days delinquent.  Formal recall files, separate from the daily update files, were not sent to NCO and PHEAA assumed that NCO knew not to continue to collect when loans were either less than 31 days or more than 60 days delinquent.
    - At day 61, default prevention services were performed by FMER.  PHEAA sent daily files to FMER containing all loans that were between 61 and 179 days delinquent.
    - PHEAA was only responsible for default prevention services for loans that were between 1 and 30 days delinquent, and for sending the final demand letter to the borrower which at the time occurred at 120 days delinquent.

- In November 2008, TERI made FMER its agent, which permitted FMER to make changes to the servicing guidelines and processes without prior approval from TERI. FMER was introduced to PHEAA as its direct contact and PHEAA began taking direction from FMER.  According to PHEAA, it is likely that FMER became TERI's agent to avoid the required sign-off process when changes to the guidelines were needed.

- In November 2009, the pre-claim process changed and PHEAA was instructed to submit claims to FMER on the 30th day of delinquency. FMER assumed all delinquency servicing activity from day 30 until the time the loan was charged off.

- In certain instances, FMC sent loans back to PHEAA for default prevention activities as part of a Champion-Challenger program.

*Confidential*                                                                                    8

**AC Apx.21**

FMER Resignation (2012):

- In April 2012 FMER resigned as special servicer, causing US Bank as the backup special servicer, to take over special servicing.

- Also in 2012, GOAL purchased FMDS rendering GOAL the new administrator of the portfolio.

- On July 20, 2012 PHEAA received an email from GOAL explaining that "NCO will need the borrower data that was previously provided to FMER" and that FMDS, as administrator for each of the NCSLT trusts, will provide a direction letter to AES (PHEAA) to document this transaction. Per PHEAA, it never received this direction letter.

- On October 26, 2012 and October 30, 2012, PHEAA received a directive from FMC to send all charged off loans directly to NCO.  The email also advised PHEAA that if it sends the charged off loans to FMC, FMC would send them to NCO.

- At the direction of FMC, PHEAA has been sending communications and claim packages to NCO since this time.  PHEAA noted that NCSLT is the most complained upon portfolio to the CFPB, however PHEAA does not have authority to make decisions and GOAL and NCO typically do not make exceptions and are non-responsive.

PHEAA Servicing Process Today (September 2015):

- PHEAA provides default prevention services for loans between 1 and 60 days delinquent. At day 61, the loans are outsourced to NCO.

- At the time a loan is charged off, PHEAA sends it to NCO pursuant to the direction PHEAA was given by FMC in 2012.

- All questions, inquiries, documents, and claim packages that were previously sent to FMER pursuant to the 2008 directive, are now sent to NCO. PHEAA stated that NCO rarely responds to any questions or inquiries and when a response is provided, it typically takes 30 to 60 days.

- PHEAA had to update SCRA guidelines on its own because it received no direction or response from either GOAL or US Bank despite numbers requests from PHEAA.

- PHEAA has recently received communication from NCO requesting that PHEAA stop sending NCO all questions and inquiries concerning non-charged off loans.

- PHEAA noted that NCSLT is the most complained about portfolio that PHEAA services. Unresolved complaints are sent to NCO, whose responses commonly tell PHEAA to follow the servicing guidelines.  This does not provide PHEAA with

*Confidential*                                                                                          9

adequate direction it needs to resolve the issue. PHEAA has sent these complaints to GOAL, however there is no evidence of replies from GOAL.

- PHEAA has attempted to preserve consistency with the consumer to maintain regulatory compliance and have had to resort to involving US Bank.  There is no evidence of any communication with US Bank.

- PHEAA indicated that throughout all of the transition and to this day, US Bank has never talked to or visited PHEAA.

- GOAL has never issued any letters to change servicing guidelines. Per PHEAA, GOAL said they do not have the authority to change guidelines.

*Confidential*                                                                                    10

**AC Apx.23**

## Operations/Systems

BPA performed a review of a Report of Independent Service Auditors (the "Auditors' Report") for the period October 1, 2013 through September 30, 2014 prepared by Grant Thornton LLP (See Appendix A attached).  The purpose of the report was to examine PHEAA's internal controls "likely or relevant to user entities' internal controls over financial reporting" and therefore does not encompass all aspects of PHEAA's operations.  The auditors examined PHEAA's computer applications for processing student loan transactions and its design suitability with respect to operating effectiveness and controls.  BPA reviewed and extracted content from the Auditors' Report pertinent to this review.

### Delinquency and Default Due Diligence

PHEAA's due diligence processing activities include emails, delinquency letters, telephone attempts/contacts, as well as skip tracing and delinquency claims.  PHEAA's COMPASS servicing system uses various applications to queue its system for calls, emails and letter production at the specified dates.

PHEAA provided a servicing due diligence schedule reflecting their current servicing practices pertaining to delinquencies.  The table below outlines AES's current servicing practices:

**AES SERVICING CURRENT DUE DILIGENCE SCHEDULE**

| Days Delinquent | Action |
|---|---|
| 1 | Email borrower only |
| 5 | Email borrower only |
| 8 | Email co-borrower only |
| 10 | Letter to borrower and co-borrower |
| 11 | Email borrower and co-borrower; begin calling borrower and co-borrower and continue until contact is made. *Contact includes leaving a message* |
| 26 | Email borrower and co-borrower |
| 150 | Final demand letter is sent. *Prior to 2/7/2012 and beginning 11/11/2009, a final demand letter was sent at 165 days* |

**AC Apx.24**

## Loan Conversion

The Auditors' Report notes that the majority of loans converted onto PHEAA's COMPASS SYSTEM are done so electronically.  A batch process is utilized to develop a validation error report identifying potential discrepancies based on pre-set program parameters.  Validation errors are addressed individually and resolved by the conversions staff.  No mention is made with respect to PHEAA's process for the intake of collateral documentation.

As noted in the Background section of this report PHEAA originally received paper documents in boxes which were sent to imaging.  Originals were stored in a vault.  Once the documents were scanned, PHEAA performed a review to confirm that the promissory notes were present, signed and dated with proper terms.  Missing promissory notes were included on a list and PHEAA would follow up for six months.  With respect to missing notes:

- If the notes were not delivered within the six month timeframe, PHEAA made a "liability" notation on the account.

- PHEAA indicated that it does not have all promissory notes because it was never required to obtain them as collateral was kept and maintained by FMC and TERI as originator and guarantor.

- PHEAA asserted that although the 2006 Agreement appoints PHEAA as custodian of the required documents, the Agreement does not place responsibility on PHEAA to ensure that all notes are present.

- PHEAA was authorized by TERI to use affidavits in claim packages, and there was a point when TERI intentionally did not send promissory notes so they would not have to request them back if a claim was filed.


## Complaints

BPA reviewed the Annual Report of the CFPB Student Loan Ombudsman (the "Report") (see Appendix B) dated October 2015.  The report analyzes student loan complaints submitted by borrowers and provides a discussion and commentary on issues faced by student loan borrowers including:

- Student loans made by private lenders *"have a higher concentration of borrowers in default or delinquency than the student loan market at-large."*

- Student loan borrowers *"continue to submit complaints describing servicing and debt collection practices that create barriers to enroll in alternative repayment plans."*

- The subjects of the majority of complaints included:

  o Locating information on repayment options
  o Paperwork processing delays on repayment plans
  o Inconsistent or confusing instructions from servicers
  o Overall difficulty in enrolling in a repayment plan.

The Report ranks companies with the most private student loan complaints and shows that PHEAA complaints have increased from 378 for the period October 2013 through August 2014 to 401 for the period October 2014 to August 2015. The table below was taken from the Report detailing the above information:

**TABLE 1:** COMPANIES WITH THE MOST PRIVATE STUDENT LOAN COMPLAINTS RANKED BY VOLUME[4]

| Company | Oct. 2013 – Aug. 2014 | Oct. 2014 – Aug. 2015 |
|---|---|---|
| Navient | 1,854 | 1,724 |
| AES/PHEAA | 378 | 401 |
| Genesis Lending | 24 | 374 |
| Wells Fargo | 229 | 244 |
| Sallie Mae | 231 | 240 |

The Report also notes that 61% of PHEAA complaint reasons included: *"Dealing with my lender or servicer"*; and 38% of complaints referenced *"Can't repay my loan"* demonstrating that borrowers are not receiving appropriate relief indicating potentially inadequate loss mitigation processes.  This point had been presented by PHEAA.

The Report noted PHEAA as one of the top recipients of student loan debt collections complaints and shows that PHEAA received 401 complaints for the period October 1, 2014 through August 31, 2015 indicating that neither GOAL nor NCO provide proper or timely responses, if at all, to borrower inquiries.

**AC Apx.26**

## Vendor Oversight

Although the Auditors' Report indicates PHEAA's reliance upon vendors to perform certain tasks throughout the report, there is no description of or review of PHEAA's vendor oversight process.

Since NCO is not technically a PHEAA vendor as the relationship is between US Bank and NCO, PHEAA did not discuss its vendor oversight process during the site visit or subsequently.

## Disaster Recovery

PHEAA operates a large technology center supporting data processing for its servicing and guaranty systems.  PHEAA has a large data network delivering these services and its IT group is the custodian of these applications.  PHEAA's Disaster Recovery Plan ("DRP") is outlined in the Auditors' Report attached as Appendix A:

---

The DRP encompasses the production applications and data supported on PHEAA platforms, including:

- Servers
- Web sites
- Local area networks
- Wide area networks
- Distributed systems
- Mainframe systems
- Telecommunication systems

The DRP was developed based upon defined critical response timeframes, potential time-associated tangible losses, and application recovery priorities.

To assist with recovery efforts, PHEAA has entered into a business recovery agreement with an off-site recovery provider. PHEAA's contract with the off-site recovery provider includes provisions for both hot-site and cold-site recovery support. The off-site recovery provider facility contains equipment comparable to that currently installed at PHEAA, which gives PHEAA the capability of providing business units and user entities with the priority services they would receive on a normal business day.

PHEAA maintains inventories of data processing equipment and software to aid in acquiring and installing the portion of the PHEAA environment that would be recovered in the cold-site facilities. PHEAA performs at least one complete exercise of its DRP annually. The exercise includes the restoration of its operating systems, system utility programs, file definitions and datasets, batch processing, and communications testing. To ensure consistency, test scripts detailing the actions and activities required to conduct the technical elements of the test are used. After the exercise, a report is submitted to Executive Management that outlines the results of the exercise. The most recent Disaster Recovery exercise was completed in June 2014.

In the event of a disaster, current information on data files may be lost or damaged. PHEAA's DRP restores data maintained at an off-site location.

---

## Business Continuity

PHEAA's Business Continuity Plan is designed to provide immediate response and recovery from any business interruption ensuring that critical business processes are restored by providing a framework for an unplanned event and minimizing loss of vital resources.  The Business Continuity Plan is described in further detail in the excerpt below as taken from the Auditors' Report:

Components of the EBCP include the recovery strategy, continuity steps, outage levels, the alternate facilities plan, the conceptual recovery timeline, business unit continuity plans, evacuation procedures, communication plan, identification of critical business processes, key personnel listing, and critical vendor contact information.

ESO is accountable for leading, managing, and providing ongoing life cycle management for the development, implementation, and validation of the EBCP. ESO works closely with IT infrastructure and application teams, business units, and external vendors to recover mission critical production systems pertaining to the EBCP.

PHEAA also contracts with communication carriers to provide a backup data communication network that is in place and held in reserve. In the event of a disaster and the subsequent move to the alternate processing site, the entire PHEAA data communication network would be re-routed with service provided to the user entity base as if operations were coming from PHEAA's local Data Center. In addition, hardware and software components of the data transmission environment are replicated at the alternative recovery site and procedures exist to expediently restore data transmissions following an outage due to physical or technical failure or damage.

Individuals in the organization have been assigned responsibility for updating the DRP and EBCP every quarter, or more frequently, as required.

**AC Apx.28**

## Loan and Collateral Review

### Sampling Methodology

BPA selected a total of 379 student loan accounts for review, 50 of which were reviewed on site at PHEAA with the remainder reviewed remotely at BPA's offices.

**First 50 Loan Sample:**

The first 50 accounts consisted of defaulted loans that were reviewed on site:

- The accounts were selected from the September 4, 2015 MR50 file sent to VCG from GOAL and provided to PHEAA on September 4, 2015 (two days prior to the site visit).

- PHEAA was unable to match the borrower identification information in the data file; therefore, BPA did not have a sample to work with when it arrived at PHEAA's office on September 8, 2015.

- To expedite productivity while on site, BPA selected 50 accounts from the November 3, 2014 charge-off file as the charged-off loans were a primary concern for the review.

**Remaining 329 Loan Sample:**

The remaining sample was selected from the August 2015 MR50 data file using 329 unique borrowers.  From this group 329 individual accounts were randomly selected to represent an accurate distribution across the entire NCSLT portfolio based on five main categories: original lender, trust, days delinquent (if not charged-off), disbursement date, and charge-off date (if charged-off).  The sample considered a mix of accounts including:

- Original Lender – As the NCSLT portfolio consists of accounts that were originated by many different lenders, accounts were selected on a basis that represents the makeup of the overall portfolio.  Over 50 different lenders are represented in the sample.

- Trust – Accounts were selected to be evenly distributed among the 15 Trusts represented in the NCSLT portfolio.

- Number of Days Delinquent – 100 of the 379 sample were not charged-off as of the time of the review.  Among the 100 non charged-off loans, 50 accounts were in some stage of delinquency which ranged from 3 days to 138 days delinquent.  The remaining 50 non charged-off accounts were zero days delinquent or "current".

**AC Apx.29**

- Disbursement Date – The disbursement dates represented in the sample ranged from September 2001 to August 2007 and accounts were selected to be evenly distributed relative to the overall NCSLT portfolio.

- Charge-Off Date – The charge-off dates represented in the sample ranged from September 2004 to July 2015 and accounts were selected to be fairly evenly distributed relative to the default experience of the overall NCSLT portfolio.

The review was conducted to:

- Validate servicing due diligence; and

- Assess loan collateral documentation integrity.

Servicing due diligence was tested against the schedule provided in the Due Diligence section of this report.

### Overall Observations

From the review of collateral files provided by PHEAA, as well as PHEAA servicing activity as observed in its servicing system, BPA notes the following concerns:

1. There were 35 instances where there was no evidence that borrowers were notified that their accounts had been transferred to PHEAA.

2. Assignments were not present in any of the collateral files provided and PHEAA did not indicate if an Assignment existed elsewhere.  Based on representations made by PHEAA, it is likely that the Assignments do not exist.   Without appropriately issued Assignments, collection efforts are more challenging and costly to defend in Court.

3. PHEAA's servicing system does not provide a schedule of delinquencies.  As borrowers make payments, delinquencies are either fully or partially cured and this activity causes delinquency information to be updated to the current status.  The servicing system does not clearly demonstrate whether a borrower payment cured a prior delinquency in part or in full as once a prior delinquency is cured, there is no clear record to track.  The above issues are significant concerns as customer service agents have limited information from which to discuss options with borrowers as they only see the most recent delinquency.  This suggests that borrowers are offered or are not offered forbearance or deferment without consideration of delinquency history.

4. There were accounts where PHEAA did not perform follow up on initial unsuccessful contact efforts for delinquent borrowers. This is a significant concern as it is essential that borrowers and co-borrowers are contacted upon becoming delinquent to remedy delinquency and in these instances, PHEAA did not engage in an effort to comply with servicing compliance requirements.

During the early stages of delinquency, establishing trust and confidence with borrowers assists in the repayment process. Borrowers are more successfully assisted in the default management process when the servicer makes early contact, obtains important information, assesses workout options and sets clear expectations for borrowers. This method of mitigating loss by educating borrowers on expectations enables quicker delinquency resolution thereby decreasing the risk that a borrower will default.

## Collateral Review

Subsequent to the site visit PHEAA delivered to BPA imaged collateral files in groups of 20 with the last group delivered on October 1, 2015. BPA reviewed 379 imaged files to validate the following information:

- The student loan Promissory Note was signed by all borrowers.

- The loan program code in the PHEAA servicing system matched the sample file to validate the data.

- If there was a co-borrower on the account.

- To determine whether terms and conditions were affixed to the Note.

- Whether or not PHEAA sent a letter to the borrower(s) notifying them that PHEAA was servicing the account and whether NCSLT was listed as the owner of the loan on the letter.

- Whether a Disclosure Statement was provided under the appropriate loan program (as noted in the AES servicing system).

- The presence of an Assignment.

**Collateral Review Results:**

1. 100% of the accounts did not contain an Assignment. It is unknown whether Assignments were appropriately issued. Based on representations made by PHEAA, it is likely that the Assignments do not exist.

2.  1 Note or .3% of the sample was not signed which renders the account uncollectable.

3.  336 or 88.7% of the PHEAA letters to borrowers did not have a statement that NCSLT was the owner of the loan.

4.  358 or 94.5% of the sample did not have terms and conditions affixed to the Note. Per the Note borrowers acknowledged receipt of the terms and conditions and PHEAA's servicing contract states that borrowers are only required to return the signature page with PHEAA responsible for maintaining the signed first and second (if applicable) page.

5.  35 or 9.2% did not contain PHEAA notification letters to the borrowers.

6.  All Disclosure Statements were provided under the appropriate loan program.


The collateral review results are illustrated in the table below:


### COLLATERAL REVIEW CHARACTERISTICS

| | Promissory Note in File | Promissory Note Signed | Promissory Note Terms & Conditions Included | Disclosure in File | PHEAA Notification Letter to Borrower in File | NCSLT Notification Included | Assignment in File |
|---|---|---|---|---|---|---|---|
| **Count** | | | | | | | |
| Fail: | 1 | 1 | 358 | 0 | 35 | 336 | 379 |
| Pass: | 378 | 378 | 21 | 379 | 344 | 43 | 0 |
| **Percentage** | | | | | | | |
| Fail: | 0.3% | 0.3% | 94.5% | 0.0% | 9.2% | 88.7% | 100.0% |
| Pass: | 99.7% | 99.7% | 5.5% | 100.0% | 90.8% | 11.3% | 0.0% |

**AC Apx.32**



**Collateral Review Results by Percentage Pass/Fail**

## Servicing Review

BPA selected 379 accounts for review.  BPA tested the accounts on the servicing system to validate whether or not PHEAA adhered to its servicing responsibilities (PHEAA refers to this as the "due diligence schedule").  There were limitations to the review which are described below:

1.  BPA tested PHEAA's compliance with its servicing responsibilities from the most recent delinquency date.  However, if the prior delinquency was not fully cured BPA had to track back to the date when due diligence started and match that with the correct delinquency date:

    - The servicing system does not provide a schedule of delinquencies that could be easily reconciled.  As borrowers make payments, delinquencies are either fully or partially cured, as such delinquency information is essentially updated (partially or fully) by a payment event.

    - The servicing system does not demonstrate whether a borrower payment cured the prior delinquency in part or in full due to the system functionality described above.

    - Once a prior delinquency is fully cured, there is no clear record to track delinquency history.

    The above issues are significant concerns as customer service agents have limited information from which to discuss options with borrowers as they only see the most recent delinquency date as prior delinquencies are cured partially or wholly by payment events.  This suggests that borrowers are offered forbearance or deferment without consideration of delinquency history.

*Confidential*                                                                                           20

2.  PHEAA's servicing system does not have a specific field for email addresses; however it does capture emails voluntarily provided by borrowers.  Therefore, BPA tested email servicing compliance using the following rules:

    - If an email was sent for any first due diligence event, then it was evident that PHEAA had an email address and all email due diligence events were tested.

    - If emails were in the system, then emails were tested to eliminate the potential for false negative results.  PHEAA's responsibility to collect emails is strictly voluntary; therefore if borrowers did not provide an email address, PHEAA was not penalized for this during the test.

**Loan Review Results:**

BPA selected 379 accounts for review, however 2 loan records were missing and therefore, 377 loan records were reviewed.

A total of 105 or 28.1% of the 377 loans tested were deemed unacceptable having failed without recourse one or more of the tests administered in accordance with PHEAA's due diligence compliance schedule.  The most problematic events within the 105 accounts found to be unacceptable demonstrate that PHEAA did not adhere to the specified due diligence schedule include:

1.  PHEAA's servicing due diligence compliance schedule requires that it send delinquency notifications to borrowers and co-borrowers via email at certain delinquency dates if it has been provided with such emails.  BPA tested PHEAA's compliance with its email notification requirements by capturing the dates that emails were sent, comparing the captured date to the delinquency date, noting whether payments that may have partially or fully cured delinquency and determining whether the emails complied with the due diligence schedule.  Below are the email due diligence findings of the 105 unacceptable accounts:

    - Day 1 Borrower Email – 6 or 5.7% of the emails did not adhere to PHEAA's delinquency notification due diligence schedule.

    - Day 5 Borrower Email – 2 or 1.9% of the emails did not adhere to PHEAA's delinquency notification due diligence schedule.

    - Day 8 Co-Borrower Email – 2 or 1.9% of the emails did not adhere to PHEAA's delinquency notification due diligence schedule.

    - Day 11 Borrower Email – 2 or 1.9% of the emails did not adhere to PHEAA's delinquency notification due diligence schedule.

**AC Apx.34**

- Day 11 Co-Borrower Email – 1 or 1% of the emails did not adhere to PHEAA's delinquency notification due diligence schedule.

- Day 26 Borrower Email – 1 or 1% of the emails did not adhere to PHEAA's delinquency notification due diligence schedule.

- Day 26 Co-Borrower Email – 1 or 1% of the emails did not adhere to PHEAA's delinquency notification due diligence schedule.

2. PHEAA's servicing due diligence compliance schedule requires that it send delinquency notifications letters to borrowers and co-borrowers on specified delinquency dates.  BPA tested PHEAA's compliance with this requirement by capturing the dates that letters were sent, comparing the captured date to the initial delinquency date, noting whether there were any payments that partially cured delinquency and determining whether the letter complied with the due diligence schedule.  Below are the letter due diligence findings of the 105 unacceptable accounts:

- Day 10 Borrower Letter – 8 or 7.6% of the delinquency notification letters did not adhere to PHEAA's delinquency notification due diligence schedule.

- Day 10 Co-Borrower Letter– 6 or 5.7% of the delinquency notification letters did not adhere to PHEAA's delinquency notification due diligence schedule.

3. PHEAA's servicing due diligence compliance schedule requires that PHEAA call and make contact with borrowers and co-borrowers on specified delinquency dates with continuous follow-up until contact is made.  BPA tested PHEAA's compliance with this requirement by capturing the dates that calls were made, comparing the captured date to the initial delinquency date, noting whether there were any payments that partially cured delinquency, and determining whether calls complied with the due diligence schedule.  Below are the call due diligence findings of the 105 unacceptable accounts:

- Day 11 Borrower Call – 7 or 6.7% of the borrowers were not called:

  o Of this group initial contact with the borrower was not successful on 93 or 88.6% of the accounts
  o Where there was no initial borrower contact, no further calls were attempted on 6 or 6.5% of the accounts.  This is a significant concern as it is imperative that borrowers are contacted to remedy delinquency and in these instances, PHEAA did not engage in an effort to comply with servicing compliance requirements.

**AC Apx.35**

- Day 11 Co-Borrower Call – 4 or 3.8% of the co-borrowers were not called:

  - Of this group initial contact with the co-borrower was not successful on 72 or 68.6% of the accounts
  - Where there was no initial co-borrower contact, no further calls were attempted on 9 or 12.5% of the accounts.  Once again, this is a significant concern as it is imperative that borrowers are contacted to remedy delinquency and in these instances, PHEAA did not engage in an effort to comply with servicing compliance requirements.

The table below breaks down the issues identified by required due diligence event. Certain tests are indicated as "N/A" as they were not applicable due to factors such as the loan was never delinquent or became current at a point where delinquency servicing efforts were no longer necessary.

### Servicing Review Characteristics for Unacceptable Accounts

| | Day 1 Borrower Email | Day 5 Borrower Email | Day 8 Co-Borrower Email | Day 11 Borrower Email | Day 11 Co-Borrower Email | Day 26 Borrower Email | Day 26 Co-Borrower Email | Day 10 Borrower Letter | Day 10 Co-Borrower Letter | Day 11 Borrower Call | Borrower Contact Made Day 11? (Y/N) | If No Borr Contact, More Calls Made? (Y/N) | Day 11 Co-Borrower Call | Co-Borrower Contact Made Day 11? (Y/N) | If No Co-Borr Contact, More Calls Made? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Count** | | | | | | | | | | | | | | | |
| Fail: | 6 | 2 | 2 | 2 | 1 | 1 | 1 | 8 | 6 | 7 | 93 | 6 | 4 | 72 | 9 |
| Pass: | 77 | 29 | 7 | 31 | 9 | 6 | 6 | 85 | 62 | 84 | 1 | 87 | 65 | 3 | 63 |
| N/A: | 22 | 74 | 96 | 72 | 95 | 98 | 98 | 12 | 37 | 14 | 11 | 0 | 36 | 30 | 0 |
| **Grand Total:** | **105** | **105** | **105** | **105** | **105** | **105** | **105** | **105** | **105** | **105** | **93** | **105** | **105** | **105** | **72** |
| **Percentage** | | | | | | | | | | | | | | | |
| Fail: | 5.7% | 1.9% | 1.9% | 1.9% | 1.0% | 1.0% | 1.0% | 7.6% | 5.7% | 6.7% | 88.6% | 6.5% | 3.8% | 68.6% | 12.5% |
| Pass: | 73.3% | 27.6% | 6.7% | 29.5% | 8.6% | 5.7% | 5.7% | 81.0% | 59.0% | 80.0% | 1.0% | 93.5% | 61.9% | 2.9% | 87.5% |
| N/A: | 21.0% | 70.5% | 91.4% | 68.6% | 90.5% | 93.3% | 93.3% | 11.4% | 35.2% | 13.3% | 10.5% | 0.0% | 34.3% | 28.6% | 0.0% |
| **Grand Total:** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** |

**AC Apx.36**

## Servicing Contract Compliance Review

A review of the PHEAA Servicing Contract along with accompanying documents was conducted to determine if PHEAA was, and remains in compliance with the provisions of the five documents listed below governing PHEAA's activities.  This section of the Report is focused on the standards of performance that could impact the performance of the trusts if compliance was not met. In summary:

- BPA identified 61 standards in the various agreements that met the criteria above. Of the 61 standards that were reviewed for testing, 34 require additional information to determine compliance. A written request has been submitted to PHEAA for the information needed to confirm compliance.

- Of the 27 that could be tested, 26 did not meet the compliance standard set forth in the agreements and are noted as Fails. These are shown in the Fail column in the table below. Of the Fails, 10 were a result of PHEAA not providing VCG with the required reports.

| Compliance Document | Pass | Fail | TBD | Total |
|---|---|---|---|---|
| Servicing Agreement | 1 | 14 | 32 | 47 |
| Servicing Guidelines | | 6 | 1 | 7 |
| Customer Service Schedule | | 3 | 1 | 4 |
| Required Reports Schedule | | 1 | | 1 |
| System Access Schedule | | 2 | | 2 |
| Total | 1 | 26 | 34 | 61 |

**AC Apx.37**

## Servicing Contract Compliance Review Result Table

| Compliance Document | Pass | Fail | TBD | Total |
|---|---|---|---|---|
| **Servicing Agreement** | **1** | **14** | **32** | **47** |
| 4.01 - Servicing Duties | | 1 | | **1** |
| 4.02 - Failed Service Levels: Notice and Cure | | | 2 | **2** |
| 4.04 - Custody Procedures | | 2 | 3 | **5** |
| 4.05 - Lost or Damaged Records | | | 2 | **2** |
| 4.07 - System Access | | 2 | 1 | **3** |
| 4.09 - Operations Meeting; Procedures Manual | | | 2 | **2** |
| 4.11 - Customer Service | | 1 | | **1** |
| 4.13 - Collections | | | 3 | **3** |
| 4.14 - Late Fees | | | 1 | **1** |
| 4.16 - Reports and Forms | | 1 | | **1** |
| 4.17 - Governmental Reporting | | | 1 | **1** |
| 4.18 - Reporting to Consumer Reporting Agencies | | | 2 | **2** |
| 4.19 - Data Error Correction; Account Adjustment | | | 1 | **1** |
| 5.06 - No Subcontractors | 1 | | | **1** |
| 5.07 - OFAC Check | | | 3 | **3** |
| 5.08 - FACT Act, PATRIOT Act and OFAC Check | | | 1 | **1** |
| 4.03 - Product Setup and Conversion (a) Credit Agreements | | | 1 | **1** |
| 7.03 - SAS 70 Audit | | 1 | 1 | **2** |
| 7.05 - Regulatory Audit | | | 1 | **1** |
| 7.06 - Financial and Other Information | | 2 | | **2** |
| 7.07 - Annual Statement as to Compliance | | 1 | | **1** |
| 7.08 - Annual Independent Public Accountant's Servicing Reports | | 1 | 1 | **2** |
| 7.09 - Cooperation with Audits; Follow-Up | | | 1 | **1** |
| 11.01 - Proprietary/ Confidential Information | | 1 | | **1** |
| 11.02 - Privacy | | | 1 | **1** |
| 11.03 - Security Program | | | 1 | **1** |
| 11.04 - Security Breach | | 1 | | **1** |
| 11.05 - Business Continuity and Site Disaster Recovery Plans | | | 3 | **3** |
| **Servicing Guidelines** | | **6** | **1** | **7** |
| Default Notifications | | 1 | 1 | **2** |
| Default Prevention Activities | | 3 | | **3** |
| Fraud/Forgery/Identity Theft | | 1 | | **1** |
| Read and Agreed dated 11/5/2008 | | 1 | | **1** |
| **Customer Service Schedule** | | **3** | **1** | **4** |
| 1. Call Monitoring | | | 1 | **1** |
| 5. Borrower Correspondence/ Complaints | | 3 | | **3** |
| **Required Reports Schedule** | | **1** | | **1** |
| Required Reports Schedule (3) - (6) | | 1 | | **1** |
| **System Access Schedule** | | **2** | | **2** |
| 4. FMC/FMER/TERI User Access Security Requirements | | 2 | | **2** |
| **Total** | **1** | **26** | **34** | **61** |

**AC Apx.38**

Servicing Contract Compliance Review Result Details

**Passed Compliance Standards**

PHEAA passed 1 of the 27 standards that could be tested. The detail of the passed compliance standard includes:

1. Section 5.06 No Subcontractors of the Servicing Agreement states with the exception of skip tracing services, PHEAA shall not utilize or engage a subcontractor to perform any Services under the Servicing Agreement without the prior written consent of FMC (VCG).

   - PHEAA advised it does not have subcontractors or third party vendors working the portfolio. The parties working on the portfolio were given the assignment by FMC or FMER and PHEAA has been instructed by FMC or FMER to work with those third parties.

**AC Apx.39**

**Failed Compliance Standards**

PHEAA has failed 26 of the 27 standards that were tested. The details of each failed compliance standard include:

1. Section 4.01 Servicing Duties of the Servicing Agreement states that PHEAA is required to provide and perform its services in full compliance with: the terms of the Servicing Agreement, including the Service Level Agreement, the Servicing Guidelines, the Program Manual, the terms and conditions of the Credit Agreements, and all federal and state laws and regulations.

   • As demonstrated in paragraphs 2 through 20 below, PHEAA has failed to comply with certain provisions of its Servicing Agreement, including the Service Level Agreement and the Servicing Guidelines. PHEAA has failed to comply with section 4.01 Servicing Duties of the Servicing Agreement.

2. Section 4.04 Custody Procedures of the Servicing Agreement states that PHEAA shall hold all Original Credit Agreements and related documents and shall retain each Credit Agreement and related documents until five (5) years after the earlier of (a) the date upon which the student loan evidenced by such Credit Agreement and related documents is paid in full, or (b) the date upon which the student loan is deconverted from PHEAA's servicing system.

   • PHEAA advised that deconversion is the change in loan servicer from PHEAA to another entity prior to charge off, which has not occurred on any loan.

   • PHEAA stated that all Original Credit Agreements were not on file as not all documents were sent to PHEAA for storage. It appears PHEAA did not have a method to check whether all accounts had appropriate documentation provided at the time the account was converted to PHEAA's system.

   • Upon receipt of loan documents, PHEAA had a procedure to notate the account on its system to indicate that the Promissory Note was missing. At that time, PHEAA would send a missing document list to FMER. FMER would send PHEAA the missing documents, and upon receipt of those missing documents, PHEAA did not log the new documents or update the student loan account on its system to state that the missing documents were now received. Without PHEAA updating its system to verify documents were received, PHEAA is without recourse in stating that they were not provided the Promissory Note.

   • PHEAA failed to maintain custody of all Original Credit Agreements and related documents as per its own admission. PHEAA has failed to comply with section 4.04 Custody Procedures of the Servicing Agreement.

**AC Apx.40**

3. Section 4.04 Custody Procedures of the Servicing Agreement requires PHEAA to create microfilm or electronic records of all Original Credit Agreements and related documents.

- Since PHEAA indicated it does not have all of the Original Credit Agreements, it would not be able to make copies of such Original Credit Agreements. PHEAA has failed to comply with section 4.04 Custody Procedures of the Servicing Agreement.

4. Section 4.07 System Access of the Servicing Agreement prohibits PHEAA from granting system access to third parties without first receiving approval from VCG (formerly FMC).

- PHEAA described its current system access procedure during the on-site visit and in its System Access Narrative letter dated September 25, 2015 (attached as Appendix C). PHEAA independently makes the decision to add users based on the user filling out a form called the AES System Access Form. PHEAA then unilaterally grants access to users based on functional need, as outlined on page 1 of its System Access Narrative. PHEAA has not requested permission from VCG or any third party to add or remove users.

- PHEAA has provided system access to more than 178 individuals from various companies.

- On page 2 of PHEAA's System Access Narrative, PHEAA stated it sent three reports to VCG since the onset of this review and identified one report to have contained 199 users which had access to PHEAA's system. However, BPA has recorded only two reports sent during the review:

  o Report 1 titled Compass Access to 122962 and dated 9/9/2015, contained 178 users.

    - The 178 individuals include: DCS Collectors (18); GOAL Staff (10); GOAL Auditing Access (14); NCO Staff (40); SIMM Collectors (29); Unknown Users/Company (67).

  o Report 2 titled Access to NCSLT and dated 9/14/2015, contained 111 users.

    - PHEAA has failed to disclose the name of the company for 37.6% of the individuals who are currently accessing the PHEAA system and NCSLT borrowers' personal identification information. On page 3 of the System Access Narrative, PHEAA explains that those users were mistakenly reported to VCG in error.

- PHEAA's failure to receive permission from VCG (formerly FMC) before giving system access to these users causes PHEAA to fail to comply with section 4.07 System Access of the Servicing Agreement.

