# EXHIBIT 2

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ESTHER HOFFMAN, et al.,

          Plaintiffs,

    v.

TRANSWORLD SYSTEMS
INCORPORATED, et al.,

          Defendants.

C18-1132 TSZ

ORDER

THIS MATTER comes before the Court on a motion for class certification, docket no. 232, filed by plaintiffs Esther Hoffman, Sarah Douglass, Anthony Kim, Il Kim, and Daria Kim (collectively "Plaintiffs"), and motions for summary judgment filed by defendants Transworld Systems Incorporated ("TSI"), docket no. 377, and National Collegiate Student Loan Trusts 2004-2, 2005-2, 2005-3, 2006-1, 2006-3, and 2007-4 (collectively, the "NCSLTs," and individually, "NCSLT"), docket no. 369. Also before the Court is the deferred portion of a motion for summary judgment filed by defendants Patenaude and Felix, A.P.C. ("P&F") and Matthew Cheung, docket no. 284.[1] Having

---

[1] The Court previously denied in part P&F's and Cheung's motion for summary judgment, rejecting their assertion of immunity from suit under Washington's judicial-action privilege. *See* Order (docket no. 380). The Court now considers the deferred portion of P&F's and Cheung's motion.

ORDER - 1

reviewed all papers filed in support of, and in opposition to, the motions, and having concluded that oral argument is unnecessary, the Court enters the following Order.[2]

**<u>Background</u>**

**1.      The NCSLTs**

Between 2004 and 2007, the NCSLTs were formed for the purpose of offering student loan asset-backed securities; Cognition Financial Corporation ("Cognition"), formerly known as the First Marblehead Corporation ("FMC"), acted as the structuring agent for the NCSLTs.  Meyer Decl. at ¶¶ 1, 3 (docket no. 371).[3]  Prior to the NCSLTs' formation, FMC entered into agreements with multiple banks such as Bank of America,

---

[2] The NCSLTs, TSI, P&F, and Cheung are referred to collectively as the "Defendants."

[3] In their response to the NCSLTs' motion for summary judgment, Plaintiffs argue that the declarations of Jens Meyer, docket no. 371, Jennifer Wilbert, docket no. 372, and Bradley Luke, docket no. 373, are inadmissible.  The Court construes Plaintiffs' argument as a motion to strike the declarations.  Although Plaintiffs' correctly label the declarations as hearsay, the declarations may nevertheless be used to support a motion for summary judgment if they set forth facts that could be offered at trial in an admissible format.  *See* Fed. R. Civ. P. 56(c).  Wilbert, the Director of Client Relations at the Pennsylvania Higher Education Assistance Agency ("PHEAA"), declares that the contents of her declaration are based on her "personal knowledge" and through her "discussions with other PHEAA employees."  Wilbert Decl. at ¶ 2 (docket no. 372).  Wilbert explains that she has knowledge of PHEAA's data maintenance and storage, record-keeping, and document retention and destruction policies, and that she makes her declaration pursuant to Federal Rules of Evidence 803(6) and 902(11).  *Id.* at ¶¶ 2, 4.  Similarly, Meyer, a Senior Vice President at Cognition, declares that his responsibilities "include knowledge of Cognition's maintenance and storage of electronic data, record-keeping, document retention, and destruction policies."  Meyer Decl. at ¶ 2 (docket no. 371).  Meyer contends that he is familiar with "how the documents, data, and database referenced" in his declaration "were created and have been maintained in the ordinary course of Cognition's business since their creation."  *Id.*  Meyer also makes his declaration pursuant to Rules 803(6) and 902(11).  *Id.* at ¶ 1.  Likewise, Luke, the Director of TSI, declares that he is personally familiar with the systems and processes TSI uses to maintain its business records.  Luke Decl. at ¶¶ 1, 4 (docket no. 373).  Plaintiffs have provided no reason to believe that these declarants could not testify regarding the facts contained in their declarations if called upon at trial, and the Court will consider their declarations when ruling on the pending motions for summary judgment.  Plaintiffs' motion to strike, docket no. 382, is therefore DENIED.

ORDER - 2

N.A. ("Bank of America") and Bank One, N.A. ("Bank One"), now known as JP Morgan

Chase Bank, N.A. ("JP Morgan Chase"), to provide loan origination services for private

student loans guaranteed by The Education Resources Institute, Inc. ("TERI").  *Id.* at ¶ 3;

Saylor Report at ¶¶ 14–15, Ex. C to Casamento Decl. (docket no. 370-3).  TERI

processed the student loans at origination, ensured the loans were disbursed to borrowers,

and initially maintained loan records and documents created during the origination

process (the "origination records").  Luke Decl. at ¶ 7 (docket no. 373).  FMC entered

into a servicing agreement with the Pennsylvania Higher Education Assistance Agency

("PHEAA") to service the student loans before securitization.[4]  Meyer Decl. at ¶ 3.

Following disbursement, TERI transferred the loans' origination records to PHEAA.

Luke Decl. at ¶ 8.

 The NCSLTs acquired student loans through the following process.  *See* Meyer

Decl. at ¶ 4.  First, pursuant to Note Purchase Agreements (or Loan Purchase

Agreements) and Pool Supplements, originating banks pooled and sold student loans to a

depositor, National Collegiate Funding LLC ("NCF"), FMC's wholly-owned subsidiary.

Saylor Report at ¶ 15; Meyer Decl. at ¶ 4.  Second, NCF sold the pooled student loans to

the purchasing NCSLTs in accordance with applicable Deposit and Sale Agreements.

Saylor Report at ¶ 15; Meyer Decl. at ¶ 4.  Upon completion of the sales, PHEAA entered

---

[4] PHEAA operates its private student loan servicing business under the trade name American Education
Services ("AES").  Wilbert Decl. at ¶ 3 (docket no. 372).

into agreements with the relevant NCSLTs to continue working as their pre-default loan

servicer.  Wilbert Decl. at ¶ 9 (docket no. 372).

For loans in default, PHEAA transferred accounts to defendant TSI, the NCSLTs'

post-default subservicer.  *See* Luke Decl. at ¶ 12.  Pursuant to a default servicing

agreement, Ex. A to Richards Decl. (docket no. 88-1), TSI serves as a records custodian

for the NCSLTs with respect to the loans that TSI services.[5]  *Id.*  As the post-default

subservicer, TSI may refer loans in default to law firms for collection litigation on behalf

of the relevant NCSLTs.  In this case, TSI placed Plaintiffs' loans with defendant law

firm P&F for collection.  Luke Decl. at ¶ 19; Cheung Decl. at ¶¶ 2–4 (docket no. 286).

Defendant Cheung is the Managing Attorney of P&F's Washington State office.  Cheung

Decl. at ¶ 1.

**2.     The Consent Order**

On September 18, 2017, TSI entered into an administrative Consent Order with

the Consumer Financial Protection Bureau ("CFPB").  *See* Consent Order, *In re*

*Transworld Systems Inc.*, No. 2017-CFPB-0018, Ex. A to Second Amended Class

Complaint ("SAC") (docket no. 61).  P&F and Cheung claim that they did not learn of

the CFPB's investigation into TSI until sometime after the agency published the Consent

Order on September 18, 2017.  Cheung Decl. at ¶ 12.  The CFPB determined that

between November 1, 2014, and April 25, 2016, law firms hired by TSI, such as P&F,

---

[5] TSI's predecessor, NCO Financial Systems, Inc. ("NCO"), previously served as the post-default
subservicer for loans owned by the NCSLTs.  Richards Decl. at ¶¶ 7–12 (docket no. 88-1).  NCO received
loan origination records for Plaintiffs' loans from AES.  Luke Decl. at ¶¶ 13.a.–r.

initiated on behalf of the NCSLTs 37,689 debt collection lawsuits across the United

States.  Consent Order at ¶ 15.  The Consent Order found that, in support of many of

these lawsuits, TSI provided law firms with executed and notarized affidavits that falsely

claimed personal knowledge of education loan records and consumers' debt.  *Id.* at

¶¶ 18–24.  The CFPB also found that some of the law firms retained by TSI initiated

lawsuits against borrowers despite lacking a "complete chain of assignment" necessary to

prove that the NCSLTs owned the subject loans.  *Id.* at ¶ 26.  Except as to facts necessary

to establish the CFPB's jurisdiction over the matter, TSI did not admit or deny any of

facts set forth in the Consent Order's findings of fact or conclusions of law.  *Id.* at ¶ 2.