5. Section 4 of the System Access Schedule prohibits PHEAA from adding or deleting users without receiving notification from VCG to do so.

   - On page 2 of PHEAA's System Access Narrative, PHEAA stated that users' accounts would be automatically deleted when non-use of the account existed for 365 days.

     - According to the second user access report dated 9/14/2015:
       - 8.4% of the users last accessed the system between September, October and December of 2014;
       - 53.9% of the users last accessed the system in 2015;
     - PHEAA has deleted users that reach 365 days of non-use

   - PHEAA has failed to comply with section 4 of the System Access Schedule by both adding and deleting users without receiving authorization from VCG to do so.

6. Section 4 of the System Access Schedule requires PHEAA to send VCG a user access report that lists who has system access to borrower information on a quarterly basis.

   - PHEAA has confirmed that these reports have never been sent to VCG. VCG has confirmed that these reports have never been received.

   - PHEAA has failed to comply with section 4 of the System Access Schedule.

7. Section 4.07 System Access of the Servicing Agreement requires PHEAA to comply with the requirements of the System Access Schedule.

   - PHEAA's failure to comply with section 4 of the System Access Schedule (see paragraphs 5 and 6 above) has caused PHEAA to fail in complying with section 4.07 System Access of the Servicing Agreement.

8. Section 5 of the Customer Service Schedule requires PHEAA to send VCG copies of escalated customer complaints from Borrowers and PHEAA's responses thereto on a weekly basis

   - PHEAA forwards escalated customer complaints to NCO. Depending on the nature of the complaint and the stage of the account (i.e. in repayment,

**AC Apx.42**

delinquency stage, charged-off, etc.), PHEAA may provide a response to the complaint or rely on NCO to make the response.

- PHEAA confirmed it has never sent escalated customer complaints to VCG. VCG has confirmed it has never received escalated customer complaints from PHEAA.

- PHEAA has failed to comply with section 5 of the Customer Service Schedule.

9. Section 5 of the Customer Service Schedule requires PHEAA to contact VCG immediately for complaints received from any regulatory body or federal or state agency.

- PHEAA forwards complaints received from any regulatory body or federal or state agency to NCO. Depending on the nature of the complaint and the stage of the account (i.e. in repayment, delinquency stage, charged-off, etc.), PHEAA may provide a response to the complaint or rely on NCO to make the response.

- PHEAA confirmed it has never sent complaints received from any regulatory body or federal or state agency to VCG. VCG has confirmed it has never received these types of complaints from PHEAA.

- PHEAA has failed to comply with section 5 of the Customer Service Schedule.

10. Section 4.11 Customer Service of the Servicing Agreement requires PHEAA to maintain compliance with the Customer Service Schedule.

- PHEAA's failure to comply with section 5 of the Customer Service Schedule (see paragraphs 8 and 9 above) has caused PHEAA to fail in complying with section 4.11 Customer Service of the Servicing Agreement.

11. Section 5. Borrower Correspondence and Complaints of the Customer Service Schedule states that PHEAA shall be responsible for handling all customer service complaints.

- As referenced in paragraphs 8 and 9, PHEAA sends complaints to NCO for handling. PHEAA has failed to comply with Section 5 Borrower Correspondence and Complaints of the Customer Service Schedule.

12. Section 3 through 6 of the Required Reports Schedule, PHEAA is required to send VCG various material reports on a monthly basis, including the weekly MR-01 Report, MR-50 Report, and the MR-53 Report, which detail things such as recent transactions, borrower account status, new defaults and recent charge offs.

- PHEAA stated these reports have not been sent to VCG. VCG it has not received these reports.

- PHEAA has failed to comply with sections 3 through 6 of the Required Reports Schedule.

13. Section 4.16 Reports and Forms of the Servicing Agreement requires PHEAA to promptly and routinely send VCG copies of all material reports, records, and other documents and data as required by the Servicing Guidelines or as otherwise required by this Agreement, including the reports set forth on the Required Reports Schedule.

- As referenced in paragraphs 6, 8, 9, 11, 13, 14, 15, 16, 17, and 18, PHEAA has failed to supply VCG with copies of all material reports, records, and other documents and data as required by the Servicing Guidelines or as otherwise required by this Agreement, including the reports set forth on the Required Reports Schedule. PHEAA has failed to comply with section 4.16 Reports and Forms of the Servicing Agreement.

14. Section 7.03 SAS 70 Audit of the Servicing Agreement requires PHEAA to engage an Independent CPA annually to conduct reviews of PHEAA's general controls. PHEAA is required to provide VCG with a copy of each report submitted by PHEAA's independent accountants within thirty (30) days of its receipt.

- PHEAA stated these reports have not been sent to VCG. VCG confirmed it has not received these reports.

- PHEAA has failed to comply with section 7.03 SAS 70 Audit of the Servicing Agreement.

15. Section 7.06 Financial and Other Information of the Servicing Agreement PHEAA is required to send VCG, within forty-five (45) days after the end of each of the first three quarters of each fiscal year, an unaudited financial statement of PHEAA for such quarter.

- PHEAA stated these reports have not been sent to VCG. VCG confirmed it has not received these reports.

- PHEAA has failed to comply with section 7.06 Financial and Other Information of the Servicing Agreement.

16. Section 7.06 Financial and Other Information of the Servicing Agreement requires PHEAA to provide VCG, within 120 days after the close of each fiscal year, a copy of an annual report as to PHEAA's obligations and activities during such fiscal year, and financial statements for such fiscal year. The annual report shall be

accompanied by an Independent Auditor's Report stating that the financial statements present fairly, in all material respects,  PHEAA's net assets as of the years stated, and its changes in net assets and cash flows for the years then ended

- PHEAA stated these reports have not been sent to VCG. VCG confirmed it has not received these reports.

- PHEAA has failed to comply with section 7.06 Financial and Other Information of the Servicing Agreement.

17. Section 7.07 Annual Statement of Compliance of the Servicing Agreement requires PHEAA to send to VCG an annual report, signed by PHEAA's Chief Executive Officer ("CEO") or Executive Vice President ("EVP"), stating that (a) a review of PHEAA's activities, and PHEAA's Performance under the Servicing Agreement, for the previous twelve (12) months has been made under such CEO's or EVP's supervision and (b) to the best of such CEO's or EVP's knowledge, based on such review, PHEAA has or has caused to be performed all of its obligations under the Servicing Agreement throughout such year and that no default has occurred, or if such a default has occurred and is continuing, specifying each such event, the nature and status thereof and the steps necessary to remedy such affair.

- PHEAA stated these reports have not been sent to VCG. VCG confirmed it has not received these reports.

- PHEAA has failed to comply with section 7.07 Annual Statement of Compliance of the Servicing Agreement.

18. Section 7.08 Annual Independent Public Accountant's Servicing Reports of the Servicing Agreement requires PHEAA to send VCG an annual report regarding PHEAA's assessment of compliance with the its servicing criteria.

- PHEAA stated these reports have not been sent to VCG. VCG confirmed it has not received these reports.

- PHEAA has failed to comply with section 7.08 Annual Independent Public Accountant's Servicing Reports of the Servicing Agreement.

19. Section 11.01 Proprietary/Confidential Information of the Servicing Agreement requires PHEAA to keep all borrower information confidential, and not disclose, transfer, use, copy, or allow any employees or any third parties access to any such borrower information, except for those who have a need to know such borrower information in order for PHEAA to accomplish the requirements of the Servicing Agreement and who are individually bound by contractual obligations of confidentiality and limitation of use sufficient to give effect to this confidentiality provision.

- As discussed in paragraph 4, PHEAA has granted system access to more than 178 individuals without permission to do so by VCG. System access permits the user to receive and copy borrower information.

- As discussed in paragraphs 8 and 9, PHEAA routinely sends NCO borrower information for escalated and regulatory complaints. Such escalated and regulatory complaints are required to be sent to VCG, not NCO. Receipt of said complaints gives NCO unauthorized access to borrower information.

- PHEAA has failed to comply with section 11.01 Proprietary/Confidential Information of the Servicing Agreement.

20. Section 11.04 Security Breach of the Servicing Agreement requires PHEAA to, among other things, immediately notify VCG if there has been any unauthorized acquisition of or access to data that compromises the security, confidentiality, or integrity of "non-public personal information" maintained by or for PHEAA. PHEAA is further required to take measures to contain and control the incident to prevent further unauthorized access and remedy the circumstances that permitted such breach to occur.

- As described in paragraph 18, and further documented in paragraphs 4, 8, and 9, PHEAA has granted system access to more than 178 individuals without permission to do so by VCG, and PHEAA routinely sends NCO borrower information for escalated and regulatory complaints.

  - System access permits the user to receive and copy non-public personal information maintained by PHEAA.
  - Escalated and regulatory complaints contain non-public personal information maintained by PHEAA.

- PHEAA has failed to comply with section 11.04 Security Breach of the Servicing Agreement.

21. The read and agreed letter dated November 5, 2008 of the Servicing Guidelines states that all questions, inquiries, documents, claim packages of all kinds or other material relating to such Student Loans shall be sent directly to FMER, including but not limited to: a. Pre-claim files; b. Cosigner release requests; c. Forbearance extension requests; d. Administrative forbearance requests; e. Default claims; f. Bankruptcy claims; and g. Death claims.

- PHEAA stated that when FMER resigned all questions, inquiries, documents, claim packages of all kinds or other material relating to such Loans were sent, and still continue to be sent, to NCO.

- PHEAA has failed to comply with the read and agreed letter dated November 5, 2008 of the Servicing Guidelines.

22. The Fraud, Forgery, and Identity Theft Section of the Servicing Guidelines, as amended by the May 14, 2010 read and agreed letter, states that the Servicer must notify the Program Administrator's fraud department within 3 business days of receipt of any fraud claims, forgery, or identity theft claims, including trade line deletions.

- PHEAA stated fraud claims, forgery, or identity theft claims, including trade line deletions are sent to NCO. NCO is not the Program Administrator.

- PHEAA has failed to comply with the Fraud, Forgery, and Identity Theft Section of the Servicing Guidelines, as amended by the May 14, 2010 read and agreed letter.

23. The Default Notifications Section of the Servicing Guidelines, as amended by the July 27, 2009 read and agreed letter, states that default notifications must be submitted to FMER between the 180th and 210th day of delinquency, and that PHEAA shall submit a daily roster of all defaulted loans (the "Defaulted Loan Roster").

- PHEAA stated that when FMER resigned all default notices and claim packages were sent, and still continue to be sent, to NCO.

- PHEAA has failed to comply with the Default Notifications Section of the Servicing Guidelines, as amended by the July 27, 2009 read and agreed letter.

24. The Default Prevention Activities Section of the Servicing Guidelines, as amended by the July 27, 2009 read and agreed letter, states that PHEAA will send delinquency notifications to borrowers and co-borrowers via email, if it has been provided with such emails, at specified delinquency dates.

- As demonstrated in the Loan Review Results, PHEAA failed to send the required emails on multiple occasions.
- PHEAA has failed to comply with the Default Prevention Activities Section of the Servicing Guidelines, as amended by the July 27, 2009 read and agreed letter.

25. The Default Prevention Activities Section of the Servicing Guidelines, as amended by the July 27, 2009 read and agreed letter, states that PHEAA will mail delinquency notifications to borrowers and co-borrowers specified delinquency dates.

- As demonstrated in the Loan Review Results, PHEAA failed to mail the required letters on multiple occasions.

**AC Apx.47**

- PHEAA has failed to comply with the Default Prevention Activities Section of the Servicing Guidelines, as amended by the July 27, 2009 read and agreed letter.

26. The Default Prevention Activities Section of the Servicing Guidelines as amended by the July 27, 2009 read and agreed letter, states that PHEAA will begin dialing the borrower and co-borrower on the 11th day of delinquency and will continue until contact is made with a right party.

- As demonstrated in the Loan Review Results, PHEAA failed to dial the borrower and/or co-borrower on multiple occasions. PHEAA failed to continue dialing the borrower and/or co-borrower until contact was made.

- PHEAA has failed to comply with the Default Prevention Activities Section of the Servicing Guidelines as amended by the July 27, 2009 read and agreed letter

*Confidential*

**AC Apx.48**

**Compliance Standards Under Review**

There are 34 of the 61 standards requiring additional information from PHEAA to determine compliance. The details of each compliance standard that is under review and the information that is being requested from PHEAA to determine compliance include:

1. Section 4.03(a) Product Setup and Conversion - Credit Agreements of the Servicing Agreement states that PHEAA shall promptly review promissory note or credit agreement forms that are proposed by FMC and/or Program Lender and accept such forms for purposes of product set-up and conversion.

   - To determine compliance with this standard, PHEAA has been asked to provide a sample of the promissory note or credit agreement forms that PHEAA received from FMC or program lender.

2. Section 4.04 Custody Procedures of the Servicing Agreement states that PHEAA shall maintain all Original Credit Agreements that have an original, wet signature in a fire resistant vault equipped with a fire suppression system which is connected to an alarm and a security locking system.

   - To determine compliance with this standard, PHEAA has been asked to provide a report identifying the active and charged off loans that have wet signatures on the Original Credit Agreements.

   - Once this report is provided, an on-site inspection of a sample of the wet signature agreements should be performed to determine
     - o The accuracy of PHEAA's report
     - o That the documents are stored in a fire resistant vault equipped with a fire suppression system which is connected to an alarm and a security locking system.

3. Section 4.04 Custody Procedures of the Servicing Agreement states that PHEAA shall maintain microfilm or electronic records onsite at Servicer's Servicing Center in Harrisburg, PA and at an off-site facility in a fire resistant vault equipped with (a) a fire suppression system which is connected to an alarm and (b) with a security locking system at least 100 miles away from the on-site facility used to house the Original Credit Agreements and related documents

   - To determine compliance with this standard, an inspection should take place of the onsite storage vault and off-site facility to verify maintenance and existence of files. While at each location, a sample of files should be reviewed to verify accuracy.

**AC Apx.49**

4. Section 4.04 Custody Procedures of the Servicing Agreement states that PHEAA shall provide FMC (VCG) 60 days advance notice of any change in the physical location of the Original Credit Agreements and related documents or any relocation of the PHEAA's servicing center.

   - To determine compliance with this standard, PHEAA has been asked to provide the address of the off-site storage facility, including all previous addresses since March 2009 and the dates of occupancy.

5. Section 4.05 Lost or Damaged Records of the Servicing Agreement states in the event that records or other data submitted to PHEAA for Servicing should be lost or damaged while in the possession, control, or custody of PHEAA or its agents, PHEAA shall pay the Owner's (VCG) expenses associated with such lost or damaged record or data, including but not limited to reasonable attorney's fees.

   - To determine compliance with this standard, PHEAA has been asked to provide
     - Policies and procedures regarding inbound document recording process and inventory management procedures for maintaining documents. A report illustrating the documents on file and the documents that are missing for each active and charged off loan

   - The Loan Review Sample has revealed that documents are missing from the loan files, but further review is needed to determine if those records were lost or damaged while in the possession of PHEAA or its agent.

6. Section 4.05 Lost or Damaged Records of the Servicing Agreement states that in the event that a Student Loan becomes uncollectible or unenforceable due to the loss or destruction of records or data in the possession, control, or custody of PHEAA or its agent then PHEAA shall, on demand, pay to the Owner (VCG) the principal balance (plus capitalized interest) and any unpaid interest due on any such Student Loan.

   - To determine compliance with this standard, PHEAA has been asked to provide policies and procedures regarding inbound document recording process and inventory management procedures for maintaining documents.

   - PHEAA has also been asked to provide a report listing active and charged off loans missing Original Credit Agreements.

   - Upon receipt of this report from PHEAA, a visit to the storage facility may be necessary to confirm accuracy.

7. Section 4.07 System Access of the Servicing Agreement states that PHEAA shall review the individual user access rights of PHEAA employees and other users no less frequently than every ninety (90) days.

**AC Apx.50**

- To determine compliance with this standard, PHEAA has been asked to confirm and provide
  - The frequency user access rights of PHEAA's employees are reviewed
  - The frequency reports are generated which memorialize PHEAA's review of the user access rights
  - To whom these reports are sent
  - Copies of the three most recent reports

8. Section 4.09 Operations Meeting; Procedures Manual of the Servicing Agreement states that PHEAA and FMC (VCG) shall create and maintain a procedures manual for all aspects of servicing which shall comply fully with the terms of the Servicing Agreement, the Service Level Agreement, the Servicing Guidelines, the terms and conditions of the Credit Agreements, and all applicable federal and state laws ("Program Manual").

   - To determine compliance with this standard, PHEAA has been asked to provide a copy of the Program Manual and all amendments.

9. Section 4.09 Operations Meeting; Procedures Manual of the Servicing Agreement states that the Program Manual shall be subject to the provisions of Section 11.01 confidentiality.

   - To determine compliance with this standard, PHEAA has been asked to provide a list of all entities to whom the Program Manual has been provided.

10. Section 1. Call Monitoring of the Customer Service Schedule states that PHEAA shall monitor on a monthly basis a minimum of 1% of the calls received per customer service representative for quality.

    - To determine compliance with this standard, PHEAA has been asked to provide three most recent reports PHEAA created memorializing its monitoring of the customer service representative calls.

11. Section 4.13 Collections of the Servicing Agreement states that all sums received by PHEAA with respect to any Student Loans, whether attributable to principal or interest shall be received in trust for the benefit of the Owner (VCG).

    - To determine compliance with this standard, PHEAA has been asked to provide a transaction level listing of all payments and reversals in a two month period and the related trustee report for these deposits. The information should include a summarized deposit and deduction report.

12. Section 4.13 Collections of the Servicing Agreement states that all funds received on behalf of Borrowers shall be deposited in a PHEAA-owned and maintained account that is a separate account in which funds are not commingled with PHEAA's non-collection account funds.

   - To determine compliance with this standard, PHEAA has been asked to provide three most recent monthly bank statements of the PHEAA-owned account in which borrower funds are deposited.

13. Section 4.13 Collections of the Servicing Agreement states that within two (2) Business Days, all available funds from Student Loans shall be electronically transmitted to an account designated by FMC (VCG).

   - To determine compliance with this standard, PHEAA has been asked to provide appropriate documents and bank statements that will demonstrate PHEAA's compliance with Section 4.13 of the Servicing Agreement states that within two (2) Business Days, all available funds from Student Loans shall be electronically transmitted to a pre-designated account.

14. Section 4.14 Late Fees of the Servicing Agreement states that Late Fees shall not be included in the amount of a claim if a default claim is submitted to the insurer.

   - To determine compliance with this standard, PHEAA has been asked to confirm whether late fees are
     - Currently included in the charge off amounts
     - Have ever been included in the charge off amounts

15. Section 4.17 Governmental Reporting of the Servicing Agreement states that PHEAA shall provide reports on form 1098E and 1099 to borrowers and the U.S. Internal Revenue Service.

   - To determine compliance with this standard, PHEAA has been asked to provide a report of all issued 1098E's and 1099's from 2014. The report should include borrower and loan identification information, amount reported to the IRS and outstanding balance on the account at the time the 1098E or 1099 was issued.

16. Section 4.18 Reporting to Consumer Reporting Agencies of the Servicing Agreement states that PHEAA shall correct any errors caused by the incorrect reporting of information to the Consumer Reporting Agencies, in a timely manner not to exceed thirty (30) days.

   - To determine compliance with this standard, PHEAA has been asked to provide

**AC Apx.52**

- o Policies and procedures on the process of reporting and correcting information sent to the credit bureaus
- o All resolved complaints from the three most recent months that PHEAA received from borrowers regarding credit report inaccuracies and the actions taken by PHEAA to resolve inaccuracy

17. Section 4.18 Reporting to Consumer Reporting Agencies of the Servicing Agreement states that PHEAA shall report to all national Consumer Reporting Agencies, which are currently Experian, Equifax, and TransUnion

- To determine compliance with this standard, further review of a sample population will be tested.

18. Section 5.07 OFAC Check of the Servicing Agreement states that all PHEAA employees performing Services or supporting PHEAA activities under the Servicing Agreement, regardless of their location, shall be validated by PHEAA to not be on any list published and maintained by the U.S. Government of persons or entities with whom any U.S. person or entity is prohibited from conducting business.

- To determine compliance with this standard, PHEAA has been asked to provide
  - o Policies and procedures on checking employees on the prohibited list of persons or entities with whom business may be conducted in accordance with the Office of Foreign Assets Control
  - o Executive acknowledgment or certification that the PHEAA's OFAC policies and procedures are being followed

19. Section 5.07 OFAC Check of the Servicing Agreement states that PHEAA shall conduct periodic reviews, no less frequently than quarterly, of its employees through the OFAC check.

- To determine compliance with this standard, PHEAA has been asked to provide copies of the three most recent quarterly reports confirming the OFAC check is completed.

20. Section 5.07 OFAC Check of the Servicing Agreement states that PHEAA shall report to FMC (VCG) immediately if the name of any PHEAA employee performing the Services matches with the name of any person listed on any list published by the Government of the U. S. of persons or entities with whom any U. S. person or entity is prohibited from doing business.

- To determine compliance with this standard, PHEAA has been asked to provide a list of employees' names that have matched OFAC's list of prohibited persons or entities which business may be conducted since March 2009.

**AC Apx.53**

21. Section 5.08 FACT Act, PATRIOT Act and OFAC Check of the Servicing Agreement states that PHEAA's performance of its Servicing obligations shall include compliance with the requirements imposed on Owner and Insurer as users and furnishers of consumer report information under the Fair and Accurate Credit Transactions Act of 2003 and all regulations issued pursuant thereto, including timely and lawful response to any identity theft report received from any borrower or consumer reporting agency and the obligation to respond to a credit report reinvestigation request in accordance with the Identity Theft Procedures.

- To determine compliance with this standard, PHEAA has been asked to provide
  - Policies and procedures on the process of reviewing and responding to identity theft claims
  - All resolved complaints from the three most recent months that PHEAA received from borrowers regarding identity theft and the resolution logs of actions taken by PHEAA to reach the resolution

22. Section 7.03 SAS 70 Audit of the Servicing Agreement states that PHEAA will engage, at its expense, an independent CPA firm that adheres to professional standards established by the American Institute of Certified Public Accountants (AICPA) to conduct reviews of PHEAA's general controls associated with PHEAA's facilities, as well as the controls associated with the Services and the programs used to provide the Services, including but not limited to controls over information technology and related processes. The independent CPA reviews shall be performed at such frequency and times as PHEAA shall determine, but shall be performed at least once annually.

- To determine compliance with this standard, PHEAA has been asked to provide copies of each annual CPA report completed since 2009.

23. Section 7.05 Regulatory Audit of the Servicing Agreement states that within thirty (30) days of its receipt, PHEAA shall provide FMC (VCG) with a summary of any audit results performed by a federal or state regulator concerning the Services provided under the Servicing Agreement.

- To determine compliance with this standard, PHEAA has been asked to confirm whether it has had any audits conducted by federal or state regulators concerning the Services provided under the Servicing Agreement. If yes,
  - Which entities conducted the audit(s)
  - When was/were the audit(s) conducted
  - Provide copies of the initial audit scope/notice sent to PHEAA by the entities
  - Provide copies of the final reports from the audit(s)

24. Section 7.08 Annual Independent Public Accountant's Servicing Reports of the Servicing Agreement states that PHEAA shall service and administer all Student Loans in accordance with all applicable requirements of the servicing criteria set forth in Item 1122(d) (the "Servicing Criteria") of Regulation AB (17 C.F.R. §§ 229.1100 - 229.1123) ("Regulation AB") promulgated by the Securities and Exchange Commission (the "SEC") under the Securities Act of 1934, as amended (the "Exchange Act").

- To determine compliance with this standard, PHEAA has been asked to provide policies, procedures, and appropriate documents, including reports of any outside party who conducted a review, demonstrating compliance with Section 7.08 Annual Independent Public Accountant's Servicing Reports of the Servicing Agreement.

25. Section 7.09 Cooperation with Audits; Follow-Up of the Servicing Agreement states that If any audit report establishes that PHEAA's performance of the Services is not in compliance with the terms of this Agreement, PHEAA shall submit to FMC (VCG) within thirty (30) days of its receipt of the relevant audit report a plan to improve PHEAA's performance to the level required by this Agreement.

- To determine compliance with this standard, PHEAA has been asked to confirm, since March 2009, whether any audit report established that PHEAA's performance of its Services under the terms of the Servicing Agreement to be non-compliant.

26. Section 11.02 Privacy of the Servicing Agreement states that PHEAA agrees that it will not sell, disclose, transfer, or rent any Confidential Information to any third party nor will it use any Confidential Information on behalf of any third party, without the express written permission of FMC (VCG) and the relevant Borrower.

- To determine compliance with this standard, PHEAA has been asked to provide PHEAA's privacy policy and a certificate of compliance to said policy.

27. Section 11.03 Security Program of the Servicing Agreement states that PHEAA shall implement and maintain an appropriate security program for Customer Information designed to meet the following Objectives, as defined below, of the Interagency Guidelines Establishing Standards for Safeguarding Customer Information pursuant to the authority of Section 501(b) of the Gramm-Leach-Bliley Act of 1999 ("Information Security Program"). "Objectives" means a program designed to (i) ensure the security and confidentiality of Customer Information (as defined below); (ii) protect against any anticipated threats or hazards to the security or integrity to Customer Information, and (iii) protect against unauthorized access to or use of Customer Information that could result in substantial harm or inconvenience to any "Customer".

**AC Apx.55**

- To determine compliance with this standard, PHEAA has been asked to provide its policies and procedures on PHEAA's information security. Include a report showing the procedures have been tested, last test completion date and results.

28. Section 11.05 Business Continuity and Site Disaster Recovery Plans of the Servicing Agreement states that PHEAA shall maintain and shall test at least once annually plans to continue business in the event of an interruption to its business or unavailability of any site from which Services are being performed (the "Disaster Recovery and Business Continuity Plans").

- To determine compliance with this standard, PHEAA has been asked to provide annual report results on PHEAA's business continuity testing since 2009.

29. Section 11.05 Business Continuity and Site Disaster Recovery Plans of the Servicing Agreement states that PHEAA covenants and agrees that it shall create on a daily basis electronically stored backup data for all Student Loan data for the particular day.

- To determine compliance with this standard, PHEAA has been asked to provide policies, procedures, and documents demonstrating PHEAA's compliance with creating daily electronically stored backup data for all Student Loan data for the particular day. (See Servicing Agreement Section11.05 Business Continuity and Site Disaster Recovery Plans of the Servicing Agreement)

30. Section 11.05 Business Continuity and Site Disaster Recovery Plans of the Servicing Agreement states that PHEAA shall test both its Disaster Recovery Plan and Business Continuity Plan on an annual basis and send its annual Overview of Business Recovery Exercise report to FMC (VCG).

- To determine compliance with this standard, PHEAA has been asked to provide
  o Annual report results on PHEAA's business continuity testing since 2009
  o Annual report results on PHEAA's disaster recovery plan testing since 2009

31. Section Default Notifications of the Servicing Guidelines states that all default notification packages require submission of the Application, Credit Agreement, and Disclosure Statement.

- To determine compliance with this standard, PHEAA has been asked to provide a report identifying the following

**AC Apx.56**

- A report illustrating the documents on file and the documents that are missing for each active and charged off loan For any missing Original Credit Agreement or disclosure statement, indicate whether the document was never received by PHEAA or the document was received but PHEAA currently does not have
- For any missing Original Credit Agreement or disclosure statement, indicate whether a request for the missing document was made, the date the request for the missing document was sent, to whom it was sent, and whether a response to the request was provided to PHEAA

**Compliance Standards Under Review – Self Reporting**

There are three standards under review that require PHEAA to self-report. These three standards do not initiate until PHEAA fails to comply with the terms of the Agreement. Until testing is completed, these standards cannot be determined as pass or fail.

1. Section 4.02 Failed Service Levels: Notice and Cure of the Servicing Agreement states that PHEAA shall notify FMC (VCG) through the reports required by the Service Level Agreement of any failure to meet any Servicing standard set forth in the Service Level Agreement

2. Section 4.02 Failed Service Levels: Notice and Cure of the Servicing Agreement states that in the event that PHEAA shall fail to perform the same Servicing standard for thirty (30) days, then the Owner (VCG) shall be entitled to a reduction (or rebate if already paid) of two and one-half percent (2.5%) of the Servicing Fees. The Owner (VCG) shall continue to be entitled to a Fee Reduction for each subsequent consecutive month in which PHEAA shall fail to perform the same standard.

3. Section 4.19 Data Error Correction; Account Adjustment of the Servicing Agreement states that in the event that any data file transmitted to FMC or any Owner or any account contains a material error, PHEAA shall, within one (1) calendar day of discovery of such error, notify FMC (VCG) or the affected Owners of such error. PHEAA shall use best efforts to provide a corrected file as soon as possible but no later than three (3) calendar days.

> Brown
> v.
> Transworld
>
> Exhibit C
> to
> Amended Complaint

### UNITED STATES OF AMERICA
### CONSUMER FINANCIAL PROTECTION BUREAU

ADMINISTRATIVE PROCEEDING File
2017-CFPB-0018

| | |
|---|---|
| In the Matter of: | **CONSENT ORDER** |
| **TRANSWORLD SYSTEMS, INC.** | |

### I.
### Overview

The Consumer Financial Protection Bureau (Bureau) has reviewed the debt collections litigation practices of the Attorney Network business unit of Transworld Systems, Inc. ("TSI") ("Respondent"), the agent and Service Provider for fifteen (15) Delaware statutory trusts referred to as the National Collegiate Student Loan Trusts ("NCSLTs", or "the Trusts", which are the National Collegiate Master Student Loan Trust, NCSLT 2003-1, NCSLT 2004-1, NCSLT 2004-2, NCSLT 2005-1, NCSLT 2005-2, NCSLT 2005-3, NCSLT 2006-1, NCSLT 2006-2, NCSLT 2006-3, NCSLT 2006-4, NCSLT 2007-1, NCSLT 2007-2, NCSLT 2007-3, and NCSLT 2007-4), and has identified violations of sections 1031(a) and 1036(a)(1) of the Consumer Financial Protection Act of 2010 (CFPA). Under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, the Bureau issues this Consent Order (Consent Order).

To collect on defaulted private student loans, Law Firms engaged by Respondent's Attorney Network business unit filed debt Collections Lawsuits in state

1

**AC Apx.58**



EXHIBIT
18

DEPONENT NAME: Cheung     DATE: 1/3/20

courts across the country on behalf of the Trusts. In support of many of these lawsuits, Respondent executed affidavits that falsely claimed personal knowledge of the account records and the consumer's debt, and in many cases, personal knowledge of the chain of assignments establishing ownership of the loans. In addition, since November 1, 2014, Law Firms hired by Respondent filed hundreds of debt Collections Lawsuits without the documentation necessary to prove Trust ownership of the loans.

## II

### Jurisdiction

1.    The Bureau has jurisdiction over this matter under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565.

## III
### Stipulation

2.    Respondent has executed a "Stipulation and Consent to the Issuance of a Consent Order," dated September 14, 2017 (Stipulation), which is incorporated by reference and is accepted by the Bureau. By this Stipulation, Respondent has consented to the issuance of this Consent Order by the Bureau under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, without admitting or denying any of the findings of fact or conclusions of law, except that Respondent admits the facts necessary to establish the Bureau's jurisdiction over Respondent and the subject matter of this action.

## IV
### Definitions

2

**AC Apx.59**

3.    The following definitions apply to this Consent Order:

a.   "Affiant" means any signatory to an Affidavit, signing in his or her capacity as an employee or agent of Respondent, but excluding one signing solely as a notary or witness to the act of signing.

b.   "Affidavit" means any sworn statement filed with a court in connection with a Collections Lawsuit.

c.   "Board" means TSI's duly elected and acting Board of Directors.

d.   "Clearly and Prominently" means:

   i.   as to written information: written in a type size and location sufficient for an ordinary consumer to read and comprehend it, and disclosed in a manner that would be easily recognizable and understandable in language and syntax to an ordinary consumer; if the information is contained in a multi-page print document, the disclosure appears on the first page.

   ii.   as to information presented orally: spoken and disclosed in a volume, cadence, and syntax sufficient for an ordinary consumer to hear and comprehend.

e.   "Collections Lawsuits" means attempts by a Law Firm engaged by Respondent's Attorney Network business unit, for an account owned or alleged to be owned by a Trust, through judicial processes in the United States of America, to collect or establish a Consumer's liability for a Debt.

f.   "Consumer" means any natural person obligated or allegedly obligated to pay any Debt.

3

g. "Debt" means any obligation or alleged obligation of a Consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

h. "Effective Date" means the date on which the Consent Order is issued.

i. "Enforcement Director" means the Assistant Director of the Office of Enforcement for the Consumer Financial Protection Bureau, or his/her delegate.

j. "Law Firm" means a law firm engaged by Respondent's Attorney Network business unit to collect student loan Debt on behalf of the National Collegiate Student Loan Trusts.

k. "Regional Director" means the Regional Director for the Northeast Region for the Office of Supervision for the Consumer Financial Protection Bureau, or his/her delegate.

l. "Related Consumer Action" means a private action by or on behalf of one or more consumers or an enforcement action by another governmental agency brought against Respondent based on substantially the same facts as described in Section V of this Consent Order.

m. "Relevant Period" includes the period from November 1, 2014 to April 25, 2016.

n. "Respondent" means Transworld Systems, Inc., and its successors and assigns.

4

**AC Apx.61**

o.  "Service Providers" means any service provider, as defined in section 1002(26) of the CFPA, 12 U.S.C. § 5481, that provides or provided services with respect to the servicing of the student loans owned by a NCSLT.

## V.

### Bureau Findings and Conclusions

The Bureau finds the following:

4.    The National Collegiate Student Loan Trusts ("NCSLTs" or "the Trusts") comprise fifteen (15) Delaware statutory trusts created between 2001 and 2007. The basic purpose of each Trust is to acquire a pool of student loans, enter into the so-called trust-related agreements, and provide for the administration of the Trusts and the servicing of student loans.

5.    The Trusts do not have any employees and all actions taken by the Trusts in connection with loan servicing and collecting Debt are carried out by third parties.

6.    Debt-collection activities on behalf of the Trusts are carried out by the successor special servicer's sub-servicer pursuant to servicing agreements with the successor special servicer.

7.    Sub-servicers that executed and notarized the deceptive affidavits did so as Service Providers and agents of the Trusts.

8.    Law Firms that filed lawsuits on behalf of the Trusts did so as Service Providers and agents of the Trusts.

5

**AC Apx.62**

9. Respondent Transworld Systems, Inc. (TSI) is incorporated under the laws of the State of California and maintains a principal place of business in Ft. Washington, Pennsylvania.

10. TSI maintains an office in Peachtree Corners, Georgia, where its employees execute and notarize affidavits for Collections Lawsuits brought on behalf of the Trusts.