Pursuant to the Consent Order, TSI agreed to identify any lawsuits filed between

November 1, 2014, and September 18, 2017, that are missing the documentation

necessary to prove the NCSLTs' ownership of a subject loan.  *See id.* at ¶ 45.  As a result,

P&F closed a small number of accounts and returned them to TSI.  Patenaude Decl. at ¶ 7

(docket no. 285).  Defendants contend, however, that the loans at issue in this case were

not affected by the Consent Order because the NCSLTs possess the complete chain of

assignment necessary to establish ownership of Plaintiffs' loans.

**3.    Plaintiffs' Loans**

      **a.    Hoffman**

      In July 2004, plaintiff Esther Hoffman obtained a $6,000 student loan from Bank

of America.  *See* Ex. B-1 to Luke Decl. (docket no. 375-1); Wilbert Decl. at ¶ 22.  On

August 4, 2004, PHEAA began servicing Hoffman's loan.  Wilbert Decl. at ¶ 21.

Pursuant to a Pool Supplement effective October 28, 2004, Hoffman's student loan was

purportedly sold to NCF, and then sold to NCSLT 2004-2, pursuant to a Deposit and Sale
Agreement effective the same day. Wilbert Decl. at ¶ 23; Meyer Decl. at ¶¶ 4, 9; Luke
Decl. at ¶ 13; Ex. D-1 to Luke Decl. (docket no. 375-4 at 3). PHEAA serviced
Hoffman's loan from August 4, 2004, to October 3, 2011, when it transferred the loan to
NCSLT 2004-2's default subservicer (TSI's predecessor NCO) after Hoffman failed to
make payments on the loan. Wilbert Decl. at ¶ 25; Luke Decl. at ¶ 12.

On November 6, 2013, TSI referred Hoffman's loan to P&F for collection.
Cheung Decl. at ¶ 15. On January 16, 2014, Hoffman commenced a payment plan with
P&F and made multiple payments on her student loan between February 7, 2014, and
February 2, 2016. *Id.* at ¶¶ 19–21. On June 8, 2016, after Hoffman stopped making
payments in accordance with her payment plan, P&F filed a lawsuit against her in a
matter captioned *NCSLT 2004-2 v. Hoffman*, Snohomish County Superior Court Case
No. 16-2-15162-31. *Id.* at ¶ 23; Ex. 2 to Rosenberg Decl. (docket no. 16-1).[6] On August
25, 2016, NCSLT 2004-2 moved for default judgment against Hoffman after she did not
appear in the action or otherwise defend. Cheung Decl. at ¶ 25; Ex. 6 to Rosenberg Decl.
(docket no. 16-1). In support of the motion for default judgment, Cheung filed with the
court an "Affidavit and Verification of Account" of TSI employee Dudley Turner to
establish NCSLT 2004-2's ownership of Hoffman's student loan. Cheung Decl. at ¶ 25;

---

[6] In support of their motion under Federal Rule of Civil Procedure 12(b)(6) to dismiss this action, docket
no. 15, defendants P&F and Cheung requested judicial notice of numerous documents filed in the
underlying collection actions brought against Plaintiffs by the NCSLTs. *See* Rosenberg Decl. (docket
no. 16). In an Order entered November 2, 2018, the Court granted judicial notice of these documents.
Order at 2 (docket no. 29).

1    Ex. 4 to Rosenberg Decl. (docket no. 16-1).  The Snohomish County Superior Court

2    entered judgment against Hoffman the same day, Cheung Decl. at ¶ 26; Ex. 7 to

3    Rosenberg Decl. (docket no. 16-1), and Hoffman has never moved to set aside the

4    judgment, Cheung Decl. at ¶ 28.  All events occurring in Hoffman's underlying lawsuit

5    were completed by August 30, 2016.  *Id.* at ¶ 29.

6       **b.    Douglass**

7       In December 2005 and April 2006, plaintiff Sarah Douglass acquired two student

8    loans from Bank of America, one for $2,000 and the other for $2,500.  *See* Ex. B-2 to

9    Luke Decl. (docket no. 375-1); Wilbert Decl. at ¶¶ 29, 31.  PHEAA began servicing

10   Douglass's loans on December 21, 2005, and April 20, 2006, respectively. Wilbert Decl.

11   at ¶¶ 28, 30.  Douglass's Bank of America student loans were allegedly included in a

12   pool of loans NCSLT 2006-3 acquired on September 28, 2006.  Wilbert Decl. at ¶ 32;

13   Meyer Decl. at ¶¶ 4, 9; Luke Decl. at ¶ 13; Ex. D-5 to Luke Decl. (docket no. 375-4 at

14   24).  PHEAA serviced Douglass's first loan from December 21, 2005, to December 2,

15   2013, and her second loan from April 20, 2006, to December 2, 2013, Wilbert Decl. at

16   ¶¶ 34–35, at which time it transferred both loans to TSI's predecessor following

17   Douglass's non-payment, *id.* at ¶ 36; Luke Decl. at ¶ 12.

18      On December 5, 2015, TSI referred Douglass's loans to P&F for collection.

19   Cheung Decl. at ¶ 31.  Following multiple unsuccessful attempts to contact Douglass,

20   P&F filed two lawsuits against her on April 24, 2017, in matters captioned *NCSLT 2006-*

21   *3 v. Douglass*, King County Superior Court Case No. 17-2-10605-4, and *NCSLT 2006-3*

22   *v. Douglass*, King County Superior Court Case No. 17-2-10604-6.  *Id.* at ¶¶ 33–37; *see,*

23

ORDER - 7

*e.g.*, Ex. 10 to Rosenberg Decl. (docket no. 16-1).  After Douglass did not appear in the two lawsuits or otherwise defend, NCSLT 2006-3 moved for default judgment against her.  Cheung Decl. at ¶ 38; *see*, *e.g.*, Ex. 12 to Rosenberg Decl. (docket no. 16-2).  In support of the motions, Cheung submitted affidavits of TSI employee Brian Jackson to establish that NCSLT 2006-3 owned Douglass's loans.  Cheung Decl. at ¶ 38; *see*, *e.g.*, Ex. 13 to Rosenberg Decl. (docket no. 16-2).

On April 25, 2017, the King County Superior Court entered judgment against Douglass in both actions.  Cheung Decl. at ¶ 39; *see*, *e.g.*, Ex. 14 to Rosenberg Decl. (docket no. 16-2).  Douglass, however, appeared through counsel in both lawsuits in July 2017, and subsequently moved to set aside the judgments in the matters.  Cheung Decl. at ¶ 41.  On November 17, 2017, the King County Superior Court vacated the default judgments so that Douglass could challenge the lawsuits on the merits.  Cheung Decl. at ¶ 42; *see*, *e.g.*, Ex. 20 to Rosenberg Decl. (docket no. 16-2).  On March 3, 2018, P&F moved for voluntary dismissal of the first lawsuit.  Ex. 21 to Rosenberg Decl. (docket no. 16-3).  It took no action concerning the second case.  Ex. 23 to Rosenberg Decl. (docket no. 16-3).  The King County Superior Court dismissed the first action on March 20, 2018, Ex. 22 to Rosenberg Decl. (docket no. 16-3), and on August 1, 2018, it dismissed the second, Ex. 23 to Rosenberg Decl. (docket no. 16-3).

### c.   Kim

Between 2005 and 2007, plaintiff Anthony Kim obtained four student loans from Bank One (JP Morgan Chase) and two from Bank of America, all totaling $103,000.  *See* Ex. B-3 to Luke Decl. (docket no. 375-2); Wilbert Decl. at ¶¶ 38, 40, 42, 47, 52, 57, 62.

ORDER - 8

Anthony Kim's father, plaintiff Il Kim, co-signed four of these loans, and his mother, plaintiff Daria Kim, co-signed the other two loans. *See* Ex. B-3 to Luke Decl. (docket no. 375-2); Wilbert Decl. at ¶ 38. PHEAA serviced all six of Kim's loans. *Id.* at ¶¶ 39, 41, 46, 51, 56, 61. Kim's loans were purportedly included in pools of loans sold by Bank One (JP Morgan Chase) and Bank of America pursuant to multiple pool supplements.

On June 9, 2005, NCSLT 2005-2 acquired a pool of loans which allegedly included two of Kim's Bank One loans. *See* Wilbert Decl. at ¶ 43; Meyer Decl. at ¶¶ 4, 9; Ex. D-2 to Luke Decl. (docket no. 375-4 at 8). On October 12, 2005, NCSLT 2005-3 acquired a pool of loans which allegedly included Kim's third Bank One loan, *see* Wilbert Decl. at ¶ 48; Meyer Decl. at ¶¶ 4, 9; Ex. D-3 to Luke Decl. (docket no. 375-4 at 12), and on March 9, 2006, NCSLT 2006-1 acquired a pool of loans which allegedly included Kim's fourth Bank One loan, *see* Wilbert Decl. at ¶ 53; Meyer Decl. at ¶¶ 4, 9; Ex. D-4 to Luke Decl. (docket no. 375-4 at 18).