11. A national network of Law Firms engaged by Respondent file and prosecute Collections Lawsuits on behalf of the Trusts in courts across the country.

12. TSI has operated as the successor sub-servicer to the successor special servicer of the Trusts since November 1, 2014.

13. TSI is a "covered person" under 12 U.S.C. § 5481(6) because it is engaged in the collection of debt and is a Service Provider. 12 U.S.C. § 5481(15)(A)(x), (26).

14. TSI is an agent and Service Provider of the Trusts.

### FALSE AND MISLEADING AFFIDAVITS AND TESTIMONY

15. In connection with collecting or attempting to collect Debt from Consumers, between November 1, 2014 and April 25, 2016, Law Firms hired by Respondent on behalf of the Trusts initiated 37,689 Collections Lawsuits in courts across the country on behalf of the Trusts.

16. In support of the Collections Lawsuits, Law Firms submitted Affidavits executed by Respondent and documents in support of the Trusts' claims that Consumers owed Debts to a Trust.

17. Respondent executed and notarized Affidavits–often with attached exhibits–that were used by Law Firms in many of the Collections Lawsuits

6

**AC Apx.63**

brought on behalf of the Trusts between November 1, 2014 and April 25, 2016.

18.    In these Affidavits, the Affiants swore that they had personal knowledge of the education loan records evidencing the Debt. In fact, in numerous instances, Affiants lacked personal knowledge of the education loan records evidencing the Debt when they executed the Affidavits.

19.    The Affiants also asserted that they were authorized and competent to testify about the Consumers' Debts through review of and "personal knowledge" of the business records, including electronic data in their possession. In fact, in certain instances, Affiants lacked personal knowledge of the business records, including the electronic data, showing that Consumers owed Debts to the Trusts. Affiants were instructed to review certain data on a computer screen as part of an effort to verify some information in the Affidavits about the Debts. Affiants, however, did not always know the source of the data on that screen, how the data was obtained or maintained, whether it was accurate, or whether that data meant that the Debt was in fact owed to the Trusts.

20.    Each Affiant also swore that he/she had "personal knowledge of the record management practices and procedures of Plaintiff [the Trust] and the practices and procedures Plaintiff requires of its loan servicers and other agents." In fact, certain Affiants lacked personal knowledge of the record management practices and procedures of the Trusts and the practices and procedures the Trusts required of its loan servicers and other agents.

**AC Apx.64**

21.  In many Affidavits, the Affiants also stated that "I have reviewed the chain of title records as business records" regarding the relevant account. In some cases, Affiants did not possess the chain of title records but reviewed "chain of title" records that were found online on a government portal maintained by the Securities and Exchange Commission. In numerous instances, Affiants did not review the chain of title records prior to executing the Affidavits.

22.  In certain Affidavits, the Affiants asserted that they had personal knowledge that the loans were transferred, sold, and assigned to the plaintiff Trusts on dates certain. In fact, in numerous instances, Affiants lacked personal knowledge of the chain of assignment records necessary to prove that the relevant Trust owned the subject loans.

23.  In some instances, certain Affiants complained to supervisors that they did not have personal knowledge of the representations made in the Affidavits. These affiants continued to execute Affidavits, however, for fear of losing their jobs.

24.  Affiants also provided live testimony in court, purportedly based on personal knowledge, similar to the statements made in the Affidavits as described in Paragraphs 18-22.

## FILING LAWSUITS WITHOUT THE INTENT OR ABILITY TO PROVE THE CLAIMS, IF CONTESTED

25.  From November 1, 2014 to April 25, 2016, on behalf of the Trusts, Law Firms filed numerous Collections Lawsuits against Consumers even though

8

**AC Apx.65**

the complete documentation needed to prove that the Trusts owned the loans did not exist.

26. In these lawsuits, documentation of a complete chain of assignment evidencing that the subject loan was transferred to and owned by the Trust was lacking.

27. In addition, Law Firms hired by Respondent on behalf of the Trusts filed numerous Collections Lawsuits where the loans in question were disbursed to the Consumers after the loans allegedly were transferred to the Trusts according to the chain of assignment documents.

28. On numerous occasions, Law Firms hired by Respondent filed Collections Lawsuits even though the promissory note to prove that a Debt was owed did not exist.

29. For each Collections Lawsuit described in Paragraphs 25-28, Law Firms hired by Respondent could not prove that a Debt was owed to the Trusts, if contested.

### Violations of the Consumer Financial Protection Act

30. Covered persons are prohibited from engaging "in any unfair, deceptive, or abusive act or practice" in violation of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

31. An act or practice is deceptive under the CFPA if it involves a material representation or omission that misleads, or is likely to mislead, a consumer acting reasonably under the circumstances.

32. An act or practice is unfair if "(A) the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by

9

**AC Apx.66**

consumers; and (B) such substantial injury is not outweighed by countervailing benefits to consumers or competition." 12 U.S.C. § 5531(c)(1).

## FALSE AND MISLEADING COLLECTION AFFIDAVITS AND TESTIMONY

33.  In numerous instances, in connection with collecting or attempting to collect Debt from Consumers, Respondent executed Affidavits that were used by Law Firms with many of the Collections Lawsuits filed by Law Firms on behalf of the Trusts in courts across the country, and in live testimony, Respondent represented, directly or indirectly, expressly or by implication, that:

   a.  Affiants had personal knowledge of the account records and the Debt;

   b.  Affiants had personal knowledge of the chain of assignment records evidencing Trust ownership of the subject loan; and

   c.  Affiants had personal knowledge of the record management practices and procedures of the Trusts and all prior servicers.

34.  In fact, as described in Paragraphs 18 to 24, in numerous instances, these representations were either false or the Affiant did not have a basis for making the representation.

35.  The representations are material because they are likely to affect a Consumer's choice or conduct regarding how to respond to a Collections Lawsuit and are likely to mislead a Consumer acting reasonably under the circumstances.

**AC Apx.67**

36.   Thus, representations by Respondent, as described in Paragraphs 18-24, constitute deceptive acts or practices in violation of sections 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

## FILING LAWSUITS WITHOUT THE INTENT OR ABILITY TO PROVE THE CLAIMS, IF CONTESTED

37.   In numerous instances, in connection with collecting or attempting to collect Debt from Consumers, Respondent, acting through the Law Firms hired by Respondent on behalf of the Trusts, represented, directly or indirectly, expressly or by implication, that it could be proven in the Collections Lawsuits that the Trusts owned the loans in question and that the Consumers in question owed Debts to the Trusts, if contested.

38.   In fact, in numerous instances, Respondent lacked the complete chain of assignment documentation needed to prove Trust ownership of the subject loans and the promissory note needed to prove the existence of certain loans.

39.   The representations are material because they are likely to affect a Consumer's choice or conduct regarding how to respond to a lawsuit and are likely to mislead a Consumer acting reasonably under the circumstances.

40.   Thus, Respondent's representations, as described in Paragraphs 25-29, constitute deceptive acts or practices in violation of sections 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

41.   In addition, Respondent's acts and practices, caused or were likely to cause substantial injuries to consumers.

**AC Apx.68**

42. The injuries to consumers included, but were not limited to, all payments made, including garnishments of wages and bank accounts, to settle Debts not enforceable.

43. The injuries to consumers were not reasonably avoidable by consumers and were not outweighed by any countervailing benefits to consumers or to competition.

44. Thus, Respondent's conduct, as described in Paragraph 25-29, constitutes unfair acts or practices in violation of sections 1031(c) and 1036(a)(1)(B ) of the CFPA, 12 U.S.C. §§ 5531(c)(1), 5536(a)(1)(B).

# ORDER
## VI
### Conduct Provisions

**IT IS ORDERED**, under sections 1053 and 1055 of the CFPA, that:

45. Respondent and its officers, Service Providers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not violate sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536, and must take the following affirmative actions:

    a. Respondent shall take all actions necessary to comply with the terms of the Consent Order.

    b. Respondent must require that any Law Firm it retains in connection with the collection of student loans owned by the Trusts agree to abide by the terms and conditions of the Consent Order.

    c. Within ninety (90) days of the Effective Date, Respondent must identify all Collections Lawsuits that were filed between November 1,

12

**AC Apx.69**

2014 and the Effective Date and that are missing the documentation described in subsection (f)(i)and (ii) of this Paragraph.

d.   Within ninety (90) days of the Effective Date, Respondent must identify all Collections Lawsuits that were filed seeking Debt outside the statute of limitations and provide this information to the successor special servicer or any other Service Provider of the Trusts.

e.   Within one-hundred twenty (120) days of the Effective Date, Respondent must provide to the successor special servicer and to the Bureau for each Consumer named in the suits identified in Paragraph 45c and 45d: the Consumer's name, all available contact information for the Consumer (including information in the possession of the attorneys who filed the suit), and the total amount of all payments made by the Consumer on or after the date on which the suit was filed.

f.   Respondent and its officers, agents, Service Providers, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not initiate a Collections Lawsuit to collect Debt unless Respondent possesses:

   i.   the documentation necessary to prove that a Trust owns the loan, including but not limited to, documentation reflecting the complete chain of assignment from the Debt's originator to the specific Trust claiming ownership; and

   ii.  a document signed by the Consumer, such as a promissory note, evidencing the agreement to pay the loan forming the basis of the Debt.

13

g.  Respondent and its officers, agents, Service Providers, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not cause Law Firms hired by Respondent on behalf of the Trusts to initiate a Collections Lawsuit to collect on a loan for which the applicable statute of limitations has expired.

h.  Respondent shall establish written policies requiring Law Firms to confirm that the applicable statute of limitations has not expired at the time of the filing of the Collections Lawsuit;

i.  Respondent shall require Law Firms to provide a quarterly report to Respondent that includes, for each Collections Lawsuit, any data relevant to determining the applicable statute of limitations, such as date of lawsuit, date of default, and date of last payment, as well as identifies any lawsuits in which a consumer alleges in his pleadings that the lawsuit was filed outside the statute of limitations.

j.  Respondent shall not collect any Debt through a Collections Lawsuit that Respondent knows or learns was filed outside the statute of limitations, and if any such cases are pending, Respondent shall seek the immediate withdrawal or dismissal of the lawsuit.

k.  Respondent and its officers, agents, Service Providers, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not cause Law Firms hired by Respondent on behalf of the Trusts to collect any Debt through

14

**AC Apx.71**

Collections Lawsuits that Respondent or its agents have any reason to believe may be unenforceable.

l. Respondent, its officers, agents, Service Providers, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Consent Order, whether acting directly or indirectly, are permanently restrained and prohibited from, in connection with the collection of a Debt, executing any Affidavit containing any misrepresentations, including false statements that:

   i. the Affiant is familiar with or has personal knowledge of the Consumer's education loan records or the maintenance of those records;

   ii. the Affiant has personal knowledge of the Consumer's debt;

   iii. the Affiant has personal knowledge of the loan's chain of assignment or ownership;

   iv. the Affiant has personal knowledge of the documents relating to the loan's chain of assignment or ownership;

   v. the Affidavit has been properly notarized if the Affidavit was not executed in the presence of a notary or if the notarization was otherwise not compliant with applicable notary laws; or

   vi. certain documents or records concerning the Debt forming the basis of the Collections Lawsuit have been reviewed by the Affiant.

46. Respondent, its officers, agents, Service Providers, servants, employees, and attorneys, and all other persons in active concert or participation with any

**AC Apx.72**

of them, who receive actual notice of this Consent Order, whether acting directly or indirectly, are permanently restrained and prohibited from, in connection with the collection of a Debt, providing any testimony that contains any misrepresentations, including false statements that the witness:

    a. is familiar with or has personal knowledge of the Consumer's education loan records or the maintenance of those records;

    b. has personal knowledge of the Consumer's debt;

    c. has personal knowledge of the loan's chain of assignment or ownership; or

    d. has personal knowledge of the documents relating to the loan's chain of assignment or ownership.

47.   If Respondent determines that it engages in any conduct prohibited by this Order, including but not limited to Paragraphs 45-46 of this Order, Respondent promptly will take the necessary steps to ensure that it ceases any and all practices that violate this Order.

48.   Within ten (10) days of making the determination described in Paragraph 47 Respondent must submit to the Regional Director a report detailing (a) the practices that violate the Order, (b) the specific agents engaged in the practices in question, and (c) a plan to ensure that the practices cease and to remediate any harm resulting from the practices.

49.   With regard to pending Collections Lawsuits filed by a Law Firm in which Respondent executed an Affidavit that was filed in support of the pending Collection Lawsuit and that contains any misrepresentations—including but

**AC Apx.73**

not limited to false statements that the Affiant: (1) is familiar with or has personal knowledge of the Consumer's education loan records or the maintenance of those records, (2) has personal knowledge of the consumer's indebtedness, (3) has personal knowledge of the loan's chain of assignment or ownership, (4) has personal knowledge about the maintenance of documents relating to the loan's chain of assignment or ownership, or (5) has attached as an exhibit a true and correct copy of a document—Respondent shall take the steps necessary, including getting permission from the successor special servicer, to direct Law Firms acting on behalf of the Trusts to withdraw such Affidavit unless the Trusts dismiss the suit in which the Affidavit was filed. Respondent shall take the steps necessary, including getting permission from the successor special servicer, to direct Law Firms acting on behalf of the Trusts to notify the court of the following in writing and must also simultaneously provide the court with a copy of the Consent Order entered into between the Bureau and the Respondent: "Plaintiff withdraws the affidavit of [insert name of Affiant] pursuant to Consent Order entered into by the Consumer Financial Protection Bureau and Transworld Systems, Inc."

50.    With regard to Collections Lawsuits that were filed in which Respondent executed an Affidavit that was filed with a court or in arbitration, and a judgment was entered, that contained any misrepresentations—including but not limited to false statements that the Affiant: (1) is familiar with or has personal knowledge of the Consumer's education loan records or the maintenance of those records, (2) has personal knowledge of the

**AC Apx.74**

Consumer's indebtedness, (3) has personal knowledge of the loan's chain of assignment or ownership, (4) has personal knowledge about the maintenance of documents relating to the loan's chain of assignment or ownership, or (5) has attached as an exhibit a true and correct copy of a document—Respondent must instruct the Law Firms to cease post-judgment enforcement activities and Respondent will take the steps necessary, including getting permission from the successor special servicer, to instruct the Law Firms acting on behalf of the Trusts to seek to remove, withdraw, or terminate any active wage garnishment, bank levies, and similar means of enforcing those judgments or settlements as well as cease accepting settlement payments related to any such Collections Lawsuits.

51.   Respondents must cooperate in all respects with any directive from the successor special servicer acting on behalf of the Trusts to:

   a.  Make certain disclosures in connection with the collection of Debt owned by the Trusts;

   b.  Withdraw any Affidavit or Collection Lawsuit; or

   c.  Provide loan information or documents to the successor special servicer, including but not limited to, information and documents related to:

      i.  Whether certain loans owned by the Trusts are no longer legally enforceable because the applicable statute of limitations has expired;

      ii.  Whether Collections Lawsuits have been filed on any loans where sufficient documentation, including signed promissory notes and

**AC Apx.75**

documentation reflecting the complete chain of assignment from the Debt's originator to the Collection Lawsuit's named plaintiff, is not in the possession, custody or control of the Collection Lawsuit's named plaintiff to prove the existence of the Debt owed to the named plaintiff, or where the applicable statute of limitations has expired; and

iii. Whether judgments were obtained in Collections Lawsuits described in Paragraph 51(c)(ii) and the identity of Consumers from whom the Trusts obtained payments in response to those Collections Lawsuits, and the specific amounts collected from these Consumers.

## VII

## Compliance Plan

**IT IS FURTHER ORDERED** that:

52. Within ninety (90) days of the Effective Date, Respondent must submit to the Regional Director for review and determination of non-objection a compliance plan designed to ensure that the Attorney Network business unit of Respondent complies with all applicable Federal consumer financial laws with respect to Collections Lawsuits and the terms of this Consent Order (Compliance Plan). The Compliance Plan must include, at a minimum:

a. Detailed steps for addressing each action required by this Consent Order;

19

b.  Comprehensive, written policies and procedures designed to prevent
    violations of Federal consumer financial laws and associated risks of
    harm to Consumers with respect to Collections Lawsuits;

c.  An effective employee training program required for all employees with
    any involvement in Collections Lawsuits, including but not limited to
    Affiants, whose duties include reviewing, executing, preparing,
    processing, verifying, , or notarizing of Affidavits that includes regular,
    specific, comprehensive training in Federal consumer financial laws
    commensurate with individual job functions and duties;

d.  Implementation of reasonable and appropriate written policies and
    procedures to ensure the proper notarization processes for Affidavits,
    including that notaries place the Affiants under oath and witness their
    signatures;

e.  Implementation of reasonable and appropriate written policies and
    procedures to ensure that Affiants verify the accuracy of each
    statement made in an Affidavit before executing the Affidavit;

f.  Comprehensive, written policies and procedures designed to ensure
    that any Law Firms engaged by Respondent to collect Debt do not
    violate any Federal consumer financial laws, which must include at a
    minimum:

    i.  the Law Firm's duty to maintain adequate internal controls to
        ensure compliance with Federal consumer financial laws;

    ii. the Law Firm's duty to provide adequate training on compliance
        with all applicable Federal consumer financial laws and

20

**AC Apx.77**

Respondent's policies and procedures related to Collections
Lawsuits;

   iii.  Respondent's authority to conduct periodic onsite reviews of the
Law Firm's controls, performance, and information systems related
to Collections Lawsuits; and

   iv.  periodic review by Respondent of the Law Firm's controls,
performance, and information systems related to Collections
Lawsuits; and

  g.  Specific timeframes and deadlines for implementation of the steps
described above.

53.  The Regional Director will have the discretion to make a determination of
non-objection to the Compliance Plan or direct Respondent to revise it. If
the Regional Director directs Respondent to revise the Compliance Plan,
Respondent must make the revisions and resubmit the Compliance Plan to
the Regional Director within thirty (30) days.

54.  After receiving notification that the Regional Director has made a
determination of non-objection to the Compliance Plan or any amendments
thereto, Respondent must implement and adhere to the steps,
recommendations, deadlines, and timeframes outlined in the Compliance
Plan.

## VIII

## Role of the Board

**IT IS FURTHER ORDERED** that:

21

**AC Apx.78**

55. Respondent's Board must review all submissions (including plans, reports, programs, policies, and procedures) required by this Consent Order prior to submission to the Bureau.

56. Although this Consent Order requires Respondent to submit certain documents for the review or non-objection by the Regional Director, the Board will have the ultimate responsibility for proper and sound management of Respondent and for ensuring that Respondent complies with Federal consumer financial law and this Consent Order.

57. In each instance that this Consent Order requires the Board to ensure adherence to or perform certain obligations of Respondent, the Board must:

   a. Authorize whatever actions are necessary for Respondent to fully comply with the Consent Order;

   b. Require timely reporting by management to the Board on the status of compliance obligations; and

   c. Require timely and appropriate corrective action to remedy any material non-compliance with any failures to comply with Board directives related to this Section.

## IX

## Order to Pay Civil Money Penalties

**IT IS FURTHER ORDERED** that:

58. Under section 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law described in Section V of this Consent Order, and taking

**AC Apx.79**

into account the factors in 12 U.S.C. § 5565(c)(3), Respondent must pay a civil money penalty of $2.5 million to the Bureau.

59.   Within ten (10) days of the Effective Date, Respondent must pay $1.5 million of the civil money penalty by wire transfer to the Bureau or to the Bureau's agent in compliance with the Bureau's wiring instructions. The remainder of the civil money penalty shall be paid in one installment within sixty (60) days of the Effective Date.

60.   The civil money penalty paid under this Consent Order will be deposited in the Civil Penalty Fund of the Bureau as required by section 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

61.   Respondent must treat the civil money penalty paid under this Consent Order as a penalty paid to the government for all purposes. Regardless of how the Bureau ultimately uses those funds, Respondent may not:

   a.   Claim, assert, or apply for a tax deduction, tax credit, or any other tax benefit for any civil money penalty paid under this Consent Order; or

   b.   Seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made under any insurance policy, with regard to any civil money penalty paid under this Consent Order.

62.   To preserve the deterrent effect of the civil money penalty in any Related Consumer Action, Respondent may not argue that Respondent is entitled to, nor may Respondent benefit by, any offset or reduction of any compensatory monetary remedies imposed in the Related Consumer Action because of the civil money penalty paid in this action or because of any

23

payment that the Bureau makes from the Civil Penalty Fund (Penalty

Offset). If the court in any Related Consumer Action grants such a Penalty

Offset, Respondent must, within thirty (30) days after entry of a final order

granting the Penalty Offset, notify the Bureau, and pay the amount of the

Penalty Offset to the U.S. Treasury. Such a payment will not be considered

an additional civil money penalty and will not change the amount of the

civil money penalty imposed in this action.

## X

### Additional Monetary Provisions

**IT IS FURTHER ORDERED** that:

63.   In the event of any default on Respondent's obligations to make payment

under this Consent Order, interest, computed under 28 U.S.C. § 1961, as

amended, will accrue on any outstanding amounts not paid from the date of

default to the date of payment, and will immediately become due and

payable.

64.   Respondent must relinquish all dominion, control, and title to the funds

paid to the fullest extent permitted by law and no part of the funds may be

returned to Respondent.

65.   Under 31 U.S.C. § 7701, Respondent, unless it already has done so, must

furnish to the Bureau its taxpayer identifying numbers, which may be used

for purposes of collecting and reporting on any delinquent amount arising

out of this Consent Order.

**AC Apx.81**

66.  Within thirty (30) days of the entry of a final judgment, consent order, or
     settlement in a Related Consumer Action, Respondent must notify the
     Regional Director of the final judgment, consent order, or settlement in
     writing. That notification must indicate the amount of redress, if any, that
     Respondent paid or is required to pay to Consumers and describe the
     Consumers or classes of Consumers to whom that redress has been or will
     be paid.

## XI

### Reporting Requirements

**IT IS FURTHER ORDERED** that:

67.  Respondent must notify the Bureau of any development that may affect
     compliance obligations arising under this Consent Order, including but not
     limited to a dissolution, assignment, sale, merger, or other action that
     would result in the emergence of a successor company; the creation or
     dissolution of a subsidiary, parent, or affiliate that engages in any acts or
     practices subject to this Consent Order; the filing of any bankruptcy or
     insolvency proceeding by or against Respondent; or a change in
     Respondent's name or address. Respondent must provide this notice, if
     practicable, at least thirty (30) days before the development, but in any case
     no later than fourteen (14) days after the development.

68.  Within ninety (90) days of the Effective Date, and again one year after the
     Effective Date, Respondent must submit to the Regional Director an

accurate written compliance progress report (Compliance Report) that has been approved by the Board, which, at a minimum:

    a. Describes in detail the manner and form in which Respondent has complied with this Consent Order; and

    b. Attaches a copy of each Order Acknowledgment obtained under Section XII unless previously submitted to the Bureau.

## XII

## Order Distribution and Acknowledgment

**IT IS FURTHER ORDERED** that,

69.   Within thirty (30) days of the Effective Date, Respondent must deliver a copy of this Consent Order to each of its board members as well as to any managers, employees, Service Providers, or other agents and representatives who have responsibilities related to the subject matter of the Consent Order.

70.   For five (5) years from the Effective Date, Respondent must deliver a copy of this Consent Order to any business entity resulting from any change in structure referred to in Section XI, any future board members or executive officers, as well as to any managers, employees, Service Providers, or other agents and representatives who will have responsibilities related to the subject matter of the Consent Order before they assume their responsibilities.

71.   Respondent must secure a signed and dated statement acknowledging receipt of a copy of this Consent Order, ensuring that any electronic

signatures comply with the requirements of the E-Sign Act, 15 U.S.C.

§§ 7001-7031, within thirty (30) days of delivery, from all persons receiving

a copy of this Consent Order under this Section.

## XIII

## Recordkeeping

**IT IS FURTHER ORDERED** that

72.  Respondent must create, or if already created, must retain for at least five
     (5) years from the Effective Date, the following business records:

     a.  All documents and records necessary to demonstrate full compliance
         with each provision of this Consent Order, including all submissions to
         the Bureau.

73.  Respondent must retain the documents identified in Paragraph 72 for the
     duration of the Consent Order.

74.  Respondent must make the documents identified in Paragraph 72 available
     to the Bureau upon the Bureau's request.

## XIV

## Notices

**IT IS FURTHER ORDERED** that:

75.  Unless otherwise directed in writing by the Bureau, Respondent must
     provide all submissions, requests, communications, or other documents
     relating to this Consent Order in writing, with the subject line, "*In re
     Transworld Systems, Inc.*, File No. Year-CFPB- 0018," and send them
     either:

     a.  By overnight courier (not the U.S. Postal Service), as follows:

27

**AC Apx.84**

Regional Director, Bureau Northeast Region
Consumer Financial Protection Bureau
140 East 45th Street, 4th Floor
New York, NY 10017]

or

b. By first-class mail to the below address and contemporaneously by

email to Enforcement_Compliance@cfpb.gov:

Regional Director, Bureau Northeast Region
Consumer Financial Protection Bureau
140 East 45th Street, 4th Floor
New York, NY 10017

## XV

## Cooperation with the Bureau

**IT IS FURTHER ORDERED** that:

76.  Respondent must cooperate fully with the Bureau in this matter and in any

investigation related to or associated with the conduct described in Section

V. Respondent must provide truthful and complete information, evidence,

and testimony and Respondent must cause its officers, employees,

representatives, or agents to appear for interviews, discovery, hearings,

trials, and any other proceedings that the Bureau may reasonably request

upon ten (10) days written notice, or other reasonable notice, at such places

and times as the Bureau may designate, without the service of compulsory

process.

## XVI

## Compliance Monitoring

28

**AC Apx.85**

**IT IS FURTHER ORDERED** that, to monitor Respondent's compliance with this Consent Order:

77. Within fourteen (14) days of receipt of a written request from the Bureau, Respondent must submit additional Compliance Reports or other requested information, which must be made under penalty of perjury; provide sworn testimony; or produce documents.

78. Respondent must permit Bureau representatives to interview any employee or other person affiliated with Respondent who has agreed to such an interview. The person interviewed may have counsel present.

79. Nothing in this Consent Order will limit the Bureau's lawful use of civil investigative demands under 12 C.F.R. § 1080.6 or other compulsory process.

## XVII
## Modifications to Non-Material Requirements

**IT IS FURTHER ORDERED** that:

80. Respondent may seek a modification to non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) by submitting a written request to the Regional Director.

81. The Regional Director may, in his/her discretion, modify any non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) if he/she determines good cause justifies the modification. Any such modification by the Regional Director must be in writing.

**AC Apx.86**

## XVIII

### Administrative Provisions

82.  The provisions of this Consent Order do not bar, estop, or otherwise prevent the Bureau, or any other governmental agency, from taking any other action against Respondent, except as described in Paragraph 83.

83.  The Bureau releases and discharges Respondent from all potential liability for law violations that the Bureau has or might have asserted based on the practices described in Section V of this Consent Order, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. The Bureau may use the practices described in this Consent Order in future enforcement actions against Respondent and its affiliates, including, without limitation, to establish a pattern or practice of violations or the continuation of a pattern or practice of violations or to calculate the amount of any penalty. This release does not preclude or affect any right of the Bureau to determine and ensure compliance with the Consent Order, or to seek penalties for any violations of the Consent Order.

84.  This Consent Order is intended to be, and will be construed as, a final Consent Order issued under section 1053 of the CFPA, 12 U.S.C. § 5563, and expressly does not form, and may not be construed to form, a contract binding the Bureau or the United States.

85.  This Consent Order will terminate five (5) years from the Effective Date or five (5) years from the most recent date that the Bureau initiates an action alleging any violation of the Consent Order by Respondent. If such action is dismissed or the relevant adjudicative body rules that Respondent did not

30

**AC Apx.87**

violate any provision of the Consent Order, and the dismissal or ruling is either not appealed or upheld on appeal, then the Consent Order will terminate as though the action had never been filed. The Consent Order will remain effective and enforceable until such time, except to the extent that any provisions of this Consent Order have been amended, suspended, waived, or terminated in writing by the Bureau or its designated agent.

86.    Calculation of time limitations will run from the Effective Date and be based on calendar days, unless otherwise noted.

87.    Should Respondent seek to transfer or assign all or part of its operations that are subject to this Consent Order, Respondent must, as a condition of sale, obtain the written agreement of the transferee or assignee to comply with all applicable provisions of this Consent Order.

88.    The provisions of this Consent Order will be enforceable by the Bureau. For any violation of this Consent Order, the Bureau may impose the maximum amount of civil money penalties allowed under section 1055(c) of the CFPA, 12 U.S.C. § 5565(c). In connection with any attempt by the Bureau to enforce this Consent Order in federal district court, the Bureau may serve Respondent wherever Respondent may be found and Respondent may not contest that court's personal jurisdiction over Respondent.

89.    This Consent Order and the accompanying Stipulation contain the complete agreement between the parties. The parties have made no promises, representations, or warranties other than what is contained in this Consent Order and the accompanying Stipulation. This Consent Order and the

31

accompanying Stipulation supersede any prior oral or written

communications, discussions, or understandings.

90.    Nothing in this Consent Order or the accompanying Stipulation may be

construed as allowing the Respondent, its Board, officers, or employees to

violate any law, rule, or regulation.

**IT IS SO ORDERED**, this 15th day of September, 2017.

Richard Cordray
Director
Consumer Financial Protection Bureau

32

**AC Apx.89**

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THE NATIONAL COLLEGIATE MASTER STUDENT LOAN TRUST I, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2003-1, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-1, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-2, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-1, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-3, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-1, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-2, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-1, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-2, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-3, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
|        Plaintiffs, | ) ) ) | |
|    v. | ) ) | |
| U.S. BANK NATIONAL ASSOCIATION, GSS DATA SERVICES, INC., TURNSTILE CAPITAL MANAGEMENT, LLC, AND TRANSWORLD SYSTEMS, INC., | ) ) ) ) ) ) | |
|        Defendants. | ) ) | |

Brown
v.
Transworld

Exhibit D
to
Amended Complaint

C.A. No.  2018-0167-JRS

**VERIFIED AMENDED
COMPLAINT FOR
INJUNCTIVE AND
EQUITABLE RELIEF
AND DAMAGES**

EXHIBIT
*10*
DEPONENT NAME: Luke
DATE: 10 / 24 / 19

**GRANT & EISENHOFER P.A.**
123 Justison Street
Wilmington, DE 19801
302-622-7000
*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

Page

NATURE OF THE ACTION ....................................................................1

THE PARTIES.........................................................................................6

JURISDICTION AND VENUE ...............................................................7

FACTUAL BACKGROUND...................................................................8

A.   The Structure and Operation of the Trusts .....................................8

B.   The Trusts' Service Providers ......................................................11

    1.   The Master Servicing Agreement .........................................11

    2.   The Indenture .......................................................................11

    3.   The Administration Agreement.............................................14

    4.   The Special Servicing Agreement.........................................15

    5.   The Special Subservicing Agreement ...................................15

C.   Defendants Improperly Send Defaulted Loans to TSI in Violation
    of the Governing Documents..........................................................21

D.   Defendants Allow the Statute of Limitations on Defaulted Loans to
    Expire and Refuse to Provide Information Regarding Such Loans .............27

E.   Defendants' Failure to Obtain and Safeguard Documents Impedes
    the Trusts' Ability to Collect on Defaulted Loans .........................30

F.   Defendants' Improper Collection Activities Thwart Collections on
    Defaulted Loans and Expose the Trusts to Liability ......................37

G.   The Partial Audit of PHEAA..........................................................42

H.   GSS and U.S. Bank Prevent the Trusts' Servicer, Auditor and Lawyers From Being Paid ...........................................................................................43

    1.   Failure to Pay the Trusts' Servicer (Odyssey) ....................................43

    2.   Failure to Pay the Trusts' Auditor......................................................46

    3.   Failure to Pay the Trusts' Lawyers ....................................................48

COUNT I:   Breach of Contract (against GSS) ......................................................53

COUNT II:   Tortious Interference with Contract (against GSS) ..........................55

COUNT III:   Breach of Contract (against U.S. Bank) ............................................56

COUNT IV:   Breach of Duty of Care and to Avoid Conflicts of Interest (against U.S. Bank).............................................................................58

COUNT V:   Breach of Contract (against U.S. Bank) (Alternative Count)...........59

COUNT VI:   Breach of Contract (against Turnstile) ..............................................61

COUNT VII: Injurious Falsehood (against TSI) .....................................................63

Plaintiffs, The National Collegiate Master Student Loan Trust I, The National Collegiate Student Loan Trust 2003-1, The National Collegiate Student Loan Trust 2004-1, The National Collegiate Student Loan Trust 2004-2, The National Collegiate Student Loan Trust 2005-1, The National Collegiate Student Loan Trust 2005-2, The National Collegiate Student Loan Trust 2005-3, The National Collegiate Student Loan Trust 2006-1, The National Collegiate Student Loan Trust 2006-2, The National Collegiate Student Loan Trust 2006-3, The National Collegiate Student Loan Trust 2006-4, The National Collegiate Student Loan Trust 2007-1, The National Collegiate Student Loan Trust 2007-2, The National Collegiate Student Loan Trust 2007-3, The National Collegiate Student Loan Trust 2007-4 (collectively, "Plaintiffs" or "The Trusts"), for their Verified Amended Complaint against Defendants U.S. Bank National Association ("U.S. Bank"), GSS Data Services, Inc. ("GSS"), Turnstile Capital Management, LLC ("Turnstile"), and Transworld Systems, Inc. ("TSI"), based on personal knowledge as to themselves and information and belief as to all other matters, allege as follows:

## **NATURE OF THE ACTION**

1.      This case involves egregious breaches of contract and other duties by Defendants that have cost the Plaintiff Trusts billions of dollars and that have

resulted in wrongful and fraudulent foreclosure cases being brought against thousands of borrowers of Student Loans owned by the Trusts.

2.      Plaintiffs are each Delaware statutory Trusts created to acquire pools of Student Loans that had been originated by banks and other financial institutions, provide for the servicing of the loans, and issue Notes backed by the Trust assets. The face amount of all Student Loans held by the Trusts is approximately $15 billion.

3.      In order to help the Trusts fulfill their responsibilities under the Trust Agreements, various entities were hired to perform certain discrete tasks.   At present, Defendant U.S. Bank serves as Indenture Trustee and also Special Servicer; Defendant GSS serves as Administrator; Defendant Turnstile serves as Special Subservicer; and Defendant TSI performs certain collection activities.   In addition, non-party Pennsylvania Higher Education Assistance Agency ("PHEAA") serves as the principal Servicer.