Likewise, Kim's first Bank of America loan was allegedly acquired by NCSLT 2006-3 on September 28, 2006, *see* Wilbert Decl. at ¶ 58; Meyer Decl. at ¶¶ 4, 9; Luke Decl. at ¶ 13; Exs. D-5 and D-6 to Luke Decl. (docket no. 375-4 at 24, 30), and Kim's second Bank of America loan was allegedly acquired by NCSLT 2007-4 on September 20, 2007, Wilbert Decl. at ¶ 63; Meyer Decl. at ¶¶ 4, 9; Luke Decl. at ¶ 13; Ex. D-7 to Luke Decl. (docket no. 375-4 at 36). PHEAA serviced all of Kim's loans from disbursement until transfer to TSI's predecessor for post-default servicing. Wilbert Decl. at ¶¶ 45, 50, 55, 60, 65; Luke Decl. at ¶ 12.

ORDER - 9

On December 5, 2014, TSI referred all six of Kim's loans to P&F for collection. Cheung Decl. at ¶ 46.  Between May 20, 2015, and May 31, 2015, P&F filed, on behalf of NCSLTs 2005-2, 2005-3, 2006-1, and/or 2007-4, six lawsuits in Snohomish County Superior Court against Kim and one or the other of his parents (depending on which had co-signed the loan at issue).  *Id.* at ¶ 52; Exs. 24, 32, 47, 48, 49, and 50 to Rosenberg Decl. (docket nos. 16-3 and 16-4).  In all six lawsuits, the relevant NCSLTs moved for default judgment against Kim, providing affidavits from TSI employee Dudley Turner to support that the relevant NCSLTs owned his student loans.  Cheung Decl. at ¶ 54; *see*, *e.g.*, Ex. 36 to Rosenberg Decl. (docket no. 16-3).  The Snohomish County Superior Court entered judgment against Kim in each case.  Cheung Decl. at ¶ 55.  On October 28, 2015, Kim appeared through counsel in the actions, and on December 1, 2015, the court vacated the judgments.  Cheung Decl. at ¶ 58; *see* Exs. 24, 32, 47, 48, 49, and 50 to Rosenberg Decl. (docket nos. 16-3 and 16-4).  P&F took no further action in the cases after December 1, 2015, and the matters were later dismissed between April 25, 2018, and July 10, 2018, for lack of prosecution.  Cheung Decl. at ¶¶ 59–60.

**4.     The Present Matter**

Plaintiffs allege that Defendants submitted fraudulent, deceptive, and misleading affidavits to obtain default judgments against them in the underlying debt collection actions.  For example, in support of the motion for default judgment against Hoffman, Cheung filed an "Affidavit and Verification of Account" of TSI employee Dudley Turner to establish NCSLT 2004-2's ownership of Hoffman's student loan.  Cheung Decl. at ¶ 25; Ex. 4 to Rosenberg Decl. (docket no. 16-1).  In his affidavit, Turner represented that

he was "competent and authorized to testify" in the action "through personal knowledge of the business records, including the electronic data, sent to TSI that detail the education loan records" and that he was "familiar with the education loan records within [TSI's] possession as custodian of records" for the matter.  Ex. 4 to Rosenberg Decl. (docket no. 16-1).  Although not specifically discussed in his affidavit, Turner attached a Pool Supplement (apparently obtained from the Security and Exchange Commission ("SEC") archives) documenting the sale of pooled loans from Bank of America to NCSLT 2004-2.  *See id.* (docket no. 16-1 at 21–24).

The Pool Supplement attached to Turner's affidavit referenced a separate document titled "Schedule 2," which purportedly contained a list of all pooled loans (including Hoffman's loan) involved in the transaction.  *Id.* (docket no. 16-1 at 21).  The document titled "Schedule 2" that was attached to Turner's affidavit, however, did not contain a list of any loans.  *Id.* (docket no. 16-1 at 24).  Rather, the document attached to the affidavit stated that loan schedule was "[o]n file with the Indenture Trustee."  *Id.*  Also attached to Turner's affidavit was a Deposit and Sale Agreement.  *Id.* (docket no. 16-1 at 25–36).  Like the Pool Supplement, the Deposit and Sale Agreement did not contain a list of any student loans involved in the transaction.[7]  *See id.*

Plaintiffs contend that Defendants do not know the location of the loan schedules referenced in the relevant Pool Supplements and therefore lack a complete chain of

---

[7] Plaintiffs allege that the affidavits filed in all of their underlying collection actions suffer from similar defects.

assignment necessary to prove the NCSLTs' ownership of Plaintiffs' loans.  *See* SAC at

¶¶ 56–57, 80–81, 109–10 (docket no. 61).  Importantly, the Pool Supplements for the

above-referenced transactions do not specifically identify any individual student loans.

Instead, the Pool Supplements refer to various loan schedules which purportedly list the

loans the NCSLTs acquired.  *See* Exs. D-1 – D-7 to Luke Decl.  According to

Defendants, the loan schedules documenting the NCSLTs' ownership of Plaintiffs' loans

are comprised of six Excel spreadsheets:  (i) Bank of America Final Roster.xls; (ii) 2005-

2 Lender Payout Summary - FMC Master.xls; (iii) LENDER_ROSTERS_ALL IN.xls;

(iv) BANK_ONE_RECON_SUMMARY - Revised.xls; (v) Bank_of_America_Post_

Sale.xls; and (vi) 20074_Lender Report - Post Sale-BANK OF AMERICA.xls.

Plaintiffs, relying on their expert witness Michael Andrew, *see* Andrew Report, Ex. 3 to

Defs.' Mot. to Exclude (docket no. 329-3), contend that these spreadsheets cannot be the

loan schedules referenced in the corresponding Pool Supplements because the Excel

spreadsheets' metadata shows that the spreadsheets post-date the Pool Supplements.

Andrew Decl. at ¶ 7 (docket no. 237) ("[T]he metadata recorded for each excel

spreadsheet clearly shows that the excel spreadsheet was modified sometime after the

date associated with the connected 'Pool Supplement' document.").

Plaintiffs seek to represent a class of persons residing in Washington against

whom Defendants sought to collect a debt allegedly owned by the NCSLTs.  *See* SAC at

¶ 155.  Plaintiffs bring two causes of action in this matter, both under Washington's

Consumer Protection Act ("CPA"), RCW 19.86 *et seq.*  First, Plaintiffs allege that

defendants TSI, P&F, and Cheung committed *per se* violations of the CPA by violating

1    the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*  SAC at

2    ¶¶ 164–80.  Second, Plaintiffs allege that all Defendants violated the CPA by engaging in

3    unfair or deceptive acts or practices.  *Id.* at ¶¶ 181–86.  Defendants oppose class

4    certification and move for summary judgment on all of Plaintiffs' claims.[8]  The Court

5    will address Plaintiffs' motion for class certification, docket no. 232, before turning to

6    Defendants' respective motions for summary judgment, docket nos. 284, 369, and 377.

7    **Discussion**

8    **1.     Plaintiffs' Motion for Class Certification**

9         **a.     Plaintiffs' Proposed Class and Subclasses**

10   Plaintiffs seek to certify the following statewide Class and two Subclasses:

11   **Class:**

12   All persons residing in Washington against whom Defendants sought to
     collect an alleged debt allegedly owned by Defendants [NCSLT] 2004-2,
13   [NCSLT] 2005-2, [NCSLT] 2005-3, [NCSLT] 2006-1, [NCSLT] 2006-3,
     and [NCSLT] 2007-4, . . . on or after June 20, 2014.

14   **Subclasses**:

15
     **CPA Judgment Subclass**:   All persons in the Class against whom
16   Defendants obtained a judgment in any Washington court where a NCSLT
     was a Plaintiff and the judgment was obtained using a declaration of a
17   Transworld Systems, Inc. employee.

18   **Post-CFPB TSI Consent Order Subclass**:  All persons in the Class against
     whom Defendants maintained or filed a lawsuit to collect an alleged debt
19   owed to a NCSLT after September 18, 2017, the date the Consumer Financial
     Protection Bureau ("CFPB")/Transworld Systems Incorporated Consent
20

21   ───────────────────

22   [8] P&F and Cheung join TSI's and the NCSLTs' motions for summary judgment.  *See* Notices (docket
     nos. 374 & 379).