4.      When borrowers fail to make required payments on their loans, Defendants are responsible for pursuing collection, including legal proceedings. For example, TSI was hired to bring collection proceedings, Turnstile as Special Subservicer is responsible for monitoring and supervising the performance by TSI, and U.S. Bank as Special Servicer has control over many of TSI's activities and also is responsible for monitoring the performance of Turnstile and replacing it if it

was deficient or negligent in the performance of its duties.  Defendants have failed

miserably to discharge such duties, and in fact have engaged in improper and

fraudulent conduct regarding the collection activities.   Lawsuits brought to

foreclose on defaulted loans repeatedly have been dismissed because Defendants

failed to obtain the documentation necessary to prove the Trusts' ownership of the

loans and standing to bring collection proceedings.   Such improper collection

practices, and the false and misleading representations that Defendants have made

in the course of such lawsuits, have resulted in the Trusts being sued by borrowers

and by the Consumer Financial Protection Bureau ("CFPB").

5.    In the course of its investigation, the CFPB found rampant fraudulent

and otherwise improper conduct in the collection activities, such as suits being

filed against borrowers without all of the notes, assignments and other documents

needed to prove standing to foreclose on the loans, and submission of false and

misleading affidavits in collection cases.   As a result of such wrongdoing by

Defendants, done in the name of the Trusts, the CFPB has sought substantial

monetary and equitable relief against the Trusts, and a proposed consent decree has

been entered into whereby the Trusts would be required to pay tens of millions of

dollars to the CFPB by reason of the improper conduct by the Defendants herein.

6.    As a result of the failures of the Defendants to deal properly with

delinquent and defaulted loans, and their active obstruction of efforts by the Trusts

and the Owners of the beneficial interests therein to obtain information concerning such activities, it is estimated the statute of limitations has expired on approximately $1 billion of loans, and approximately another $4 billion have become uncollectible. Additional loans are continuing to become statute barred, as Defendants continue to fail properly to discharge their duties.

7.      Defendants have no incentive to stop their fraudulent collection activities but rather are highly motivated to perpetuate the status quo. Defendants have made hundreds of millions of dollars in servicing and other fees and want to continue to feed at the Trusts' trough. And if borrowers who have been the victims of fraudulent collection cases sue, Defendants enter into settlements whereby the settlements are paid out of Trust assets.

8.      The Trusts have reason to believe that there is fraud in the servicing and administration of all of the loans in the Trusts. The Owners, through direction to the Owner Trustee and Trust counsel, have been trying to investigate, monitor, and stop the improper activities of each of the Defendants, only to be faced with every maneuver Defendants can employ in order to maintain the current collection scheme under U.S. Bank as Special Servicer. U.S. Bank as Indenture Trustee continuously mischaracterizes its duties in order to protect the collection scheme orchestrated by U.S. Bank as Special Servicer and all the other Defendants.

9.     The Trusts have attempted to stop and rectify these abuses, but Defendants have obstructed those efforts at every turn.  The Trusts appointed a new servicer, Odyssey Education Resources LLC ("Odyssey"), to deal with newly-defaulted loans, but GSS and U.S. Bank refused to acknowledge such appointment and U.S. Bank filed a lawsuit arguing the appointment was invalid.  The Trusts retained counsel to represent them in that lawsuit, but GSS and U.S. Bank have refused to pay the bills submitted by such counsel.  The Trusts commenced an audit of the primary servicer, PHEAA, but GSS and U.S. Bank refused to pay the bills submitted by the auditor hired by the Trusts to do the audit.  The Trusts' counsel negotiated a consent decree with the CFPB that would put an end to at least some of the servicing abuses committed by Defendants, but Defendants are strenuously opposing such consent decree, and to add insult to injury, GSS and U.S. Bank have refused to pay the bills submitted by that counsel too.

10.     The Trusts seek specific performance of the Governing Documents and other injunctive and equitable remedies arising out of Defendants' substantial breaches, as well as damages to compensate the Trusts for the substantial injuries the Trusts have suffered by reason of Defendants' wrongdoing as described herein.  All of the net proceeds of this case will be deposited into the appropriate collection account to be distributed pursuant to the waterfall set forth in the Indenture.

## THE PARTIES

11.    Plaintiffs are each Delaware statutory trusts with Wilmington Trust Company ("WTC"), a Delaware banking corporation, as their Owner Trustee. WTC has its principal business office at 1100 North Market Street, Wilmington, DE 19890.  On July 20, 2017, WTC resigned as Owner Trustee, but continues to function in that role as no replacement has yet been appointed.

12.    Defendant U.S. Bank is, upon information and belief, a nationally charted bank with its headquarters located at 800 Nicollet Mall, Minneapolis, MN 55402.

13.    Defendant GSS, upon information and belief, is a Massachusetts corporation with a principal business office located at 402 West Broadway, Suite 2000, San Diego, CA 92101.

14.    Defendant Turnstile, upon information and belief, is a Delaware limited liability company with a principal business office located at 402 West Broadway, Suite 2000, San Diego, CA 92101.

15.    Defendant TSI, upon information and belief, is a California corporation with a principal place of business in Ft. Washington, Pennsylvania. TSI is the successor to NCO.

16.    Non-party PHEAA is, upon information and belief, a public corporation, organized under the laws of the Commonwealth of Pennsylvania,

engaged in non-governmental commercial activity throughout the United States, including in Delaware.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction over this action pursuant to 10 *Del. C.* § 341 because Plaintiffs seeks to compel specific performance with contractual obligations and seek other equitable relief.

18.    This Court has personal jurisdiction over Defendants in this action. U.S. Bank as Indenture Trustee and as Special Servicer and GSS as Administrator each contracted with the Trusts to provide, and has provided, services relating to loans to borrowers located in Delaware.  Furthermore, pursuant to the Indenture U.S. Bank has made payments to the Owner Trustee, WTC, in Delaware, and, on information and belief, has made payments to noteholders in Delaware.  As Special Servicer, U.S. Bank has authorized and supervised the bringing of collection lawsuits in Delaware against borrowers in default.  The Administrator has responsibility to, among other things, file tax returns for the Trusts in Delaware. Turnstile is a Delaware limited liability company that has responsibility under the Special Subservicing Agreement to, among other things, provide, and has provided, services relating to loans to borrowers located in Delaware.  TSI has, among other things, provided, services relating to defaulted loans to borrowers located in Delaware.

## FACTUAL BACKGROUND

### A.   The Structure and Operation of the Trusts

19.   Each of the NCSLT Trusts was created as a Delaware statutory trust to acquire pools of Student Loans that had been originated by banks and other financial institutions, provide for the servicing of the loans, and issue Notes backed by the Trust assets.   The Notes are held by various noteholders and traded as securities.   The face amount of all Student Loans held by the Trusts is approximately $15 billion.

20.   Under 12 *Del. C.* § 3801(g), a Delaware statutory trust is "a separate legal entity."   It is a juridical entity that "may sue and be sued." 12 *Del. C.* § 3804(a).

21.   Under the relevant Delaware statute and the Trust Agreements, the Owner Trustee is responsible for managing the Trusts' affairs at the direction of the Owners of the beneficial interest therein.  12 *Del. C.* § 3806(a) provides:

> Except to the extent otherwise provided in the governing instrument of a statutory trust, the business and affairs of a statutory trust shall be managed by or under the direction of its trustees.   To the extent provided in the governing instrument of a statutory trust, any person (including a beneficial owner) shall be entitled to direct the trustees or other persons in the management of the statutory trust.

22.   Implementing this provision, the Trust Agreements provide that the Owner Trustee has all of the "rights, powers and duties set forth herein and in the Statutory Trust Statute."   Trust Agreement § 2.04; *see* § 8.01.  Under § 2.03 of the

Trust Agreements (entitled "Purposes and Powers"), the Trusts have the obligation and power, *inter alia,* "to provide for the administration of the Trust and the servicing of the Student Loans." § 2.03(a)(ii).   The Trusts further have the power "[t]o engage in those activities and to enter into such agreements that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith."  § 2.03(a)(iii).  They also have the power "[t]o engage in such other activities as may be required in connection with the conservation of Trust Property…."  § 2.03(a)(iv).

23.    These are owner-directed Trusts.  As provided in § 2.03(b)(i) of the Trust Agreements, in conducting the operations of the Trusts, "[t]he Trust will act solely in in its own name," and "the Owner Trustee or other agents selected in accordance with this Agreement will act on behalf of the Trust subject to direction by the Owners…."  The Owner Trustee is required "to administer the Trust in the interests of the Owners." § 8.03.

24.    The beneficial interests in Plaintiff The National Collegiate Master Student Loan Trust I are owned by NC Residuals Owners Trust and SL Resid Holdings LLC.   The beneficial interests in Plaintiff The National Collegiate Student Loan Trust 2003-1 are owned by NC Owners, LLC ("NC Owners"), Pathmark Associates LLC ("Pathmark") and NC Residuals Owners Trust.   The beneficial interests in the remaining Plaintiffs are owned by NC Owners and

Pathmark.  (One or more of NC Owners, Pathmark, NC Residuals Owners Trust and SL Resid Holdings LLC are referred to herein as the "Owners.")

25.    The Owners have the right to "direct or consent to actions of the Owner Trustee and otherwise participate in the management and control of the affairs of the Trusts."  Trust Agreement p. 2 (definition of "Beneficial Interest").

26.    In October 2015, at the request of the Owners, WTC as Owner Trustee retained Chaitman LLP ("Chaitman") to represent the Trusts in litigation matters.   The Chaitman retention letter, which was executed by WTC and approved by the Administrator, provides that Chaitman "will act as Special Counsel for the Trusts managing litigation or other adversarial proceedings arising from or relating to one or more Trusts."  The letter further provides that Chaitman may act "[a]s requested or directed by … the Owners."  It further empowers Chaitman to "select[], engag[e] and manag[e] other law firms to provide" legal services to the Trusts.  Pursuant to such authorization granted by the Owner Trustee on behalf of the Trusts, Chaitman retained several other law firms to bring or defend actions and proceedings on behalf of the Trusts, including Grant & Eisenhofer P.A., McCarter & English, LLP, and DiCello Levitt & Casey LLC.

### B.    The Trusts' Service Providers

27.    In order to preserve the value of the collateral (i.e., the Student Loans), several agreements regarding the servicing and administration of the Student Loans have been entered into.

### 1.    The Master Servicing Agreement

28.    The Trusts and PHEAA are parties to the Amended and Restated Private Loan Servicing Agreement between PHEAA and the First Marblehead Corporation ("FMC") (the "Master Servicing Agreement" or "MSA") and a series of Custodial Agreements entered into among Plaintiffs, U.S. Bank in its capacity as Indenture Trustee, and PHEAA.  PHEAA acts as the custodian of the Student Loans and services the Student Loans while they are in repayment and in the early stages of delinquency or default.

### 2.    The Indenture

29.    Each of the Trusts executed an Indenture with U.S. Bank as Indenture Trustee.  U.S. Bank executed the Indentures in Massachusetts.  The Indentures are governed by New York law.  The rights and duties of the Indenture Trustee are specified in each Indenture.

30.    The Indentures give the Indenture Trustee certain specified, mostly ministerial, duties, principally to deposit money collected on the Student Loans owned by the Trusts and to pay out money to Noteholders and others according to a specified "waterfall."

31.   The Indentures also provide that in the case of an Event of Default,"
the Indenture Trustee has certain obligations, such as to notify the Trusts of the
default and to request that the Trusts take action to remedy the default.

32.   The Indentures also contain a "Granting Clause" whereby each Trust
grants to the Indenture Trustee the Trust's "right, title, and interest" in the Student
Loans, the Servicing Agreements and all causes of action and all proceeds in
respect thereof.  This provision does not nullify any of the other provisions of the
Indentures and does not deprive the Trusts of the right to assert claims against
persons or entities who have injured the Trusts by, *inter alia*, breaching their
contractual obligations to the Trusts.  The purpose of the Granting Clause is, as set
forth therein, "to secure the payment of principal of and/or interest on … the
Notes" and "to secure compliance with the provisions of this Indenture, all as
provided in this Indenture."

33.   The definition of "Grant" contained in the Indenture makes clear that
a "Grant" conveys "rights powers and options (but none of the obligations) of the
Granting party."  Indenture Appendix A-16.  Therefore, the Trusts retain all of the
obligations that they have under the Trust Agreements and the Indentures.

34.   Among the many obligations that the Trusts retain is the obligation to
take various actions to protect the Trusts and enforce the obligations of persons
doing business with the Trusts.  For example, § 3.05 of the Indentures provides:

Protection of Indenture Trust Estate. The Issuer … will take such other action necessary or advisable to:

*     *     *     *

   (iii)    enforce any of the Collateral; or

   (iv)    preserve and defend title to the Indenture Trust Estate ….

Similarly, § 3.07(d) of the Indentures provides: "If the Issuer shall have knowledge of the occurrence of a Servicer Default…, the Issuer shall promptly notify the Indenture Trustee and the Rating Agencies thereof, and shall specify in such notice *the action, if any, the Issuer is taking with respect to such default*…. *[T]he Issuer shall take all reasonable steps available to it to enforce its rights under the Basic Documents in respect of such failure*." (Emphasis added). Such provisions would make no sense if the Trusts have been divested of their ability to assert claims relating to the Student Loans or the servicing agreements.

   35.    Furthermore, the Granting Clause does not provide that the grant of rights to the Indenture Trustee makes the Indenture Trustee the "sole" or "exclusive" holder of such rights. This is in stark contrast to other provisions in the Indenture that use such words where exclusivity is intended. *See, e.g.*, Indenture § 6.10(b)(i) (describing rights that "shall be exercised … solely at the direction of the Indenture Trustee").

   36.    To the contrary, the Indenture makes clear that any grant of right to the Indenture Trustee to bring proceedings is not intended to be exclusive but rather is cumulative. Section 5.9 provides:

Rights and Remedies Cumulative. No right or remedy herein conferred upon or reserved to the Indenture Trustee … is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.

### 3. The Administration Agreement

37. The Trusts are parties to Administration Agreements entered into on various dates, by and among each of the Trusts individually, Wilmington Trust Company as Owner Trustee, U.S. Bank as Indenture Trustee, The National Collegiate Funding LLC as the Depositor, and First Marblehead Data Services, Inc. ("FMDS"), GSS's predecessor-in-interest, as the Administrator under each such Administration Agreement. FMDS, which is a Massachusetts corporation, executed the Administration Agreement in Massachusetts. The Administration Agreements are governed by New York law.

38. The Administration Agreements provide the Administrator with certain specified rights and duties, but make clear that ultimate control rests with the Trusts. Thus, § 1(d)(ii) of the Administration Agreements provides that as to non-ministerial matters, the Administrator shall not "take any action that the Issuer directs the Administrator not to take on its behalf." It further provides that in the absence of instructions from the Indenture Trustee, in accordance with the Indenture, or from the Owner Trustee or the Owners, in accordance with the Trust Agreement, the Administrator shall not take any action regarding "[t]he initiation

of any claim or lawsuit by the Issuer … except for claims or lawsuits initiated in the ordinary course of business by the Issuer or their respective agents or nominees for the collection of the Student Loans owned by the Issuer." § 1(d)(i)(B). Such provision plainly recognizes that the Issuer retained the ability to initiate lawsuits.

### 4.     The Special Servicing Agreement

39.     A Special Servicing Agreement was entered into on March 1, 2009, by and among First Marblehead Education Resources, Inc. ("FMER") as Special Servicer, U.S. Bank as Back-Up Special Servicer, and each of the Trusts, which named FMER as Special Servicer for delinquent and defaulted Loans and further provided that if FMER were to resign as Special Servicer, U.S. Bank would step in as the Special Servicer.   FMER executed the Special Servicing Agreement in Massachusetts.  The Special Servicing Agreement is governed by New York law.

40.     In March 2009, FMER hired TSI to provide default prevention and collection services in the event that U.S. Bank became Special Servicer, including hiring lawyers to bring collection cases.

### 5.     The Special Subservicing Agreement

41.     In March 2009, U.S. Bank made an agreement with Goal Structured Solutions, Inc. ("Goal") that if U.S. Bank were to become Special Servicer, it would hire an affiliate of Goal to act as Special Subservicer.

42.     In 2012, the Administrator was sold to Goal and renamed GSS, and shortly after that sale, FMER resigned as Special Servicer, triggering U.S. Bank's role as back-up Special Servicer.  U.S. Bank, as it had promised Goal, thereupon entered into the Special Subservicing Agreement dated as of September 7, 2012, hiring Turnstile – a wholly-owned subsidiary of Goal – to perform certain responsibilities regarding defaulted and delinquent loans that U.S. Bank was obligated to perform for the benefit of the Trusts pursuant to the Special Servicing Agreement.  The Special Subservicing Agreement is governed by New York law.

43.     Under the Special Subservicing Agreement, Turnstile was, among other things, "responsible for monitoring and supervising the performance by NCO" of its collection activities.   Special Subservicing Agreement ¶ 2.   The Special Subservicing Agreement required Turnstile to "conduct reviews of NCO's performance no less frequently than quarterly" and to meet with NCO on a quarterly basis to discuss with NCO its "post-default collections activities."  *Id*. Turnstile was required to "provide oversight of activities of NCO with regard to account management, litigation assistance and/or settlement strategies."   Special Subservicing Agreement Ex. A ¶ 1.   Turnstile was further required to "instruct Servicers to provide original documents to NCO," "review, monitor and assist NCO in connection with counterclaims naming … any Trust in collection

litigation," and "review all settlement offers for account[s] with judgments entered on them." *Id.* ¶ 5.

44.     The Trusts are the intended beneficiaries of the Special Subservicing Agreement.    Under the Special Subservicing Agreement, Turnstile performs services that U.S. Bank was obligated under the Special Servicing Agreement to perform for the Trusts.  Those services relate to monitoring and supervising actions being taken to collect amounts due on delinquent and defaulted loans owned by the Trusts.  The only reason for any such services is to bring money into the Trusts.  In addition, Turnstile is paid by the Trusts for its services.  U.S. Bank and Turnstile also negotiated and included a clause in the Special Subservicing Agreement for the Trusts' benefit which provides for due diligence reviews of Turnstile's books and records and servicing activities, and the parties included in the clause the obligation of the Trusts to pay for such reviews.

45.     Neither the Trusts nor the Owners approved these arrangements with Turnstile or with TSI.  To the contrary, the Owners specifically informed the Administrator and U.S. Bank that they did not want Turnstile or TSI to perform any services relating to the Trusts.  But the Administrator and U.S. Bank refused to follow the instructions from the Owners.  The Trusts did not hire Turnstile or TSI, neither Turnstile nor TSI acts at the direction of the Trusts, and they do not follow any directions or instructions issued by the Trusts.  To the contrary, as discussed

below, while the Owners and the Trusts have requested that TSI cease filing lawsuits in the name of the Trusts where TSI cannot prove that the Trusts have standing to collect on defaulted loans, TSI has nevertheless continued to file such lawsuits. The Trusts have no ability to control the activities of TSI regarding its collection activities. TSI is not and never has been an agent of the Trusts.

46.    To the contrary, TSI is an agent of U.S. Bank as Special Servicer. Under the Special Servicing Agreement, U.S. Bank was responsible for "the enforcement, collection and servicing of Delinquent Loans and Defaulted Loans." This included "[r]etaining counsel on behalf of the applicable Trust (whether directly or through collection agencies) to further pursue enforcement and collection of Delinquent Loans and Defaulted Loans, including through litigation...." U.S. Bank was responsible for approving TSI's selection of collection attorneys to bring collection lawsuits in Delaware, New York, Massachusetts and elsewhere. U.S. Bank has direct control over TSI's collection activities, and U.S. Bank's approval is needed before TSI can revise a borrower's payment schedule.

47.    U.S. Bank's duties further included monitoring the performance of Turnstile and replacing it if it was deficient or negligent in performing its duties. As set forth herein, Turnstile's performance of its duties was deficient and

negligent, but U.S. Bank failed to monitor Turnstile's performance and failed to replace Turnstile as Subservicer.

48.    The relationships among the foregoing entities are illustrated in the chart on the following page.



### C.   Defendants Improperly Send Defaulted Loans to TSI in Violation of the Governing Documents

49.   PHEAA agreed to be legally bound by the MSA, and accordingly, to "provide and perform the [services defined therein] in full compliance with" the terms of the MSA.  The MSA allows for amendments "only by written instrument duly executed by [the Trusts] and [PHEAA]."  The MSA, and in particular, the Servicing Standards it incorporates, have been properly amended numerous times by agreements that were memorialized in the form of letters, and signed by the Trusts, PHEAA, and in some instances, other interested parties.   These amendments, or agreements, are known as "Read and Agreeds."

50.   Two specific Read and Agreeds address PHEAA's ability to distribute borrower-related information to third parties.   The two agreements preclude PHEAA from sending the information to any third parties other than FMER.

51.   The first such Read and Agreed, dated November 5, 2008 ("November 2008 Read and Agreed"), states that for "all questions, inquiries, documents, claim packages of all kinds, or other material relating to [the Loans]," PHEAA shall provide the information "directly to FMER" as Special Servicer. Naturally, FMER was a signatory to the agreement, as was the administrator at the time, FMDS (now GSS), in addition to the Trusts and PHEAA.

52.   The second Read and Agreed directing PHEAA to deal only with FMER is dated July 27, 2009 ("July 2009 Read and Agreed").  In the document, PHEAA agrees to send default notifications to FMER after 180 days of delinquency:  "[d]efault notifications must be submitted to FMER between the 180th and 210th day of delinquency."  Once again, PHEAA, as well as the Trusts' owners, Administrator, and FMER executed the agreement.

53.   Despite these agreements, GSS directed PHEAA to take contrary actions.  GSS's directive, and PHEAA's acquiescence, took place without the consent, and to the detriment, of the Trusts.  On July 20, 2012, GSS informed PHEAA by email that the new Special Servicer was U.S. Bank (succeeding FMER), and that U.S. Bank had an arrangement with TSI pursuant to which TSI would perform many of U.S. Bank's collections responsibilities.  In the email, the Administrator asserted that based on this role-shifting, "NCO will need the borrower data that was previously provided to [the Special Servicer]."  As an endorsement to this proposed change, the Administrator stated that it would provide PHEAA with a "direction letter" to "document this transaction."

54.   The Administrator never provided an appropriate direction letter. Further, without amendments to the MSA and related agreements, the Administrator's direction could not properly be implemented.  The Administrator is not a party to the MSA and had no authority to amend or supplement the MSA

or related agreements without receiving instructions from the Owner Trustee or the Owners in accordance to the Trust Agreement and the Administration Agreement. The Administration Agreement provides that with respect to "non-ministerial" matters:

> [T[he Administrator … shall not take any action unless the Administrator shall have received instructions from the Indenture Trustee, in accordance with the Indenture, from the Owner Trustee or the Owners, in accordance with the Trust Agreement. For the purpose of the preceding sentence, "non-ministerial matters" shall include, without limitation:
>
> (A)   The amendment of or any supplement to the Trust Related Agreements

Administration Agreement ¶ I(d)(i).   The Administrator never requested such instructions, and neither the Owners nor the Owner Trustee ever provided such instructions to the Administrator.

55.   Indeed, on August 6, 2012, two weeks after the Administrator sent the above direction to PHEAA, PHEAA responded:   "You also mentioned that the NCSLT Trusts will be providing a direction letter to AES to document the transaction."   The Administrator wrote again on August 15, asking PHEAA what PHEAA might be looking for in such a letter:   "I would like to understand what you are looking for in the direction letter.   Is this something as simple as the trusts acknowledging the new special servicing roles and directing [PHEAA] to move data as appropriate?"   PHEAA replied:   "I believe that would make sense but we

can certainly discuss this further when we setup the call regarding the changes needed to the agreements."

56.     Not only did PHEAA and GSS thus evidence their understanding that amendments to the Servicing Standards required the Trusts' authorization, they then circulated the particular Read and Agreeds that needed to be amended for the GSS email to be effective.  On August 17, 2012, pursuant to a request from GSS for "the existing servicing guidelines," PHEAA sent the Administrator the two Read and Agreeds discussed above.

57.     Fully aware of the need to amend the MSA in order to send defaulted Loans to NCO, the Administrator nevertheless plowed forward without the Trusts' or the Owners' authorization.  Beginning in 2012, as a result of the Administrator's direction, PHEAA began to send TSI all questions, inquiries, documents and claim packages that previously were sent to FMER, including, among others, defaulted loans relating to borrowers in Delaware.

58.     The Administrator's financial motive for persuading PHEAA to send loans and loan-information to TSI is clear.  Goal, through its wholly-owned subsidiary, Turnstile, was positioned to make money overseeing TSI's performance of special servicing responsibilities.  Under the Turnstile agreement, Turnstile was "responsible for monitoring and supervising the performance of NCO," including "reviews of NCO's performance no less frequently than

quarterly." Thus, by diverting loans to NCO, GSS was increasing the fees of Goal's other subsidiary.

59.    Through an Issuer Order dated May 22, 2015 sent by the Owner Trustee on behalf of the Trusts, the Trusts sought to obtain details about these arrangements. The Order directed GSS to provide "any and all correspondence [defined as including emails, letters, and other communication] given to PHEAA whereby (i) PHEAA was directed and instructed to cease providing the so called 'Default Notifications' (as defined in the July 27, 2009 letter from the Administrator to PHEAA) to FMER and (ii) PHEAA was directed and instructed to begin providing [the Default Notifications] to any of U.S. Bank, Turnstile, NCO and GSS Data Services, or any other party not referenced herein."

60.    GSS did not respond and continues to refuse to supply the requested information. However, the Trusts obtained the Administrator's email discussed above through their emergency audit of PHEAA, and thereafter, on behalf of the Trusts, the Owner Trustee sent the Administrator an Issuer Order, dated October 1, 2015, stating that the directives in the email lacked authority, and that for any further action, the Administrator needed to obtain prior written consent of the Trusts:

> [T]o insure full and complete compliance with the Administration Agreement, the undersigned hereby advises and instructs GSS, as Administrator, and all employees, agents and subcontractors working for or acting on behalf of GSS, as follows:

1.  With regards to any duties being performed by the Administrator under Sections l(c) and l(d) of the Administration Agreement, GSS is hereby directed to immediately stop performing those duties and to immediately cease and desist from taking any further actions without the prospective and express written authorization from the Owner Trustee, on behalf of the Trusts, which prospective and express written authorization shall only be considered by the Owner Trustee, on behalf of the Trusts, after the furnishing of the additional information requested pursuant to paragraph 3 below.   For the purposes of this paragraph 1, and to avoid any doubt, the Administrator can no longer rely upon any previous actual or assumed authorization.

2.  GSS is hereby directed to immediately cease and desist from giving any direction to PHEAA and to take no further action with regards to the servicing of defaulted and delinquent loans without the express written consent of the Owner Trustee, on behalf of the Trusts, which prospective and express written consent shall only be considered by the Owner Trustee, on behalf of the Trusts, after the furnishing of the additional information requested pursuant to paragraph 3 below.  For the purposes of this paragraph 2, and to avoid any doubt, the Administrator can no longer rely upon any previous actual or assumed consent.

3.   GSS is hereby directed to provide the Owner Trustee with additional information to include an accurate and complete description of any duties it is currently performing on behalf of the Trusts under [various sections of] the Administration Agreement, accompanied by the corresponding written authorization from the Owners or the Owner Trustee, on behalf of the Trusts ... in accordance with the Administration Agreement.

61.    The additional information sought by the Trusts was never disclosed, and the Trusts never provided the consent described in the Issuer Order. Nevertheless, since that time, PHEAA has transferred over $4.5 billion of defaulted Loans directly to TSI for collection, and it continues to do so to the present date.  System access to private Student Loan data is routinely provided to

this entity and others with which it has contracted to perform collections that neither the Owners nor the Owner Trustee has ever approved as required by the MSA. A number of lawsuits by borrowers have been brought against the Trusts, the Owners and the Administrator's affiliate alleging improper debt collection activities and raising significant issues as to whether the entities pursing the collections have possession and custody of the Loans and all of the documents needed to collect on the Loans. The CFPB investigated the very things the Owners want to investigate, and on the basis of its investigation the CFPB filed a federal complaint against the Trusts complaining as to abusive servicing behavior by the certain of the Defendants herein.

### D. Defendants Allow the Statute of Limitations on Defaulted Loans to Expire and Refuse to Provide Information Regarding Such Loans

62.    In February 2013, the Owners' agent, VCG Securities LLC ("VCG"), sent a written request to GSS for information related to loans that had expired past the statute of limitations for collections, and, that would be expiring out of statute in the subsequent twelve months. GSS responded that it did not have all of the requested information, and forwarded the request to U.S. Bank. U.S. Bank, in turn, stated that it had subserviced its special servicing duties to TSI, and forwarded the request there. In truth, at the time of the Trusts' request to GSS, Goal's wholly

owned subsidiary, Turnstile, was overseeing special servicing of the Loans as Special Subservicer, by virtue of its agreement with U.S. Bank.

63.     A month passed with no data disclosures.  The Owners emailed U.S. Bank again, and the next day, March 19, 2013, GSS provided certain data.

64.     The data showed that nearly $100 million in loans had expired past the statute of limitations in the preceding 270 days since U.S. Bank took over as Special Servicer, and another $225 million would be expiring within the subsequent twelve months.

65.     The Owners received additional data in May 2013 that was similarly damning.  The information revealed an expired loan balance of approximately $276 million, and a fast-growing loan balance at risk of expiring out of statute (the total had ballooned to approximately $268 million).

66.     These disclosures, and the need for more layers of detail rather than aggregated information which had been provided to date, prompted the Owners to send a new data request to U.S. Bank on May 10, 2013.  The Owners received no reply and so they wrote again on June 18, 2013.  This time, U.S. Bank did reply, but failed to provide data.  Instead, U.S. Bank indicated that "the request may have to go through the Administrator."

67.     Eventually, in early 2014, the Owners and U.S. Bank had a phone call in which U.S. Bank requested evidence of the amount of loans that had expired

past the collection statute.   Although this request ignored that the Owners themselves had been struggling to gain access to this information, in part due to U.S. Bank's posture that it was not responsible for obtaining or providing the data, the Owners nevertheless, on March 17, 2014, provided U.S. Bank with the information it had gathered.   In the same letter, however, the Owners requested additional information from U.S. Bank regarding defaulted loans, portfolio performance, and loan-level information.

68.    U.S. Bank once again deflected the request.  It sent an April 14, 2014 letter to the Owners which, *inter alia*, (i) referred the Owners to the Administrator, (ii) claimed to have authority only to send information to the Owners if authorized by the Administrator, and (iii) asserted that it would "not be responsible or accountable for performance of [TSI and Turnstile]," the two entities to whom U.S. Bank had farmed out its special servicing responsibilities.

69.    In fact, U.S. Bank as Special Servicer has contractual rights under the Special Subservicing Agreement to demand information from Turnstile and to terminate Turnstile for any failure to perform in any material respect its obligations under that agreement.

70.    The failures of U.S. Bank and Turnstile to fulfill their contractual duties to the Trusts regarding assertion of claims against defaulting borrowers and the monitoring and supervising of such efforts has caused the statute of limitations

to expire on loans of hundreds of millions of dollars, including loans to borrowers in Delaware. Defendants' failures properly to collect on delinquent and defaulted loans, and their failures to monitor and supervise collection efforts, continues to the present date, and loans continue to become statute-barred.

### E. Defendants' Failure to Obtain and Safeguard Documents Impedes the Trusts' Ability to Collect on Defaulted Loans

71. Defendants have filed, in the name of the Trusts, lawsuits throughout the country seeking to collect on defaulted loans, and are continuing to do so to the present date. Among other places, such lawsuits have been recently filed in Delaware,[1] New York,[2] and Massachusetts.[3]

---

[1] *See, e.g.*, *NCSLT v. Plummer*, No. CPU4-17-003152 (filed July 25, 2017); *NCSLT v. Cosby*, No. CPU5-17-001090 (filed July 25, 2017); *NCSLT v. Takklai* (filed July 25, 2017); *NCSLT v. Gordon*, No. CPU5-17-001091 (filed July 25, 2017); *NCSLT v. Tineo*, No. CPU4-17-003028 (filed July 25, 2017); *NCSLT v. Morgan*, No. CPU6-16-0011273 (filed Dec. 9, 2016).

[2] *See, e.g.*, *NCSLT 2007-2 v. Singn*, No. 158221/17 (N.Y. Sup. Ct. N.Y. Co. filed Sept. 14, 2017); *NCSLT 2007-4 v. Sasieta*, No. 151612/17 (N.Y. Sup. Ct. N.Y. Co. filed Feb. 20, 2017); *NCSLT 2006-4 v. Joyner*, No. 151531 (N.Y. Sup. Ct. N.Y. Co. filed Feb. 16, 2017); *NCSLT v. Valentin*, No. 156033/16 (N.Y. Sup. Ct. N.Y. Co. filed Aug. 31, 2016).

[3] *See, e.g.*, *NCSLT 2006-4 v. Powley*, 2016 Mass. Super. LEXIS 744 (Mass. Super. Ct. May 12, 2016); *NCSLT 2007-3 v. Durgin*, 2016 Mass. Super. LEXIS 509 (Mass. Super. Ct. May 11, 2016); *NCSLT 2007-2 v. Lewis*, 2016 Mass. Super. LEXIS 719 (Mass. Super. Ct. Apr. 6, 2016); *NCSLT 2006-1 v. Sweda*, 2016 Mass. Super. LEXIS 281 (Mass. Super. Ct. Mar. 17, 2016); *NCSLT 2006-3 v. Matthew*, 2015 Mass. Super. LEXIS 1644 (Mass. Super. Ct. June 9, 2015); *NCSLT 2006-4 v. Laracy*, 2014 Mass. Super. LEXIS 504 (Mass. Super. Ct. Nov. 4, 2014).

72.    Defendants' record keeping failures, however, have impeded the Trusts' ability to collect from borrowers who have defaulted on their loans.

73.    To establish standing and obtain a judgment against a defaulted borrower, the Trusts, who were not the original lenders, must demonstrate their ownership of the loan.

74.    The transaction documents dealt with this as follows.  First, each deal included Pool Supplement agreements, whereby the originator of the loans (called the "Program Lender") "transfers, sells, sets over and assigns to The National Collegiate Funding LLC (the 'Depositor') … each student loan set forth on the attached Schedule 1."  Each Schedule 1 states that the list of loans is "On file with FMC" (i.e., First Marblehead).

75.    Second, there are Deposit and Sale agreements, whereby the Depositor sold to the Trust the loans listed on Schedule 1 to the Pool Supplement agreements.

76.    Defendants, however, have failed to obtain and safeguard the Schedule 1 to each Pool Supplement agreement.  PHEAA has admitted that it does not possess and made no effort to obtain these documents.  In a document request in a related case, the Trusts requested that PHEAA produce "All Pool Supplement Agreements, including all related schedules" in PHEAA's possession, custody or

control.   PHEAA responded that PHEAA "is not aware of any responsive documents."