23

ORDER - 13

Order was entered in CFPB Administrative Proceeding File No. 2017-CFPB-0018.

Pls.' Mot. for Class Certification (docket no. 232 at 2).[9]

### b.    Class Certification Standard

Rule 23 operates as "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)).  To maintain a class action, a plaintiff must "affirmatively demonstrate" compliance with Rule 23.  *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).  The

---

[9] In their reply brief, docket no. 364, Plaintiffs provide for the first time revised class and subclass definitions, including definitions for two additional proposed subclasses.  Defendants have asked the Court to strike these revised definitions.  *See* Surreplies (docket nos. 367 & 368).  On October 27, 2022, after their motion for class certification was fully briefed, Plaintiffs submitted a motion, docket no. 389, for leave to file a third amended class complaint, seeking in part to add the new class and subclass definitions.  Any motion for leave to amend the operative pleading, however, was due on or before February 3, 2021, *see* Order (docket no. 118 at 18).  Plaintiffs were aware of this date and moved on February 3, 2021, *see* Mot. (docket no. 122), for leave to file a third amended class complaint, which the Court subsequently denied, *see* Minute Order (docket no. 127).  By Minute Order entered November 15, 2022, docket no. 400, the Court denied Plaintiffs' renewed motion for leave file a third amended class complaint.  Plaintiffs now try again to amend by proffering revised class and subclass definitions.  Courts in the Ninth Circuit describe as "unsettled . . . to what extent a federal court is strictly limited by the class definition contained in the complaint."  *Magallon v. Robert Half Int'l, Inc.*, 311 F.R.D. 625, 634 (D. Or. 2015) (citing *Grodzitsky v. Am. Honda Motor Co. Inc.*, No. 12-cv-01142, 2014 WL 718431, at *4 (C.D. Cal. Feb. 19, 2014)).  "Courts generally agree," however, that a class definition may be narrowed to "reflect a sharpening of the issues based on discovery and other developments in the course of litigation and settlement negotiations."  *Id.* at 634 (quoting *Beaulieu v. EQ Indus. Servs., Inc.*, No. 06-CV-00400, 2009 WL 2208131, at *7 (E.D.N.C. July 22, 2009)).  In this case, the Court concludes that Plaintiffs' revised class and subclass definitions do not represent a narrowing of the definitions proposed in the operative second amended class complaint.  Notably, Plaintiffs' new definitions envision a Class far more expansive than that described in the second amended class complaint, namely a Class and Subclasses comprised in part of individuals in Washington whose student loans the NCSLTs claim to own, whereas the proposed Class and Subclasses addressed in the second amended class complaint focus on individuals who were the subject of collection litigation.  Indeed, the operative complaint makes clear that Plaintiffs challenge unfair and/or deceptive conduct in the collection or attempted collection of debt.  SAC at § 1 (docket no. 61 at 2).  Therefore, Defendants' motions to strike, docket nos. 367 and 368, are GRANTED, and the Court will not consider Plaintiffs' revised class and subclass definitions in ruling on their motion for class certification.

1  prerequisites of Rule 23 are not mere pleading standards, but rather are evidentiary

2  thresholds. *See Wal-Mart*, 564 U.S. at 350.  Plaintiffs bear the burden of proving, by a

3  preponderance of the evidence, that the prerequisites of Rule 23 are met.  *See Olean*

4  *Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664–65 (9th Cir.

5  2022).  Plaintiffs must show that all four criteria of Rule 23(a) are satisfied, namely that:

6  (i) the class is so numerous that joinder of all members is impracticable; (ii) questions of

7  law or fact common to the class exist; (iii) Plaintiffs' claims are typical of the claims of

8  the class; and (iv) Plaintiffs will fairly and adequately protect the interests of the class.

9  *See* Fed. R. Civ. P. 23(a).  In this case, Defendants do not specifically challenge the

10  requirements of numerosity or adequacy, and the Court addresses only Rule 23(a)'s

11  remaining requirements of commonality and typicality.

12  Even if Rule 23(a)'s four criteria are met, a plaintiff seeking class certification

13  must also establish that the proposed class qualifies under at least one of the three

14  provisions of Rule 23(b).  *See Comcast*, 569 U.S. at 33.  Here, Plaintiffs rely on both

15  Rules 23(b)(2) and (3).  *See Safaie v. City of Los Angeles*, No. CV 19-3921, 2021 WL

16  4786677, at *5 (C.D. Cal. July 12, 2021) ("A number of courts have certified 'hybrid'

17  classes under Rule 23(b)(2) and Rule 23(b)(3) where plaintiff can show that the

18  circumstances are appropriate.").  First, Plaintiffs seek certification under Rule 23(b)(2),

19  which contemplates a class as to which the opposing party "has acted or refused to act on

20  grounds that apply generally to the class, so that final injunctive relief or corresponding

21  declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ.

22  P. 23(b)(2).  Second, Plaintiffs seek certification under Rule 23(b)(3), which requires

23

1   proof that (i) common questions of law and fact predominate over questions affecting

2   individual members and (ii) a class action is superior to other means to adjudicate the

3   controversy.  Fed. R. Civ. P. 23(b)(3).

4          c.       **Rule 23(a) Requirements:  Commonality**

5          To satisfy Rule 23(a)(2)'s commonality requirement, Plaintiffs must demonstrate

6   that the claims of all potential class members depend on a common question of such

7   nature as "is capable of classwide resolution."  *Olean*, 31 F.4th at 663 (quoting *Wal-Mart*,

8   564 U.S. at 350).  The test is whether the determination of the truth or falsity of the

9   common question "will resolve an issue that is central to the validity of each one of the

10  claims in one stroke."  *Id.* (quoting *Wal-Mart*, 564 U.S. at 350).  "What matters . . . is not

11  the raising of common 'questions'—even in droves—but, rather the capacity of a class-

12  wide proceeding to generate common *answers* apt to drive the resolution of the

13  litigation."  *Wal-Mart*, 564 U.S. at 350 (emphasis in original, quoting Richard A.

14  Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132

15  (2009)).

16         Courts determine commonality with reference to the nature of the underlying

17  claims and must engage in a "rigorous assessment" of the available evidence and the

18  method by which Plaintiffs intend to prove the common questions in one stroke.  *See*

19  *Olean*, 31 F.4th at 666 (citation omitted).  The Court's inquiry will necessarily "entail

20  some overlap with the merits" of the underlying claims because class certification

21  considerations are generally "enmeshed" in the factual and legal issues associated with

22  the causes of action being pursued.  *See Wal-Mart*, 564 U.S. at 351; *Comcast*, 569 U.S. at

23

33–34.  In this matter, Plaintiffs' two claims under the CPA require proof of (i) an unfair

or deceptive act or practice, (ii) occurring in trade or commerce, and (iii) affecting the

public interest, as well as (iv) an injury to the plaintiff's business or property, and

(v) causation.  *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 37, 204 P.3d 885

(2009) (citing *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d

778, 784, 719 P.2d 531 (1986)).

Plaintiffs argue that a number of questions establish the requisite commonality,

including:

> (1)  Do the NCSLTs have competent proof that they obtained the loans of the Plaintiffs and the Class members, and are therefore entitled to collect on them?

> (2)  Have the NCSLTs' loan records been altered since the date of the NCSLTs' alleged acquisition of the Plaintiffs' and Class members' loans, such that the NCSLTs cannot prove that they acquired the Plaintiffs' or Class members' loans or that they are entitled to collect on them?

> (3)  Did the TSI employees who signed affidavits and/or declarations submitted by TSI, P&F, and Cheung in debt collection lawsuits for the NCSLTs have personal knowledge of the facts to which they testified in the affidavits and declarations, including whether the NCSLTs had obtained assignments of the loans?

> (4)  Did TSI have access to sufficient information that would allow its employees to testify that the NCSLTs owned the loans in question?

> (5)  Were the affidavits or declarations of TSI employees submitted by TSI, P&F and Cheung in the NCSLTs' lawsuits false, deceptive, and/or misleading, and therefore unfair and/or deceptive for purposes of the [CPA]?