77.   The Defendants involved in pursuing defaulted loans, including without limitation U.S. Bank as Special Servicer, Turnstile and TSI, have failed to obtain the Schedule 1s and other documents needed to prove ownership of the loans.   Pursuant to § 5b of Exhibit A to the Special Subservicing Agreement, Turnstile is required to "instruct Servicers to provide original documents to" TSI, but it has failed to do so.   As Special Servicer, U.S. Bank has responsibility to take action regarding "the enforcement and collection of Delinquent Loans and Defaulted Loans to maximize the collection of amounts payable of the Student Loans," including without limitation retaining collection agencies and others to prosecute lawsuits against borrowers in default.   Special Servicing Agreement § 2. And U.S. Bank is required to monitor Turnstile's performance and replace Turnstile if Turnstile's performance is deficient, but U.S. Bank has failed to do so.

78.   As a result of the failure to obtain and safeguard the Schedule 1s to the Pool Supplement agreements and other documents relating to the Student Loands, it has become difficult if not impossible properly to foreclose on defaulted loans, including loans to borrowers in Delaware, New York and Massachusetts.

79.   In the course of its investigation, the CFPB found that TSI has filed at least 1,214 collection lawsuits against borrowers even though it lacked the

documentation necessary to prove that the Trusts owned the loans.  In these lawsuits, the CFPB found, documentation of a complete chain of assignment evidencing that the subject loan was transferred to the Trusts was lacking.  In at least 208 lawsuits, TSI lacked the promissory note to prove that a debt was owned.  These deficiencies, which continue to the present to infect lawsuits brought by TSI, have crippled the Trusts' ability to prevail in attempting to collect on defaulted loans.

80.     For example, in *NCSLT 2006-1, 2007-4 v. Glynn*, 219-2015-CV-00209 (N.H. Super. Ct. 2015), the court dismissed efforts to collect on a defaulted loan, stating:

> The court determines that the evidence presented is insufficient to demonstrate that the plaintiff owns the debt.  As noted above, the 2007 pool supplement assigned certain loans to NCF [National Collegiate Funding, LLC] – namely the loans listed on Schedule 1.  However, NCSLT has failed to provide the court with a copy of Schedule 1.  Without Schedule 1, the court cannot determine which loans Bank of America assigned to NCF.  Thus, the court determines that NCSLT has failed to establish it owns Glynn's debt.

81.     In *Nat'l Collegiate Student Loan Trust 2007-4 v. Watson*, 2016 N.Y. Misc. LEXIS 5116 (N.Y. Civ. Ct. Bronx Co. Jan. 7, 2016), Jonathan Boyd, an employee of TSI, testified that "TSI is the designated custodian of records" for the plaintiff Trust and that the loan in question had been assigned to the Trust.  The court dismissed the case, because of a failure "to establish the chain of title from the original lender" to the Trust.  The court stated:

> Mr. Boyd's unsupported testimony that the defendants' loan was part of the assignment from The National Collegiate Funding LLC assigned to the Plaintiff is insufficient based upon the pool supplements listed in Schedule A. Mr. Boyd did not provide any testimony that identified defendants' Charter One Continuing Education Loan as part of Schedule A of the Deposit and Sale Agreement.

*Id.* at *8.

82.   Similarly, the Ohio Court of Appeals overturned a judgment in favor

of the Trusts because the Trusts

> neglected to include documentation to prove that it is entitled to demand judgment on the note. Although the record contains reference to the pool agreement and an uncontested affidavit that [defendant borrower] is in default, NCSLT did not include specific documentation to directly link the pool of debts assigned to NCSLT from [the originating bank] to the debt [that the defendant has] incurred and had defaulted upon.

*NCSLT 2005-1 v. Owusu*, 2016 Ohio 259 (Ohio Ct. App., Butler Co., Jan. 25,

2016).

83.   A Louisiana court made a nearly identical ruling, reversing, based on

the Trusts' document deficiencies, a lower court's grant of summary judgment in

favor of the Trusts. *NCSLT 2003-1 v. Thomas*, 129 So. 3d 1231 (La. App. 2d Cir.

2013).   Again, the court found that "[t]he Pooling Agreement offer[ed] no

description of the loans being assigned by [the originating bank] . . . . As a result,

genuine issues of material fact exist as to whether plaintiff is the rightful holder of

that loan." *Id.* at *1234-35.

84.     And in *Nat'l Collegiate Student Loan Trust 2006-1 v. Werner*, No. 169/14 (N.Y. Sup. Ct. Putnam Co. Jan. 28, 2015), the court granted the defendant's motion to dismiss based on its statute of limitations defense and also because there was not "adequate proof of the existence of an assignment" of the loan to the Trust.

85.     While all of these and similar cases were brought in the name of the Trusts, the entities responsible for bringing or supervising the cases were one or more of the Defendants herein responsible for servicing and collecting defaulted loans, namely, U.S. Bank, Turnstile and TSI.  The Trusts did not authorize such suits and had (and have) no control over the conduct of such suits.

86.     As with other servicing deficiencies, the Owners sought information to understand the causes and potential solutions.  On April 26, 2016, on behalf of the Trusts an Issuer Order to be sent by the Owner Trustee to the Administrator seeking, *inter alia*, "[a] list of all Lawsuits [defined as those "described within Section 1(d)(i)(B) of the Administration Agreement"] initiated by or against the Trusts ... that have been resolved by judgment, settlement, compromise or other final disposition over the last three (3) years ...."

87.     The Administrator's letter response came three weeks later, and contained the following admission:

> With respect to your requests ... regarding certain collection litigation under Section 1(d)(i)(B) of the Administration Agreements, by definition, that section relates to 'non-ministerial' matters which the Administrator is under no obligation to take action upon, and

therefore you have requested information that the Administrator does not compile and cannot provide.

88.     The Administrator is correct insofar as the first part of §1(d)(i)(B) does address non-ministerial matters for which the Administrator has no obligation to take action:   "Non-ministerial matters shall include, without limitation . . . (B) The initiation of any claim or lawsuit by the Issuer and the compromise of any action, claim or lawsuit brought by or against the Issuer ...."   Incredibly, however, the Administrator ignored, both in its letter, and as a service provider, the other half of the provision which continues, "except for claims or lawsuits initiated in the ordinary course of business by the Issuer or their respective agents or nominees for the collection of the Student Loans owned by the Issuer...."

89.     As demonstrated by the numerous borrower lawsuits, such as those discussed above, where the Trusts have lost, U.S. Bank, Turnstile and TSI have behaved improperly regarding pursuing defaulted loans, including loans to borrowers in Delaware, New York and Massachusetts, and this wrongdoing continues to the present date.   U.S. Bank and Turnstile are continuing to the present date to breach their obligations to monitor and supervise the collection efforts.

**F.      Defendants' Improper Collection Activities Thwart
          Collections on Defaulted Loans and Expose the Trusts to Liability**

90.      The failures by U.S. Bank, Turnstile and TSI to engage in proper servicing and collection activities, and the failures by U.S. Bank and Turnstile to fulfill their contractual obligations to monitor and supervise servicing and collection activities, have not only thwarted the ability of the Trusts to collect amounts due on defaulted loans, they have exposed the Trusts to claims by borrowers in Delaware, New York, Massachusetts and elsewhere, including class action lawsuits, as well as claims by the CFPB.

91.      In connection with collecting or attempting to collect debt from borrowers, between November 1, 2012 and April 25, 2016, Turnstile and TSI initiated at least 94,046 collections lawsuits in courts across the country.

92.      In support of the lawsuits, employees of Turnstile and TSI submitted affidavits and documents wherein the affiants swore that they had personal knowledge of the records evidencing the loans.  The CFPB has found that, in fact, in numerous instances the affiants lacked personal knowledge of the loan records.

93.      In many affidavits, the affiants stated that "I have reviewed the chain of title records as business records" regarding the relevant account.  The CFPB found that, in fact, the affiants lacked access to deposit and sale agreements, the last link in the chain of assignment transferring loans into the Trusts.  In numerous

instances, affiants did not review the chain of assignment records prior to executing the affidavits.

94.    In many affidavits, the affiants asserted that they had personal knowledge that the loans were transferred, sold, and assigned to the plaintiff Trusts on dates certain.  The CFPB found that, in fact, affiants lacked personal knowledge of the chain of assignment records necessary to prove that the relevant Trust owned the subject loan.

95.    On numerous occasions, to address a backlog of Affidavits, employees of Turnstile such as interns and mailroom clerks were instructed to execute Affidavits.

96.    On September 18, 2017, a Consent Order was entered in a CFPB administrative proceeding styled *In the Matter of Transworld Systems, Inc.*, No. 2017-CFPB-0018.  TSI stipulated to the entry of such Consent Order.  The Consent Order states that TSI hired law firms to pursue on behalf of the Trusts collections lawsuits regarding defaulted loans.  The Consent Order states that in such lawsuits, false affidavits executed by employees of TSI were submitted.  Such affidavits by TSI employees falsely stated that the affiants had reviewed the Trusts' chain of assignment documentation and that they had personal knowledge of the Trusts' records concerning the loans, although "a complete chain of assignment evidencing that the subject loan was transferred to and owned by the Trust was lacking" and

even though "the promissory note to prove that a Debt was owed did not exist." The Consent Order states that in these collection lawsuits the law firms hired by TSI "could not prove that a Debt was owed to the Trusts, if contested."

97.     By reason of the foregoing improper conduct by Turnstile and TSI, and the failures by Turnstile and U.S. Bank to discharge their contractual duties to supervise and monitor collection activities and lawsuits, numerous lawsuits brought on behalf of the Trusts to collect amounts due on defaulted loans have been dismissed.

98.     In addition, numerous lawsuits have been brought against the Trusts by borrowers because of alleged improper servicing/collection activities and the failures by Turnstile and U.S. Bank to discharge their contractual duties to supervise and monitor collection activities and lawsuits.  For example, *Winne v. NCSLT 2005-1*, No. 16-cv-00229 (D. Me.), is a purported class action by borrowers who claim they are being unlawfully pursued for student loan debts that they do not owe.  The complaint alleges claims under, *inter alia*, the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq*, and the Truth in Lending Act, 15 U.S.C. § 1631, *et. seq*.  While the case asserts claims against the Trusts (as well as the Owners' agent, VCG), in fact all of the collection activities complained of were performed by, or were the responsibility of, various of the Defendants herein, including U.S. Bank as Special Servicer, Turnstile, and TSI.

99.    A similar case asserting claims against the Trusts due to wrongful conduct by TSI is *Eul v. Transworld Sys., Inc.*, No. 15-cv-7755 (N.D. Ill.).  The Trusts sustained damages because the settlement in that case, which was approved by the Court on May 1, 2018, provided, among other things, that the amounts owed by class members (i.e., obligors on the Student Loans) to the Trusts would be reduced and that plaintiffs' counsel would be paid their attorneys' fees and expenses by, on information and belief, the Trusts.  (The Trusts were not consulted concerning the litigation, which was handled and settled by TSI and attorneys hired by TSI.)

100.    Other such lawsuits against the Trusts include, without limitation, *Miller v. Transworld Systems Inc.*, No. 18-cv-0748 (E.D.N.Y.); *Kennedy v. Transworld Sys., Inc.*, No. 16-cv-0033 (N.D. Ga.); *Carden v. NCSLT 2006-4*, No. 16-cv-692 (E.D. Pa.); *Sheld v. NCO Fin. Sys., Inc.*, No. 15-cv-1140 (D. Nev.); *Bartell v. NCSLT 2005-3*, No. 14-cv-4238 (N.D. Cal.); and *Muzac v. Wilmington Trust Co.*, No. BC 607214 (Cal. Super. Ct.).

101.    *Winslow v. Forster & Garbus, LLP*, 2017 U.S. Dist. LEXIS 205113 (E.D.N.Y. Dec. 13, 2017), illustrates some of the false statements that TSI and its agents have made concerning the Trusts in cases brought against borrowers that have put the Trusts in jeopardy.  Counsel retained by TSI filed in the name of NCSLT 2005-3 a case against a borrower in the New York Civil Court.  The

complaint in that case "falsely identifie[d] the Trust as the original creditor" on the

loan. *Id.* at \*28.  Indeed, the court noted that the lawyers retained by TSI "have

filed numerous complaints stating that [the Trusts] 'are the original creditor' and

that the Trust 'is authorized to proceed with the action.'"  *Id.* at \*38.  The court

held that this "statement that the Trust was the original creditor is a false and

misleading statement" and that "this false statement as to the Trust's status as the

'original creditor' is material as a matter of law."  *Id.* at \*29.  The court held: "The

statement as to the Trust's 'original creditor' status violates both the FDCPA and

Section 349" of the N.Y. Gen. Bus. Law.  *Id.* at \*54.

102.   In addition, as noted above, the CFPB conducted an investigation

regarding whether the collections are being sought from persons who do not owe

money to the Trusts, or who are being sued in situations where the documentation

needed to establish liability is missing and/or false affidavits are being used in the

collection proceedings.  The CFPB filed a complaint against the Trusts over these

activities.  *See Consumer Financial Protection Bureau v. The National Collegiate*

*Master Student Loan Trust, et al.*, No. 17-cv-1323 (D. Del.).  In that proceeding, a

Consent Judgment has been agreed to requiring the Trusts to pay millions of

dollars and also imposing significant equitable relief against the Trusts.   In

addition, state regulators, including the Attorney General of the State of New York

and the Attorneys General of at least 10 other states, are investigating these

activities, and Defendants' conduct has exposed the Trusts to sanctions from such regulators as well.

103.   The improper lawsuits being brought in the name of the Trusts have also caught the attention of state attorneys general.  For example, on February 27, 2018, the Minnesota Attorney General wrote to the Owners concerning a case that TSI had filed in the name of NCSLT 2007-4 against a borrower in Minnesota state court.   The Attorney General asked for, among other things, documentation reflecting the complete chain of assignment from the loan originator to the Trust, and demanded that all collection activities cease until full and complete verification and documentation of the debt is provided to the borrower.  As the Owners do not have any such documentation nor any ability (without judicial assistance) to stop TSI and its agents from pursuing their improper collection activities, they have been unable to comply.

104.   Because of Defendants' improper servicing and collection activities, the Trusts have been barred from doing business in several states.

### G.   The Partial Audit of PHEAA

105.   After PHEAA continuously failed to cooperate with the Trusts by providing certain information and was in default of various reporting obligations to the Trusts under the MSA, the Trusts invoked the Emergency Audit provision of the MSA, Section 7.10.

106.   The Trusts retained Boston Portfolio Advisors ("BPA") to conduct the Emergency Audit.  The Emergency Audit commenced on September 11, 2015 and continued for less than two days before PHEAA abruptly and without justification terminated it.

107.   Despite PHEAA's failure to cooperate with the Emergency Audit (although it did provide certain additional information for off-site review), the preliminary results of the Emergency Audit show pervasive and material breaches of the servicing requirements of the Governing Documents.

### H.    GSS and U.S. Bank Prevent the Trusts' Servicer, Auditor and Lawyers From Being Paid

108.   After years of fighting for transparency, eventually obtaining information in piecemeal, and all the while suffering massive damages, the Trusts then faced GSS's and U.S. Bank's tandem gamesmanship with respect to payments.  U.S. Bank and GSS worked together to refuse to pay a key servicer hired by the Trusts and the auditor retained by the Trusts to conduct the audits of PHEAA.

### 1.    Failure to Pay the Trusts' Servicer (Odyssey)

109.   To improve the performance of the Loans, the Owners exercised their right to appoint a Servicer to the Trusts.  The Trusts chose Odyssey.  In appointing Odyssey, the Trusts had the objective of improving the poor performance of the deals by, among other things: (1) determining which Loans have a market value

that is lower than the amount of fees that are being paid to service them, and disposing of them in accordance with the Indenture (by doing this, the Trusts benefit by not having to pay Administrator, Indenture Trustee and Servicer Fees on Loans that have no chance of recovery, thus increasing the amount of money available to pay Noteholders); and (2) improving the performance of any Loans that defaulted after the Odyssey engagement by instructing the Servicer, PHEAA, to direct "newly defaulted loans" to Odyssey.

110.  The Trusts' engagement of Odyssey was done in strict adherence to the exclusive rights of the Issuer to hire Servicers under the Governing Documents. On December 30, 2014, pursuant to § 2.03 of each of the Trust Agreements and § 3.07(b) of each of the Indentures, the Issuers of six of the trusts caused the Owner Trustee to engage Odyssey as a "Servicer," as defined in the Indentures, to perform certain services for the Trusts.  A "Servicing Agreement" was executed by and between Odyssey as a Servicer for the Trusts and Wilmington Trust Company as the Owner Trustee for each of the trusts.  Pursuant thereto, in consideration of the services provided, Odyssey is entitled to payment by the Trusts.

111.  Odyssey provided such services, and the Trusts each owe Odyssey for those services.  Odyssey rendered the corresponding bills, which, pursuant to the Administration Agreement, were duly provided to the Administrator, with the

direction that it forward same to the Indenture Trustee, U.S. Bank, so that it will make payment to Odyssey.

112.   Pursuant to Section 1(a)(i)(G) of the Administration Agreement, the Administrator was obligated to follow that direction.   Under that provision, the Administrator "shall take all appropriate action that is the duty of the Issuer to take pursuant to the Trust Related Agreements including, without limitation, ... [p]roviding instructions to the Indenture Trustee as required by Section 8.02(d) of the Indenture."   Section 802(d)(1) of the Indentures provides that the Administrator "shall instruct the Indenture Trustee" to make distributions to pay "Servicing Fees," and further, that "the Indenture Trustee shall comply with such instruction." Thus, under the Administration Agreement, it is the Administrator's duty to instruct the Indenture Trustee to pay the Servicer at the direction of the Issuer.   The Administrator cannot demand further approval or seek further details of the services rendered.   If the Administrator has a question or needs guidance in this regard, it is to seek direction from the Owner Trustee, not the Indenture Trustee.

113.   Notwithstanding the foregoing, the Administrator objected to the bills and took the position that it would not forward the bills to the Indenture Trustee unless extensive information concerning Odyssey was provided.

114.   The Owner Trustee thereupon issued an Issuer Order on behalf of the Trusts on January 20, 2016 directing the Administrator to prepare and transmit all

of the documents necessary to cause the Indenture Trustee to pay the Odyssey bills. The Administrator did so, but when it transmitted the bills to the Indenture Trustee the Administrator stated that it had concerns about whether Odyssey was properly appointed a servicer.

115. While under the Indenture, the Indenture Trustee is obligated to pay bills sent to it by the Administrator, the Indenture Trustee has failed and refused to pay Odyssey's bills.

116. Instead, the Indenture Trustee filed a petition in a Minnesota state court purporting to seek instructions as to whether Odyssey was properly appointed and whether its invoices should be paid.

117. On April 25, 2018, Magistrate Judge Fallon filed a Report and Recommendation that the Odyssey invoices should be paid. *See In re NCSLT 2003-1*, 2018 U.S. Dist. LEXIS 75802 (D. Del. Apr. 25, 2018). Odyssey still has not been paid.

## 2.  **Failure to Pay the Trusts' Auditor**

118. As discussed earlier, the Trusts hired BPA to conduct an emergency audit of PHEAA. The Trusts were authorized to do so by § 9.03(b) of the Trust Agreements, which permits the Owner Trustee to consult with counsel, accountants and other skilled persons.

119. Concomitantly, the Owner Trustee is entitled to reimbursement. Section 10.01 of the Trust Agreements provides, among other things, that the Owner Trustee "shall be entitled to be reimbursed by the Administrator," and, to the extent not paid by the Administrator, from the Trust Property, for "the reasonable compensation, expenses and disbursements of such agents, representatives, experts and counsel as the Owner Trustee may employ in connection with the exercise and performance of its rights and duties" under the Trust Agreements and the Trust Related Agreements [as defined therein]."

120. Section 1(a)(i)(C) of the Administration Agreement states that the Administrator will pay the Owner Trustee its fees and expenses as are set forth in Section 10.01 of the Trust Agreements. Further, under Section 8.02(d)(l)(i) of the Indentures for the Trusts, the Administrator shall instruct the Indenture Trustee to make distributions from the Trusts' Collection Accounts for the payment of the fees and expenses of the Owner Trustee.

121. On July 20, 2016, the Owner Trustee issued an Issuer Order on behalf of the Trusts directing the Administrator to prepare and transmit all of the documents necessary to cause the Indenture Trustee to pay the BPA bills.

122. On August 9, 2016, the Administrator, working hand-in-glove with PHEAA in trying to intimidate BPA, sent an email to the Owner Trustee stating that the Administrator "is not comfortable instructing the Indenture Trustee to pay"

BPA's invoices relating to its work on the Emergency Audit.  The Administrator confirmed this refusal in an August 24, 2016 letter.

123.   This refusal constitutes a violation of the Administration Agreement, pursuant to which the Administrator does not have the discretion to disobey an Issuer Order and refuse to send the auditor's bills to U.S. Bank.

### 3.   **Failure to Pay the Trusts' Lawyers**

124.   Under the Governing Documents, the procedure for the Trusts' lawyers to be paid is straightforward.  The Owner Trustee sends the bills to the Administrator, who in turn sends bills to the Indenture Trustee for payment.  Upon receipt of the bills, the Indenture Trustee is supposed to pay them on a monthly basis.  The Governing Documents do not give the Administrator discretion to pick and choose which bills it will send, nor do the Governing Documents give the Indenture Trustee discretion as to which bills sent to it by the Administrator it will pay.  *See* Indenture § 8.02(d).

125.   For some period of time, the process worked as intended, i.e., the Owner Trustee sent the bills to the Administrator, the Administrator sent the bills to the Indenture Trustee, and the bills were paid.  However, the process came to a halt in the fall of 2016, when the Administrator and the Indenture Trustee began working in tandem to refuse to pay the Trusts' lawyers and thereby stifle attempts by the Trusts to rectify the servicing failures.  First, the Administrator and the

Indenture Trustee questioned the validity of transactions whereby NC Owners and Pathmark obtained interests in the beneficial ownership of the Trusts, and therefore whether their directions to the Owner Trustee concerning the payment of legal bills (and other matters) are valid. Pending their satisfaction on this alleged issue, the Administrator refused to send bills to the Indenture Trustee, and the Indenture Trustee refused to pay bills it has received.

126. There is no merit to the alleged concern regarding the ownership status of NC Owners and Pathmark. The transfers of beneficial interests to them complied with all applicable rules and provisions of the Governing Documents, and the expressed concerns by U.S. Bank and GSS were merely ploys designed to prevent the Trusts from pursuing its claims against Defendants. The validity of the transactions involving the transfer of the ownership interests was upheld by Vice Chancellor Slights. *See* Order in *The Nat'l Collegiate Student Loan Master Trust I v. PHEAA*, No. 12111-VCS (Del. Ch. Nov. 17, 2017).

127. But the resolution of the ownership issue did not cause the Administrator to resume processing the bills from the Trusts' lawyers. Instead, the Administrator invented other reasons to refuse to process the bills from the Trusts' lawyers. The Administrator has taken the position that it will not process bills unless the Owner Trustee sends an issuer order directing the Administrator to do so and making various representations concerning the bills. Nothing in the

Administration Agreements, the Trust Agreements, or any other relevant agreement contains any such requirement.

128.   In addition, the Administrator and the Indenture Trustee have taken the position that the Trusts' lawyers are not entitled to be paid from the Trusts' assets.   This is inconsistent with the fact that up until the fall of 2016, the Administrator did process for payment the bills of the Trusts' lawyers, and the Indenture Trustee paid them out of Trust assets.   It is also inconsistent with the Trust Agreements, the Administration Agreements, and the Indentures.

129.   As set forth above, by retention letter dated October 12, 2015, the Owner Trustee retained Chaitman LLP as Special Counsel to the Owner Trustee. That engagement letter authorized Chaitman to retain other counsel as needed, and Chaitman has done so.  Section 9.03(b) of the Trust Agreements permits the Owner Trustee to consult with counsel in the exercise or administration of the Trusts. Section 10.01 of the Trust Agreements provides that the Owner Trustee shall be entitled to be reimbursed by the Administrator, and, to the extent not paid by the Administrator, from the Trust property for the reasonable compensation, expenses and disbursements of such agents and counsel as the Owner Trustee may employ in connection with the exercise and performance of its rights and duties under the Trust Agreements.  Section 1(a)(i)(C) of the Administration Agreements states that the Administrator will pay the Owner Trustee its fees and expenses as are set forth

in Section 10.01 of the Trust Agreements. Further, under Section 8.02(d)(1)(i) of the Indentures, the Administrator shall instruct the Indenture Trustee to make distributions from the Trusts' Collection Accounts for the payment of the fees and expenses of the Owner Trustee.

130. In June 2016, on behalf of the Trusts, the Owner Trustee sent an Issuer Order to the Administrator, certifying that the bills submitted by Chaitman and the law firms retained by Chaitman were incurred in the Owner Trustee's capacity as Owner Trustee pursuant to Sections 9.03(b) and 10.01 of the Trust Agreements and are payable under Section 8.02(d)(1)(i) of the Indentures.

131. The bills submitted by Chaitman and the law firms retained by Chaitman are Owner Trustee expenses and the Administrator and the Indenture Trustee have no valid reason for refusing to process them for payment. Nevertheless, the Administrator has persisted in refusing to process for payment bills from the Trusts' lawyers, including lawyers located in Delaware.

132. The Administrator's refusal to process bills from lawyers hired by the Trusts stands in stark contrast with the Administrator's conduct with respect to lawyers hired by the Administrator or by TSI to represent the Trusts. The Administrator and/or TSI have hired law firms to represent the Trusts in lawsuits brought by borrowers against the Trusts, such as those discussed above. The

Administrator has not objected to the payment of invoices submitted by such lawyers.

133.   The Administrator's willingness to process such lawyers bills is particularly noteworthy because neither the Administrator nor TSI even has the right to hire lawyers to represent the Trusts.  Section 1(d)(ii) of the Administration Agreements provides that the Administrator shall not "take any action that the Issuer directs the Administrator not to take on its behalf."  As discussed above, on October 1, 2015, on behalf of the Trusts the Owner Trustee sent an Issuer Order to the Administrator directing the Administrator to cease performing any non-ministerial duties on behalf of the Trusts.  Hiring counsel to defend the Trusts is clearly a non-ministerial duty, and therefore the Administrator lacks the right to hire such counsel, but the Administrator has wrongfully disobeyed this instruction.

134.   TSI also lacks the right to hire counsel to defend the Trusts.  TSI was hired by the Special Servicer, U.S. Bank, and therefore TSI's rights cannot exceed those of the Special Servicer.  The Special Servicing Agreement does not give the Special Servicer the right to hire counsel to defend the Trusts, and therefore TSI does not possess that right either.

135.   But while refusing to process payment to the lawyers properly hired by the Trusts, the Administrator has continued to process payment for the lawyers improperly hired by the Administrator or TSI to represent the Trusts.

136.   In addition, Defendants have continued improperly to pay out of Trust assets their own lawyers' fees.  The Owners directed GSS to cease processing such bills for payment, but GSS ignored such directions.  As noted above, Section 1(d)(ii) of the Administration Agreements provides that the Administrator shall not "take any action that the Issuer directs the Administrator not to take on its behalf." On December 8, 2017, the Owners, acting on behalf of the Trusts, directed GSS to cease authorizing payments to all counsel other than counsel hired by the Trusts and counsel engaged to bring lawsuits on behalf of the Trusts in the ordinary course of the Trusts' business.  GSS was further directed to furnish the Owners with records of all payments from Trust assets to lawyers or law firms since November 22, 2015.  GSS has refused to comply with these requests and, on information and belief, continues to process such bills for payment, and U.S. Bank as Indenture Trustee continues to pay such bills from lawyers for GSS, U.S. Bank, Turnstile and TSI, including lawyers located in Delaware, out of Trust assets.

### COUNT I
### (Breach of Contract against GSS)

137.   Plaintiffs incorporate by reference, as if set forth fully herein, the averments in paragraphs 1 through 136 above.

138.   The Administration Agreement constitutes a valid and binding agreement enforceable against GSS by Plaintiffs.

139.  GSS had contractual obligations to provide specified services under the Administration Agreement.

140.  GSS had an additional obligation to fully carry out each and every action necessary to fulfill the Administration Agreement under the covenant of good faith and fair dealing implied in every contract.

141.  Because of GSS's acts and omissions described above, GSS breached its contractual obligations to Plaintiffs, as well as the implied covenant of good faith and fair dealing.

142.  Plaintiffs request an award of specific performance requiring GSS to comply with the Administration Agreement in all material respects, including without limitation:

a.   requiring GSS to comply with all Issuer Orders directed to GSS by the Owner Trustee or the Owners;

b.   requiring GSS to provide to the Owners the information that the Trusts have requested with respect to defaulted loans;

c.   requiring GSS to revoke its direction to PHEAA to send defaulted Student Loans and other Loan-related information to NCO;

d.   requiring GSS to obtain and provide to the Trusts information regarding lawsuits involving borrowers brought by or against the Trusts;

e.   requiring GSS to send to U.S. Bank BPA's invoices with instructions to pay same;

f.   requiring GSS to send to U.S. Bank invoices from the Trusts' lawyers with instructions to pay same;

g.   requiring GSS to cease attempting to block the Trusts' retention of Odyssey as a servicer;

h.   requiring GSS to cease processing for payment out of Trust assets bills submitted by lawyers for GSS, U.S. Bank, Turnstile and TSI.

143.   In addition, as a direct, proximate result of GSS's breaches, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

144.   Plaintiffs have no adequate remedy at law.

## COUNT II
### (Tortious Interference with Contract against GSS)

145.   Plaintiffs incorporate by reference, as if set forth fully herein, the averments in paragraphs 1 through 144 above.

146.   The Governing Documents constitute valid and binding agreements enforceable against PHEAA by Plaintiffs.

147.   As Administrator for the Trusts, GSS has at all relevant times known that the Governing Documents constitute valid and binding agreements enforceable against PHEAA by Plaintiffs.

148.   As set forth above, GSS has caused PHEAA to violate its obligations under the MSA and other Governing Documents by, among other things, in bad faith instructing PHEAA to send defaulted Student Loans and other information to NCO.

149.   GSS has no justification for causing PHEAA to breach the MSA and other Governing Documents by, among other things, in bad faith instructing PHEAA to send defaulted Student Loans and other information to NCO.

150.   As a direct, proximate result of GSS's conduct interfering with PHEAA's performance of its agreements, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

## COUNT III
## (Breach of Contract against U.S. Bank)

151.   Plaintiffs incorporate by reference, as if set forth fully herein, the averments in paragraphs 1 through 150 above.

152.   The Indenture and the Special Servicing Agreement constitute valid and binding agreements enforceable against U.S. Bank by Plaintiffs.

153.   U.S. Bank had contractual obligations to provide specified services under the Indenture and the Special Servicing Agreement.

154.   U.S. Bank had an additional obligation to fully carry out each and every action necessary to fulfill the Indenture and the Special Servicing Agreement under the covenant of good faith and fair dealing implied in every contract.

155.   The Special Servicing Agreement provides that the Special Servicer, at its discretion shall, *inter alia*, provide "oversight of the activities of Subservicer with regard to account management, litigation assistance, and/or settlement strategies." It further provides the Special Servicer shall, in its sole judgment,

replace any subservicer who is "deemed to be deficient or negligent in performing the duties outlined in its subservicing agreement with the Special Servicer." U.S. Bank breached the covenant of good faith and fair dealing by failing to exercise any discretion or any judgment whatsoever regarding the activities of the subservicers. There is a gap in the Special Servicing Agreement that may be filled by the covenant of good faith and fair dealing. By leaving these matters to the Special Servicer's discretion and judgment, the Special Servicing Agreement assumed that the Special Servicer would, in fact, exercise such discretion and judgment in good faith. If the parties had thought about the matter, they would have negotiated a provision requiring the Special Servicer to exercise its discretion and judgment in good faith regarding the actions of the subservicers.

156. Because of U.S. Bank's acts and omissions described above, U.S. Bank breached its contractual obligations to Plaintiffs, as well as the implied covenant of good faith and fair dealing.

157. Plaintiffs request an award of specific performance requiring U.S. Bank to comply with the Indenture and the Special Servicing Agreement in all material respects, including without limitation:

a.   requiring U.S. Bank as Indenture Trustee to pay invoices for services rendered by Odyssey;

b.   requiring U.S. Bank as Indenture Trustee to pay invoices for legal services rendered by lawyers representing the Trusts;

c.  requiring U.S. Bank as Indenture Trustee to pay invoices for services rendered by BPA;

d.  requiring U.S. Bank as Indenture Trustee to cease making payments out of Trust assets to lawyers for U.S. Bank, GSS, Turnstile and TSI;

e.  requiring U.S. Bank as Special Servicer to provide to the Owners the information that the Trusts have requested with respect to defaulted loans;

f.  requiring U.S. Bank as Special Servicer to perform its supervisory duties over the activities of Turnstile and TSI.

158.  In addition, as a direct, proximate result of U.S. Bank's breaches, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

159.  Plaintiffs have no adequate remedy at law.

### COUNT IV
### (Breach of Duty of Care and to Avoid Conflicts of Interest against U.S. Bank)

160.  Plaintiffs incorporate by reference, as if set forth fully herein, the averments in paragraphs 1 through 159 above.

161.  As Indenture Trustee, U.S. Bank owes Plaintiffs a duty of due care and a duty to avoid conflicts of interests.

162.  Because of U.S. Bank's acts and omissions described above, U.S. Bank breached its obligation of duty care.

163.  In addition, by serving both as Indenture Trustee and as Special Servicer, U.S. Bank has a conflict of interest that has caused it to thwart the Trusts' efforts to take appropriate action in response to the wrongdoing by the Special

Servicer and those entities that it has hired and is supposed to supervise with respect to servicing and collection activities regarding loans in default.

164.   Because of U.S. Bank's failure to exercise due care and its conflicts of interest, U.S. Bank is liable in tort to Plaintiffs.

165.   Plaintiffs request an injunction:

   a.   requiring U.S. Bank as Indenture Trustee to pay invoices for services rendered by Odyssey;

   b.   requiring U.S. Bank as Indenture Trustee to pay invoices for legal services rendered by lawyers representing the Trusts;

   c.   requiring U.S. Bank as Indenture Trustee to pay invoices for services rendered by BPA;

166.   In addition, as a direct, proximate result of U.S. Bank's tortious conduct, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

167.   Plaintiffs have no adequate remedy at law.

## COUNT V
### (Breach of Contract against U.S. Bank)
### (Alternative Count)

168.   Plaintiffs incorporate by reference, as if set forth fully herein, the averments in paragraphs 1 through 167 above.