Pls.' Mot. for Class Certification (docket no. 232 at 14–15).  Although Plaintiffs raise

multiple questions, the Court is unconvinced that any will generate common answers on a

class-wide basis. Rather, these questions necessarily require Plaintiffs to present

evidence that varies from member to member. *See Olean*, 31 F.4th at 663. Plaintiffs, for

example, ask whether the NCSLTs have competent proof that they own the loans of the

putative class members and whether their loan records (*i.e.*, the Excel spreadsheets) have

been altered. But a finding that any of the six Excel spreadsheets were modified after the

effective dates listed in the corresponding Pool Supplements does not mean that the

NCSLTs do not own the putative class members' loans. Individual inquiry is required to

determine whether TSI or the NCSLTs can present sufficient documentation to support

ownership of each class member's loan. Such an inquiry will likely require review of the

origination records for class members' loans and other documents supporting the chain of

assignment, and must be completed for every loan at issue in this action on an individual

basis.

Similarly, whether the affidavits and declarations of TSI employees are false,

deceptive, and/or misleading requires inquiry concerning the individual affiants. For

example, James Cummins was employed by TSI from February 2, 2015, until August 2,

2018. Cummins Decl. at ¶ 2 (docket no. 240). During his period of employment, three to

six people reviewed and signed affidavits for use in litigation. *Id.* at ¶ 6. Although

Cummins alleges that some affiants lacked personal knowledge regarding the

representations made in their affidavits, *see id.* at ¶¶ 6, 12, he acknowledges that, after

reviewing hundreds of files during his employment, he did not find any errors or missing

documents in the NCSLTs' records, Cummins Affidavit at ¶ 11, Ex. A to Cummins Decl.

(docket no. 240). The question of whether TSI's employees executed false or misleading

1    affidavits is not likely to generate common answers and cannot be resolved in one stroke.

2    Plaintiffs cannot show by a preponderance of the evidence that the documents Defendants

3    used in every debt collection action suffered from the same alleged deficiencies (*i.e.*, that

4    all TSI affiants lacked the training or knowledge necessary to execute accurate

5    affidavits).[10]   The Court therefore concludes that Plaintiffs have not demonstrated the

6    commonality required for class certification.[11]

7         Because Plaintiffs have not met their burden of proving by a preponderance of the

8    evidence that all four of Rule 23(a)'s criteria are satisfied, their motion for class

9    certification, docket no. 232, is DENIED.[12]

10

_____

11   [10] The revised class and subclasses identified in Plaintiffs' reply brief would also suffer from the same
12   lack of commonality because the key question of whether the NCSLTs own a particular class member's
     student loan cannot be answered on a class-wide basis.

13   [11] Commonality is not the only Rule 23(a) requirement that Plaintiffs have failed to satisfy.  Rule 23(a)(3)
     requires that a plaintiff's claims or defenses be "typical of the claims or defenses of the class."  Fed. R.
14   Civ. P. 23(a)(3).  "The purpose of the typicality requirement is to assure that the interest of the named
     representative aligns with the interests of the class."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508
15   (9th Cir. 1992).  "The test of typicality 'is whether other members have the same or similar injury,
     whether the action is based on conduct which is not unique to the named plaintiffs, and whether other
16   class members have been injured by the same course of conduct.'"  *Ellis v. Costco Wholesale Corp.*, 657
     F.3d 970, 984 (9th Cir. 2011) (quoting *Hanon*, 976 F.2d at 508).  "Typicality refers to the nature of the
17   claim or defense . . . not to the specific facts from which it arose or the relief sought."  *Id.*  The NCSLTs
     and TSI argue that Plaintiffs have defined the proposed Class so broadly that typicality is not present.
18   The Court agrees that the proposed class, defined as "[a]ll persons residing in Washington against whom
     Defendants sought to collect an alleged debt allegedly owned by [the NCSLTs]," Pls.' Mot. for Class
     Certification (docket no. 232 at 2), is ambiguous.  *See Juvera v. Salcido*, 294 F.R.D. 516, 520 (D. Ariz.
19   2013) (citing *Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 490 (S.D. Ill. 1999)).  Because the proposed class
     definition is imprecise, the Court cannot conclude that Plaintiffs' experiences and injuries, which relate to
20   Defendants' initiation of collection actions against them, are reasonably co-extensive with those of
     putative class members who might not have faced litigation.  The record reflects that only 467 of the
     6,817 Washington loans purportedly owned by the NCSLTs went into default and were the subject of
21   litigation.  *See* Beckett Decl. at ¶ 12 (docket no. 238); NCSLTs' Resp. to Pls.' Interrogs., Exs. 1–6 to
     Beckett Decl. (docket no. 238-1).

22   [12] Even if Plaintiffs had satisfied all four of Rule 23(a)'s criteria, the Court would not certify a class under
     Rules 23(b)(2) or (3).  Rule 23(b)(2) contemplates class treatment where "the party opposing the class has

23

**2.      Defendants' Motions for Summary Judgment**

      **a.      Summary Judgment Standard**

The Court shall grant summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is material if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To survive a motion for summary judgment, the adverse party must present affirmative evidence, which "is to be believed" and from which all "justifiable inferences" are to be favorably drawn. *Id.* at 255, 257. When the record, however, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, summary judgment is warranted. *See Beard v. Banks*, 548 U.S. 521, 529 (2006) ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that

---

acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Plaintiffs' reliance on Rule 23(b)(2) fails because Plaintiffs seek primarily monetary, rather than injunctive, relief. *See* SAC at § VII (docket no. 61 at 37–38). A class for monetary damages cannot be sustained under Rule 23(b)(2) unless the monetary relief is merely incidental to injunctive or declaratory relief. *Wal-Mart Stores, Inc.*, 564 U.S. at 360–61. Similarly, Plaintiffs cannot demonstrate predominance under Rule 23(b)(3). Predominance under Rule 23(b)(3) "requires at least one common question, as does Rule 23(a)(2), but also requires that the common question, or questions, outweigh the noncommon questions." *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1304 (D. Nev. 2014). As discussed above, individual issues are more prevalent than common ones in this case.

party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322)).  The Court first addresses Plaintiffs' stand-alone CPA claim against all Defendants before moving to Plaintiffs' *per se* CPA claim against TSI, P&F, and Cheung.

### b.      Stand-Alone CPA Claim Against All Defendants

Plaintiffs allege that Defendants violated the CPA by relying on false and misleading affidavits, continuing to collect on loans purportedly owned by the NCSLTs without first performing audits required by the CFPB Consent Order, and knowingly filing false affidavits in Washington courts.  SAC at ¶ 184.  The CPA makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  RCW 19.86.020.  To prevail on their stand-alone CPA claim, Plaintiffs must prove five elements, namely (i) an unfair or deceptive act or practice, (ii) occurring in trade or commerce, (iii) affecting the public interest, (iv) an injury to Plaintiffs' business or property, and (v) causation.[13]  *See Panag*, 166 Wn.2d at 37 (citing *Hangman Ridge*, 105 Wn.2d at 784).

### i.      Unfair or Deceptive Act or Practice

To qualify as an unfair or deceptive act or practice within the meaning of the CPA, the alleged act must have had the "capacity to deceive a substantial portion of the public." *Hangman Ridge*, 105 Wn.2d at 785.  If the relevant facts about a party's act or practice are undisputed, a trial court may decide whether the act or practice was deceptive or

---

[13] Defendants do not meaningfully contest that the "business of debt collection affects the public interest." *Panag*, 166 Wn.2d at 54.

unfair as a matter of law.  *See Young v. Toyota Motor Sales, U.S.A.*, 196 Wn.2d 310, 317, 472 P.3d 990 (2020) (citing *Leingang v. Pierce Cnty. Med. Bureau, Inc.*, 131 Wn.2d 133, 150, 930 P.2d 288 (1997)).  Defendants argue that they are entitled to summary judgment on Plaintiffs' stand-alone CPA claim because Plaintiffs cannot show that the loan schedules at issue in this action are lost or missing.  Essentially, Defendants contend that, if the NCSLTs own the loans at issue in this action, their conduct cannot be unfair and/or deceptive as a matter of law.

As discussed above, Defendants have presented evidence that the loan schedules documenting the NCSLTs' ownership of Plaintiffs' loans are comprised of six Excel spreadsheets.  According to the Declaration of TSI Director Bradley Luke, docket no. 373, TSI's predecessor NCO Financial Systems received the Excel files from FMC on November 14, 2012.  Luke Decl. at ¶ 13.d.  Since that time, the Excel files have been maintained on secure servers with user-based permissions.  *Id.* at ¶ 13.e.  Luke declares that TSI has not modified the Excel spreadsheets at any time.  *Id.* at 13.f.