169.   This Count is pleaded in the alternative in the event that it is determined that by reason of the Granting Clause in the Indenture, the Trusts lack

standing to assert some or all of the claims pleaded herein and that the right and obligation to assert such claims belongs exclusively to the Indenture Trustee.

170. The Indenture constitutes a valid and binding agreement enforceable against U.S. Bank by Plaintiffs.

171. U.S. Bank had contractual obligations to provide specified services under the Indenture.

172. U.S. Bank had an additional obligation to fully carry out each and every action necessary to fulfill the Indenture under the covenant of good faith and fair dealing implied in every contract.

173. U.S. Bank and GSS have asserted that pursuant to the Granting Clause in the Indenture, the Trusts assigned to U.S. Bank all of the Trusts' rights and obligations to assert claims concerning the matters pleaded herein.

174. U.S. Bank has failed to sue Turnstile for breach of the Special Subservicing Agreement. U.S. Bank has failed to sue GSS for breach of the Administration Agreement. U.S. Bank has failed to sue itself as Indenture Trustee for breach of the Indenture. U.S. Bank has failed to sue itself as Special Servicer for breach of the Special Servicing Agreement. U.S. Bank has failed to sue TSI for injurious falsehood. And U.S. Bank has failed to request the Trusts, pursuant to Section 5.16 of the Indentures, to take such action.

175.   In the event it is determined that U.S. Bank and GSS are correct as to the application of the Granting Clause, then by failing to sue GSS, Turnstile, TSI and U.S. Bank for the wrongdoing described herein, U.S. Bank has breached its contractual obligations under the Indenture.

176.   Because of U.S. Bank's acts and omissions described above, U.S. Bank breached its contractual obligations to Plaintiffs, as well as the implied covenant of good faith and fair dealing.

177.   Plaintiffs request an award of specific performance requiring U.S. Bank to comply with the Indenture in all material respects, including by filing suit against Turnstile, GSS, U.S. Bank and TSI on account of the wrongdoing described herein.

178.   In addition, as a direct, proximate result of U.S. Bank's breaches, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

179.   Plaintiffs have no adequate remedy at law.

## COUNT VI
### (Breach of Contract against Turnstile)

180.   Plaintiffs incorporate by reference, as if set forth fully herein, the averments in paragraphs 1 through 179 above.

181.   The Special Subservicing Agreement constitutes a valid and binding agreement enforceable against Turnstile by Plaintiffs.

182.   Because, among other things, the purpose of the Special Subservicing Agreement was to monitor and supervise the performance by TSI and thereby to recover for the Trusts monies owed to the Trusts with respect to Student Loans, and the Special Subservicing Agreement represents an outsourcing of obligations owed by U.S. Bank to the Trusts pursuant to the Special Servicing Agreement, the Trusts are intended third-party beneficiaries of the Special Subservicing Agreement.

183.   Turnstile had contractual obligations to provide specified services under the Special Subservicing Agreement.

184.   Turnstile had an additional obligation to fully carry out each and every action necessary to fulfill the Special Subservicing Agreement under the covenant of good faith and fair dealing implied in every contract.

185.   Because of Turnstile's acts and omissions described above, Turnstile breached its contractual obligations to Plaintiffs, as well as the implied covenant of good faith and fair dealing.

186.   Plaintiffs request an award of specific performance requiring Turnstile to comply with the Special Subservicing Agreement in all material respects.

187.   In addition, as a direct, proximate result of Turnstile's breaches, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

188.   Plaintiffs have no adequate remedy at law.

## COUNT VII
### (Injurious Falsehood against TSI)

189.  Plaintiffs incorporate by reference, as if set forth fully herein, the averments in paragraphs 1 through 188 above.

190.  TSI has caused to be filed, and continues to cause to be filed, in the name of the Trusts lawsuits against borrowers in default.

191.  In such lawsuits, TSI has knowingly and/or recklessly made false and misleading statements concerning the Trusts and their standing to foreclose on the loans.  In particular, TSI has falsely expressly or impliedly represented that the Trusts are legally entitled to foreclose on the loans and that the Trusts possess all of the notes, assignments and other documents needed to prove standing to foreclose on the loans.  TSI has also falsely represented that the Trusts are the original creditors on the loans.

192.  By reason of such false statements concerning the Trusts and by bringing lawsuits in the name of the Trusts in situations where the Trusts are not legally entitled to foreclose on the loans and where the Trusts do not possess notes, assignments and other documents needed to demonstrate standing to foreclose on loans, TSI has exposed the Trusts to lawsuits from borrowers.

193.  Because of TSI's acts, misrepresentations and omissions described above, TSI is liable to Plaintiffs for the tort of injurious falsehood.

194. Plaintiffs request an injunction requiring TSI to cease filing lawsuits in the name of the Trusts without having proof that the Trusts are legally entitled to foreclose on the loans and possess notes, assignments and other documents needed to demonstrate standing to foreclose on loans.

195. In addition, as a direct, proximate result of TSI's tortious conduct, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

196. Plaintiffs have no adequate remedy at law.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

a) Granting Plaintiffs injunctive relief in the form of an order of specific performance;

b) Enjoining Defendants from bringing or authorizing lawsuits against borrowers until and unless Defendants can demonstrate that the Trusts possess all of the documentation necessary to prove that the Trusts are entitled to collect on the borrowers' loans;

c) Enjoining Defendants from paying into the Collection Account monies received from borrowers unless Defendants can demonstrate that the Trusts possess all of the documentation necessary to prove that the Trusts are entitled to collect on the borrowers' loans;

d) Awarding Plaintiffs damages in an amount to be determined at trial;

e) Requiring each Defendant to refund to the Trusts all attorneys' fees that they have charged to the Trusts;

f) Awarding Plaintiffs their costs and attorneys' fees incurred in litigating this action;

g) Awarding Plaintiffs prejudgment and post-judgment interest; and

h) Awarding Plaintiffs such other and further relief as this Court may deem just and equitable.

Dated:  June 15, 2018

Respectfully submitted,

**GRANT & EISENHOFER P.A.**

By ___*/s/ James J. Sabella*___
James J. Sabella (#5124)
Michael T. Manuel (#6055)
123 Justison Street
Wilmington, DE 19801
302-622-7000

*Attorneys for Plaintiffs*

Brown
v.
Transworld

Exhibit E
to
Amended Complaint

UNITED STATES OF AMERICA

CONSUMER FINANCIAL PROTECTION BUREAU

ADMINSITRATIVE PROCEEDING File

2017-CFPB-0016

In the Matter of:                                    CONSENT ORDER

TRANSWORLD SYSTEMS INC.


AFFIDAVIT OF JAMES H. CUMMINS

1.  My name is James H. Cummins, I am over the age of 18 and I have
    the capacity to make this affidavit, which is based upon my
    personal knowledge of the facts stated herein.

2.  I was employed by Transworld Systems Inc. ("TSI") from February
    2, 2015 until August 2, 2018 as a Legal Case Manager/Legal
    Account Specialist ("LCM's").  My job duties included reviewing
    the records of the National Collegiate Student Loan Trusts (the
    "Trusts") in order to accurately execute affidavits, respond to
    Discovery requests, and prepare for Trial testimony as a
    custodian of records.  During the course of my employment I was
    assigned to testify in approximately 140 Trials in person and
    telephonically.   I prevailed on behalf of the Trusts by
    obtaining a Judgment of the Court or by entering into a Consent
    Judgment with the Defendant(s) mutually agreeing to a fixed
    payment schedule.  In fewer than ten (10) cases I did not prevail
    on behalf of the Trusts.

3.  Prior to my TSI employment I worked as a Litigation Paralegal
    for twelve (12) years after earning a Paralegal Certificate from
    the University of Georgia in March 2003.  My duties included

**AC Apx.158**

drafting demand letters, complaints, preparing and responding to Discovery requests, researching, *Shepardizing,* and drafting dispositive pleadings in final draft form. I was/am proficient in Civil Practice in State Courts, State Court of Appeals, State Supreme Court, and Federal Courts.

4.    When I arrived at TSI, the deficiencies described in paragraphs 21 through 24 of the Consent Order existed. Those deficiencies still existed when I was fired on August 2, 2018, despite the new online affidavit training that was provided. The new online affidavit training was the same procedure and test that pre-dated the Consent Order, except for a few terms that created additional confusion. The affidavit training procedures were authored by Bradley Luke, who held several titles during my employment but, always had complete control or final approval of the hiring, training, work assignments, the Trial calendar, affidavit production, NCT records, disciplinary actions regarding the LCM's.

5.    The deficiencies described in paragraphs 21 through 24 of the Consent Order created a hostile, frustrating, and toxic work environment. The training was inadequate to accurately execute an affidavit or develop accurate trial testimony. There was no reliable resource to answer questions regarding the language used in the affidavits or the terminology used in witness testimony. Typical responses from management were to "review your training", "you don't need to know that", or "I'll get back to you". The frustration created by management's responses and hostility led to the turnover of sixteen (16) LCM's during my employment.

6.    The training provided in preparation for appearing as a Trial witness was conducted by Bradley Luke. Several LCM's described this training as confusing, off the wall, and mean-spirited. After Bradley Luke made comments to me "wait until it's your

turn" and "let's see if you can handle it", I objected to this training as a "hazing ritual" to Chris Thomas, the Director to whom I reported.   Chris Thomas later advised me that the training was required for all LCM's and that I would have to participate.

7.  My previous comments were prescient – it was a hazing ritual. The Trial witness training went on for hours and there were an unlimited number of sessions.  During the Trial witness training there were no questions asked reflecting the statements made in the affidavits regarding the recordkeeping practices of the Trusts, the accuracy of the records, how the pre-default servicer, American Education Services ("AES"), interacted with the borrowers, etc.  All the essential information required to prevail at Trial was completely left out of Trial witness training.

8.  When the Consent Order was announced there were departmental meetings conducted by VP Tanya McComb and Bradley Luke, now Director of Operations, was my reporting manager.  The meetings were very brief with Bradley Luke repeatedly stating that it was "business as usual" going forward.  That statement created an endless amount of confusion since it did not address the adverse findings contained in the Consent Order or provide any direction to the department of its role in the corrective actions committed to by TSI's management.

9.  On or about the time that the Consent Order was announced, an email message was sent by TSI's CEO, Joseph Laughlin, stating that TSI had "Best in Class" processes that would enable to the company to move forward.  I responded to that email message that TSI had no "Best in Class" processes and that the deficiencies described in the Consent Order still existed exposing the company to future sanctions.  Shortly thereafter I was called into a telephonic meeting with Chris Thomas, my reporting

Director, VP of HR Michelle Hauser, and Elizabeth Blanco, an attorney from Sessions, Fishman, Nathan & Israel. After describing the lack of any effective affidavit training or "Best in Class" processes, I was asked to revise the affidavit training procedure to eliminate the deficiencies cited in the Consent Order and I agreed. Attorney Elizabeth Blanco also advised me that TSI was forbidden by the FDCPA from retaliating against me for raising these issues. I objected forcefully several times that she could not make that claim. Over the next month, I revised the affidavit training procedure with the assistance of the most experienced and accurate LCM's, Dudley Turner and former LCM Jonathan Boyd. The completed procedure was submitted for review and approval in approximately thirty (30) days. I never received any feedback and none of the revisions were included in the post Consent Order procedure.

10. TSI management took no action for eight to ten months when new online affidavit training and testing were available for all LCM's. The affidavit training was a version that pre-dated the Consent Order with the exception of some new terms, which created additional confusion. The new terms for existing resources were not part of the commonly used language in the office or by the supporting law firms. The test was a version that pre-dated the Consent Order.

11. It is critical to note that, after reviewing hundreds of files during my employment, I did not find any errors or missing documents in the records of the Trusts, including American Educations Services ("AES"). The deficiencies cited in the Consent Order, regarding these issues, are due to TSI's inability/refusal to effectively train its staff and the resulting high rate of staff turnover.

12. In January 2018 I telephonically received a Final Warning issued by Michelle Hauser VP of Human Resources, in VP Tanya McComb's

**AC Apx.161**

office with Ralph Lyons on the phone, though he didn't speak.
Although Bradley Luke was my direct manager, he did not appear.
Bradley Luke, my direct manager, had asked me to contact a
California attorney representing the Trusts in a case set for
Trial.  I contacted the California attorney and advised that I
was available to make the Trial appearance on behalf of the
Trusts.  The California attorney responded that only Bradley
Luke could appear, since he provided deposition testimony on
the case and opposing counsel intended to challenge Bradley
Luke's deposition testimony.  She further advised that she had
attempted to contact Bradley Luke 12 – 13 times via email message
and voicemail and that he had not responded.  Since Bradley Luke
was not in the office, I escalated the issue to SVP Ralph Lyons
and General Counsel Jonathan Thompson because I believed they
had the authority to answer on Bradley Luke's behalf and the
request was urgent.  I don't know if the issue was ever resolved.
However, one or more people took offense to my message and
Michelle Hauser VP of Human Resources said that it was
unprofessional.  Michelle Hauser VP of Human Resources also
stated that any further violations would lead to my firing from
the company.

13.   In the weeks leading up to my firing on August 2, 2018, a
discussion regarding the Loan Payment History Report ("LPHR")
began.  The LPHR is a TSI generated report that discloses the
updated payment history and updated interest calculations up to
the date that the report was run.  It is attached to Summary
Judgment affidavits, provided in Discovery, and used as a Trial
exhibit.  During my employment Bradley Luke had made changes to
the report, or had someone make changes, without notice to the
staff.  I had received an email message from a law firm asking
why the category Disbursement Amount on the LPHR was incorrect.
The Disbursement Amount on the LPHR that was referenced was

incorrect — it was the disbursement amount plus the origination
fee.   When I raised the issue with Bradley Luke, he refused to
correct the field for the Disbursement Amount on the LPHR and
replied that "they will have to learn how to explain it".
Submitting false or incorrect documents with an affidavit or at
trial is a violation of the FDCPA and a breach of the Consent
Order.   I advised Bradley Luke, SVP Ralph Lyons, Chief Legal
Officer/Chief Compliance Officer Jonathan Thompson, and VP of
HR Michelle Hauser that I would not make any Trial appearances
until the LPHR was corrected.   Since I had already committed to
appear for two Trials in Phoenix, AZ the following week, I
declined to discuss any future Trial appearances with Bradley
Luke.   I   also   declined   to   discuss   the   LPHR   with   the
aforementioned managers since they could easily resolve the
issue by directing Bradley Luke to correct the field for the
Disbursement Amount on the LPHR.   On information and belief,
the field for the Disbursement Amount on the LPHR remains
uncorrected as of the date of this affidavit.

14.   When I appeared for the first Trial in Phoenix, AZ the attorney
had a LPHR that I had not provided to her and the Disbursement
Amount on the LPHR was incorrect, but it was not challenged and
the Trust was granted Judgment.   In the second Trial the
Disbursement Amount on the LPHR was incorrect and was challenged
exhaustively by an opposing attorney.   The Court would not allow
the LPHR to be admitted into evidence because of the error, but
granted Judgment to the Trust on the strength of the evidence
that was admitted.   When I returned to the office, I was fired
by Michelle Hauser VP of Human Resources over the phone, with
SVP Ralph Lyons on the phone though he did not speak, with VP
Tanya McComb, and manager Jonathan Boyd present.   My direct
manager Bradley Luke was not present.   Though I was severely
jet-lagged after thirty hours (30) of flight and flight delays,

I remember Michelle Hauser VP of Human Resources arguing again that I was being fired for being unprofessional. But to me it was perfectly clear, I was fired for refusing to make Trial appearances with an incorrect document, the LPHR. Because I refused to violate the FDPA and the Consent Order that is the subject of this action, TSI retaliated against me by terminating my employment. Further TSI has continued to willfully submit this incorrect and false LPHR with affidavits and witness testimony to date.

15. These deficiencies and the persistent violations of the Consent Order indicate that TSI management cannot conduct any meaningful training given its entrenched culture of dishonesty and contempt for its staff, the interest of the Trusts, and the statutes and regulatory bodies that govern the industry.

16. These statements reflect that the deficiencies described in paragraphs 21 through 24 of the Consent Order still exist and that the lack of a competent management response ensure that they will persist.

17. These statements further reflect that the corrective action described in paragraphs 47 and 48 of this Consent Order has been repeatedly breached by TSI management on the business unit level as well as the corporate level.

JAMES H. CUMMINS

SWORN and SUBSCRIBED before me this 6th day of January 2020.

NOTARY

(SEAL)

**AC Apx.164**

Brown
v.
Transworld

Exhibit F
to
Amended Complaint

UNITED STATES OF AMERICA

CONSUMER FINANCIAL PROTECTION BUREAU

ADMINSITRATIVE PROCEEDING File

2017-CFPB-0016

In the Matter of:                          CONSENT ORDER

TRANSWORLD SYSTEMS INC.

<u>AFFIDAVIT OF JACQUELINE JEFFERIS</u>

1.  My name is Jacqueline Jefferis, I am over the age of 18 and I have the capacity to make this affidavit, which is based upon my personal knowledge of the facts stated herein.

2.  I was employed by Transworld Systems Inc. ("TSI") on or about July 11, 2016 until November 15, 2019 as a Legal Case Manager/Legal Account Specialist ("LCM's").  My job duties included reviewing the records of the National Collegiate Student Loan Trusts (the "Trusts") in order to accurately execute affidavits and prepare for Trial and Deposition testimony as a custodian of records.  During the course of my employment I testified in several trials and provided deposition testimony to a representative of the New York Attorney General's office.

3.  After expressing my ongoing concerns about training deficiencies regarding affidavit execution, trial and deposition training, the possibility of supplementing or revising my deposition testimony to the New York Attorney General's office, and the falsification of TSI's internal records at the direction of VP Tanya McComb during the US Bank, N.A. audit, I was fired by the

VP of Human Resources Michelle Hauser at the insistence of Jonathan Thompson, Chief Legal Officer/Chief Compliance Officer effective November 15, 2019.  I had expressed those concerns and my fear of retaliation to attorney Allyson B. Baker from Venable, LLP and Jonathan Thompson, Chief Legal Officer/Chief Compliance Officer. I was advised by attorney Allyson B. Baker from Venable, LLP, that if any of my responses to the US Bank, N.A. Auditors reflected the training deficiencies, the "office would be shut down and everyone would loses their jobs".

4.  My firing was consistent with what I had witnessed while working as an LCM.  More than a year earlier, I listened as Bradley Luke, Director of Operations made several statements to Jim Cummins, an LCM, in a threatening voice.  Jim Cummins had refused to make a court appearance because the Payment History Report document was false/incorrect.  The Loan Payment History Report, a TSI record, was false/incorrect and Jim Cummins told me that he had asked Bradley Luke to correct the Report, and that Bradley Luke had refused. I was later called into VP Tanya McComb's office to speak to Michelle Hauser, VP of Human Resources.  I reported to Michelle Hauser what I had witnessed.  Jim Cummins, an LCM was fired shortly afterwards.

5.  When the Consent Order was announced there were departmental meetings conducted by VP Tanya McComb and Bradley Luke, Director of Operations, who was my reporting manager.  The meetings were very brief with Bradley Luke repeatedly stating that it was "business as usual" going forward.  That statement created an endless amount of confusion since it did not address the adverse findings contained in the Consent Order or provide any direction to the department of its role in the corrective actions committed to by TSI's management.

6.  That confusion continued for eight to ten months when online affidavit training and testing became available for all LCM's.

**AC Apx.166**

The affidavit training was a version that pre-dated the Consent Order with the exception of some new terms, which created additional confusion. The new terms for existing resources were not part of the commonly used language in the office or by the supporting law firms. Both tests provided in this training had problems: one was a version that pre-dated the Consent Order. The newest test had several errors one of which referred to Bankruptcy, though no Bankruptcy training had ever been provided, and another question referred to an exhibit that was not included in any of the affidavits, refer to Exhibit "X". I was directed by Jonathan Boyd, Department Manager, how to respond correctly, so that I would pass the test. In addition, the training program the "Source" was never completed and was continuously changing without notification to the staff.

7. All attempts to resolve the confusion were rebuffed by the office management including Jonathan Boyd, Department Manager, Bradley Luke, Director of Operations, and VP Tanya McComb. Their typical responses were to "review your training", "you don't need to know that", "I'll get back to you" and "I never read the Source". When I sent an email message to Jonathan Boyd, Department Manager and my co-workers regarding questions about The Pool Supplements, the Deposit & Sale Agreements, AES, the Schedules, and the Loan Payment History Report, Bradley Luke, Director of Operations called me into his office with Jonathan Boyd, Department Manager. Bradley Luke, Director of Operations told me never to ask questions in an email message since they could be audited and "it would look like we weren't trained". My questions were never answered. Repeatedly asking unanswered questions resulted in the threat of disciplinary action or disciplinary action being taken for "being unprofessional". There is no resource in the office or the company for questions regarding training on any matter.

8.   On several occasions I refused to approve affidavits that had attached terms and conditions that were illegible.   I was repeatedly chastised by Jonathan Boyd, Department Manager, Bradley Luke, Director of Operations and VP Tanya McComb for that refusal.   In a meeting they advised me to purchase a magnifying glass so I could read the terms and conditions, but they were also badly blurred.   I repeatedly asked for a clearer copy of the terms and conditions, but they were never provided. On several occasions afterwards, the affidavits that I rejected were given to Aaron Motin who approved these affidavits.   The affidavits were processed as a "RUSH" and handed directly to Aaron Motin by Department Manager Jonathan Boyd.

9.   The training provided in preparation for appearing as a Trial witness is an unbearable exercise conducted by attorneys from Sessions, Fishman, Nathan & Israel ("Sessions") at the direction of Bradley Luke, Director of Operations.   It goes on for hours and there are an unlimited number of sessions.   During the training Sessions attorneys  pepper the LCM with questions that bear no resemblance to the statements made in the affidavits, don't address how the records are kept, how the records are verified for accuracy, etc.   Having made numerous trial appearances and given testimony in an exhaustive deposition with the New York Attorney General's Office, I now know that Sessions attorneys questions have no relevancy to the records, the recordkeeping of the Trusts or any of the questions that will be raised at Trial.   I raised this issue with the Business Unit Managers as well as corporate management i.e., Jonathan Thompson, Chief Legal Officer/Chief Compliance Officer and VP of Human Resources Michelle Hauser, but no action was ever been taken except my firing.   When I described the Trial training to attorney Allyson B. Baker from Venable, LLP she said "they're only hazing you".

10. Prior to giving deposition testimony to a representative of the New York Attorney General's office, I received training from attorney Allyson B. Baker from Venable LLP with Jonathan Thompson, Chief Legal Officer/Chief Compliance Officer in attendance. The training was very helpful since it focused on the records of the Trusts, the recordkeeping practices, and how the records are verified and accessed. Following the deposition, I was repeatedly complimented by the representative of the New York Attorney General's office, Jonathan Thompson, Chief Legal Officer/Chief Compliance Officer, and attorney Allyson B. Baker from Venable LLP for the depth of my knowledge and composure.

11. Following the deposition with a representative of the New York Attorney General's Office, Bradley Luke, Director of Operations informed me that I needed more training before he would authorize my testimony in any future depositions and that he was arranging it. The training was conducted by Sessions attorneys at the direction of Bradley Luke, Director of Operations. Like the Trial training, the questions bore no resemblance to the questions raised by the representative of the New York Attorney General's Office or in any Trial appearance. In fact some of it was directed at deeply personal and inappropriate issues that were degrading and humiliating. The Sessions attorney said it was to establish my personal credibility. However, I protested that I was testifying as a custodian of records, not as a personal witness. The following training sessions were no different and Bradley Luke, Director of Operations the Sessions attorneys, Jonathan Boyd, Department Manager and VP Tanya McComb informed me after my last deposition training that I still needed more training, since the testimony I had given would have resulted in TSI "being sanctioned and shut down".

**AC Apx.169**

12. Though additional training was never scheduled, Bradley Luke, Director of Operations, sent me an email request to appear at four (4) depositions, immediately following my first phone conversation with Allyson B. Baker from Venable LLP regarding the US Bank, N.A. audit. I was confused by these requests, so I forwarded his requests to Jonathan Boyd, Department Manager, VP Tanya McComb, Allyson B. Baker from Venable LLP, Jonathan Thompson, Chief Legal Officer/Chief Compliance Officer, and Bradley Luke, Director of Operations asking whether I was now considered qualified. At about the same time, Jonathan Boyd, Department Manager, asked me verbally to appear at another deposition. I did not receive any response regarding my qualification to testify.

13. At all times relevant, Bradley Luke, Director of Operations had complete control or final approval of the hiring, training, work assignments, Trial calendar, NCT records, and disciplinary actions regarding the LCM's. Although his title changed several times, his control over these functions did not.

14. It is critical to note that, after reviewing hundreds of files during my employment, I did not find any errors or missing documents in the records of the Trusts, including American Educations Services ("AES").

15. The training on Concur, the travel software, was likewise insufficient. While this does not relate to the Consent Order violations cited, it is instructive. The Business Unit Management provided no training on the use of Concur, but threatened me with disciplinary action if the expenses were not submitted timely, refused payment of personal travel expenses and mileage, failed to approve expenses submitted timely, and VP Tanya McComb prohibited my use of Adelman Travel Services even though the Travel Policy specifically recommends it.

16. Concur and all related LCM training demonstrates the obstacles that this Business Unit Management, with the full support of VP of Human Resources Michelle Hauser, regularly place in the way of the LCM staff to confuse, frustrate, and sabotage their efforts.   This Business Unit Management consists of SVP Ralph Lyons, VP Tanya McComb, Director Bradley Luke, and Manager Jonathan Boyd.

17. Regardless of the quality of any training that could be provided, the hostility and sabotage of this Business Unit Management combined with the efforts VP of Human Resources Michelle Hauser, will ultimately result in its failure.

18. These statements reflect that the deficiencies described in paragraphs 21 through 24 of the Consent Order still exist and that the lack of a competent management response ensure that they will persist.

19. These statements further reflect that the corrective action described in paragraphs 47 and 48 of this Consent Order has been repeatedly breached by TSI management on the business unit level as well as the corporate level.

JACQUELINE JEFFERIS

SWORN and SUBSCRIBED before me this 6th day of January, 2020.