Plaintiffs, however, assert that the Excel spreadsheets are not the loan schedules referenced in the corresponding Pool Supplements because the documents' metadata shows that the spreadsheets were modified after the Pool Supplements' effective dates.  Andrew Decl. at ¶ 7 (docket no. 237); Andrew Report, Ex. 3 to Defs.' Mot. to Exclude

(docket no. 329-3 at 6).[14]  In contrast, TSI's and the NCSLTs' expert Roger Saylor,[15] who is familiar with the NCSLTs' securitization process, believes that Plaintiffs' argument lacks merit because "it is absolutely appropriate and customary for an electronic schedule of loans pertaining to a particular securitization to post-date the closing of the securitization."  Saylor Report at ¶ 34, Ex. 1 to Henry Decl. (docket no. 334-1).  Similarly, TSI's and the NCSLTs' computer and document forensics expert Sandy Goldstein believes that Plaintiffs have failed to consider how the last modified dates of the Excel spreadsheets could have changed without affecting the files' content.  Goldstein Report, Ex. 2 to Leonard Decl. (docket no. 331-1 at 16–19).

To be clear, the Court recognizes that TSI and the NCSLTs have presented considerable evidence suggesting that the NCSLTs own Plaintiffs' student loans.  For example, TSI maintains, on behalf of the NCSLTs, origination records for Plaintiffs' loans such as credit agreements and note disclosure statements.  *See* Ex. B to Luke Decl. (docket no. 375-2).  Additionally, documents stored in PHEAA's and Cognition's internal databases support that the NCSLTs acquired Plaintiffs' loans in the transactions discussed above.  *See generally* Meyer Decl. (docket no. 371) (explaining that Cognition's MS Access Database reflects that the NCSLTs own Plaintiffs' loans);

---

[14] The Court has previously denied Defendants' request to exclude Plaintiffs' expert Andrew's testimony in its entirety.  Order (docket no. 381).  The Court explained that Andrew may testify about the process he used to identify metadata within the spreadsheets such as their "Last Modified" dates, and deferred ruling on whether Andrew may testify about his opinion that the Excel spreadsheets are not the original loan schedules referenced in the Pool Supplements.  *See id.*

[15] The Court previously denied Plaintiffs' motion to exclude Saylor's testimony.  Order (docket no. 381).

ORDER - 23

1    Wilbert Decl. (docket no. 372) (explaining that PHEAA's COMPASS servicing system

2    supports the NCSLTs' ownership).  The Court, however, must draw all justifiable

3    inferences from the evidence in Plaintiffs' favor, and cannot ignore that Plaintiffs have

4    presented evidence from which a reasonable jury could conclude that the NCSLTs lack a

5    complete chain of assignment demonstrating their ownership of Plaintiffs' loans.[16]

6           The record is even less clear as to whether P&F and Cheung engaged in an unfair

7    and/or deceptive act or practice by using false and misleading affidavits.  *See* SAC at

8    ¶ 184.  P&F and Cheung declare that they did not become aware of the CFPB's

9    investigation of TSI or the subsequent Consent Order until sometime after the document

10   was published on September 18, 2017, *see* Cheung Decl. at ¶ 12; Patenaude Decl. at ¶ 6,

11   and had no reason to question the veracity of TSI's affidavits or the NCSLTs' claim of

12   ownership of Plaintiffs' loans, *see* Cheung Decl. at ¶¶ 10, 25, 38, 54.  Although one King

13   County Superior Court judge asked P&F and Cheung about the generic nature of a

14   particular affidavit submitted in an unrelated 2014 matter involving NCSLT 2005-1,[17] *see*

15   Tr. at 14:2–15:3, Ex. 8 to Leonard Decl. (docket no. 309-8); Ex. 9 to Leonard Decl.

16   (docket no. 309-9), the judge's questions do not establish that P&F and Cheung were

17   _____

18   [16] Moreover, Plaintiffs have presented evidence suggesting that, in affidavits filed in the underlying
     collection actions, TSI employees falsely claimed personal knowledge of education loan records.  Turner
19   declared, for example, in an affidavit filed in *NCSLT 2004-2 v. Hoffman*, Snohomish County Superior
     Court Case No. 16-2-15162-31, that he was familiar with the education loan records within [TSI's]
20   possession as custodian of records for the action.  Ex. 4 to Rosenberg Decl. (docket no. 16-1).  In his
     deposition for this matter, however, Turner testified that he did not understand what a custodian of
21   records is and could not recall how he became familiar with the education loan records referenced in his
     affidavit.  Turner Dep. at 32:4–18, 33:1–9, Ex. 5 to Leonard Decl. (docket no. 309-5).

22   [17] NCSLT 2005-1 is not a defendant in this action.

23

ORDER - 24

1  aware of alleged issues with the affidavits used in Plaintiffs' proceedings.  According to

2  Cheung, in addition to the affidavits, TSI "provided a significant amount of documents"

3  supporting the NCSLTs' ownership of Plaintiffs' loans, such as loan applications, loan

4  activity reports, repayment history, and other records.  Cheung Decl. at ¶¶ 5, 7.

5  Additionally, the vast majority of P&F's and Cheung's activities in the underlying

6  collection actions occurred *before* the CFPB published the Consent Order on September

7  18, 2017.  For example, P&F and Cheung obtained default judgments (using the subject

8  TSI affidavits) against Hoffman on August 25, 2016, against Douglass on April 25, 2017,

9  and against Kim in April and May 2015.  *See* Cheung Decl. at ¶¶ 25, 39, 55.

10         The Court, however, cannot ignore that P&F and Cheung stopped prosecuting or

11  voluntarily dismissed the debt collection actions against Douglass and Kim as soon as

12  these plaintiffs contested the matters.  *See* Ex. 21 to Rosenberg Decl. (docket no. 16-3);

13  Ex. 23 to Rosenberg Decl. (docket no. 16-3); Cheung Decl. at ¶ 59.  Although P&F's and

14  Cheung's actions might be unrelated to the Consent Order, a reasonable jury could

15  possibly conclude that P&F and Cheung stopped prosecuting the underlying cases

16  because they had knowledge of the alleged issues with TSI's affidavits and the NCSLTs'

17  ability to establish ownership of Plaintiffs' loans.  *See Anderson*, 477 U.S. at 255

18  ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate

19  inferences from the facts are jury functions, not those of a judge . . . .  The evidence of

20  the non-movant is to be believed, and all justifiable inferences are to be drawn in his

21  favor.").

22

23

The Court therefore concludes that genuine disputes of material fact preclude summary judgment on the first element of Plaintiffs' stand-alone CPA claim against Defendants.[18]

### ii.        Trade or Commerce

The NCSLTs, P&F, and Cheung also argue that their alleged conduct did not occur in trade or commerce.  With respect to the NCSLTs, Plaintiffs rely on an agency theory and argue that the NCSLTs have the right to control TSI's actions and the processes by which TSI collects debt.  *See Stephens v. Omni Ins. Co.*, 138 Wn. App. 151, 182–83, 159 P.3d 10 (2007) (citing *Kroshus v. Koury*, 30 Wash. App. 258, 267, 633 P.2d 909 (1981)).  In this case, Plaintiffs allege that TSI is a debt collection agency, and the Ninth Circuit previously held in this action that TSI's activities occurred within trade or commerce.  *See* Memorandum Disposition (docket no. 51 at 5) ("The complaint alleges that TSI is a debt collection agency, so its activities occurred within trade or commerce for purposes of the CPA.").  Although the NCSLTs argue that TSI is an independent contractor pursuant to a Special Servicing Agreement between the NCSLTs and FMC, *see* Ex. A to Richard Decl. (docket no. 88-1), and a Default Prevention and Collection Services Agreement between FMC and TSI's predecessor, NCO Financial Systems,

---

[18] Plaintiffs' request for judicial notice of a Verified Complaint in *Nat'l Collegiate Master Student Loan Trust I v. U.S. Bank Nat'l Assoc.*, No. 2018-0167 (Del. Ch. June 15, 2018), is GRANTED, and the Court takes judicial notice of the document's existence.  The Court, however, does not accept as true the allegations made in the document.  *See NuCal Foods, Inc. v. Quality Egg LLC*, 887 F. Supp. 2d 977, 984 (E.D. Cal. 2012).

1   Ex. B to Richard Decl. (docket no. 88-1 at 43), whether an agency relationship exists is

2   "usually a question for the jury," *see Wilcox v. Basehore*, 189 Wn. App. 63, 95, 356 P.3d

3   736 (2015) (quoting *ITT Rayonier, Inc. v. Puget Sound Freight Lines*, 44 Wn. App. 368,

4   377, 722 P.2d 1310 (1986)).