NOTARY

(SEAL)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
FIRST MARBLEHEAD CORPORATION, )
FIRST MARBLEHEAD EDUCATION    )
RESOURCES, INC., and FIRST    )
MARBLEHEAD DATA SERVICES,     )
INC.,                         )
                              )
           Appellants,        )     Civil Action NO.
                              )     11-10241-DPW
     v.                       )
                              )
THE EDUCATION RESOURCES        )
INSTITUTE, INC.,              )
                              )
           Appellee.          )
                              )
                              )
```

> Brown
> v.
> Transworld
>
> Exhibit G
> to
> Amended Complaint

MEMORANDUM AND ORDER
December 8, 2011

First Marblehead Corporation, First Marblehead Education

Resources, Inc., and First Marblehead Data Services, Inc.

(collectively "FMC") appeal a Bankruptcy Court order interpreting

an agreement between FMC and The Education Resources Institute,

Inc. ("TERI").  FMC argues that the Bankruptcy Court did not have

subject matter jurisdiction to decide the meaning and effect of

the agreement, and that even if it did, its interpretation was

erroneous.  Concluding that the Bankruptcy Court properly

retained jurisdiction over the dispute and that its resolution on

the merits was appropriate, I affirm.

## I.  BACKGROUND

### A.  *Factual Background*

TERI is a nonprofit organization that promotes access to

education.  Since its inception in 1985, TERI has been in the



**AC Apx.172**

business of processing and guaranteeing education loans
originated by private lenders.  In 2001, TERI entered into a
series of transactions with FMC.  FMC offers "outsourcing
services to national and regional financial institutions and
educational institutions in the United States for designing and
implementing private education loan programs."

Pursuant to the agreements between the parties, TERI paid
FMC a fee to undertake risk management, administrative, and
support functions for TERI, and to provide origination services
and securitization of loans guaranteed by TERI.  The agreements
between TERI and FMC included the Master Servicing Agreement, the
Master Loan Guaranty Agreement, the Marketing Services Agreement,
and the Database Sale and Supplemental Agreement (the "Database
Agreement").

Under the Database Agreement, the only agreement at issue in
this appeal, TERI agreed to transfer a database of information it
had collected regarding loans and default rates to FMC and to
support FMC's maintenance of the database.  Database Agreement,
art. III, June 20, 2001, Record 95, Ex. 2.  In exchange, FMC
agreed to tender up-front and monthly payments.  *Id.* art. IV.
The transferred information - the "Delivered Database" - is a
subset of the "Loan Database," which is defined in the agreement
as consisting "of any and all data now or hereafter obtained,
generated, recorded, or otherwise received by TERI in connection

2

**AC Apx.173**

with its business as a loan guarantor . . . ."  *Id.* art. 1, §§
3.01, 3.02.

The Database Agreement placed restrictions on FMC's use of
the Delivered Database and TERI's use of both the Delivered
Database and the Loan Database.  *Id.* §§ 2.02, 2.03.  Under §
2.03, TERI agreed that

> during the term of this Agreement it will use the Loan
> Database, and/or its retained copy of the Delivered
> Database only for the Retained Uses.  Specifically, but
> not by way of limitation, TERI will not sell, license
> or transfer, the Loan Database or any substantial
> portion thereof to any person nor will it disclose the
> same except in furtherance of the Retained Uses.

The "Retained Uses" are defined as "the right retained by TERI to
utilize the original version of the Loan Database . . . for its
own use for purposes of designing, underwriting, implementing,
evaluating and managing education loan guarantee programs."  *Id.*
art. I.  These provisions essentially allowed TERI to use the
Loan Database in furtherance of its own loan guarantee activities
but prohibited it from selling or licensing it to third parties.

Under § 10.01 of the Database Agreement, the restrictions in
§§ 2.02 and 2.03, as well as § 2.01 and Articles VIII, IX and X,
which are defined as the "Surviving Obligations," "survive
termination of [the Database] Agreement for a period of two years
after the termination date."  *Id.* art. I, § 10.01.  The Database
Agreement was to last up to ten years, terminating June 20, 2011.
*Id.* § 5.02.

3

**AC Apx.174**

After entering into the agreements with FMC, TERI continued to guarantee and securitize student loans and earn fees for those activities. However, by the spring of 2008, the financial crisis had dried up the market for securities backed by student loans, and TERI's revenue dropped significantly. On March 26, 2008, TERI's issuer rating was downgraded, causing a lender to demand the segregation of reserves to its loans guaranteed by TERI. *Id.* ¶ 17. TERI could not meet the reserve requirement without jeopardizing its ability to meet other obligations and decided to file a Chapter 11 petition on April 7, 2008.

**B.  *Bankruptcy Proceedings and Transition Services Agreement***

Two months after initiating the bankruptcy proceeding, TERI requested an order from the Bankruptcy Court authorizing it to reject the agreements with FMC and enter into a Transition Services Agreement ("TSA"). In its motion, TERI explained that it could no longer operate under the fee structure of its various agreements for outsourcing services to FMC. In order to allow TERI to transition away from reliance on FMC, the parties negotiated the TSA, pursuant to which FMC would supply certain essential services at a reduced cost for up to four months.

On June 23, 2008, the Bankruptcy Court issued an order (the "June 2008 Order") granting the motion. The June 2008 Order provided:

> ORDERED, that the Debtor the FMC Contracts [sic] are rejected effective of May 31, 2008; and it is further

**AC Apx.175**

ORDERED, that each of the FMC Entities may treat each
of the FMC Contracts as terminated as of May 31, 2008,
and it is further

ORDERED, that the Debtor is authorized to enter into
the Transition Services Agreement, as amended, between
the Debtor and the FMC Entities, which Transition
Services Agreement will govern the relationship of the
Parties from June 1, 2008 forward, and its further
. . .

ORDERED, that this Court will retain jurisdiction to
construe and enforce the terms of this Order.

*Id.*

In addition to providing for FMC's provision of certain
transitional services, the TSA required that FMC transfer to TERI
"the data comprising the Loan Database (as defined in the Loan
Database)," Transition Services Agreement, § 2.1, which was still
owned by TERI, but was being maintained by FMC.

The TSA authorized FMC to continue to possess and use the
Delivered Database it had received pursuant to the Database
Agreement and maintained the restrictions on FMC and TERI's use
of data as follows:

Notwithstanding the rejection or other termination of
the Database Agreement, (I) FMER [an FMC entity First
Marblehead Education Resources, Inc.] shall continue to
possess all right, title and interest in and to the
Delivered Database (as defined in the Database
Agreement), including the right to use and possess the
Delivered Database and the right to share the data with
FMC, to disclose the data to others, to copy and
manipulate the data and generally to exercise ownership
of the Delivered Database and all modifications and
enhancements thereof and (ii) the Loan Database
transferred from FMER to TERI pursuant to Section 2.1
of this Agreement shall remain subject to sections 2.01
(Grant), 2.02 (FMER Restrictions) and 2.03 (TERI
Restrictions) of such Database Agreement and any and

5

**AC Apx.176**

        all additional terms of the Database Agreement that
        pursuant to section 10.01 of the Database Agreement
        survive termination of such agreement and remain in
        full force and effect.

*Id.* § 2.1. Section 3.13 provides that Article II, which includes

§ 2.1, "shall survive termination of this Agreement."

    Over two years later, on October 29, 2010, the Bankruptcy

Court approved a Reorganization Plan for TERI to emerge from

bankruptcy proceedings and continue operations.

**C.  *The Database Dispute***

    On October 7, 2010, prior to approval of the Reorganization

Plan, FMC, TERI, and the Official Committee of Unsecured

Creditors entered into a joint motion for approval of a

stipulation resolving FMC's claims against TERI.  The motion

noted that a "Database Dispute" between FMC and TERI remained

unresolved.  In an October 18, 2010 hearing regarding the

stipulation and other matters before the Bankruptcy Court, TERI

referenced the Database Dispute and TERI's intention to file a

motion for the resolution of the issue.

    In summary, the Database Dispute concerns whether the TSA

imposes a permanent restriction on TERI's use of the Loan

Database, rather than the two-year restriction described in the

Database Agreement.  FMC argues that §§ 2.1 and 3.13 of the TSA

permanently limit TERI's use of the database to the "Retained

Uses" described in the Database Agreement at § 2.03.  TERI

disputes this interpretation, arguing that the TSA did not

permanently restrict its use of the Loan Database but rather confirmed the two-year post-termination survival of § 2.03 found in § 10.01 of the Database Agreement.

On November 2, 2010, TERI filed a "Motion for Interpretation of Order" requesting that the Bankruptcy Court interpret its June 2008 Order approving the TSA, in order "to preclude the First Marblehead Entities from asserting that restrictions on TERI's use of Data and TERI's obligations to indemnify the First Marblehead Entities have not expired and that the Court otherwise enforce the Contracts Order."  FMC objected to the motion, disputing TERI's interpretation and arguing that the Bankruptcy Court lacked subject matter jurisdiction because it had already issued its confirmation order for the reorganization plan.

On December 14, 2010, the Bankruptcy Court issued a Memorandum of Law addressing TERI's motion.  As to jurisdiction, it found that it had subject matter jurisdiction over the motion because it retained jurisdiction over the interpretation of the TSA through its June 2008 Order.  As to the merits, it concluded that, under the plain reading of the TSA, § 2.1 incorporates the Database Agreement's two-year survival of the use restrictions and did not make such restrictions permanent.

## II.  STANDARD OF REVIEW

Appellate review of conclusions of law by a bankruptcy Court are *de novo*.  *See Stornaweye Fin. Corp. v. Hill* (*In re Hill*), 562 F.3d 29, 32 (1st Cir. 2009) (noting that the Bankruptcy appellate

panel, the district court, and the court of appeals all review a bankruptcy court's conclusions of law *de novo*). Both of the issues on appeal – the presence of subject matter jurisdiction and the interpretation of the TSA to the degree it is unambiguous – involve conclusions of law. Bankruptcy courts, however, are entitled to substantial deference in the interpretation of their own arguably ambiguous orders. *See Travelers Indemnity Co. v. Bailey*, 129 S.Ct. 2195, 2204 n.4 (2009).

### III.  ANALYSIS

#### A.  *Subject Matter Jurisdiction*[1]

By statute, district courts[2] have "original and exclusive jurisdiction of all cases under title 11" and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  28 U.S.C. § 1334(a)-(b).  "A case under title 11," subject to the exclusive jurisdiction of the district courts "is the bankruptcy petition itself, such as a Chapter 11 reorganization."  *New*

---

[1]  The Supreme Court has recently decided a sequence of cases addressing the subject matter jurisdiction of bankruptcy courts.  *See Stern v. Marshall,* 131 S. Ct. 2594, 2620 (2011); (holding that bankruptcy courts lack "the constitutional authority to render a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim"); *Marshall v. Marshall*, 597 U.S. 293 (2006). Although instructive, none of the recent decisions are on point for the issues in this case.

[2]  District courts may refer bankruptcy proceedings to bankruptcy judges under 28 U.S.C. § 157, as the District of Massachusetts has by general reference.  D. Mass. Local R. 201.

**AC Apx.179**

*England Power & Marine, Inc. v. Town of Tyngsborough* (*In re Middlesex Power Equip. & Marine, Inc.*), 292 F.3d 61, 66 (1st Cir. 2002). "Arising under" proceedings are "those cases in which the cause of action is created by title 11," while "'arising in' proceedings generally are 'those that are not based on any right expressly created by title 11, but nevertheless would have no existence outside of the bankruptcy;" *Id.* at 68 (quoting *Wood v. Wood* (*In re Wood*), 825 F.2d 90, 96 (5th Cir. 1987)). The First Circuit has defined the last category of cases over which 28 U.S.C. § 1334(c) grants jurisdiction - "related to" proceedings - as those "which 'potentially have some effect on the bankruptcy estate, such as altering debtor's rights, liabilities, options, or freedom of action, or otherwise have an impact on the handling and administration of the bankrupt estate.'" *Id.* (quoting *In re G.S.F. Corp.*, 938 F.2d 1467, 1475 (1st Cir. 1991) (internal quotation omitted)).

Rather than rely on the grant of jurisdiction in 28 U.S.C. § 1334, the Bankruptcy Court and TERI both primarily contend that the June 2008 Order, which states that the Bankruptcy Court "will retain jurisdiction to construe and enforce the terms of this Order," is sufficient to confer subject matter jurisdiction over TERI's motion requesting an interpretation of the TSA.[3]

---

[3] The Bankruptcy Court distinguished the instant case from those where no "related to" jurisdiction was found, implying that "related to" jurisdiction is present here as well. The Bankruptcy Court found it "unnecessary to wade into the murky

9

**AC Apx.180**

The resolution of the question whether the Bankruptcy Court retained jurisdiction over the interpretation of the TSA requires the application of two principles – first, that a court's interpretation of its own order is afforded deference by a reviewing court, and second, that in order to retain jurisdiction over an agreement, a court's order must either incorporate the terms of the agreement or include a provision retaining jurisdiction over the approved agreement. I find that the Bankruptcy Court had subject matter jurisdiction over TERI's motion because both principles are applicable here.

1.  The Bankruptcy Court's Interpretation of its Order

The Supreme Court indicated in *Travelers* that bankruptcy

---

waters of post-confirmation jurisdiction jurisprudence" since it had reserved jurisdiction in the June 2008 Order. Because I too find that the Bankruptcy Court's June 2008 Order retained jurisdiction over the interpretation of the TSA, I will not comprehensively analyze the existence of "related to" jurisdiction. However, I must note my reservation that it is unlikely that "related to" jurisdiction exists here because it does not appear that the interpretation of the TSA would have an impact on the administration of the bankrupt estate. The dispute was resolved after the plan of reorganization had been approved and "courts sometimes have found a need to curtail the reach of related to jurisdiction . . . so that bankruptcy court jurisdiction does not continue indefinitely." *Boston Reg'l Med. Ctr. Inc. v. Reynolds* (*In re Boston Reg'l Med. Ctr., Inc.*), 410 F.3d 100, 106 (1st Cir. 2005). Although in certain circumstances, such as liquidation proceedings, a broader view of post-confirmation "related to" jurisdiction may be appropriate, *id.* at 106-107, TERI has presented no such justification here. Furthermore, after *Stern v. Marshall*, 131 S. Ct. 2594 (2011), there is some question whether the bankruptcy court could make a final determination using "related to" jurisdiction absent consent of the parties. As noted above, however, I need not address that issue because the June 2008 Order was sufficient to confer jurisdiction on the bankruptcy court.

**AC Apx.181**

courts are entitled to substantial deference in the
interpretation of their own orders.  There, a bankruptcy court
issued an "Insurance Settlement Order" enjoining potential
claimants from bringing suits against Travelers Indemnity Co.
("Travelers"), and other of the Debtor's insurers, for "any and
all claims, demands, allegations, duties, liabilities and
obligations . . . which have been or could have been, or might
be, asserted . . . against [insurers] based upon, arising out of
or relating to any or all of the Policies." *Travelers*, 129 S.Ct.
at 2199.  The Insurance Settlement Order was incorporated into
the Confirmation Order, collectively the "1986 Orders."  *Id.* at
2199-2200.

Over a decade after confirmation, a number of claims were
made directly against Travelers for its own conduct on behalf of
the Debtor insured.  *Id.* at 2200.  Travelers sought declaratory
relief from the bankruptcy court under the 1986 Orders, and the
bankruptcy court concluded that the claims against Travelers were
barred by the 1986 Orders.  *Id.* at 2201.  On review, the Supreme
Court held that the bankruptcy court had continuing jurisdiction
to interpret its own orders and agreed with its interpretation,
finding the terms of the 1986 Orders unambiguous and noting "that
a court should enforce a court order, a public governmental act,
according to its unambiguous terms."  *Id.* at 2204*; see also*
*Negrón-Almeda v. Santiago*, 528 F.3d 15, 23 (1st Cir. 2008) ("[A]

**AC Apx.182**

court must carry out and enforce an order that is clear and
unambiguous on its face.").

Although it held that the terms of the 1986 Orders were
unambiguous, the Court also observed that:

> Even if we found the 1986 Orders to be ambiguous as
> applied to the [claims at issue], and even if we
> concluded that it would be proper to look to the
> parties' communications to resolve that ambiguity, it
> is far from clear that respondents would be entitled to
> upset the Bankruptcy Court's interpretation of the 1986
> Orders. Numerous Courts of Appeals have held that a
> bankruptcy court's interpretation of its own
> confirmation order is entitled to substantial
> deference. . . . Because the 1986 Orders clearly cover
> the [claims], we need not determine the proper standard
> of review.

*Travelers*, 129 S.Ct. at 2204 n.4 (collecting cases).[4]

In summary, the Supreme Court in *Travelers* described a two-
step process for the review of a bankruptcy court's suggested
interpretation of its own order. First, if a bankruptcy court's
order is unambiguous, the plain meaning must be given effect.
Second, if the reviewing court finds that the order is ambiguous,
the court must undertake an additional step of review, giving the
bankruptcy court's interpretation substantial deference.

The Supreme Court in *Travelers* relied in part on *Monarch
Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973 (1st Cir. 1995), where

---

[4] Although the Supreme Court referred specifically to
confirmation orders, two of the circuit court cases it cited
involved orders of dismissal. *See Casse v. Key Bank Nat'l Ass'n*
(*In re Casse*), 198 F.3d 327 (2d Cir. 1999)*; Colonial Auto Center
v. Tomlin* (*In re Tomlin*), 105 F.3d 933 (4th Cir. 1997). As a
result, I find no reason to limit the Court's observations to
confirmation orders.

**AC Apx.183**

the First Circuit held that "customary appellate deference is appropriate" when the bankruptcy court is "interpreting its own order of confirmation." *Id.* at 983. Several other circuits reviewing bankruptcy courts' interpretations have applied an abuse of discretion standard. *See, e.g.*, *In re Shenango*, 501 F.3d 338, 345-46 (3d Cir. 2007); *Official Comm. of Unsecured Creditors v. Dow Corning Corp.* (*In re Dow Corning Corp.*), 456 F.3d 668, 675 (6th Cir. 2006); *Finova Capital Corp. v. Larson Pharmacy Inc.* (*In re Optical Techs., Inc.*), 425 F.3d 1294, 1300 (11th Cir. 2005); *Enodis Corp. v. Emp'rs Ins. of Wausau* (*In re Consol. Indus.*), 360 F.3d 712, 716 (7th Cir. 2004); *Gen. Elec. Capital Corp. v. Dial Bus. Forms* (*In re Dial Bus. Forms, Inc.*), 341 F.3d 738, 744 (8th Cir. 2003).

The First Circuit has not explicitly addressed the precise standard of deference applicable in these circumstances, but in *Monarch Life*, it cited cases affording "full deference," *In the Matter of Weber*, 25 F.3d 413, 416 (7th Cir. 1994) (internal quotation omitted), "substantial deference," *William B. Schnach Ret. Trust v. Unified Capital Corp.* (*In re Bono Development, Inc.*), 8 F.3d 720, 722 (10th Cir. 1993), and reviewing for "abuse of discretion," *Texas N. W. Ry. Co. v. Diamond Shamrock Refining & Mktg. Co.* (*In the Matter of Chicago, Rock Island & Pacific R. Co.*), 865 F.2d 807, 810 (7th Cir. 1988) (internal quotation omitted). *Monarch Life*, 65 F.3d at 983 n.12. Although it is unclear which articulation of the standard the First Circuit will

**AC Apx.184**

ultimately embrace, any distinctions among them are immaterial to my review of the Bankruptcy Court's interpretation of the June 2008 Order because the same outcome would result no matter which I apply.

FMC argues that the Bankruptcy Court improperly interpreted the *TSA*, and not its own June 2008 Order. The Bankruptcy Court actually undertook two layers of interpretation grounded in the June 2008 Order. First, it construed its June 2008 Order as retaining jurisdiction over the interpretation of the TSA, and second, it interpreted the relevant terms of the TSA. I too will apply the two-step analysis. I address the first layer of the Bankruptcy Court's interpretation in this section and address the second layer in Section III.B.

As an initial matter, I do not find the June 2008 Order to be ambiguous. The Bankruptcy Court "ORDERED, that the Debtor is authorized to enter into the Transition Services Agreement, as amended, between the Debtor and the FMC Entities, which Transition Services Agreement will govern the relationship of the Parties from June 1, 2008 forward," and retained "jurisdiction to construe and enforce the terms of this Order." The plain reading of "the terms of this Order" must include the TSA, which is specifically referenced in the June 2008 Order and which TERI attached to the motion requesting the authorization. This specific reference to the TSA is sufficient to satisfy me that

14

**AC Apx.185**

the agreement must be interpreted as part of the terms of the June 2008 Order in which the Bankruptcy Court retained jurisdiction.

Even were I to find the June 2008 Order ambiguous, I would defer to the Bankruptcy Court's interpretation. However, such deference must be considered against the backdrop of the requirements applicable to orders that retain jurisdiction over an agreement where jurisdiction may not otherwise exist. As a result, I will canvas the jurisprudence on that topic before reaching a conclusion on whether the Bankruptcy Court's interpretation of its own arguably ambiguous order should be afforded deference.

2. Retention of Jurisdiction Under *Kokkonen*

FMC challenges the retention of jurisdiction asserted by the Bankruptcy Court under *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375 (1994). In *Kokkonen*, a non-bankruptcy case, the parties to a dispute in district court came to a settlement agreement which they recited on the record before the court. *Id.* at 376-77. Following this resolution, the parties executed a stipulation and order for the dismissal of the complaint and cross-complaint. *Id.* at 377. The district court signed the stipulation and order, which "did not reserve jurisdiction in the District Court to enforce the settlement agreement; indeed it did not so much as refer to the settlement

15

agreement." *Id.* Thereafter, the parties disputed the obligations under the agreement, and one party moved for the district court's enforcement of the agreement. *Id.* The district court entered an enforcement order, purporting to rely upon its "inherent power" to do so. *Id.*

The Supreme Court found that the district court had no such "inherent power" because (1) the facts underlying the dismissed claim and those underlying the breach of the settlement agreement were unrelated, and (2) the only order of the court at issue "was that the suit be dismissed, a disposition that is in no way flouted or imperiled by the alleged breach of the settlement agreement." *Id.* at 380-81. As a result, the enforcement of the agreement was not related to the enforcement of the district court's order. The Court noted that:

> The situation would be quite different if the parties'
> obligation to comply with the terms of the settlement
> agreement had been made part of the order of dismissal
> — either by separate provision (such as a provision
> 'retaining jurisdiction' over the settlement agreement)
> or by incorporating the terms of the settlement
> agreement in the order. In that event, a breach of the
> agreement would be a violation of the order, and
> ancillary jurisdiction to enforce the agreement would
> therefore exist.

*Id.* at 381.

Under *Kokkonen*, "a federal court does not have inherent jurisdiction to enforce a settlement merely because it presided over the law suit that led to the settlement," *F.A.C., Inc. v. Cooperative de Seguros de Vida de Puerto Rico*, 449 F.3d 185, 189

(1st Cir. 2006), nor does it have jurisdiction to interpret such an agreement. *Sea Hawk Seafoods, Inc. v. State of Alaska* (*In re Valdez Fisheries Dev. Ass'n, Inc.*), 439 F.3d 545, 549-50 (9th Cir. 2006). Accordingly, FMC argues that the Bankruptcy Court's June 2008 Order is insufficient under *Kokkonen* to retain jurisdiction over the interpretation of the TSA and that it therefore lacks subject matter jurisdiction.

The First Circuit in *F.A.C.* examined a district court's order of dismissal to determine whether that order satisfied the requirement in *Kokkonen* for the retention of jurisdiction to adjudicate disputes related to the settlement agreement. The Court observed that "[h]ard and fast rules" regarding the sufficiency of language retaining jurisdiction "may be unwise because of variations in language and context." *Id.* at 190. In *F.A.C.*, the First Circuit found the order sufficient to retain jurisdiction because it described the district court's participation in settlement discussions, summarized the settlement agreement, resolved a dispute as to its terms, and referenced the settlement agreement with the following language: "[a]s per the terms of the settlement agreement and Fed. R. Civ. P. 41(a)(2), the Amended Complaint is hereby DISMISSED with prejudice." *Id.* 189-90 (internal quotation omitted). The First Circuit concluded that the district court had retained jurisdiction even though the order did not do so explicitly. *See*

17

*also Fafel v. Dipaola*, 399 F.3d 403, 414 (1st Cir. 2005) (holding that a judgment under Fed. R. Civ. P. 68 "necessarily incorporates the terms of the underlying offer, with or without the additional measures prescribed in *Kokkonen*").

Here, in its Memorandum, the Bankruptcy Court explained that:

> The TSA, which was attached to the Contracts Motion and carefully reviewed by this Court before it entered the Contracts Order, provides that, as a condition precedent to the effectiveness of the TSA, this Court 'shall have entered a final order in form and substance reasonably acceptable to [First Marblehead] *approving this Agreement* . . . .' TSA, § 1.4(c) (emphasis supplied). There is no question but that the Contracts Order did just that — it did not merely authorize TERI to enter into the TSA, but, as understood by the Court, TERI, *and First Marblehead*, it approved the terms of the TSA and retained jurisdiction to construe and enforce those terms.

Applying *Kokkonen* to the order at issue here, and considering the fact that specific language is not required for the retention of jurisdiction, I find the Bankruptcy Court's interpretation to be reasonable and entitled to substantial deference.

FMC emphasizes that "mere awareness and approval of the terms of the settlement agreement do not suffice to make them part" of an order. *Kokkonen*, 511 U.S. at 381; *see also Sea Hawks*, 439 F.3d at 549-50 (holding that even though an agreement required the approval of the bankruptcy court, such approval alone was insufficient to retain of jurisdiction). Here, the Bankruptcy Court refers to its review and approval of the TSA, as

18

well as a requirement in the TSA that it issue an order of approval; thus, here the approval forms both the basis and the background for the Bankruptcy Court's jurisdiction.

In addition to the June 2008 Order's plain language, the Bankruptcy Court considered the context and language of the June 2008 Order, as well as the Court's and parties' understanding at the time. The Bankruptcy Court's approach is consistent with *Kokkonen* and its application in this Circuit. *See F.A.C.*, 449 F.3d at 190; *Municipality of San Juan v. Rullan*, 318 F.3d 26, 31 (1st Cir. 2003) (finding the "mutual consent of the parties" relevant to determination whether a district court retains jurisdiction over an action). In particular, and unlike the order of the district court in *Kokkonen*, the June 2008 Order explicitly referenced the TSA and retained jurisdiction.

I find that the Bankruptcy Court's interpretation is not at odds with *Kokkonen*; it did not assert inherent power to interpret the TSA, but rather explained that it had retained jurisdiction in the June 2008 Order. Even if I were somehow to find the June 2008 Order somehow did not plainly incorporate the terms of the TSA or retain jurisdiction over that agreement, I would defer to the Bankruptcy Court's reasonable interpretation of its own Order that in fact it did so.

**B. *Interpretation of the TSA***

Having found that the Bankruptcy Court had subject matter jurisdiction over the interpretation of the TSA, I now turn to

**AC Apx.190**

the merits of the interpretation itself.  Under Massachusetts law a "court interprets a contract that is free from ambiguity according to its plain meaning." *S. Union Co. V. Dep't of Pub. Utils*, 941 N.E.2d 633, 640 (Mass. 2011).  A contract term "is ambiguous 'only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.'" *Id.* (quoting *Citation Ins. Co. v. Gomez*, 688 N.E.2d 951, 953 (Mass. 1998)).  I agree with the Bankruptcy Court that the TSA unambiguously incorporates the two-year limit on the Data Use Restrictions and other Surviving Obligations.

Section 2.1 of the TSA obligates FMC to transfer the Loan Database in its possession to TERI, grants FMC certain rights in the Delivered Database, restricts TERI's use of the Loan Database, and provides for certain terms in the Database Agreement.  The interaction between the TSA and the incorporated terms in the Database Agreement requires a close reading of the two agreements.

As an initial matter, although FMC claims that the distinction between the "Loan Database" and the "Delivered Database" is immaterial to the instant dispute, that position does not comport with the language of TSA § 2.1.  The first paragraph of § 2.1 requires FMC to deliver to TERI the "Loan Database (as defined in the Database Agreement," while § 2.1(I) confers to FMC the rights to the "Delivered Database (as defined in the Database Agreement)."  Section 2.1(ii) states that the

**AC Apx.191**

"*Loan Database transferred from FMER to TERI* shall remain subject
to [§§ 2.01, 2.02, and 2.03] of such Database Agreement and any
and all additional terms of the Database Agreement that pursuant
to § 10.01 of the Database Agreement survive termination of such
agreement and remain in full force and effect."  (emphasis
added.)  The unambiguous reading of § 2.1 is that the provisions
of the Database Agreement apply to the Loan Database transferred
from FMC to TERI, but not to the *Delivered Database* retained by
FMC.

     The distinction between the two databases, with respect to
the survivability of the Database Agreement terms, comports with
the apparent understanding of both parties that FMC's rights to
the Delivered Database are permanent while the restrictions on
the use of the Loan Database are temporary.  Due to inartful
drafting, this interpretation may render the reference to § 2.02
of the Database Agreement superfluous because that term only
restricts FMC's use of the Delivered Database and does not
concern the Loan Database.  However, the only reasonable reading
is that FMC received all rights to the Delivered Database, while
the Loan Database remained subject to provisions of the Database
Agreement.

     Given this construction of § 2.1 of the TSA, I now turn to
the question of how long the restrictions incorporated in §
2.1(ii) survive.  FMC's position is that the plain meaning of the
reference to § 10.01 merely incorporates the "Surviving

**AC Apx.192**

Obligations" and not the two-year time limit.  This argument
fails for at least three reasons.

First, although the reference to § 10.01 within § 2.1 is
vague and, standing alone, may not clearly incorporate both the
referenced surviving obligations as well as the two-year time
limit on those obligations, a close examination of the two
agreements reveals that the only reasonable understanding is that
the two-year time limit applies to the surviving obligations.
Section 2.1 (ii) provides that, in addition to §§ 2.01, 2.02, and
2.03, "any and all additional terms of the Database Agreement
that pursuant to section 10.01 of the Database Agreement survive
termination of such agreement and remain in full force and
effect."  It may be possible through a strained reading to treat
this sentence as merely referencing the "Surviving Obligations"
subject to § 10.01 and providing that they survive indefinitely.
However, as the Bankruptcy Court pointed out, § 10.01 does not
itself define which provisions survive termination.  "Surviving
Obligations" are defined in Article I, while § 10.01 explains
that they survive for two years.  As a result, a reference to the
definition of "Surviving Obligations" would be more appropriate
if the two-year limit was not being incorporated.  Further,
regardless of whether § 2.1 incorporates the two-year time limit
directly, one of the "Surviving Obligations" is Article X, which
includes § 10.01, and to give § 10.01 "full force and effect,"

22

**AC Apx.193**

the "Surviving Obligations" may only last for two years after the termination of the Database Agreement.

Second, although FMC argues that the two-year time limit would render § 3.13 superfluous, § 3.13 has meaning and effect even in light of the incorporation of the two-year time limit. Section 3.13 refers to the entire Article II, which includes those provisions of § 2.1 not subject to § 10.01, i.e., the first paragraph and § 2.1(I), as well as § 2.2. Further, even if the two-year limit applied to the entirety of Article II, nothing in § 3.13 requires that the provisions survive indefinitely, and so the two-year limitation in § 10.01 would be consistent with § 3.13.

Third, the TSA adopts the definition of "Loan Database" set out in the Database Agreement, which provides that the Loan Database:

> consists of any and all data now or hereafter obtained, generated, recorded, or otherwise received by TERI in connection with its business as a loan guarantor, including, without limitation, borrower data such as credit scores and other credit information, loan payment histories and statistics, default and recovery data, data regarding schools attended by borrowers and students whose education was financed with TERI-guaranteed loans, and underwriting criteria.

Database Agreement, art. I. Under this definition, and FMC's assertion that TERI's use of the Loan Database is restricted for all time, TERI would not be able to sell or transfer data to a third party even if it were to create a completely new database of information related to its loan guarantee business. The plain

**AC Apx.194**

reading of the TSA does not contemplate such a perpetual constriction of TERI's future activities.

### IV. CONCLUSION

For the reasons outlined above, I conclude that, acting within its subject matter jurisdiction, the Bankruptcy Court properly ruled that the Surviving Obligations in the Database Agreement, incorporated by reference in the TSA, do not extend beyond two years following the termination of the Database Agreement. As a result, I AFFIRM the Bankruptcy Court's Order of December 14, 2010.

_/s/ Douglas P. Woodlock_
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

**AC Apx.195**

ATTORNEY GENERAL OF THE STATE OF NEW YORK
BUREAU OF CONSUMER FRAUDS & PROTECTION
———————————————————————————

In the Matter of the
Investigation by Letitia James,
Attorney General of New York, of

Assurance No. 20-061

Transworld Systems, Inc.,

Respondent.
———————————————————————————

| Brown |
| v. |
| Transworld |
| Exhibit H to Amended Complaint |

## ASSURANCE OF DISCONTINUANCE

The Office of the Attorney General of the State of New York ("NYAG") commenced an

investigation under New York Executive Law § 63(12) and New York General Business Law

§ 349 concerning the debt collection practices of respondent Transworld Systems, Inc. ("TSI"

and, together with the NYAG, the "Parties").  This Assurance of Discontinuance ("Assurance")

contains the findings of the NYAG's investigation and the relief agreed to by the Parties.

## I.   FINDINGS

### A.   TSI's Role in the National Collegiate Student Loan Trust Servicing Structure

1.      TSI is a California corporation with its principal place of business in

Pennsylvania.  TSI provides account receivable management services, including consumer-

facing loan servicing and debt collection, nationwide, including in New York.

2.      Since 2014, TSI, as a special subservicer, has provided services in connection

with collecting defaulted debt owed to the National Collegiate Student Loan Trusts, fifteen

Delaware statutory trusts that collectively own hundreds of thousands of private student loans with a face value of approximately $12 billion ("Trusts").[1]

3.     The fifteen Trusts are as follows:  National Collegiate Master Student Loan Trust I, National Collegiate Student Loan Trust 2003-1, National Collegiate Student Loan Trust 2004-1, National Collegiate Student Loan Trust 2004-2, National Collegiate Student Loan Trust 2005-1, National Collegiate Student Loan Trust 2005-2, National Collegiate Student Loan Trust 2005-3, National Collegiate Student Loan Trust 2006-1, National Collegiate Student Loan Trust 2006-2, National Collegiate Student Loan Trust 2006-3, National Collegiate Student Loan Trust 2006-4, National Collegiate Student Loan Trust 2007-1, National Collegiate Student Loan Trust 2007-2, National Collegiate Student Loan Trust 2007-3, and the National Collegiate Student Loan Trust 2007-4.

4.     The Trusts are passive entities with no employees, and therefore must hire third parties to carry out their business, including servicing performing and non-performing student loans.

5.     TSI's duties as special subservicer are set forth in an agreement with the Trusts' special servicer.  The terms of this agreement and its multiple amendments provide that TSI "shall administer, manage and oversee collection litigation," "shall be responsible for selecting and directly supervising collection attorneys," and "shall review all complaints and affidavits

---

[1] From 2012 to November 1, 2014, an entity known as NCO Financial Systems, Inc. ("NCO") served as the special subservicer to the Trusts.

utilized by" attorneys retained by TSI on behalf of the Trusts, all "with the goal of maximizing the collection of amounts payable on" the loans owned by the Trusts.

6.     When a borrower with a Trust loan has not made a payment for 180 days, the loan is considered in default, and the defaulted loan is transferred to TSI from the pre-default servicer. Generally, if collection efforts have been unsuccessful after two years, TSI retains third-party law firms to attempt to collect the debt on behalf of the Trusts, including by filing lawsuits in the name of the particular Trust.  TSI refers to these law firms as the "Attorney Network."

7.     In New York, TSI retained, on behalf of the Trusts, the Attorney Network law firms Forster & Garbus LLP, a New York limited liability partnership with its principal place of business in New York ("F&G"), and Rubin & Rothman LLC, a New York professional service limited liability company with its principal place of business in New York ("R&R").  TSI retained F&G and R&R pursuant to retainer agreements ("Retainer Agreements").

8.     TSI's form Retainer Agreements provided that each Client, including the Trusts, "authorized [TSI], as its agent, to engage [F&G and R&R] to provide legal services on behalf of such Client in connection with the collection of certain account balances."  The Retainer Agreements give TSI "the absolute right to recall any of [sic] all Accounts placed with [the firms] at any time for any reason, in its sole discretion, with or without cause," grant TSI the right to review written communications to borrowers and "all pleadings prior to filing," and require F&G and R&R to comply with all applicable state and federal laws and TSI's standard operating procedures for debt collection law firms in TSI's Attorney Network.

9.     Once a particular borrower account is placed with the firm, F&G and R&R are required to attempt to contact the borrower – and, if applicable, the co-signer – to try to collect

on the debt before filing a lawsuit.  If traditional methods of debt collection such as phone calls and letters fail, F&G and R&R may turn to litigation.  They have filed thousands of lawsuits against borrowers in New York state courts on behalf of the Trusts ("Trust Lawsuits").[2]  The majority of borrowers sued by the Trusts do not respond to the lawsuits in any way.

10.     When borrowers fail to respond to the complaint filed against them, F&G and R&R generally prepare motions for default judgments, which require the plaintiff Trust to submit proof of service of the summons and complaint, and "proof of the facts constituting the claim, the default and the amount due by affidavit made by the party."  *See* N.Y.C.P.L.R. § 3215.  Upon placement of an account to F&G and R&R, they receive certain documents for each account. Attorney Network law firms can request additional information from TSI, as well as an affidavit with supporting documents attached.

11.     TSI employs a specialized group of employees known as "affiants" who, using templates, execute affidavits for use by Attorney Network law firms in lawsuits brought by the Trusts.  When law firms request affidavits with supporting documents, affiants populate the template, then review the accuracy and completeness of the affidavit against TSI's internal computer system and the computer system of the pre-default servicer.  Following this review, affiants sign the affidavits under penalty of perjury.  TSI then transmits the affidavit and attachments to the law firm that requested it.  TSI's standard operating procedures for its Attorney Network prohibit law firms from altering the format of these affidavits without TSI's consent.

---

[2] Unless otherwise indicated, this Assurance only concerns conduct that took place in New York and/or related to a New York resident.

12.    On September 18, 2017, TSI resolved, without admitting or denying liability, a regulatory inquiry regarding its debt collection practices on behalf of the Trusts through a Consent Order with the Consumer Financial Protection Bureau.[3]

13.    The NYAG commenced an investigation into TSI's role as the Trusts' special subservicer in 2017. In the course of its investigation the NYAG reviewed documents produced by TSI, other entities involved in servicing the Trusts, and publicly-available documents from the period 2012 to 2019.

### B. <u>TSI's Debt Collection Practices on Behalf of the Trusts</u>

14.    Based on this investigation, the NYAG has found, as described below, that from November 2014 through at least April 2016, TSI has, directly or indirectly, repeatedly:

      a)  made, or caused to be made, false, misleading, and deceptive statements in formal documents filed in Trust Lawsuits;

      b)  made, or caused to be made, false, misleading, and deceptive statements in communications with borrowers; and

      c)  engaged law firms on behalf of the Trusts that filed lawsuits beyond the applicable statute of limitations.

### 1. <u>Original Creditor</u>

15.    Law firms retained by TSI on behalf of the Trusts repeatedly filed complaints in Trust Lawsuits that incorrectly identified the Trust as the borrower's "original creditor."

---

[3] *See* CFPB, Press Release, *CFPB Takes Action Against National Collegiate Student Loan Trusts, Transworld Systems for Illegal Student Loan Debt Collection Lawsuits*, Sept. 18, 2017, *available at* https://www.consumerfinance.gov/about-us/newsroom/cfpb-takes-action-against-national-collegiate-student-loan-trusts-transworld-systems-illegal-student-loan-debt-collection-lawsuits/.

16.     The statement that any Trust is an "original creditor" of any borrower is false because no borrower took out a loan from any of the Trusts.  In fact, the Trusts are assignees of the original creditors (the large financial institutions that originated the loans).