5          Further, the record is unclear as to whether P&F's and Cheung's conduct was

6   related only to the performance of legal services.  Although the Washington Supreme

7   Court "has concluded that the CPA has no application to the performance of legal

8   services," *Panag*, 166 Wn.2d at 56 n.14, law firms and attorneys might be liable under

9   the CPA when they engage in a commercial enterprise such as debt collection, *see Styrk*

10  *v. Cornerstone Invs., Inc.*, 61 Wn. App. 463, 471, 810 P.2d 1366 (1991); Memorandum

11  Disposition (docket no. 51 at 5–7).  P&F and Cheung do not dispute that P&F is a

12  licensed Washington collection agency, Ex. 1 to Leonard Decl. (docket no. 309-1), which

13  sent collection letters to Plaintiffs before filing suit, Patenaude Dep. at 58:24–59:17,

14  Ex. 2 to Leonard Decl. (docket no. 309-2); Ex. 7 to Leonard Decl. (docket no. 309-7),

15  and established a payment plan for Hoffman, Patenaude Dep. at 59:14–22, 60:10–18;

16  Hoffman Decl. at ¶ 4 (docket no. 311).  The Court concludes that genuine issues of

17  material fact also preclude summary judgment on the second element of Plaintiffs' stand-

18  alone CPA claim.

19              **iii.      Injury to Business or Property**

20         Defendants argue that Plaintiffs have presented no evidence that they suffered the

21  requisite injury for the purposes of a CPA claim.  "The CPA's requirement that injury be

22  to business or property excludes personal injury, 'mental distress, embarrassment, and

23

1    inconvenience.'" *Frias v. Asset Foreclosure Servs., Inc.*, 181 Wn.2d 412, 431, 334 P.3d

2    529 (2014) (quoting *Panag*, 166 Wn.2d at 57).  Otherwise, compensable injuries to

3    business or property under the CPA "are relatively expansive."  *Id.*  A plaintiff, for

4    example, "can establish injury based on unlawful debt collection practices even where

5    there is no dispute as to the validity of the underlying debt."  *Id.*; *see also Panag*, 166

6    Wn.2d at 62 ("Consulting an attorney to dispel uncertainty regarding the nature of an

7    alleged debt is distinct from consulting an attorney to institute a CPA claim. . . .

8    Investigation expenses and other costs resulting from a deceptive business practice

9    sufficiently establish injury.").

10          In this case, the Ninth Circuit has already held that "obtaining legal counsel to

11   defend [Plaintiffs] against the collections actions filed against them in state court is not an

12   actionable injury" under the CPA.  Memorandum Disposition (docket no. 51 at 6–7)

13   (citing *Sign-O-Lite Signs, Inc. v. DeLaurenti Florists, Inc.*, 64 Wn. App. 553, 564, 825

14   P.2d 714 (1992)).  Plaintiffs, however, have presented evidence that they incurred costs

15   investigating their debts in addition to other expenses.  *See* Hoffman Decl. at ¶¶ 5–6

16   (docket no. 311) (explaining that she retained counsel to determine who owned her loan

17   and incurred expenses after Defendants attempted to garnish one of her bank accounts);

18   Douglass Decl. at ¶¶ 1–4 (docket no. 310) (describing how she took time off work and

19   incurred travel expenses to attend a legal clinic); Kim Decl. at ¶¶ 3–6 (docket no. 388)

20   (explaining that his wages were garnished and that he and his parents incurred costs to

21   retain an attorney to investigate the loans).  The Court therefore concludes that factual

22

23

ORDER - 28

disputes preclude summary judgment on the fourth element of Plaintiffs' stand-alone CPA claim.

### iv.    Causation

The final contested element of Plaintiffs' stand-alone CPA claim is causation. Under the CPA, a "plaintiff must establish that, but for the defendant's unfair or deceptive practice, the plaintiff would not have suffered an injury." *Indoor Billboard/Washington, Inc. v. Integra Telecom of Wash., Inc.*, 162 Wn.2d 59, 83, 170 P.3d 10 (2007).  The question of proximate cause is a question of fact and is typically "not susceptible to summary judgment." *Kosovan v. Omni Ins. Co.*, 19 Wn. App. 2d 668, 702–03, 496 P.3d 347 (2021) (quoting *Swank v. Valley Christian Sch.*, 188 Wn.2d 663, 685, 398 P.3d 1108 (2017)).  In this case, the available evidence demonstrates that genuine issues of material fact exist regarding a causal link between Defendants' allegedly unfair or deceptive acts or practices and Plaintiffs' alleged injuries. Accordingly, Defendants' motions for summary judgment are DENIED as they relate to Plaintiffs' stand-alone CPA claim.[19]

---

[19] In a surreply, docket no. 398, Plaintiffs move to strike certain portions of TSI's reply in support of its motion for summary judgment, and Exhibit C to the Declaration of Justin Homes, docket no. 392-3. Plaintiffs contend that TSI's arguments in its reply brief regarding the subject Excel spreadsheets are not supported by admissible evidence because TSI filed only excerpts of the spreadsheets.  Plaintiffs also argue that Exhibit C to the Declaration of Justin Homes, a transcript from former TSI employee James Cummins's trial testimony in an unrelated state court action, is irrelevant.  The Court has considered Home's declaration and the accompanying exhibits, and DENIES Plaintiffs' motion to strike the material.

1          c.      *Per Se* **CPA Claim Against TSI, P&F, and Cheung**

2          A *per se* CPA claim allows a plaintiff to satisfy the first three elements of the

3 five-part test articulated in *Hangman Ridge* "by proving a predicate violation of 'a statute

4 that contains a specific legislative declaration of public interest impact.'"  *Frias v.*

5 *Patenaude & Felix APC*, No. C20-805, 2022 WL 136816, at *6 (W.D. Wash. Jan. 14,

6 2022) (quoting RCW 19.86.093(2)).  In this case, Plaintiffs allege one *per se* CPA claim

7 predicated on P&F's, Cheung's, and TSI's alleged violations of the FDCPA, namely

8 15 U.S.C. §§ 1692e(2)(A), 1692e(10), and 1692f.  SAC at ¶¶ 164–180.  The FDCPA is a

9 strict-liability statute, meaning that debt collectors are "liable for violations that are not

10 knowing or intentional."  *Reichert v. Nat'l Credit Sys., Inc.*, 531 F.3d 1002, 1005 (9th

11 Cir. 2008).  Debtors may pursue claims under multiple sections of the FDCPA even if

12 "each violation [is] based upon the same circumstances."  *Clark v. Cap. Credit &*

13 *Collection Servs., Inc.*, 460 F.3d 1162, 1177 (9th Cir. 2006).  "When a violation of debt

14 collection regulations occurs," such a violation "constitutes a per se violation of the CPA

15 . . . under state . . . law."  *Panag*, 166 Wn.2d at 53–54 (citing *Jeter v. Credit Bureau, Inc.*,

16 760 F.2d 1168, 1174 (11th Cir. 1985), and *Evergreen Collectors v. Holt*, 60 Wn. App.

17 151, 155, 803 P.2d 10 (1991)).

18          Indeed, this District has repeatedly held that a violation of the FDCPA, which

19 prohibits abusive debt collection practices, constitutes a *per se* violation of the CPA.  *See*,

20 *e.g.*, *Collins v. Seterus, Inc.*, No. C17-943, 2019 WL 1254878, at *7 (W.D. Wash.

21 Mar. 19, 2019); *Howard v. Patenaude & Felix APC*, --- F. Supp. 3d ---, 2022 WL

22 4598089, at *14 (W.D. Wash. Sep. 30, 2022).  Plaintiffs contend that P&F, Cheung, and

23

1   TSI violated the FDCPA, specifically 15 U.S.C. §§ 1692e(2)(A) and 1692e(10), by

2   making "false, deceptive, and misleading representations to debtors and Washington

3   courts" regarding the documents they possessed and/or reviewed, allegedly

4   demonstrating that the NCSLTs were entitled to collect on student loan debt.  *See* SAC at

5   ¶ 167.  Plaintiffs further assert that P&F, Cheung, and TSI violated 15 U.S.C. § 1692f by

6   "filing and sending as verification of debt TSI employee affidavits that were misleading

7   or false in order to obtain debt settlements, default judgments, and summary judgments."

8   *Id.* at ¶ 169.  Section 1692e of the FDCPA prohibits the use of "any false, deceptive, or

9   misleading representation or means in connection with the collection of any debt,"

10  including the false representation of "the character, amount, or legal status of any debt,"

11  15 U.S.C. § 1692e(2)(A), and "[t]he use of any false representation or deceptive means to

12  collect or attempt to collect any debt," *id.* at § 1692e(10).  Section 1692f broadly

13  prohibits "unfair or unconscionable means to collect or attempt to collect any debt."  15

14  U.S.C. § 1692f.  Importantly, the FDCPA "applies to attorneys who 'regularly' engage in

15  consumer-debt-collection activity, even when that activity consists of litigation."  *Heintz*

16  *v. Jenkins*, 514 U.S. 291, 299 (1995).