17.     Identifying a Trust as an "original creditor" may confuse consumers about the nature and legal status of the debt, impede consumers' ability to respond to the lawsuit, and influence consumers to settle rather than litigate (or to settle on less favorable terms than they would otherwise accept).[4]

18.     TSI has represented to the NYAG that law firms retained by TSI on behalf of the Trusts – including F&G and R&R – have ceased identifying the Trusts as "original creditors."

### 2.      "Redacted" Documents

19.     TSI repeatedly submitted sworn affidavits attaching documents TSI identified as "redacted" versions of student loan rosters when, in fact, they were excerpts of student loan rosters that had been cut and pasted into new documents with borrowers' personally identifiable information redacted.[5]

20.     The following is an example of a document identified by TSI as "a redacted copy of the Schedule of transferred loans":

---

[4] In 2017, a New York federal court held that F&G "violated both the [Fair Debt Collection Practices Act] and [New York General Business Law] Section 349 as a matter of law" when it filed complaints identifying Trusts as original creditors, and that "this false statement as to the Trust's status as the 'original creditor' is material as a matter of law."  *Winslow v. Forster & Garbus, LLP*, Case No. 15-Civ.-2996 (AYS), 2017 WL 6375744, at *10, 13, 19 (E.D.N.Y. Dec. 13, 2017).

[5] The Trust loans were originated by third parties and then subsequently assigned, directly or indirectly, to one of the Trusts.  Each assignment agreement included a document identifying the specific student loans being assigned under that agreement.  This list of loans is variously known as a student loan roster, schedule, or exhibit.

| National Collegiate Student Loan Trust 2006-4 | | | | |
|---|---|---|---|---|
| Roster: | | CHASE BANK | | |
| Lender | Lender Code | Marketer | Loan Product | BSSN |
| CHASE BANK | 804976QT | Chase Bank | DTC - Ed One – Undergraduate | XXXXX0648 |

| GUARREF | Disb. Date | Tier | Repay Type | Margin |
|---|---|---|---|---|
| 04336894 | 14-Nov-06 | 6 | DP | 0.0725 |

| Fee to Borrower | TERI Admin Fee | Marketing Fee | Total Gross Disbursed | Total Net Disbursed |
|---|---|---|---|---|
| 0.105 | 0.0175 | 0.0725 | $26,068.16 | $23,331.00 |

| Total Net Principal | Total Capitalized Interest | Total Outstanding Gross Principal | Total Outstanding Unpaid Interest | Fee Reimbursement on 0% Fee Loans |
|---|---|---|---|---|
| $23,331.00 | $0.00 | $26,068.16 | $206.48 | $0.00 |

| | | | Final Reconciliation Settlement Figures | |
|---|---|---|---|---|
| Origination Fee Reimbursement Due Bank | Total Marketing Fees | Marketing Fees Due FMC | Marketing Fees Due Bank | Total Amount Due Bank |
| $225.00 | $1,691.50 | $0.00 | $1,691.50 | $28,191.14 |

21.     In fact, this is a document TSI *created* for the specific litigation by copying identical text and data from a large spreadsheet with multiple accounts and pasting it into a new account-specific document, and removing part of the borrower's Social Security number for privacy purposes.

22.     The schedule listing the individual student loans transferred to the Trust in question is essential to establishing that the Trust is the owner of the loan.  TSI's description of a

newly-created document as a "redacted" version of the original document may confuse

consumers about the nature and legal status of the debt, impede consumers' ability to respond to

the lawsuit, and influence consumers to settle rather than litigate (or to settle on less favorable

terms than they would otherwise accept).

23.    TSI has represented to the NYAG that TSI has ceased identifying excerpts of loan

rosters cut and pasted into new documents as "redacted" versions of original loan rosters.

### 3.    Personal Knowledge

24.    TSI affiants repeatedly submitted affidavits in support of default judgment

motions filed in Trust Lawsuits in which TSI affiants asserted that they had personal knowledge

of certain business records when, in fact, they lacked such knowledge.

25.    One New York judge, in dismissing a Trust Lawsuit, found that the affiant was

"not involved" in preparing the underlying documents and that the TSI affidavit submitted in that

case was, thus, "virtually all hearsay" and did not satisfy the business record exception.[6]

26.    TSI statements purporting to have personal knowledge of key documents the

affiants lack may confuse consumers about the nature and legal status of the debt, impede

consumers' ability to respond to the lawsuit, and influence consumers to settle rather than litigate

(or to settle on less favorable terms than they would otherwise accept).[7]

---

[6] *See* Doc. No. 35, *Nat'l Collegiate Student Loan Trust 2007-3 v. Ellison*, Index No. 2016EF1013 (Sup. Ct. Onondaga County).

[7] A New York federal court, in permitting a case to proceed, held that statements made in Trust lawsuit affidavits concerning the affiants' personal knowledge were "materially misleading" under the Fair Debt Collection Practices Act and New York General Business Law § 349. *Michelo v. Nat'l Collegiate Student Loan Tr. 2007-2*, Case No. 18-Civ.-1781 (PGG), 2019 WL 5103885, at *23 (S.D.N.Y. Oct. 11, 2019).

27.     TSI has produced documents to the NYAG demonstrating that it has substantially revised its affiant training policies.  TSI now requires affiants working on the Trust portfolio to receive comprehensive, substantive training and be tested on their knowledge periodically.

28.     Among other things, TSI requires affiants to complete training modules on the computer systems used by TSI and the Trusts' pre-default servicer, and how those systems are "used in relation to the NCSLT student loan portfolio, including information on the utilization of both systems and training on data integrity, maintenance of the systems, the data contained within the systems, and the process of record entry/creation."  This same training includes the computer system TSI uses to communicate with Attorney Network law firms.  Following completion of the modules, affiants are required to take a test and answer every question correctly.

29.     Affiants also must take a module called "NCSLT History," which teaches affiants about "the structure of NCSLT and general lifecycle of such loans, starting with the origination of the loans by national banks; the securitization process; servicing and default; and collections."

30.     After affiants receive the foregoing and other substantive training, they are paired with experienced TSI employees for a three-week "nesting" period.  Following this nesting period, affiants are given a test with 50 questions and must receive a score of 90% to pass.  Affiants who pass the test are certified to work on the Trust portfolio, and must be re-certified six months later and semi-annually thereafter.

**4.     Proof of Ownership**

31.     TSI affiants repeatedly signed affidavits in support of default judgment motions filed in Trust Lawsuits that unequivocally stated that a particular student loan was transferred to

a particular Trust when, in fact, the documents submitted to support this assertion failed to conclusively demonstrate a link between the loan at issue and the plaintiff Trust.

32.    As discussed above, in some instances TSI attached an excerpt of a loan roster to the affidavits law firms retained on behalf of the Trusts filed in support of default judgment motions.  Barring any evidentiary objections, this excerpt provides a definitive link between the loan and the Trust.

33.    But, previously, affidavits did not always include an excerpt of a loan roster, and generally linked a particular borrower's loan to the plaintiff Trust by referring to the name of the loan program.  In some instances, however, the loan programs referenced in the documents were not an exact match, and a third-party reviewing the documents – such as a court – would have no non-speculative way to confirm the loan at issue is actually owned by the plaintiff Trust.  Although affiants ensure a particular loan was transferred to a particular Trust by other means – for example, comparing borrower account numbers or Social Security numbers – these additional checks were not disclosed in the affidavits.

34.    Affiants' statements concerning ownership may also confuse consumers about the nature and legal status of the debt, impede consumers' ability to respond to the lawsuit, and influence consumers to settle rather than litigate (or to settle on less favorable terms than they would otherwise accept).

35.    TSI has represented to the NYAG that it attaches an excerpt of the loan roster to all affidavits submitted in Trust Lawsuits.

### 5.    Servicing Agent

36.    Law firms retained by TSI on behalf of the Trusts repeatedly filed complaints in Trust Lawsuits which referenced a loan's "servicing agent," thereby causing potential confusion about the entities involved in originating borrower loans.

37.    These statements concerning a "servicing agent" may confuse consumers about the nature and legal status of the debt, impede consumers' ability to respond to the lawsuit, and influence consumers to settle rather than litigate (or to settle on less favorable terms than they would otherwise accept).

38.    TSI has represented to the NYAG that law firms retained by TSI on behalf of the Trusts – including F&G and R&R – are no longer including references to an unidentified "servicing agent" in Trust Lawsuits.

### 6.    Lawsuits Filed Outside the Statute of Limitations

39.    Law firms retained by TSI on behalf of the Trusts repeatedly filed lawsuits in New York outside of the applicable three-year statute of limitations.

40.    The NYAG maintains that the Trusts are subject to New York's borrowing statute, and, by operation of the borrowing statute, Trust Lawsuits must be filed within three years of the date of breach.  While TSI does not agree that operation of the borrowing statute requires Trust Lawsuits be brought within three years, TSI has represented to the NYAG that, out of an abundance of caution, law firms bringing Trust Lawsuits have been applying a three-year statute of limitations.

### 7.     Communications Implying Actions TSI Cannot Legally Take

41.     Collection agencies retained by TSI on behalf of the Trusts have repeatedly threatened legal action against borrowers even though the Trusts could not or would not sue because the statute of limitations for suing on the debt had expired.

42.     In attempting to collect time-barred debt, collection agencies retained by TSI on behalf of the Trusts sent certain borrowers a notice bearing a heading of "Settlement Offer" stating that the subject Trust was "willing to settle your account for [percentage] of your total balance due to settle your past balance."

43.     These communications may confuse consumers with debt as to which the statute of limitations has expired about the nature and legal status of the debt, impede consumers' ability to respond, and influence consumers to settle rather than litigate (or to settle on less favorable terms than they would otherwise accept).

44.     TSI amended its standard operating procedures – with which all agencies retained by TSI on behalf of the Trusts must comply – to "require[] that Agencies  refrain from using certain words which have been deemed to imply litigation ('settle' or 'settlement') in any verbal or written communication related to TSI's client's debts that Agencies are attempting to collect outside of the statute of limitations." TSI recommends "instead using words which do not imply litigation which may include 'resolve,' 'resolution,' 'satisfaction,' and 'satisfied.'"

### C.  The NYAG's Conclusions

45.     The NYAG finds that TSI's acts and practices as described in paragraphs 1 to 44 above ("Findings") constitute repeated violations of New York Executive Law § 63(12) ("Executive Law § 63(12)"), New York General Business Law § 349 ("GBL § 349"), the Fair

Debt Collection Practices Act, 15 U.S.C. §§ 1692 *et seq.* ("FDCPA"), and the Consumer

Financial Protection Act of 2010, 12 U.S.C. §§ 5531 *et seq.* ("CFPA").

46.     TSI neither admits nor denies the NYAG's Findings.

The NYAG finds the relief and agreements contained in this Assurance appropriate and

in the public interest.

THEREFORE, the NYAG is willing to accept this Assurance pursuant to Executive Law

§ 63(15), in lieu of commencing a statutory proceeding for violations of New York Executive

Law § 63(12), GBL § 349, the FDCPA, and the CFPA, based on the conduct described above.

IT IS HEREBY UNDERSTOOD AND AGREED, by and between the Parties:

## II.   RELIEF
### A.   Injunctive Relief

47.     This Assurance shall apply to TSI, its employees, agents, servants,

representatives, parents, subsidiaries, affiliates, predecessors, shareholders, officers, directors,

heirs, executors, administrators, principals, successors, and assigns, and all other persons or

entities acting on TSI's behalf or under its control, including law firms retained by TSI on behalf

of the Trusts to file Trust Lawsuits.  This Assurance concerns conduct in New York and/or

related to a New York resident.

48.     This Assurance shall be effective as of September 11, 2020 ("Effective Date").

49.     TSI, in collecting or attempting to collect debts on behalf of the Trusts, shall not

engage or attempt to engage in conduct in violation of any applicable law, including, but not

limited to, Executive Law § 63(12), GBL § 349, the FDCPA, and the CFPA.

50.   TSI shall not directly or indirectly make, or cause to be made, false, misleading, or deceptive statements in any document filed in a Trust Lawsuit, including, but not limited to, the following:

a)   identifying excerpts of documents as "redacted" versions of original documents unless they are versions of original documents altered only by the obscuring of wholly irrelevant or sensitive information on pages, spreadsheet lines, or database records;

b)   representing that an affiant has personal knowledge of education loan records unless the affiant (i) has personally reviewed the education loan records; and (ii) has completed the following training concerning:  (A) the names and types of systems in which the education loan records have been stored since their initial creation, and the entity which owned and controlled each system, or, alternatively, the representations of the prior servicer that it maintained the educational loan records in the course of its regularly conducted business activity; (B) the name, type, and methods of operation of the system in which the education loan records are now held; and (C) the means by which the education loan records were transferred into the system currently holding them, whether operated by TSI or another, and the methods used to check the integrity of the import or to verify the data imported by other means; and

c)   representing that an affiant has personal knowledge of the chain-of-title of a particular loan unless the affiant has personally reviewed the records establishing the Trust's ownership of the loan, including the underlying loan agreements and each sales, pooling, or assignment agreement governing every sale or other transfer of the loan in question, including (if the loan is not specifically and individually identified in the body of the agreement) the schedule, excerpt from the loan roster, or exhibit establishing that the agreement refers specifically and individually to the loan being sued upon.

51.   TSI shall take all reasonable steps available to TSI, including regular monitoring of its Attorney Network, to ensure that Attorney Network law firms retained by TSI on behalf of the Trusts shall not:

    a) file lawsuits outside the three-year statute of limitations applicable to Trust Lawsuits brought in New York;

    b) identify one of the Trusts as a borrower's "original creditor" (or substantially similar language); and

    c) represent that a borrower applied for a loan from a "servicing agent" or other entity if such entity did not receive or process such applications.

52. TSI shall take all reasonable steps available to TSI, including regular monitoring of collections agencies, to ensure that collections agencies retained by TSI shall not use the word "settlement" in communications with consumers regarding time-barred debt.

53. Within ninety (90) days of the Effective Date, law firms engaged by TSI on behalf of the Trusts shall voluntarily dismiss with prejudice all time-barred lawsuits filed after January 1, 2018 ("Untimely Trust Lawsuits") and pending as of the Effective Date.

54. Within ninety (90) days of the Effective Date, TSI shall release, vacate, or withdraw, or cause to be released, vacated, or withdrawn, all pending garnishments, levies, liens, restraining notices, attachments, or any other judgment enforcement mechanism, obtained as a result of judgments obtained in Untimely Trust Lawsuits and pending as of the Effective Date.

55. With respect to Untimely Trust Lawsuits no longer pending as of the Effective Date, TSI shall take steps toward obtaining the vacatur of any judgment, including requesting consent of the relevant parties to vacate and, upon receiving such consent, directing the law firm to so vacate by joint stipulation, pursuant to N.Y.C.P.L.R. 5015(b), provided the following conditions are met::

    a) the borrower requests vacatur of the judgment, either by filing a motion with a court or by request directed to TSI, F&G, R&R, or one of the Trusts;

b)  the lawsuit was filed on or after January 1, 2018;

c)  the lawsuit was filed more than three years from the date of breach; and

d)  a default judgment was entered.

56.     With respect to all default judgments vacated by stipulation pursuant to the foregoing paragraph, TSI shall request consent from the relevant parties to return the amounts collected after the default judgment was entered and, upon receiving such consent, and monies from the Trust, return the monies collected pursuant to any such default judgment to a borrower.

57.     Within fifteen (15) days of the Effective Date, TSI shall provide a copy of this Assurance to all individuals at TSI who have supervisory responsibilities regarding the Trust portfolio.

58.     TSI shall maintain a training program for all TSI affiants involved with servicing the Trust portfolio that is substantially similar to the training program described in the Assurance and the materials TSI provided to the NYAG.

59.     Within thirty (30) days of the Effective Date, TSI shall deliver a copy of this Assurance to all law firms retained on behalf of the Trusts to collect debts in New York.  TSI shall secure a signed and dated statement from each law firm acknowledging receipt of the Assurance.

60.     TSI shall take all reasonable steps to ensure that all law firms retained on behalf of the Trusts to collect debts in New York comply with the Assurance.

**B.  Monetary Relief**

61.     In consideration of the making and execution of this Assurance, TSI shall pay to the State of New York the sum of $600,000.00, such money to be disbursed by the NYAG as the

NYAG deems appropriate.  TSI shall pay the $600,000 in two installments:  $300,000 shall be payable within thirty (30) days of the Effective Date, and the remaining $300,000 shall be payable within ninety (90) days of the Effective Date.  TSI shall make each installment payment by wire transfer using account information to be provided by the NYAG prior to the Effective Date.

62.     Within ninety (90) days of the Effective Date, TSI shall submit to the NYAG an electronic database identifying all Untimely Trust Lawsuits.  For each Untimely Trust Lawsuit, the database shall identify the plaintiff's name; the court where the lawsuit was filed; the defendant's name; the defendant's last known address, telephone number, and email address; the date on which the defendant allegedly breached the student loan agreement; the date on which the lawsuit was filed; and all amounts collected post-judgment.

63.     Any funds not disbursed pursuant to paragraph 61 shall be retained by the NYAG as penalties and costs.

### III.   COMPLIANCE AND TRAINING

64.     Within ninety (90) days of the Effective Date and continuing for a period of two (2) years thereafter, TSI shall submit to the NYAG, no later than thirty (30) days after the conclusion of each three-month period, quarterly reports describing with specificity TSI's compliance with the provisions of this Assurance during the prior quarter, including, but not limited to, TSI's efforts to ensure all law firms and collection agencies retained on behalf of the Trusts to collect debts in New York have complied with this Assurance.

65.     If TSI determines that it or any law firm or collection agency it retained on behalf of the Trusts in New York has engaged in any conduct prohibited by this Assurance, it shall promptly take all actions necessary to cease such conduct.

66.     Within ten (10) days of making the determination described in the foregoing paragraph, TSI shall submit to the NYAG a report detailing the conduct, the specific TSI employees, law firms, or collection agencies who engaged in the conduct, and TSI's plan to ensure that the practices cease and to remediate any resulting harm.

67.     TSI shall notify the NYAG of any development that may affect TSI's compliance obligations under this Assurance, including, but not limited to, a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor company; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Assurance; the filing of any bankruptcy or insolvency proceeding by or against TSI; or a change in TSI's name or address.  TSI shall make all reasonable efforts to provide such notice at least thirty days (30) before the development, but in no event shall TSI provide such notice later than fourteen days after the development.

## IV.   <u>MISCELLANEOUS</u>

68.     TSI expressly agrees and acknowledges that the NYAG may initiate a subsequent investigation, civil action, or proceeding to enforce this Assurance, for violations of the Assurance, or if the Assurance is voided for any reason, and agrees and acknowledges that in such event:

> a)  any statute of limitations or other time-related defenses are tolled from and after the effective date of this Assurance;

b)  the NYAG may use statements, documents or other materials produced or provided by TSI prior to or after the effective date of this Assurance;

c)  any civil action or proceeding must be adjudicated by the courts of the State of New York, and that TSI irrevocably and unconditionally waives any objection based upon personal jurisdiction, inconvenient forum, or venue; and

d)  evidence of a violation of this Assurance shall constitute prima facie proof of a violation of the applicable law pursuant to Executive Law § 63(15).

69.     If a court of competent jurisdiction determines that TSI has violated the Assurance, TSI shall pay to the NYAG the reasonable cost, if any, of obtaining such determination and of enforcing this Assurance, including, but not limited to, legal fees, expenses, and court costs.

70.     All terms and conditions of this Assurance shall continue in full force and effect on any successor, assignee, or transferee of TSI.

71.     Nothing contained herein shall be construed as to deprive any person of any private right under the law.

72.     This Assurance may not be used by any third party in any other proceeding.  This Assurance is not intended to be, and should not be construed as, an admission of liability by TSI.

73.     This Assurance resolves and releases all claims by the NYAG against TSI for the alleged conduct described in the Findings from the commencement of the NYAG's investigation to the Effective Date; provided, however, that nothing in this Assurance shall be deemed to preclude the NYAG's review of conduct that occurs after the Effective Date, or any claims that may be brought by the NYAG to enforce TSI's compliance with this Assurance.

74.     Any failure by the NYAG to insist upon the strict performance by TSI of any of the provisions of this Assurance shall not be deemed a waiver of any of the provisions hereof, and the NYAG, notwithstanding that failure, shall have the right thereafter to insist upon the strict performance of any and all of the provisions of this Assurance to be performed by TSI.

75.     All notices, reports, requests, and other communications pursuant to this Assurance must reference Assurance No. 20-061, and shall be in writing and shall, unless expressly provided otherwise herein, be given by hand delivery; express courier; or electronic mail at an address designated in writing by the recipient, followed by postage prepaid mail, and shall be addressed as follows:

> If to the NYAG:
>
> New York State Office of the Attorney General
> Bureau of Consumer Frauds and Protection
> Attn:  Christopher L. McCall, Assistant Attorney General
> 28 Liberty Street, 20th Floor
> New York, New York  10005
> Telephone:  (212) 416-8303
> Facsimile:  (212) 416-6003
>
> If to TSI:
>
> Allyson B. Baker, Esq.
> Venable LLP
> 600 Massachusetts Avenue, N.W.
> Washington, D.C.  20001
> Telephone:  (202) 344-4708
> Facsimile:  (202) 344-8300

76.     The NYAG has agreed to the terms of this Assurance based on the NYAG's own investigation as set forth in the Findings, and representations that TSI has made to the NYAG. To the extent that any material representations by TSI or its counsel are later found to be inaccurate or misleading, this Assurance is voidable by the NYAG in its sole discretion.

77.     No representation, inducement, promise, understanding, condition, or warranty not set forth in this Assurance has been made to or relied upon by TSI in agreeing to this Assurance.

78.     TSI represents and warrants, through the signatures below, that the terms and conditions of this Assurance are duly approved.

79.     Nothing in this Agreement shall relieve TSI of other obligations imposed by any applicable state or federal law or regulation or other applicable law.

80.     Nothing contained herein shall be construed to limit the remedies available to the NYAG in the event that TSI violates the Assurance after its effective date.

81.     This Assurance may not be amended except by an instrument in writing signed on behalf of the Parties to this Assurance.

82.     In the event that any one or more of the provisions contained in this Assurance shall for any reason be held by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, in the sole discretion of the NYAG, such invalidity, illegality, or unenforceability shall not affect any other provision of this Assurance.

83.     TSI acknowledges that it has entered this Assurance freely and voluntarily and upon due deliberation with the advice of counsel.

84.     This Assurance shall be governed by the laws of the State of New York without regard to any conflict of laws principles.

85.     This Assurance may be executed in multiple counterparts by the Parties hereto. All counterparts so executed shall constitute one agreement binding upon all Parties,

notwithstanding that all Parties are not signatories to the original or the same counterpart.  Each

counterpart shall be deemed an original to this Assurance, all of which shall constitute one

agreement to be valid as of the effective date of this Assurance.  For purposes of this Assurance,

copies of signatures shall be treated the same as originals.  Documents executed, scanned and

transmitted electronically and electronic signatures shall be deemed original signatures for

purposes of this Assurance and all matters related thereto, with such scanned and electronic

signatures having the same legal effect as original signatures.

Dated:  September 11, 2020

TRANSWORLD SYSTEMS, INC.

By: _____

Joseph E. Laughlin
Chief Executive Officer

LETITIA JAMES
Attorney General of the State of New York

By: _____

Jane M. Azia
Bureau Chief

By: _____

Christopher L. McCall
Assistant Attorney General

Consumer Frauds and Protection Bureau
28 Liberty Street
New York, New York  10005

*Counsel for the Attorney General*
*of the State of New York*

notwithstanding that all Parties are not signatories to the original or the same counterpart. Each

counterpart shall be deemed an original to this Assurance, all of which shall constitute one

agreement to be valid as of the effective date of this Assurance. For purposes of this Assurance,

copies of signatures shall be treated the same as originals. Documents executed, scanned and

transmitted electronically and electronic signatures shall be deemed original signatures for

purposes of this Assurance and all matters related thereto, with such scanned and electronic

signatures having the same legal effect as original signatures.

Dated:  August _____, 2020

TRANSWORLD SYSTEMS, INC.                    LETITIA JAMES
                                            Attorney General of the State of New York


By: _____              By: _____

Joseph E. Laughlin                          Jane M. Azia
Chief Executive Officer                     Bureau Chief
                                            Consumer Frauds and Protection Bureau
                                            28 Liberty Street
                                            New York, New York  10005

                                         By: _____

                                            Christopher L. McCall
                                            Assistant Attorney General
                                            Consumer Frauds and Protection Bureau
                                            28 Liberty Street
                                            New York, New York  10005

                                            *Counsel for the Attorney General*
                                            *of the State of New York*

# State of Connecticut Department of Banking

| | |
|---|---|
| \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*   \* <br><br> **IN THE MATTER OF:** <br><br> **TRANSWORLD SYSTEMS INC.** <br> **NMLS # 950422** <br><br>      **("TSI")** <br><br> \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*   \* | Brown <br> v. <br> Transworld <br><br> Exhibit I <br> to <br> Amended Complaint |

**CONSENT ORDER**

**WHEREAS,** the Banking Commissioner ("Commissioner") is charged with the administration of Part XII of Chapter 669, Sections 36a-800 to 36a-814, inclusive, of the Connecticut General Statutes, "Consumer Collection Agencies";

**WHEREAS,** TSI is a California corporation that is licensed as a consumer collection agency in Connecticut with a main office at 500 Virginia Drive, Suite 514, Fort Washington, Pennsylvania;

**WHEREAS,** the Commissioner, through the Consumer Credit Division ("Division") of the Department of Banking, examined the activities of TSI pursuant to Sections 36a-17 and 36a-801 (d) of the Connecticut General Statutes to determine if it had violated, was violating or was about to violate the provisions of the Connecticut General Statutes within the jurisdiction of the Commissioner;

**WHEREAS,** as a result of such examination, the Commissioner alleges that TSI failed to produce complete, accurate and timely responses to requests for information made by the Department concerning TSI's consumer collection agency business, in violation of Section 36a-17 of the Connecticut General Statutes;

**WHEREAS,** as a result of the examination, the Commissioner further alleges that TSI failed to maintain and implement adequate policies and procedures pertaining to its National Collegiate Student Loan Trust ("NCSLT", which are the National Collegiate Master Student Loan Trust, NCSLT 2003-1, NCSLT 2004-1, NCSLT 2004-2, NCSLT 2005-1, NCSLT 2005-2, NCSLT 2005-3, NCSLT 2006-1, NCSLT 2006-2, NCSLT 2006-3, NCSLT 2006-4, NCSLT 2007-1, NCSLT 2007-2, NCSLT 2007-3, and NCSLT 2007-4) consumer collection accounts, including verification of debtor charge-off dates from certain loan servicers, adequate management of its vendor relationships and remediation of internal audit findings, that would demonstrate that the financial responsibility, character, reputation, integrity and general fitness of TSI are sufficient to warrant the belief that the business will be operated soundly and efficiently, in the public interest and consistent with the purposes of Sections 36a-800 to 36a-812, inclusive, of the Connecticut General Statutes, as required pursuant to Section 36a-801(c) of the Connecticut General Statutes;

**WHEREAS,** TSI represents that, effective November 1, 2014, TSI assumed, among other items, the Attorney Network business unit of NCO Financial Systems, Inc. ("NCO"), including the NCSLT consumer collection account portfolio;

**WHEREAS,** as part of the examination, the Division reviewed numerous affidavits executed by TSI's employees and filed by law firms retained by TSI on behalf of NCSLT in collection actions in Connecticut ("CT Affidavits");

**WHEREAS,** TSI neither admits nor denies any of the Commissioner's allegations stated herein;

**AC Apx.219**

**WHEREAS,** the Commissioner alleges that from November 2014 to February 2016, TSI engaged in unfair or deceptive acts or practices in connection with its execution of CT Affidavits, in violation of Sections 36a-806 and 36a-808 of the Connecticut General Statutes, and that the CT Affidavits contained false or misleading statements, in violation of Section 36a-53b(2) of the Connecticut General Statutes;

**WHEREAS,** the Commissioner believes that the allegations contained herein would support the initiation of enforcement proceedings against TSI, including proceedings to issue an order to cease and desist against TSI pursuant to Sections 36a-804 and 36a-52 of the Connecticut General Statutes, an order revoking TSI's consumer collection agency license in Connecticut pursuant to Sections 36a-804 and 36a-51 of the Connecticut General Statutes, and an order imposing a civil penalty of up to one hundred thousand dollars ($100,000) per violation upon TSI pursuant to Sections 36a-804 and 36a-50 of the Connecticut General Statutes;

**WHEREAS,** initiation of such enforcement proceedings would constitute a "contested case" within the meaning of Section 4-166(4) of the Connecticut General Statutes;

**WHEREAS,** Section 4-177(c) of the Connecticut General Statutes and Section 36a-1-55(a) of the Regulations of Connecticut State Agencies provide that a contested case may be resolved by consent order, unless precluded by law;

**WHEREAS,** both the Commissioner and TSI acknowledge the possible consequences of formal administrative proceedings, and TSI voluntarily agrees to consent to the entry of the injunctive relief and monetary penalty imposed below without admitting or denying any allegation set forth herein and solely for the purpose of obviating the need for formal administrative proceedings concerning the allegations set forth herein;

**WHEREAS,** the Commissioner and TSI now desire to resolve the matters set forth herein;

**WHEREAS,** TSI specifically assures the Commissioner that the violations alleged herein shall not occur in the future;

**WHEREAS,** TSI represents that it has reviewed all charge-off dates of NCSLT loans actively placed with TSI for collection to ensure that such dates match the charge-off dates on the pre-default servicer's system of record and has adjusted the amounts of interest owed by such borrowers on TSI's system accordingly;

**WHEREAS,** TSI represents that it has implemented a process by which charge-off dates for NCSLT loan information is received upon default from the pre-default servicer's system of record and then incorporated into TSI's system of record;

**WHEREAS,** TSI represents that since November 2014, all TSI employees who have executed CT Affidavits have received the training set forth in TSI's NCSLT Affiant Training Manual prior to execution of such CT Affidavits;

**WHEREAS,** TSI represents that to ensure uniformity of training and to facilitate the occurrence of effectiveness audits, the NCSLT affiant training process, which covers initial and on-going procedures, will be moved out of the business unit to TSI's company-wide Learning Management System no later than six (6) months after the date of issuance of this Consent Order, although business-level training for affiants will continue to occur within the business unit, as necessary;

**WHEREAS,** TSI represents that since November 2014, the templates used in its CT Affidavits have been reviewed by external Connecticut counsel retained by TSI to ensure compliance with all applicable laws;

**WHEREAS,** TSI represents that it has made significant investments and enhancements to the

**AC Apx.220**

administration of its vendor management program and in improving upon all Attorney Network policies and procedures to ensure, among other things, that TSI has a record of its related communications with law firms, those firms' acknowledgements and related remediation efforts;

**WHEREAS,** TSI represents that it has implemented an enhanced remediation process to ensure that all internal audit findings relating to vendor or law firm compliance are timely remediated, including the termination of such vendor and law firm relationships when necessary;

**WHEREAS,** TSI acknowledges that this Consent Order is a public record and is a reportable event for purposes of the regulatory disclosure questions on the Nationwide Multistate Licensing System and Registry ("NMLS"), as applicable;

**AND WHEREAS,** TSI, through its execution of this Consent Order, voluntarily agrees to waive its procedural rights as they concern any aspect of this Consent Order, including a right to a notice and an opportunity for a hearing as it pertains to the allegations set forth herein, and voluntarily waives its right to seek judicial review or otherwise challenge or contest the validity of this Consent Order.

## CONSENT TO ENTRY OF INJUNCTIVE RELIEF
## AND MONETARY PENALTY

**WHEREAS,** TSI, through its execution of this Consent Order, consents to the Commissioner's entry of a Consent Order imposing the following injunctive relief and monetary penalty:

1. No later than the date this Consent Order is executed by TSI, it shall remit to the Department of Banking by wire transfer, cashier's check, certified check or money order made payable to "Treasurer, State of Connecticut," the sum of Two Hundred Thousand Dollars ($200,000) as a civil penalty;

2. TSI shall comply with Sections 36a-17, 36a-53b(2), 36a-806 and 36a-808 of the Connecticut General Statutes;

3. TSI shall implement policies and procedures to ensure that its NCSLT Affiant Training Manual and Attorney Network Standard Operating Procedure Manual, as amended from time to time, are adhered to and shall provide evidence of such implementation upon request by the Commissioner;

4. TSI shall ensure that its affidavit templates, which are executed by TSI for NCSLT collection proceedings and filed in Connecticut state court by external counsel retained by TSI on behalf of NCSLT, are reviewed by external counsel licensed in Connecticut at least annually for compliance with Connecticut Practice Book requirements and are timely updated to reflect Connecticut and federal laws at all times;

5. TSI shall implement policies and procedures to require that every future NCSLT Affidavit executed by TSI and filed by external counsel retained by TSI on behalf of NCSLT in a Connecticut collection proceeding: (a) complies with Connecticut laws, including Connecticut Practice Book requirements, (b) properly references the documents attached, and (c) accurately reflects the knowledge of the affiant and amount of student loan debt owed by the borrower, provided, however that NCSLT affidavits executed by TSI regarding Connecticut borrowers may seek an amount less than the amount owed by the borrower;

6. No later than forty-five (45) days after each calendar quarter beginning with the quarter ending December 31, 2017 (the first report to be due on or before February 14, 2018), for a period of eight calendar quarters, TSI shall provide to Carmine Costa, Division Director at carmine.costa@ct.gov, evidence of compliance with the following requirements:  (a) accurate and complete monthly reconciliations of NCSLT debtor balances, last payment dates and open/closed inventory between all collection systems used to collect on NCSLT accounts of

**AC Apx.221**

Connecticut debtors by TSI and its vendors, including law firms, (b) accurate and complete monthly reconciliations of all collection trust accounts used to deposit Connecticut debtor monies for the NCSLT portfolio by TSI and its active vendors, including law firms, and (c) timely remediation of all TSI internal audit findings relating to law firms and vendors used in the collection of NCSLT accounts of Connecticut debtors such that no high risk audit finding shall remain outstanding for more than six (6) months. TSI shall off-board any law firm or vendor which fails to comply with such requirement; and

7. TSI shall require that: (a) TSI and each of its vendors, including law firms, which collect on an NCSLT loan of a Connecticut debtor: (1) provide the validation notice required by Section 36a-809-13(a) of the Regulations of Connecticut State Agencies upon receipt of the account for collection; (2) designate at least one (1) employee as the NCSLT account representative, which individual shall be qualified and reasonably available to answer any questions of Connecticut debtors concerning the collection of NCSLT loans; and (3) within ninety (90) days from the effective date of this Consent Order, all validation notices sent to Connecticut debtors regarding NCSLT loans shall clearly identify the amount of debt and interest owed, the original and current creditor and a phone number of the vendor issuing the validation notice that a consumer may call in order to speak with a representative at that vendor who has reasonable knowledge about this portfolio and the consumer's account(s), and (b) any law firm retained by TSI on behalf of NCSLT shall not initiate a lawsuit in Connecticut state court on an NCSLT loan of a Connecticut debtor for at least thirty (30) days after sending such validation notice.

## CONSENT ORDER

**NOW THEREFORE,** the Commissioner enters the following:

1. The Injunctive Relief and Monetary Penalty set forth above be and are hereby entered;

2. Upon issuance of this Consent Order by the Commissioner, this matter will be resolved and the Commissioner will not take any future enforcement action against TSI, based upon the allegations set forth herein; provided that issuance of this Consent Order is without prejudice to the right of the Commissioner to take enforcement action against TSI based upon a violation of this Consent Order or the matters underlying its entry, if the Commissioner determines that compliance with the terms herein is not being observed or if any representation made by TSI, and reflected herein is subsequently discovered to be untrue. Nothing in this Consent Order shall be construed as limiting the Commissioner's ability to take enforcement action against TSI based upon evidence indicating that TSI withheld information from, or made any misstatement or omission to the Commissioner in connection with this matter;

3. Subject to the foregoing, and so long as this Consent Order is promptly disclosed by TSI and its control persons on NMLS, as applicable, nothing in the issuance of this Consent Order shall adversely affect the ability of TSI to apply for or obtain licenses or renewal licenses under Part XII of Chapter 669, Sections 36a-800 *et seq.*, of the Connecticut General Statutes, provided all applicable legal requirements for any such license are satisfied;

4. This Consent Order shall be binding upon TSI and its successors and assigns; and

5. This Consent Order shall become final when issued.

Issued at Hartford, Connecticut
this <u>11th</u> day of <u>October</u> 2017.     _____/s/_____
                       Jorge L. Perez
                       Banking Commissioner

**AC Apx.222**

I, John E. Laughlin, state on behalf of Transworld Systems Inc., that I have read the foregoing Consent Order; that I know and fully understand its contents; that I am authorized to execute this Consent Order on behalf of Transworld Systems Inc.; that Transworld Systems Inc., agrees freely and without threat or coercion of any kind to comply with the injunctive relief and monetary penalty entered herein; and that Transworld Systems Inc., voluntarily agrees to enter into this Consent Order, expressly waiving the procedural rights set forth herein as to the matters described herein.

By: _____/s/_____
    Name:  Joseph E. Laughlin
    Title:  Chief Executive Officer
    Transworld Systems Inc.

State of:  Illinois

County of:  Lake

On this the 2nd day of October 2017, before me, Stefanie Leaser, the undersigned officer, personally appeared Joseph E. Laughlin who acknowledged himself/herself to be the Chief Executive Officer of Transworld Systems Inc., a corporation, and that he/she as such Chief Executive Officer being authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the corporation by himself/herself as Chief Executive Officer.

In witness whereof I hereunto set my hand.

_____/s/_____
Notary Public
Date Commission Expires:  Apr 21, 2021

Administrative Orders and Settlements

**AC Apx.223**