            **i.      15 U.S.C. § 1692e(2)(A)**

18      With respect to Plaintiffs' allegations under 15 U.S.C. § 1692e(2)(A), the record

19  does not support that P&F, Cheung, and TSI misrepresented the character or amount of

20  any debt.  Courts interpret "character" as a "reference to the kind of obligation."  *See*

21  *Rhone v. Med. Bus. Bureau, LLC*, 915 F.3d 438, 440 (7th Cir. 2019) ("A secured auto

22  loan would be of one character, an unsecured credit-card debt another, a judgment debt a

23

third, and a subordinated debenture (an instrument junior by contract) a fourth."); *see also Heffington v. Gordon, Aylworth & Tami, P.C.*, No. 16-cv-02079, 2018 WL 3763799, at *5 (D. Or. Aug. 8, 2018) ("Cases interpreting the 'character' or 'legal status' components of § 1692e(2)(A) illustrate that those elements typically address whether the debt itself is collectable, for example, if it is barred by a statute of limitations or owed by someone else, or what comprises the debt, for example if the debt includes non-recoverable fees.").  Here, TSI, P&F, and Cheung attempted to collect on delinquent student loan obligations, and Plaintiffs have not provided any evidence demonstrating P&F, Cheung, and TSI misrepresented that their student loans were in default or falsely identified the amount of debt owed.  Plaintiffs, however, have demonstrated that factual disputes preclude summary judgment on the issue of whether these defendants misrepresented the "legal status" of Plaintiffs' loans (*i.e.*, whether the NCSLTs own the loans at issue in this action and can therefore collect the debt).

### ii.   15 U.S.C. §§ 1692e(10) and 1692f

For many of the reasons discussed above, the record also demonstrates that genuine issues of material fact exist regarding TSI's, P&F's, and Cheung's alleged violations of 15 U.S.C. §§ 1692e(10) and 1692f.  Attempts to collect debts with false affidavits and without the necessary documentation to prove the claims is unfair or unconscionable and involves false, deceptive, and/or misleading representations in

1  violation of the FDCPA.  Therefore, TSI's, P&F's, and Cheung's motion for summary

2  judgment is DENIED as it relates to Plaintiffs' *per se* CPA claim.[20]

3      **d.    Injunctive Relief**

4      Finally, the NCSLTs move for summary judgment on Plaintiffs' request for

5  injunctive relief.  Plaintiffs ask the Court for "an injunction preventing Defendants from

6  all future collection attempts upon the alleged NCSLT loan debts of Plaintiffs . . . ,

7  pursuant to RCW 19.86.090."  SAC at § VII.2.  The NCSLTs argue that Plaintiffs'

8  demand for prospective injunctive relief is nothing more than a demand for debt

9  forgiveness, and cite to *McDonald v. OneWest Bank, FSB*, 929 F. Supp. 2d 1079

10  (W.D. Wash. 2013).  There, a borrower brought a CPA claim against a mortgage servicer

11  in connection with foreclosure proceedings because the mortgage servicer allegedly

12  lacked the original signed promissory note memorializing the loan.  *Id.* at 1084–86.  In

13  addition to other requested relief, the borrower sought a permanent injunction precluding

14

15  ───────────────

16  [20] Plaintiffs' motion to strike P&F's and Cheung's argument regarding the good-faith defense and discussion of Washington's Collection Agency Act is DENIED.  *See* Surreply (docket no. 320).  P&F and Cheung asserted the good-faith defense as an affirmative defense in this action, Ans. & Affirmative

17  Defenses at 25, ¶ 6 (docket no. 139), and briefly discussed the issue in their motion for summary judgment, *see* Mot. for Summary J. (docket no. 284 at 16) ("In all of its actions in representing its clients, [P&F] acted in good faith under an arguable interpretation of the law, and attempted to do its best in a

18  difficult field.").  The good-faith defense, however, "is not a defense where a party's violation is a *per se* unfair or deceptive practice under" the CPA.  *See Ten Bridges, LLC v. Midas Mulligan, LLC*,

19  No. C19-1237, 2021 WL 4592385, at *4 (W.D. Wash. Oct. 6, 2021), *aff'd*, Nos. 21-35896 & 21-35921, 2022 WL 17039001 (9th Cir. Nov. 17, 2022).  The Court also DENIES Plaintiffs' motion to strike Exhibit

20  3 to the Supplemental Declaration of Marc Rosenberg, docket no. 317-3, which contains excerpts from the transcript of James Cummins' deposition taken in *Michelo v. National Collegiate Student Loan Trust*

21  *2007-2*, Nos. 18 Civ. 1781 & 7692 (S.D.N.Y.).  Plaintiffs argue that the Court cannot consider the deposition transcript because it was taken in an unrelated action but ignore that the deposition transcript

22  may be used to support a motion for summary judgment if the facts set forth in the transcript could be offered at trial in an admissible format, such as through Cummins' testimony.  *See* Fed. R. Civ. P. 56(c).

23

all future foreclosure actions. *Id.* at 1086. The district court denied the borrower's request. *Id.* at 1088–89. As the court explained:

> Even if plaintiff is able to prove at trial that the note [a certain defendant] currently holds is not the original, he will not be entitled to a permanent injunction precluding all future foreclosure actions. It is undisputed that plaintiff borrowed money to purchase his home and that he has defaulted on the loan. Plaintiff has not identified any legal or equitable justification for erasing the debt. Even if defendants are ultimately unable to utilize the expedited [Deed of Trust Act] procedure in the future, they would be entitled to initiate a judicial foreclosure action and, if applicable, to seek a deficiency judgment against plaintiff for any unrecovered amounts. . . . Defendants are entitled to summary judgment to the extent plaintiff seeks a permanent injunction against all future foreclosure actions.

*Id.* (citing *Donovick v. Seattle–First Nat'l Bank*, 111 Wn.2d 413, 420–21, 757 P.2d 1378 (1988)). In this case, Plaintiffs' request for an injunction barring the NCSLTs from all future collection attempts rests on an assumption that the NCSLTs can never prove their ownership of Plaintiffs' loans. The Court questions the validity of this assumption and the legal basis for Plaintiffs' requested relief. Like the defendants in *McDonald*, the NCSLTS are entitled to summary judgment to the extent that Plaintiffs seek a permanent injunction against all future debt collection actions.

**Conclusion**

For the foregoing reasons, the Court ORDERS:

(1) The parties' various motions to strike are GRANTED in part and DENIED in part as follows:

a.      Plaintiffs' motion, docket no. 382, to strike certain portions of the Declarations of Jens Meyer, docket no. 371, Jennifer Wilbert, docket no. 372, and Bradley Luke, docket no. 373, is DENIED.[21]

b.      Plaintiffs' motion, docket no. 320, to strike P&F's and Cheung's argument regarding the good-faith defense, discussion of Washington's Collection Agency Act, and Exhibit 3 to the Supplemental Declaration of Marc Rosenberg, docket no. 317-3, is DENIED.

c.      Plaintiffs' motion, docket no. 398, to strike certain portions of TSI's reply in support of its motion for summary judgment, and Exhibit C to the Declaration of Justin Homes, docket no. 392-3, is DENIED.

d.      Defendants' motions, docket nos. 367 and 368, to strike Plaintiffs' revised class and subclass definitions are GRANTED.

(2)      Plaintiffs' motion for class certification, docket no. 232, is DENIED.

(3)      TSI's motion for summary judgment, docket no. 377, is DENIED.

(4)      The NCSLTs' motion for summary judgment, docket no. 369, is GRANTED in part and DENIED in part.  The NCSLTs' motion is GRANTED as it relates to Plaintiffs' request for injunctive relief.  All other requested relief is DENIED.

(5)      The deferred portion of P&F's and Cheung's motion for summary judgment, docket no. 284, is DENIED.

---

[21] The Court's discussion of the parties' various motions to strike can be found in footnotes 3, 9, 19, and 20 of this Order.

ORDER - 35

1     (6)    The Clerk is directed to send a copy of this Order to all counsel of record.

2    IT IS SO ORDERED.

3    Dated this 26th day of January, 2023.

_Thomas S. Zilly_

Thomas S. Zilly
United States District Judge

ORDER - 36